1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF OHIO

3             WESTERN DIVISION
                  - - -

4

UNITED STATES OF AMERICA,    :   CRIMINAL ACTION CR-1-02-054

5                            :

           Plaintiff,        :   Cincinnati, Ohio

6                            :   Wednesday, August 21, 2002

    -vs-                     :

7                            :

WALTER PUGH, JR, and         :   MOTION TO SUPPRESS

8  TYREESE PUGH,             :   AND FINAL PRETRIAL CONFERENCE

                             :

9        Defendants.         :   1:30 p.m.

10                    - - -

11          TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE

12                    - - -

13

14  For the Plaintiff:    Wende Cross, Esq.
                          Amul Thapar, Esq.

15                        Asst. U.S. Attorney
                          Atrium II, Suite 400

16                        221 East Fourth Street
                          Cincinnati, Ohio  45202

17

    For the Defendant:    Pro Se

18    (Walter Pugh, Jr.)

                          J. Robert Andrews, Esq.

19    (Legal advisor)     Schuh & Goldberg
                          2662 Madison Road

20                        Cincinnati, Ohio  45208

21    (Tyreese Pugh)      Edward J. Felson, Esq.
                          Felson & Felson

22                        CBLD Center, Suite 1650
                          36 East Seventh Street

23                        Cincinnati, Ohio  45202.

24  Law Clerk:  Mike Rich
    Courtroom Deputy:  Steve Snyder

25  Court Reporter:  Betty Schwab

```
 1                         PROCEEDINGS

 2              THE COURTROOM DEPUTY:  The case is CR-1-02-54,

 3     United States of America v. Walter Pugh and Tyreese Pugh.

 4              THE COURT:  Good afternoon to everyone.  We're

 5     here on the motion of Defendant Walter Pugh to suppress

 6     various evidence that he argues was obtained in violation

 7     of the Fourth Amendment.

 8              In addition to the defendant Walter Pugh's

 9     motion, the Court just received Defendant's trial brief and

10     a motion to extend time for filing Defendant's response to

11     the suppression.

12              Has the government received a copy of those

13     pleadings?

14              MS. CROSS:  We have, Your Honor.  We have no

15     objection to the motion to extend time for filing of their

16     response.

17              THE COURT:  I'm having difficulty hearing you.

18              MS. CROSS:  I'm sorry, Your Honor.  I will keep

19     my voice up.  We have received both the trial brief and the

20     motion.  We have no objection to extending time if the

21     Court be so inclined for Mr. Pugh to file his response to

22     our response to his reply.

23              THE COURT:  All right.  Mr. Pugh, how much time

24     would you like to file a written response?

25              DEFENDANT W. PUGH:  I don't know, Judge, Your
```

1    Honor, because last Wednesday the United States came in and

2    took out the computers out of the law library.

3         THE COURT:  At the Hamilton County Courthouse?

4         DEFENDANT W. PUGH:  Yes, ma'am.

5         THE COURT:  I don't think so.

6         DEFENDANT W. PUGH:  That's what I was told.

7         THE COURT:  I tell you what, I don't know for a

8    fact, but we had -- the United States government has

9    absolutely no jurisdiction in the Hamilton County Justice

10   Center, and, in fact, if Sheriff Leis had let any federal

11   government official in there to do anything, I would be

12   shocked.  So I think it's unlikely that it's the U.S.

13   government that did it.  I would suspect that it has to do

14   with the sheriff's office.

15        DEFENDANT W. PUGH:  Yes, ma'am.

16        THE COURT:  But let me assure you of one thing,

17   that Fourth Amendment law is pretty well settled.  It's

18   been established for a long time.  It's relatively simple.

19   I'm very familiar with it.  I believe, based on what I have

20   read of your motion and everything, that I think this is a

21   factually intense matter.  I think it depends more on the

22   facts of what occurred than on the law.  I think the law is

23   simple in this area.

24        There is really not much new in Fourth Amendment

25   law, but, if you would like, you know, if you would like a

 1   week to file something additional, you're welcome to do

 2   that.

 3              DEFENDANT W. PUGH:  Thank you.

 4              MR. ANDREWS:  Your Honor, as -- just as his

 5   advisor, I will contact Joe Schmidt, who is one of the

 6   senior people in the jail, and see what the problem is with

 7   the computers and make sure that my client -- or make sure

 8   that Mr. Pugh has access to what he needs.

 9              THE COURT:  Thank you, Mr. Andrews.

10              Why don't I have counsel enter their appearances

11   for the record?

12              MS. CROSS:  Your Honor, Wende Cross, Your Honor,

13   for the United States, along with Amul Thapar and Detective

14   Jim Calhoun of the Hamilton Police Department.

15              THE COURT:  All right.

16              MR. FELSON:  Edward Felson for Mr. Pugh,

17   Defendant Pugh, Jr.

18              THE COURT:  That's Tyreese Pugh.

19              MR. FELSON:  Tyreese, yes.

20              DEFENDANT W. PUGH:  Walter Pugh, pro se.

21              THE COURT:  And you have with you your advisor?

22              MR. ANDREWS:  J. Robert Andrews acting in

23   advisory capacity to Mr. Pugh.

24              THE COURT:  Although this is the defendant's

25   motion, it's my practice to let the government proceed in

1    these matters.  So at this time I'll turn it over to the

2    government.

3              MS. CROSS:  Your Honor, just for clarification,

4    it's the position of the United States that Mr. Pugh has no

5    standing on three of the four issues in this case.  He has

6    moved to suppress all physical evidence in this case

7    obtained from four locations, two vehicles, a home, and

8    then his own vehicle.  It is the position of the United

9    States that he has no standing to challenge the searches of

10   the two vehicles owned by Kimberly Hinton and Bessie Pew,

11   and he has no standing to challenge the search of the

12   residence of Cortes Renfro, and it is our position that the

13   search of his 1989 Cadillac de Ville was valid pursuant to

14   a valid search warrant.

15             We intend to call one witness on the issues

16   today.

17             THE COURT:  All right.

18             MS. CROSS:  That is Detective Jim Calhoun.

19             THE COURT:  All right.  You may call your

20   witness.

21             (Witness sworn by the courtroom deputy.)

22             THE COURT:  Counsel, let me say that we're sort

23   of experimenting today with the courtroom, because it's the

24   first time we have used it for a criminal proceeding since

25   it has been remodeled, and it's substantially different in

1   size, and also what we're trying to ascertain is how we

2   will conduct the trial with the defendants at counsel table

3   and Mr. Pugh representing himself from counsel table.  So

4   I'm not quite sure about standing and sitting.

5           Let me ask you this, Mr. Pugh, is it difficult

6   for you to stand if you want to address the Court, or is

7   it -- is that possible?

8           DEFENDANT W. PUGH:  It would be more comfortable

9   if I could sit down.

10          THE COURT:  Okay.  Second question for you.  If

11  for the trial, if you didn't have the leg irons on, would

12  you then be able to stand comfortably, or do you just

13  prefer to address the Court sitting from counsel table?

14          DEFENDANT W. PUGH:  Sitting.

15          THE COURT:  Okay.  All right.

16          Okay.  You may proceed.  In this proceeding,

17  Ms. Cross, I don't care if you sit or stand.

18          DEFENDANT W. PUGH:  If I didn't have the cuffs

19  on, I prefer to stand.

20          THE COURT:  Okay.  That's what I'm asking,

21  because I think, for the trial, we are not going to have

22  the -- I don't think -- I've still got to discuss this with

23  the marshal, but I think we may not have the cuffs on you.

24  What we may do instead is use some kind of belt to make

25  sure that you're secure but that there is nothing visible

1    to the jury.

2            You look like you're puzzled.  Can I --

3            MR. ANDREWS:  I think he's, as I am, just trying

4    to envision what that would be like.  But we will cross

5    that bridge when we get to it.

6            THE COURT:  Let me say this.  I just used it in a

7    trial, in the last criminal trial I had with Mr. Waagner, a

8    defendant who was -- I guess he wasn't at the Hamilton

9    County -- well, he was at Boone County.  One of you is at

10   Boone County, I know.  And it worked really well.  It

11   didn't bother him.  It wasn't uncomfortable.  It fits under

12   your shirt, goes around your waist, and it's not at all

13   visible to the jury.  And it sort of gives you freedom of

14   movement.  You can stand.  You can walk, you know, a little

15   bit, and stuff.  So it's something to consider.

16           And you want to ask me any questions about it?

17           DEFENDANT W. PUGH:  Not at this particular time.

18           THE COURT:  If you do, just let the Court know.

19           All right.  Ms. Cross, I'm sorry.  You may

20   proceed.

21           MS. CROSS:  Thank you, Your Honor.  If it please

22   the Court, I prefer to sit today.

23           THE COURT:  Okay.  That's fine.

24                        JIM CALHOUN

25                   DIRECT EXAMINATION

1    BY MS. CROSS:

2    Q.    Please state your name for the record and spell your

3    last name.

4    A.    Jim Calhoun, C-a-l-h-o-u-n.

5    Q.    Where and how are you employed?

6    A.    I'm a detective with the City of Hamilton, Ohio Police

7    Department.

8    Q.    And how long have you been so employed in that

9    capacity?

10   A.    As a detective for the past four years.

11   Q.    How long have you been working in law enforcement?

12   A.    For thirteen years now.

13   Q.    Are you familiar with the events of a bank robbery in

14   the City of Hamilton, Ohio, in April of 2002?

15   A.    Yes, ma'am.

16   Q.    Were you involved in the investigation of that bank

17   robbery in any way?

18   A.    Yes, I was.

19   Q.    What bank was robbed?

20   A.    First National Bank Southwestern Ohio located at the

21   corner of Peck and Williams Boulevard in the City of

22   Hamilton, Ohio.

23   Q.    And what exact date was the robbery?

24   A.    It was April 24th.

25   Q.    Based on your investigation, how was the robbery

1    perpetrated?

2    A.    Based on the investigation, what I learned was two

3    male black subjects entered the bank, both carrying

4    firearms.  They put the manager of the bank on the ground.

5    The tellers were told to empty their drawers into a trash

6    can that one of the males had picked up from inside the

7    bank.  Then one teller was put on the ground.  The second

8    teller was taken into the vault of the bank, told to empty

9    the vault into the trash can.  Both males then fled in a

10   maroon Cutlass Ciera.

11   Q.    Detective Calhoun, Defendant Walter Pugh has filed a

12   motion to suppress all the physical evidence that was

13   obtained in this case.  Were you responsible for obtaining

14   any of the physical evidence in this case against him?

15   A.    Yes, ma'am.

16   Q.    Briefly describe the areas from which you obtained

17   physical evidence.

18   A.    From a maroon Olds Cutlass Ciera that I learned from

19   the investigation belonged to Mr. Pugh's sister, Bessie,

20   also from a maroon Cadillac Sedan de Ville that belonged to

21   Mr. Pugh, a little silver car -- I don't remember the make

22   and model -- that belonged to a Kimberly Hinton, and also

23   from a home that belonged to Cortes Renfro.

24   Q.    Where is that home located; do you know?

25   A.    I believe the area is Mt. Healthy.  It's in Hamilton

1    County just across the line south from the City of

2    Fairfield.

3    Q.    Turning your attention to the evidence that you

4    obtained from the vehicle owned by Bessie Pew, do you

5    recall what physical evidence you obtained from that

6    vehicle?

7    A.    Yes, ma'am.

8    Q.    What?

9    A.    In particular, it was a partially torn piece of a

10   latex glove.

11   Q.    Will you describe for the Court when you found that

12   and the circumstances surrounding how you came to search

13   that vehicle?

14   A.    We knew what kind of vehicle we were looking for from

15   descriptions given to us by bank employees.  One of our

16   officers received information that a vehicle of that type

17   belonged to a Bessie Pew and that Walter Pugh had been in

18   that vehicle.  Attempts had been made to locate that

19   vehicle by talking with Mr. Pugh's ex-girlfriend.  We

20   couldn't locate the vehicle.  We were looking for it, and,

21   subsequently, we located that vehicle the day following the

22   robbery.

23   Q.    April 25, 2002?

24   A.    Yes, ma'am.

25   Q.    And when you located the vehicle, where was it?

1    A.   It was on Gordon Smith Boulevard, which is in the City

2    of Hamilton.   Myself and Detective Cifuentes followed the

3    vehicle for probably a half hour or so.   There was a female

4    black driving the vehicle, and she made a couple of stops,

5    one on Gordon Smith Boulevard to pick up two passengers,

6    and then another stop in downtown Hamilton at the One

7    Renaissance Center Building to drop off two passengers.

8    She then proceeded to a nursing home where she parked the

9    car and went into the nursing home.   At that time, we

10   believed she was going into work, so Detective Cifuentes

11   and myself headed on into town to find out who the people

12   were that she had dropped off at the building downtown.

13   Q.   At the time, did you know who the driver of the

14   vehicle was?

15   A.   We were not positive who the driver of the vehicle

16   was.   We believed it to be Bessie Pew, but at that time we

17   weren't positive.

18   Q.   Okay.

19   A.   When we got back into town, I received a radio

20   dispatch informing me that Bessie Pew had called our

21   detective bureau and advised that she was on her way in and

22   wanted to talk with us.

23   Q.   Did she, in fact, on that day, April 25, 2002, come

24   into the police station and speak with you?

25   A.   Yes, ma'am.   She beat me back into the police station.

1  Q.    And tell the Court what happened when she arrived.

2  A.    When she arrived, I interviewed her.  I asked her for

3  consent to search her vehicle, which she executed our

4  standard consent to search form.  I searched the vehicle,

5  took photographs of the vehicle.  And at that time I

6  located the partially torn latex glove underneath the

7  driver's seat of the vehicle.  I took -- and Ms. Pew was

8  with me the whole time while we searched the car.

9      We went back in, and I interviewed her and took a

10 written statement from her.  I also showed her photographs

11 that we recovered from the bank surveillance videotape, and

12 she made an identification of one of those persons in the

13 photograph.

14 Q.    Who did she identify?

15 A.    Mr. Walter Pugh.

16     MS. CROSS:  Your Honor, if I may show the witness

17 Government Exhibit 1, which has been shown to Mr. Pugh.

18     THE COURT:  Um-hum.  That's fine.  Do you have a

19 copy for the Court of any of these exhibits?

20     MS. CROSS:  I do, Your Honor, and I'm looking for

21 a copy for the Court, Your Honor.  It is attached to our

22 response which we filed.

23     THE COURT:  All right.  You may proceed.

24     MS. CROSS:  Thank you, Your Honor.

25 BY MS. CROSS:

Q.   Detective Calhoun, I'm showing you what has been

previously marked as Government's Exhibit Number 1.  Do you

recognize that exhibit?

A.   Yes, ma'am.

Q.   What do you recognize it to be?

A.   It is a copy of the original form, consent to search

form, that Ms. Pew and myself signed on April 25th of 2002

allowing me to search her '88 Olds Cutlass.

         MS. CROSS:  Your Honor, if there is no objection,

I would move to admit Government Exhibit Number 1 into

evidence.

         THE COURT:  Any objection, Mr. Pugh?

         DEFENDANT W. PUGH:  No, ma'am.

         THE COURT:  Government Exhibit 1 is admitted.

BY MS. CROSS:

Q.   I believe that you stated that Ms. Pew gave you a

statement?

A.   Yes, ma'am.

Q.   And identified Walter Pugh from a photograph that you

showed her?

A.   Yes, ma'am.

Q.   During the course of your investigation, you had cause

to search a vehicle that was owned by Walter Pugh, correct?

A.   Yes, ma'am.

Q.   Will you tell -- explain to the Court how you came to

1    search that vehicle.

2    A.    We were at the time looking for Mr. Walter Pugh.

3    There were warrants issued through Hamilton Municipal Court

4    for aggravated robbery and theft.  The vehicle, the --

5    excuse me.  The Cadillac Sedan de Ville was registered to

6    Mr. Walter Pugh, and we had received information that he

7    was in that vehicle.  Specifically, we received a phone

8    call that he was in the vehicle on Front Street in

9    Hamilton, and I believe the date was May the 2nd.

10        I, immediately upon receiving that phone call, caused

11    the radio broadcast to all of our patrol units to be on the

12    lookout for the car in that area.  Within five minutes, the

13    vehicle was located parked on Beckett Street near Garden

14    Street in the City of Hamilton, Ohio, unoccupied.  The

15    patrol units were instructed to stay back, and I placed

16    plain clothes detectives in plain cars in the area to watch

17    the vehicle for several hours, probably two hours or so.

18    No one went to the vehicle.

19        Knowing that it was Mr. Pugh's car and receiving the

20    information that he had been in it as recently as ten, 15

21    minutes before we found it, we towed the vehicle, impounded

22    the vehicle.  It was sealed.  It was not opened, not

23    searched at that time.

24        While the vehicle was being towed, I returned to our

25    office, drafted an affidavit requesting a search warrant

1    for the vehicle, went to one of our common pleas judges and

2    had him review the affidavit, review the search warrant,

3    and he signed it at that time.  The search on the vehicle

4    was then executed within four hours of locating the

5    vehicle.

6    Q.    You said that, when you first located the vehicle, you

7    knew that it belonged to the defendant Walter Pugh?

8    A.    Yes, ma'am.

9    Q.    How did you know that?

10    A.    The vehicle registration, license plates.

11    Q.    What do you recall finding after you searched that

12    vehicle?

13    A.    A black bag containing ammunition for a 12-gauge

14    shotgun, also for a 22 caliber weapon and a larger caliber

15    rifle ammunition.  I'm not positive of the caliber

16    ammunition.  I would have to look at it to be sure.  We

17    also got a walkie-talkie out of the vehicle.  There was a

18    empty box of Black & Mild cigars.  There was a hotel

19    parking -- I guess you would call it a tag that hangs from

20    the rearview mirror for a hotel in downtown Atlanta.  We

21    also took a paper that showed video rentals from a video

22    rental place in downtown Atlanta, Georgia.

23    Q.    I believe it was your testimony that that evidence was

24    obtained as a result of execution of a search warrant?

25    A.    Yes, ma'am.

1  Q.   Who drafted the affidavit for the search warrant?

2  A.   I did.

3       MS. CROSS:  Your Honor, if I may at this time

4  have permission to show Government Exhibit Number 2 to the

5  witness.

6       THE COURT:  Yes, you may.

7       MS. CROSS:  Again, Your Honor, this has been

8  shown to the defendant today, and it's attached to our

9  response.

10      THE COURT:  Thank you, Ms. Cross.

11 BY MS. CROSS:

12 Q.   Do you recognize Government Exhibit Number 2,

13 Detective?

14 A.   Yes, ma'am.

15 Q.   What do you recognize it to be?

16 A.   It is a three-page document containing the affidavit

17 requesting the search warrant, the actual search warrant

18 signed by Judge Bressler in common pleas court, and then

19 the return of the search warrant listing the property that

20 was taken.

21 Q.   To whom did you make application to for the search

22 warrant?

23 A.   Judge H. J. Bressler.

24 Q.   On what day and time?

25 A.   It was the 2nd of May, 2002, 5 p.m.  It's barely

1    readable underneath the certification stamp from the court.

2    Q.    What information did you convey to the state court

3    judge in making application for the search warrant?

4    A.    The information that's listed on the affidavit itself,

5    and the judge also asked me a couple of questions about how

6    the identification of Mr. Pugh came about.

7    Q.    And what information did you provide?

8    A.    I told him the names of those that identified Mr. Pugh

9    via the photographs from the bank.

10          MS. CROSS:  Your Honor, if there is no objection,

11    we would ask permission to move into evidence Government

12    Exhibit Number 2.

13          THE COURT:  Mr. Pugh, any objection to admission

14    of the Government Exhibit 2?

15          DEFENDANT W. PUGH:  Object, Your Honor.

16          THE COURT:  What's the basis for your objection?

17          DEFENDANT W. PUGH:  On the video ticket that he

18    said he confiscated out of my car, it's nowhere on the

19    inventory sheet.

20          THE COURT:  Okay.  You can bring that out if you

21    want in cross-examination of this witness, but the issue

22    here is are you objecting to the admission of the

23    affidavit, the search warrant and the return of the

24    affidavit that this witness has identified.  It's just the

25    admission of the documents.  It's just putting the

1  documents themselves into evidence.  If you want to then

2  cross-examine the detective about why a specific item isn't

3  on the return of inventory, you need that document in

4  evidence to do that.

5          DEFENDANT W. PUGH:  Yes, ma'am.

6          THE COURT:  So are you still objecting?

7          DEFENDANT W. PUGH:  I withdraw my objection.

8          THE COURT:  All right.  Then Government Exhibit 2

9  will be admitted.

10          MS. CROSS:  Thank you, Your Honor.

11 BY MS. CROSS:

12 Q.    Detective, did you testify that the car was impounded

13 prior to receiving the search warrant?

14 A.    Yes, ma'am.

15 Q.    Why was that done?

16 A.    To secure the vehicle.  It was parked on a city

17 street.  We didn't know who had access to the vehicle, who

18 had keys, who might come back to the vehicle.  We didn't

19 have resources to place a person watching it for another

20 three hours.  So the vehicle was impounded for safekeeping,

21 to keep it secure and in the condition it was in on the

22 street when we found it.

23 Q.    Was the vehicle searched upon being impounded?

24 A.    No, ma'am.

25 Q.    How long was the car impounded prior to receiving the

1    search warrant?

2    A.    At the most, three, three-and-a-half hours.

3    Q.    And was the information that the car had been

4    impounded communicated to the judge in making application

5    for the search warrant?

6    A.    Yes, ma'am.

7    Q.    Turning your attention now to the third vehicle that

8    was searched in this case, I believe you stated that was a

9    vehicle that belonged to Kimberly Hinton?

10   A.    Yes, ma'am.

11   Q.    Do you recall what day that search took place?

12   A.    I do.  It was very early in the morning on May the

13   3rd.

14   Q.    Will you explain the events that took place from the

15   time that you executed the search warrant on Mr. Pugh's

16   vehicle on May 2nd, 2002, until this third vehicle was

17   searched?

18   A.    We were contacted by an informant who was to lead us

19   to Mr. Pugh.  The informant took us to the area where

20   Mr. Pugh was, the exact house, showed it to us.  It was in

21   Hamilton County's jurisdiction, so I contacted Hamilton

22   County Sheriff's Department to coordinate with them the

23   events to surround the house.  They activated their SWAT

24   team because of the nature of the crime and the warrants

25   for Mr. Pugh, and there were I don't know how many Hamilton

1    County sheriff's deputies, several Hamilton County

2    sheriff's deputies.  There were three detectives -- four

3    detectives from the City of Hamilton Police Department and

4    Special Agent Moran from the FBI there.  We staged in the

5    LoBill parking lot on Hamilton Avenue near the house where

6    Mr. Pugh was located on Wincanton Road.

7        The little silver vehicle owned by Ms. Hinton pulled

8    up into the house while the Hamilton County sheriff's

9    deputies were surveilling it.  Two subjects exited the

10   house, got into the vehicle and were driving away.  The

11   vehicle was subsequently stopped by the Hamilton County

12   Sheriff's Department.  Located in the car in the rear seat

13   was Mr. Walter Pugh.  In the front passenger seat was

14   Cortes Renfro, and the front driver was Kimberly Hinton.

15       Mr. Pugh was arrested pursuant to the warrants out of

16   our department or out of our municipal court.  Mr. Renfro

17   was also arrested pursuant to warrants out of our municipal

18   court.  And Ms. Hinton was arrested pursuant to warrants

19   through Hamilton County, City of Cincinnati, I believe.

20   Q.   Okay.  Upon the arrest of Ms. Hinton, did she -- did

21   anyone ask if they could search her vehicle?

22   A.   Yes.  Myself and Agent Moran asked if we could search

23   her vehicle.  Ms. Hinton filled out, executed, a consent to

24   search right there in the LoBill parking lot, and I

25   searched the vehicle.

1    Q.    When you're saying LoBill parking lot, is LoBill a

2    grocery store?

3    A.    Yes, ma'am.

4         MS. CROSS:  Your Honor, if I may have permission

5    to show the witness Government Exhibit Number 3.

6         THE COURT:  Yes, of course.

7    BY MS. CROSS:

8    Q.    Do you recognize Government Exhibit Number 3?

9    A.    Yes, I do.

10   Q.    What do you recognize it to be?

11   A.    It is a one-page document, a consent to search an

12   automobile, signed by Kimberly Hinton and myself on May 3rd

13   of 2002, allowing me to search her 2000 Plymouth Neon.

14   Q.    Is that the consent form that you were testifying

15   about that you had Ms. Hinton execute on the night of her

16   arrest?

17   A.    Yes, ma'am.

18        MS. CROSS:  Your Honor, if there is no objection,

19   I would move to admit into evidence Government Exhibit

20   Number 3.

21        THE COURT:  Any objection, Mr. Pugh?

22        THE DEFENDANT:  No, ma'am.

23        THE COURT:  Okay.  Government Exhibit Number 3

24   will be admitted.

25   BY MS. CROSS:

1    Q.    Upon Ms. Hinton executing that consent form, what

2    happened?

3    A.    I searched the vehicle.

4    Q.    What, if anything, did you find?

5    A.    A multi-channel scanner located in the rear passenger

6    compartment where Mr. Walter Pugh had been sitting.

7    Q.    After the search of the vehicle and the arrest of all

8    three persons in the vehicle who were traveling in the

9    vehicle, what happened?

10   A.    The Hamilton County Sheriff's deputies were talking

11   with Mr. Renfro, getting information, intelligence, to

12   supply to their officers about who was still in the house,

13   possible weapons, things of that nature that they would

14   need to know before making entry into the home.  Because,

15   at the time, we believed that Tyreese Pugh was still in the

16   house, found out that he was indeed still in the house.

17   And the best course of action was to ask Mr. Renfro for

18   consent to search his house, the easiest way to do it so to

19   speak.  And so he was asked for permission to search his

20   home, and he executed a consent to search for his home

21   located at 11979 Wincanton Drive.

22   Q.    Subsequent to his -- did he consent?

23   A.    Yes, ma'am.

24   Q.    Subsequent to his consent, was the consent form given

25   to -- who was it given to?

1    A.    It was given to me.

2            MS. CROSS:  And I ask permission at this time to

3    show Government Exhibit Number 4.

4            THE COURT:  Yes.

5            MS. CROSS:  Which I believe is in front of the

6    witness.

7            THE COURT:  All right.

8    BY MS. CROSS:

9    Q.    Detective, do you recognize that exhibit?

10   A.    Yes, ma'am.

11   Q.    Will you tell the Court, for the record also, what

12   that is?

13   A.    It's a one-page document signed by Cortes Renfro and

14   Sergeant Matthew Guy of the Hamilton County Sheriff's

15   Department allowing a search to be made of 11979 Wincanton

16   Drive.

17   Q.    Is that the exhibit that you received?  Is that a copy

18   of the exhibit that you received on the night of their

19   arrests?

20   A.    Yes, ma'am.

21           MS. CROSS:  I move to admit Government Exhibit

22   Number 4 at this time.

23           THE COURT:  Any objection, Mr. Pugh?

24           DEFENDANT W. PUGH:  No, ma'am.

25           THE COURT:  Government Exhibit Number 4 will be

1   admitted.

2   BY MS. CROSS:

3   Q.   When Mr. Renfro executed that form, what happened?

4   A.   The Hamilton County Sheriff's Department SWAT team

5   entered the home.  At that time, Tyreese Pugh was located

6   in bed laying on top of a 12-gauge shotgun with his

7   girlfriend Stephanie Luster.

8           MS. CROSS:  If I may have a moment, Your Honor,

9   to confer with counsel.

10          THE COURT:  Sure.

11          (Pause.)

12          MS. CROSS:  Just a few more questions, Detective

13  Calhoun.

14  BY MS. CROSS:

15  Q.   I just want to talk to you for a few minutes about the

16  ownership of each of the vehicles that you searched

17  beginning with Bessie Pew's vehicle.  How did you find out

18  it was her vehicle?

19  A.   Through the license plate registration, and also

20  Ms. Pew told us that it was her car.

21  Q.   What did you discuss with her, if anything, as to

22  where her vehicle had been during or about the time of this

23  bank robbery?

24  A.   She actually, when she came to us, told us that she

25  believed her vehicle might have been used in a bank

1  robbery.  That is what she had heard on the street.

2  Q.    And were there any discussions as to why she believed

3  that?

4  A.    Yes, there were.

5  Q.    What did she say?

6  A.    We were told that her brother Walter had had her car

7  for the past three weeks approximately and that on April

8  24th he had appeared at her work telling her that he wanted

9  his car back, which she had been driving, told her that her

10  car was parked in a parking lot in the Old Apple Creek

11  Apartments, which is in Fairfield, Ohio, just south of the

12  City of Hamilton, but that her car was parked down there

13  and she could go get it.

14  Q.    So, on April 24th, she returned his car to him,

15  referring to Mr. Pugh, Walter Pugh?

16  A.    Yes, ma'am.

17  Q.    And he had returned her car that he was using to her?

18  A.    Correct.  Actually, he didn't return it to her.  He

19  told her where it was.  She had to go retrieve it.

20  Q.    Regarding the ownership of Ms. Hinton's vehicle, how

21  did you know that the vehicle belonged to her?

22  A.    Again, license plate registration and the fact that

23  she told us that it was her vehicle.

24  Q.    At the time that Ms. Hinton stated that the vehicle

25  that she was driving belonged to her, was the defendant

1    Walter Pugh with her?

2    A.    Yes, ma'am.

3    Q.    Did he hear these things?

4    A.    Well, by "with her," he was in the same area.  He was

5    in the rear of the Hamilton County Sheriff's Department

6    cruiser.  I don't believe he would have heard the

7    conversation that we had with her.

8    Q.    At any time, did Walter Pugh that night tell you that

9    that car belonged to him?

10   A.    No, ma'am.

11         MS. CROSS:  Your Honor, I believe that's all the

12   questions I have.

13         Thank you, Detective.

14         THE COURT:  Thank you, Ms. Cross.

15         Mr. Pugh, do you wish to cross-examine this

16   witness?

17         DEFENDANT W. PUGH:  Yes, ma'am.

18         THE COURT:  Okay.  You may proceed.

19                    CROSS-EXAMINATION

20   BY DEFENDANT W. PUGH:

21   Q.    Detective Calhoun, where did you get the information

22   that led you to Bessie Pew's car?

23   A.    The information that -- what's her -- how did we come

24   about a --

25   Q.    You said that you got the plates number.  You told the

1   prosecution that you received Bessie Pew's plate number.

2   Where did you receive the plate numbers from?

3   A.   No, sir, I don't believe I ever said I received the

4   plate number for Bessie Pew's car.

5   Q.   So what led you to Bessie Pew's car?

6   A.   One of our officers received information that you were

7   in a car matching the description of the car from the bank

8   robbery.

9   Q.   Was it the Cadillac?

10  A.   No, sir.  It was a Olds Cutlass Ciera, maroon in

11  color.

12  Q.   On the 24th?

13  A.   On the 24th did I receive the --

14  Q.   On the 24th of April, 2002, I was driving Bessie Pew's

15  car?

16  A.   At the bank robbery, yes, sir, that was the

17  information.

18  Q.   That's what an officer told you?

19  A.   No.  We received the information on the 25th, early

20  morning.

21  Q.   Thank you.

22       THE COURT:  Mr. Pugh, why don't you pull the

23  microphone a little closer?  You can move it.  It would be

24  more comfortable for you.  Good.

25  BY DEFENDANT W. PUGH:

1  Q.    And you received this information from Bessie Pew that

2  I was driving her car on the 24th?

3  A.    She told me that you had her car up until the

4  afternoon of the 24th, yes.

5  Q.    How could I have her car up to the afternoon on the

6  24th when you stated that I told her when I picked her car

7  up that her car was parked in Fairfield somewhere?

8  A.    I don't --

9  Q.    You stated that.  You stated on record that Bessie Pew

10  told you I had her car all the way up to the afternoon.

11  A.    Yes, sir.

12  Q.    How could I have Bessie Pew car all the way until the

13  afternoon?  When I came and got my Cadillac out of Bessie

14  Pew, I did not have Bessie Pew car.

15  A.    She said she did not know how you got to her work, but

16  that you came to her work late in the afternoon on the 24th

17  and took your Cadillac from her.

18  Q.    Detective Calhoun, concerning the Cadillac, you did a

19  search warrant for that Cadillac, correct?

20  A.    Yes, sir.

21  Q.    The items that you obtained according to the inventory

22  sheet, black bag containing 12-gauge shotgun shells, 22

23  ammunition and 22.3 -- .223 ammo front seat of car?

24  A.    Yes, sir.

25  Q.    A walkie-talkie, a Travelodge Hotel parking pass from

1    Atlanta, glove compartment, right?

2    A.    Correct.

3    Q.    Empty box for Black & Mild cigars, front floor,

4    correct?

5    A.    Yes, sir.

6    Q.    Where did this other ticket thing come from concerning

7    the video?

8    A.    I believe it was on the rear seat, on the floor.

9    Q.    It's not on the inventory sheet though, sir.

10   A.    That is correct.

11   Q.    Why is that?

12   A.    I really don't know, sir.

13   Q.    But you took it out of the Cadillac, right?  You took

14   it out of my Cadillac, correct?

15   A.    Yes, sir.  I believe it's in evidence in our property

16   room.

17   Q.    What else did you take out of there, sir?

18   A.    I believe those were the only items.

19   Q.    I see that you took out another piece of paper

20   containing that that's my car.  You took out three pieces

21   of paper, correct?  Atlanta, Georgia parking ticket?

22   A.    For the Travelodge.

23   Q.    A video slip?

24   A.    Correct.

25   Q.    And a piece of paper stating that's Walter Pugh's car?

1   A.    I believe we may have taken your vehicle registration

2   out of the glove compartment, yes, sir.

3   Q.    But it's not on the inventory sheet?

4   A.    No, sir.

5   Q.    But it's into evidence?

6   A.    It's in our property room.  As far as evidence --

7   Q.    I got it on file that you --

8            THE COURT:  Wait.  Wait.  You've got to let the

9   witness finish his answers.  Okay?

10  A.    As far as what is being used as evidence, I don't know

11  what exactly the prosecutor is going to use to put into

12  evidence, but the vehicle registration we took to prove

13  ownership of the vehicle.

14  Q.    But I'm saying you took those items out of my

15  Cadillac.  Why are they not on this inventory sheet if you

16  took them out of the Cadillac?

17  A.    I have no answer for that, sir.

18            DEFENDANT W. PUGH:  Excuse me for a minute,

19  Judge.

20            THE COURT:  Certainly.

21  BY DEFENDANT W. PUGH:

22  Q.    Sir, didn't you take an oath concerning that matter?

23  You swore to tell the truth on the matter of things that

24  you took out of that car?

25  A.    Yes, sir.

1    Q.    But yet you said that was all that you took, but you

2    took more items out of that car that's not on this oath

3    that you took?

4    A.    Those are the items that I wrote down, sir, and I

5    believe that's all we took.  I was not the only officer on

6    the search, and the items were sealed into bags.  I didn't

7    know what Detective Cifuentes put in the bag other than

8    what he told me.

9    Q.    But you are a professional, sir.  You know the things

10   that came out of that car should have went on this

11   inventory list.  You just do not take things out of

12   people's cars and it's not on the inventory list.  That's a

13   violation of the Fourth Amendment, sir.  Are you aware of

14   that?

15   A.    If you're telling me that's a violation, sir, then

16   that's --

17   Q.    That's the law, sir.  You know that's the law, sir.

18   You're a law officer.

19           THE COURT:  Let's not get argumentative with the

20   witness.  I get your point.  It's for the Court to

21   determine what's a violation of law and what's not, not the

22   witness.

23           DEFENDANT W. PUGH:  I'm sorry.  Thank you.

24   BY DEFENDANT W. PUGH:

25   Q.    You got a search warrant -- no, not a search

1    warrant -- excuse me -- a consent form to search Mr. Cortes

2    Renfro's establishment, home, residence, correct?

3    A.    At 11979 Wincanton Road, that is correct, sir.

4    Q.    That consent form consists of his property, right, his

5    personal things, correct?

6    A.    It allowed us to search his home, sir.  He told us he

7    owned the home or the residence there.

8    Q.    Did that consent form, sir, authorize you to search my

9    personal belongings, the bag?

10    A.    The consent form, sir, authorized us to take any

11    letters, papers, materials or other property which is

12    contraband or may be used as evidence in criminal or civil

13    proceedings.

14    Q.    His personal things.  I'm talking about the bag.  The

15    bag was my bag.  I did not give you the consent form.  I

16    did not sign the consent form.  You did not have a search

17    warrant to take my bag.  I'm saying that you know that

18    Walter Pugh Jr. was at that resident.  I'm saying, if you

19    knew Walter Pugh, Jr. was there, you had time -- you had

20    enough time to get a search warrant.  Correct?

21    A.    We could have gotten a search warrant, yes, sir.

22    Q.    Knowing that Walter Pugh, Jr. was there and knowing

23    that he probably has some contraband there or whatever

24    personal things, don't you think that a warrant would have

25    been reasonable?

A.    We took what we believed at the time to be the most

reasonable course of action, sir.

Q.    Why you did not ask me to search my personal

belongings?

A.    We tried to talk to you, sir, but you told us you

would not talk to us.

Q.    So you did not have my consent, correct?

A.    You wouldn't talk to us at all, sir, so no.

Q.    So you did not have my consent, right?

A.    I answered no, sir.

Q.    Thank you.  Concerning Bessie Pew's car again, you

said you found a piece of latex glove.  Did Bessie Pew

state that that was Walter Pugh's?

A.    Bessie Pew said it was not hers.

Q.    Did Bessie Pew say -- did she say it was Walter Pugh?

She said it was her car, but did she say that was Walter

Pugh's piece of glove?

A.    I told you what Ms. Pew said, sir.  She said it was

not hers.

Q.    So it wasn't Walter Pugh, right?

A.    I cannot say that, sir.

        DEFENDANT W. PUGH:  Excuse me.

        THE COURT:  Certainly.

        DEFENDANT W. PUGH:  Thank you, Mr. Calhoun.

        THE COURT:  Anything further, Mr. Pugh?

1         DEFENDANT W. PUGH:  No, ma'am.

2         THE COURT:  All right.  Anything further of this

3    witness, Ms. Cross?

4         MS. CROSS:  Your Honor, just two follow-up

5    questions if I may.

6                    REDIRECT EXAMINATION

7    BY MS. CROSS:

8    Q.   Detective Calhoun, at the time that the consent for

9    Mr. Renfro's home was obtained, was Tyreese Pugh a

10   fugitive?

11   A.   Yes, ma'am.

12   Q.   And did you have any knowledge or information as to

13   whether or not Mr. Tyreese Pugh was in the home?

14   A.   Walter Pugh told the sheriff's deputies that his son

15   was in the home and that he was concerned for his safety.

16   Should we go in the home and there be problems, I guess

17   that's what he was worried about.

18         MS. CROSS:  Thank you.

19         No further questions, Your Honor.

20         THE COURT:  Mr. Pugh, anything further of this

21   witness?

22                    RECROSS-EXAMINATION

23   BY DEFENDANT W. PUGH:

24   Q.   Excuse me.  Mr. Calhoun, my attorney just brought to

25   my attention that you stated earlier that I didn't have no

1    conversation for you, but then you just stated that we had

2    conversation.

3    A.    No, sir.  I said you wouldn't talk to me.  You did

4    talk to the Hamilton County Sheriff's deputies about your

5    son being in the house.

6    Q.    Sir, the only one that I spoke to is you and the FBI

7    agent.  I did not speak to no Hamilton County sheriffs.

8    A.    That was not the information that was provided to me,

9    sir.

10            DEFENDANT W. PUGH:  Thank you, sir.

11            Thank you, Judge.

12            MS. CROSS:  No further questions, Your Honor.

13            THE COURT:  Thank you, Detective Calhoun.  You

14    are excused.

15            Any additional witnesses for the government,

16    Ms. Cross?

17            MS. CROSS:  No, Your Honor.

18            THE COURT:  All right.  Thank you.

19            Mr. Pugh, do you wish to present any evidence?

20            THE DEFENDANT:  Not at this particular time,

21    ma'am.

22            THE COURT:  All right.  Then the Court will take

23    this matter under submission.  I'm going to ask -- you're

24    going to provide a legal memo to us by August 28th?

25            DEFENDANT W. PUGH:  Yes.

1          THE COURT:  Mr. Pugh, you're welcome to do that.

2   I will tell you at this point, though, that my inclination

3   is to deny the motion to suppress just because I want you

4   to have notice of adequate time to prepare for trial,

5   because this matter is set for trial September the 3rd,

6   which is, I think, about a week and a half away.  Yes.

7   We're looking at about ten days, something like that.

8          So, you know, subject to my seeing something in

9   your memo that I haven't thought of, it's likely that I

10  will deny the motion to suppress, and the trial will go

11  forward on the 3rd.

12         So I guess at this point we're going to have the

13  final pretrial conference.  Does anybody need a break

14  before we start that?

15         MS. CROSS:  No, Your Honor.

16         THE COURT:  Anybody want a break?  All right.

17  Then let's talk.

18         MR. FELSON:  Your Honor, I'm sorry.  Tyreese says

19  he needs a bathroom break.

20         THE COURT:  All right.  Let me ask Mr. Riley, how

21  long do you need for a break?

22         DEPUTY MARSHAL RILEY:  Ten minutes.

23         THE COURT:  All right.  Let's take a ten-minute

24  break.

25             (Recess at 2:25 p.m.)

1                         AFTER RECESS

2         THE COURT:  All right.  I have to find my little

3  checklist here.  All right.  Let's start with counsel.

4  Who's going to be sitting at counsel table, and who's going

5  to be representing the U.S?  You, Ms. Cross?

6         MS. CROSS:  Mr. Thapar and I are co-counsel, and

7  Special Agent Terry Moran of the FBI.

8         THE COURT:  Okay.  And, Mr. -- I'm trying to

9  think of how we can refer to you.  I know that you're

10  Walter Pugh, Jr., and you're Tyreese Pugh.  Do you have

11  a -- are you junior, too?

12         DEFENDANT T. PUGH:  No, I'm senior.

13         THE COURT:  Okay.  It's reversed.

14         I'm trying to think, for purposes of the record,

15  would you like me maybe to explain to the jury at the

16  beginning, maybe when you're doing voir dire, when we are

17  picking the jury, that you are father and son, and, even

18  though you're Walter Pugh, Jr. and you're Tyreese Pugh,

19  Sr., that's to differentiate so I don't have to say

20  Mr. Walter Pugh and Mr. Tyreese Pugh every time?  I could

21  do that.

22         Would you like me to do that?  I could refer to

23  you as Mr. Pugh the elder or Mr. Pugh, Sr. and Mr. Pugh.

24  What would you like?  How would you like --

25         DEFENDANT T. PUGH:  Tyreese Pugh.

1          THE COURT:  Just want to -- just Tyreese Pugh?

2          DEFENDANT T. PUGH:  Okay.

3          THE COURT:  I could say Tyreese Pugh or Walter

4     Pugh.

5          DEFENDANT T. PUGH:  Pugh the son and Pugh the

6     father.

7          THE COURT:  Mr. Pugh, the father?

8          DEFENDANT W. PUGH:  Yes, ma'am.

9          THE COURT:  Okay.  Mr. Pugh the father.

10          MR. FELSON:  Judge, I think I'm a little more

11     comfortable with Tyreese Pugh, because I'm trying to --

12          THE COURT:  Separate.  Okay.  I hear you.

13          MR. FELSON:  Tyreese Pugh would be fine.

14          THE COURT:  All right.  I'll just say Mr. Walter

15     Pugh and Mr. Tyreese Pugh.

16          What I want to do is, if somebody looks at the

17     transcript later, they're not going to know which one of

18     you I was referring to unless I use something to

19     differentiate you.  So we'll do it that way.  Okay.

20          Mr. Felson, you're representing Tyreese Pugh.

21          And, Mr. Andrews, you're going to be standby

22     counsel for Walter Pugh.

23          MR. ANDREWS:  That is correct, Your Honor.

24          THE COURT:  Let me just, even though, as you all

25     know, the Court can't be involved in any plea negotiations,

1  I just wanted to inquire as to whether or not there is a

2  possibility that there might be any pleas or whether this

3  is definitely going to trial.

4         MS. CROSS:  Your Honor, I believe at this point

5  it's definitely going to go to trial.  There are no plea

6  offers that have been extended.

7         THE COURT:  All right.  Does the government

8  intend to make any?

9         MS. CROSS:  Well, actually, Your Honor, there was

10  one offer made to Mr. Tyreese Pugh, but it's been rejected.

11  So there is no additional offers at this time.

12         THE COURT:  Okay.  Then there is no more motions

13  to be filed.  The motion deadline has past.

14         Let me talk about, though, some other deadlines.

15  Exhibit lists and witness lists, those are submitted to the

16  Court, only those don't get filed with the clerk's office.

17  The Court would like those lists, the exhibit lists and the

18  witness lists, this Friday, which is six business days

19  before trial.  Is that doable for everyone?

20         MS. CROSS:  Yes, Your Honor.

21         MR. FELSON:  Yes, Your Honor.

22         THE COURT:  All right.  And I'll get into that in

23  a minute how I would like you to mark your exhibits, too.

24  Why don't I do that now so I don't forget?

25         Give me an idea of how many exhibits the

1  government has.

2         MS. CROSS:  Your Honor, the government has 22

3  exhibits, and, for example, Exhibit 1 has eight parts to

4  it.

5         THE COURT:  Okay.

6         MS. CROSS:  But the number is 22.

7         THE COURT:  All right.

8         MS. CROSS:  Because Number 1 are basically

9  photographs.

10         THE COURT:  Okay.  I think --

11         And then what about, Mr. Felson, how many

12  exhibits?

13         MR. FELSON:  Actually, we have our witness

14  Dr. Fulero, the identification witness I discussed, is

15  probably going to have a curriculum vitae, and he may have

16  a couple of exhibits, but, other than that, we have a

17  notice of alibi we're going to file; although it's a little

18  vague, because it's hard to pin down, you know, since they

19  arrested him sometime later, to find out exactly where he

20  was two weeks earlier at a specific time is kind of

21  difficult for a 20, early 20's year old gentleman.  So we

22  did want to make a point to say we are asserting an alibi

23  that he wasn't there, although we may not be able to say

24  exactly where he was at that particular time a couple weeks

25  earlier, but I want to make that clear.

1    I don't know if the Court requires a notice of

2    alibi in that instance.  I'm putting the state on notice

3    now that we're claiming we weren't there.  And I think they

4    knew that.

5        THE COURT:  Ms. Cross?

6        MS. CROSS:  I think that the defense has an

7    obligation to file something in the record about the alibi

8    defenses.  We were not formally -- we didn't formally know

9    that he was going to raise that defense, although we

10   suspected.

11       THE COURT:  Let me take a look at the federal

12   rules.

13       MR. FELSON:  Is my position clear on that, Your

14   Honor?  In other words, he can't exactly say where he was

15   at that moment, since he was arrested sometime later.

16       THE COURT:  No.  I hear you.  But I think there

17   is a federal rule about alibis.  I think it's 12.

18       MS. CROSS:  Rule 12.1, I believe, Your Honor.

19       THE COURT:  Yes.  Let's see what that says here.

20   Do you have a copy of the rule in front of you, Ms. Cross?

21       MS. CROSS:  I do, Your Honor.

22       THE COURT:  Yes.  The Court does, too.

23       I would like to hear from you, how you feel the

24   rule applies to what Mr. Felson just said.

25       MS. CROSS:  Actually, Your Honor, he does not

1  have an obligation unless we provide a written demand for

2  notice, which we have not.

3          THE COURT:  All right.  Okay.  And I assume,

4  Ms. Cross, that what you're saying, and correct me if I'm

5  wrong, that, if the government doesn't make a written

6  demand, then the defendant is not obligated to respond, in

7  which point Rule 12.1(b) is not applicable, correct?

8          MS. CROSS:  That is correct, Your Honor.  That's

9  my reading.

10         THE COURT:  Okay.  Mr. Felson?

11         MR. FELSON:  So I just won't -- I won't have to

12  file anything?

13         THE COURT:  Right.  You don't have to file

14  anything.  What I'm saying here is that under Rule 12.1(b),

15  notice of alibi, here under the federal rules, it says that

16  within ten days thereafter, but in no event less than ten

17  days before trial, unless the Court otherwise directs, the

18  attorney for the government shall serve upon the defendant

19  or the defendant's attorney a written notice stating the

20  names and addresses of the witnesses upon whom the

21  government intends to rely to establish the defendant's

22  presence at the scene of the alleged offense and any other

23  witnesses to be relied on to rebut testimony of any of the

24  defendant's alibi witnesses.

25         So I think what Ms. Cross or I believe what

1   Ms. Cross and I just said is that the government has no

2   obligation to do that if you don't have an obligation to

3   serve them with written notice.  I just want to make sure

4   everybody is clear on that.

5           MR. FELSON:  Oh, okay.  Well, let me put it this

6   way.  We are -- I mean, I can do that in writing, but

7   obviously implicit in the defense of not guilty is, I

8   guess, well it could be different defenses, but he wasn't

9   there.  That implies an alibi, except that an alibi seems

10  required to be evidence that you were somewhere else.  In

11  other words, you're saying you were somewhere else as

12  opposed to there.  But that's not what we're really saying,

13  because we don't know where he was a week or two weeks

14  before he was arrested.

15          THE COURT:  You're saying your alibi was he was

16  not at the bank when it was robbed.

17          MR. FELSON:  That's right.  He was not there.

18  Now, if they're going to have witnesses that they're going

19  to submit to me that are going to testify -- I guess try to

20  testify that he was there at the bank, and so they would

21  still have to provide me that witness list.

22          THE COURT:  In federal court, they don't have to

23  provide a witness list in criminal cases.  What they --

24  what we do have is pretty liberal discovery as a practice

25  here in the Southern District of Ohio, and I assume that

1  you have already had that discovery.

2          MS. CROSS:  We have, Your Honor.  And, in fact,

3  out of an abundance of caution, we have sent Mr. Felson a

4  letter regarding the specific witness that will put

5  Mr. Tyreese Pugh in the bank.

6          MR. FELSON:  All right.  I think it's just

7  semantics here, and we're all on the same page.  I have got

8  my witness list.  I requested it, and et cetera.  I just

9  want to make sure there is nothing I'm missing here.

10         THE COURT:  All right.  That's fine.  So the

11 Court would like the exhibit lists, the witness lists by

12 Friday, but you don't have to serve them on the other side.

13 The government can go ahead and use numbers, and, where you

14 have got subparts to the numbers, then you can just use

15 letters like 1-A, B, C, D, something like that.

16         With regard to the defendants, Mr. Felson, it

17 sounds like you're going to have, what, under five

18 exhibits?

19         MR. FELSON:  That's probably right.

20         THE COURT:  Why don't I have you -- then why

21 don't you take -- why don't I have you take numbers 1

22 through 9, or actually I'm going to have you do letters.

23 I'm sorry.  Let me have you do letters.  Why don't we have

24 Tyreese Pugh will be letters.  So you will start with A,

25 and then, if there are subparts to any of your exhibits,

1  you will go like A-1, 2, 3 whatever.

2          And Mr. Walter Pugh, are you going to have any

3  exhibits?

4          DEFENDANT W. PUGH:  Yes, ma'am.

5          THE COURT:  Do you have any idea of the number,

6  just approximately, so I can figure out?

7          DEFENDANT W. PUGH:  Twelve.

8          THE COURT:  About 12?

9          DEFENDANT W. PUGH:  Yes, ma'am.

10         THE COURT:  Okay.  Why don't we have you -- oh, I

11 know what we can do.  Here's what we'll do.  I have got

12 this all figured out.  Why don't we have -- let me ask

13 this.  Who's going to be going first in the order of

14 defenses?  Normally, one defendant goes first and then the

15 second defendant.  It usually goes in the same order.  In

16 other words, somebody takes the lead.

17         Have you decided between you which defendant is

18 going to go first?

19         MR. FELSON:  Well, we haven't discussed that.

20 I'm assuming we're going to discuss that later today or

21 within -- before Friday we're going to have that answer.

22 My guess is that, in one sense, I sort of want to go

23 second, but, on the other hand, I maybe understand for

24 practical reasons I ought to go first.

25         THE COURT:  I will leave it to you.  Yes, I think

1    it might be easier if you go first, but that will be your

2    decision who is.

3         Let me suggest this.  Since it sounds like, well,

4    whoever decides to be the first defendant to question, why

5    don't you take A through Z?  And why don't we have the

6    second defendant for their exhibits use double A, double B,

7    double C.  So we will know that anything with a letter on

8    it are the defendant's exhibits, and that's how we will

9    know the difference between one defendant and the other

10   defendant.  One of you will be A through Z, and the other

11   will be double A, double B, double C for your exhibits.

12   Okay?

13        All right.  The Court also wants, if you have any

14   proposed jury instructions or any proposed voir dire

15   instructions or any trial briefs, the Court would like

16   those as well this Friday.

17        With regard to the jury instructions, the Court

18   uses Sixth Circuit Pattern Instructions first.  If they're

19   not in the Sixth Circuit pattern instructions, then the

20   next thing we look at would be Sixth Circuit case law and

21   Devitt and Blackmar, which now has a new name, but the set

22   of federal pattern jury instructions.  So, if you have any

23   proposed jury instructions, we would like those by this

24   Friday as well.  And this Friday is August 23rd.

25        If you have trial briefs, and they're not at all

1    necessary, but if you wish to file a trial brief, it would

2    be helpful to have it this Friday, but I'll allow you to

3    file it up to the day of trial if you want to file that

4    later.

5              The Court intends to do all the voir dire.  In

6    other words, the Court's going to question all the

7    prospective witnesses.  I'll try -- I'll cover things in

8    general with the jury like, you know, any reason why they

9    feel they can't serve, if they have ever been the victim of

10   a crime, you know, and if that would influence their

11   decision in any way, sort of general questions.  And then,

12   if there are any specific questions you would like the

13   Court to ask the prospective jurors, I would like you to

14   submit those to me in writing by this Friday.

15             Do you understand what I'm saying, Mr. Walter

16   Pugh?

17             DEFENDANT W. PUGH:  Yes, ma'am.

18             MR. FELSON:  Would it be possible to have until

19   Monday on these?

20             THE COURT:  Yes, Mr. Felson, you may have until

21   Monday.  Is that just for the proposed voir dire

22   instructions, or you want on jury instructions, too?  You

23   want it on everything?

24             MR. FELSON:  Whatever you can muster, I would

25   love to have this weekend.

1           THE COURT:  Why don't we do it for everything,

2    for everybody?  Let's go to Monday, because I would rather

3    have something that you had time to -- adequate time to

4    prepare.  So everything will be due Monday, the 26th, that

5    I have talked about, the exhibit lists, the witness lists,

6    proposed jury instructions, trial briefs if you have any,

7    and I'm not saying that the Court needs them.  I don't

8    think we do, but, if you wish to file one, you can file it

9    then, and any proposed voir dire instructions.

10           And attached to the criminal trial procedure

11   are -- I think that is where we have got our list, Mike, of

12   questions?

13           Yes.  We have got a list of questions that we

14   generally ask.  So you can review that.  And then, if there

15   are things in addition to that that you would like the

16   Court to ask, if you would submit that list to us, that

17   would be helpful.

18           One more thing with exhibits.  For the

19   government, I don't know if the defendant is going to be

20   able to -- I know Mr. Felson, you will be able to make

21   copies of your exhibits.

22           And, Mr. Andrews, would you assist Mr. Walter

23   Pugh in making copies?

24           MR. ANDREWS:  We have discussed that already, and

25   Mr. Pugh is going to provide.  There are a couple of

1  exhibits which I'm going to have to get for him.  We were

2  then going to put them together in a three-ring binder.  It

3  will be in his handwriting, but still bound.

4      THE COURT:  What the Court would like to have

5  from all parties is either an original or set of copies for

6  the witness, a set for the Court, and a set for my law

7  clerk.  So we are talking about three sets altogether.  And

8  if you will have those marked ahead of time and if you need

9  exhibit stickers, my courtroom deputy can provide you with

10  those.  If you will have all that marked, and then you

11  won't need to ask, as the government did today, to hand a

12  particular exhibit to the witness.  They will already have

13  it.  So all you have to do is say to the witness, you know,

14  I would like to direct your attention to what's been marked

15  as Exhibit A.  Can you identify that?  And then you have

16  the witness identify it.  If the witness then identifies it

17  and you want to move for its admission, then you will ask

18  the Court to admit it.  And I think that will cut down on

19  the cumbersomeness of getting exhibits in.

20      Any questions on any of those things?

21      All right.  Then let's go on to pending motions.

22  Defendant Tyreese Pugh currently has two motions pending,

23  one for discovery and bill of particulars, and two for

24  additional discovery.  Defendant Tyreese Pugh's motion for

25  discovery asks disclosure of all statements of witnesses

1  and the co-defendant background information on witnesses,

2  police records and recordings regarding the crime, as well

3  as any Brady or Jencks Act material that has not yet been

4  disclosed.

5        Ms. Cross, where are we on that motion, those two

6  motions?

7        MS. CROSS:  Your Honor, we have provided all the

8  discovery to which the defendant is entitled.  We have also

9  provided over what probably isn't Brady, but we were trying

10 to be very cautious and did provide information that we

11 thought was Brady to Mr. Pugh.  I think everything has been

12 provided.

13       THE COURT:  To Tyreese Pugh?

14       MS. CROSS:  Tyreese Pugh.

15       THE COURT:  What about Jencks Act material, has

16 that already been provided as well?

17       MS. CROSS:  That has not been provided, Your

18 Honor, but we will provide it the day before trial or

19 whatever the Court's standard order is.

20       THE COURT:  All of it the day before trial for

21 all your witnesses.

22       MS. CROSS:  For the next day?

23       THE COURT:  So you will provide it the day before

24 for the witnesses.

25       MS. CROSS:  That's coming up the next day.

1    THE COURT:  Half a day, great.

2    And, Walter Pugh, what about you, do you have any

3  idea the number of witnesses you might have, if any?

4    DEFENDANT W. PUGH:  Not at this particular time,

5  Judge.

6    THE COURT:  Okay.  All right.  After the first

7  morning of trial, the first morning we will start at 9:30.

8  Once we have the jury selected, then we will start at 9

9  o'clock on subsequent mornings.

10    We need to do an order of trial, so if you will

11  let -- if, Mr. Andrews and Mr. Felson, you will advise my

12  law clerks what the order is going to be by this Friday,

13  that will be helpful to us.

14    MR. FELSON:  We can do that.

15    MR. ANDREWS:  Your Honor, in talking to my

16  client, I just need some reassurance.  He would, and I

17  think this is what Mr. Felson was saying earlier, in the

18  order of handling witnesses, et cetera, my client would

19  like to go second.

20    I believe Mr. Felson expressed a preference for

21  going first.  His only reassurance that he wants was that,

22  if Mr. Felson cross-examined the witness, he himself could

23  cross-examine the witness as well.  I just reassured him of

24  that.  He has absolutely no problem with that and is

25  comfortable with what he's saying.  That would hopefully

1        The government said they don't even intend to

2    call Mr. Dixon, so I think, Mr. Pugh, it may not be any

3    legal issue for you at all.

4        DEFENDANT W. PUGH:  Yes, ma'am.

5        THE COURT:  Okay.  All right.  Trial is going to

6    take place in this room.  We will start the first morning

7    at 9:30 with jury selection.

8        Do we have any idea on length of trial?

9        MS. CROSS:  Your Honor, we believe that the

10   government's case will take two days' proof.

11       THE COURT:  Okay.  And, Mr. Felson, what about

12   any idea on the defense's case yet?

13       MR. FELSON:  Two witnesses that I know of.  The

14   defendant may take the stand.  We haven't decided yet.  We

15   will make that decision last minute.

16       THE COURT:  That is in addition to the two

17   witnesses?

18       MR. FELSON:  In addition to the two, yes.

19       THE COURT:  Okay.  So are yours short or long

20   witnesses?

21       MR. FELSON:  Well, the identification witness, I

22   don't think he's going to be more than an hour.  I can't

23   imagine that.  But that depends on the cross, but I don't

24   think I'll need him for more than an hour.  So I may be

25   done in less than half a day.

1      THE COURT:  All right.  That's agreeable to the

2  Court.

3          Anything you wish to say in that regard,

4  Mr. Felson?

5      MR. FELSON:  No, Your Honor.  I have no reason to

6  believe that there is anything else.

7      THE COURT:  Then Defendant Walter Pugh also has

8  two pending motions, one for the suppression of evidence,

9  which we heard today, and, two, an in limine motion to

10  exclude evidence of prior bad acts or incarceration.

11          The Court is going to address the suppression

12  motion in a separate order that will be filed after I

13  receive Walter Pugh's memo of law next week.

14          With regard to Walter Pugh's motion in limine, it

15  asks that any prior bad acts evidence Under Federal Rule of

16  Evidence 404(b) be excluded, including testimony for a

17  Mr. Dixon, that he met Defendant Walter Pugh in prison.

18  The government has responded that it does not intend to

19  introduce any evidence under rule 404(b) and does not know

20  of or intend to call a Mr. Dixon.

21          The Court does not intend to rule on the motion

22  in limine at this time, because the Sixth Circuit

23  discourages us from doing that until it arises in the

24  evidence.  But it sounds to me like it may never arise in

25  the evidence.

1    help the Court.

2              THE COURT:  The only thing I ask is that you

3    don't cover the same cross-examination.  I don't want you

4    to do the identical cross-examination Mr. Felson did, but

5    anything that you have additional to that is fine.  You

6    certainly have a right to cross-examine as well, Walter

7    Pugh.  Okay?

8              DEFENDANT W. PUGH:  Thank you.

9              THE COURT:  All right.  Then Tyreese Pugh's

10   counsel will go first, and then Walter Pugh.

11             Do the parties want separation of witnesses,

12   which means that -- do you want witnesses excluded from the

13   courtroom if they're not testifying at that time?

14             MR. FELSON:  Yes, on behalf of Tyreese.

15             THE COURT:  All right.  Then we will have a

16   separation of witnesses.

17             Do you anticipate any stipulations?  That means

18   facts that you all agree upon.

19             MS. CROSS:  We have not had any agreement or even

20   any decision on stipulations at this point, Your Honor, but

21   two areas that -- two issues would be FDIC could be

22   stipulated to, as well as Mr. Tyreese Pugh's prior

23   conviction.  He's charged in one of the counts as being a

24   felon in possession of a firearm.

25             THE COURT:  Okay.  Well, I will leave that to you

1    to negotiate.  If you want --

2              Do you know what a stipulation is, Mr. Pugh?

3              MR. ANDREWS:  Actually, Mr. Walter Pugh and I

4    have discussed the stipulation as to the federal insurance,

5    FDIC.  My client looked at me and candidly said what bank

6    isn't, and I said very few since the mid-1980's in Ohio,

7    which, even where he was in the mid-1980's, he knows.  So

8    we will stipulate that it was a federally insured bank; is

9    that correct, Walter?

10             DEFENDANT W. PUGH:  Yes, sir.

11             MR. ANDREWS:  That was our decision.

12             THE COURT:  And Mr. Felson with Tyreese Pugh as

13   well?

14             MR. FELSON:  Yes.

15             THE COURT:  What I require is that there be a

16   written pleading captioned "stipulation" setting forth what

17   the stipulation is, signed by all counsel or, in this case,

18   Mr. Felson, Ms. Cross and Mr. Walter Pugh, so we have that

19   for the record.

20             MS. CROSS:  Yes, Your Honor.

21             THE COURT:  And believe it or not, Mr. Walter

22   Pugh, when I was an assist U.S. attorney back in the '70s,

23   we did have to prove that in those days, and we actually

24   had to get the certificate off the wall of the bank and

25   bring a bank officer in to testify that they were in fact

1    an FDIC bank.  I'm glad it's a little easier these days.

2            Okay.  Opening statements, how long would

3    everyone like for opening statements?

4            MS. CROSS:  Mr. Thapar is going to do opening,

5    and he says 20 minutes.

6            THE COURT:  Okay.  Mr. Felson?

7            MR. FELSON:  We both -- I think Mr. Walter Pugh

8    just said that I can do the opening.  So I'll do it for

9    both of us.  I don't think that's appropriate.  We can both

10   do them, I think.

11           THE COURT:  You can both make opening statements.

12           MR. FELSON:  I only need about ten minutes for

13   Tyreese.  Certainly wouldn't need much more than that.

14           THE COURT:  And, Walter Pugh?

15           DEFENDANT W. PUGH:  Ten to 15 minutes, Your

16   Honor.

17           THE COURT:  Okay.  That's fine.  That will be

18   fine.  Any other problems anybody is anticipating that we

19   ought to discuss now?  All right.

20           DEFENDANT W. PUGH:  Yes.

21           THE COURT:  Okay?

22           DEFENDANT W. PUGH:  Far as me being able to

23   participate in my legal process, Judge, Your Honor, I would

24   like the Court to know I'm in administrative segregation,

25   and I don't know why.  I filed a grievance, and nobody told

1  me nothing.  They won't even answer me when I talk to them.

2  I been on this ever since June 20th.

3       And then I'm doing my legal work.  I constantly

4  work on my legal work, and I'm shook down four times a day.

5  They come in and go through my stuff.  Then I have to go

6  right back over it, start over again and sort it out.  And

7  I have constant legal work.  This is constant.

8       I have been in administrative segregation for 60

9  days now.  Nobody told me nothing.  I come out for an hour,

10  one hour law library and one hour for a shower and

11  whatever.  That's it.  When I travel, they shackle me down.

12  They call me Hannibal on "Silence of the Lambs," Hannibal.

13  That's how they keep me.  Then, every four to five days,

14  they move me.  Every four to five days, I'm packing up,

15  moving.  I been in the whole system in the Justice Center,

16  the whole north side, south side, every cell.  That's a

17  problem.

18       THE COURT:  I think the only thing I can maybe do

19  something about, again because I don't control the Hamilton

20  County Justice Center and neither does the marshal, is to

21  preserve the integrity of your papers.

22       Mr. Riley, can we talk to the jail about that and

23  make sure that his papers are kept intact, his legal

24  research?

25       DEPUTY MARSHAL RILEY:  Certainly, Your Honor.  I

know they have been allowing him access to the law library
and his legal documents.

One thing I would like to bring up at this point
is clothing for the defendants.

THE COURT:  Thank you.  I was going to ask that.

DEPUTY MARSHAL RILEY:  Counsel needs to provide
that clothing at the jails at least on Friday before,
because we have a holiday on that Monday.

THE COURT:  Okay.

MR. ANDREWS:  Actually, Walter Pugh and I have
already discussed his clothing, and I don't understand the
cutoff day of Friday.

DEPUTY MARSHAL RILEY:  We have a holiday the day
before trial.

MR. ANDREWS:  I'm glad you brought that up as for
him being moved.  All that is, within my experience of
seeing him, true.  And I do know that, when I go see my
client, I'm also -- my briefcase has been gone through
every time.  And, as you know, I'm in the Justice Center
probably as regularly as any other attorney in Hamilton
County.  This is the only client I have ever had where they
do that.

We have asked for an explanation.  The best we
can get is somebody at some time heard some rumor that I
was bringing a gun to Mr. Pugh, which I think can go under

1    the patently absurd doctrine, but that's all we have ever

2    been told.  And I heard that by way of rumor.

3         He is going through some problems with that.  If

4    the Court can intervene in any way, that would be helpful,

5    particularly on the use of his time in the very small legal

6    library they have there would be helpful.

7         THE COURT:  All right.  Mr. Riley, can you see

8    what you can do about that?  I would like to increase his

9    time in the law library for sure and preserve the integrity

10   of his documents.

11        DEPUTY MARSHAL RILEY:  (Nodding affirmatively.)

12        THE COURT:  Will you let the Court know, tomorrow

13   or Friday?

14        DEPUTY MARSHAL RILEY:  (Nodding affirmatively.)

15        THE COURT:  Thank you.  Oh, Mr. Riley, before you

16   came in, I brought up the issue with the defendants about

17   stun belts and in place of leg irons, and I guess -- do you

18   want any more explanation from the marshal about that?

19        DEFENDANT W. PUGH:  Me?

20        THE COURT:  Yes, either one of you.

21        DEFENDANT W. PUGH:  I would like to see the

22   instruction on the belt.  I would like to read it.

23        THE COURT:  See what it is?

24        DEFENDANT W. PUGH:  Yes.

25        THE COURT:  Is that possible, Mr. Riley?

1    DEPUTY MARSHAL RILEY:  I don't know what he's

2    referring to.  We notify them before the stun belt is

3    placed.  We have a list of instructions that they're

4    notified on, on when the belt will be activated, what is

5    expected of them while they're wearing it, and they have

6    the opportunity to read that, and we ask them to sign it at

7    that time.

8    THE COURT:  Okay.

9    MR. ANDREWS:  And this is a belt that will send a

10   shock through him if he does something like head for the

11   door?

12   DEPUTY MARSHAL RILEY:  Correct.

13   DEFENDANT W. PUGH:  Raise my hand.

14   MR. ANDREWS:  As long as he is acting as his own

15   attorney, there is no problem.

16   DEPUTY MARSHAL RILEY:  Correct.

17   MR. ANDREWS:  There is a list of things that he

18   will know.

19   DEPUTY MARSHAL RILEY:  It's rather explicit when

20   we will activate it.

21   THE COURT:  So I'll leave that to the defendants

22   to work out with the marshals if there are any questions

23   about that.

24   Okay.  Let me talk about selecting the jury.

25   Normally, in a criminal case, in a single-defendant case,

1   the defendant has ten preemptory challenges and the

2   government has six.

3          Do you know what a preemptory challenge is,

4   Walter?

5          DEFENDANT W. PUGH:  Excuse me?

6          THE COURT:  Do you know what a preemptory

7   challenge is?  Let me talk about challenges in general.

8   When you have a jury, a prospective jury, a panel, there

9   are two kinds of challenges, two reasons you can throw

10  people off of the panel.  One is that they have got some

11  kind of bias or reason that they can't sit and be a fair

12  and impartial juror.  They might say, you know, I just

13  believe if the government indicts somebody they must be

14  guilty.  That person can't serve, because they have a bias

15  against any defendant.  So the Court would excuse that

16  person, would not allow that person to sit.

17         Once we have gone through the panel for those

18  kind of people, people who can't be fair and impartial, and

19  we have excused all of them, or people who say I'm going to

20  have surgery tomorrow and I can't be here, there is some

21  kind of excuse like that, once we have excused all those

22  folks, then the people who are remaining you have a right

23  to excuse or if you -- if it's one defendant, you would

24  have the right to excuse ten people for any reason or no

25  reason at all.  You don't have to give the Court a reason.

1    You can just ask that they be excused.  The government can

2    do that with six people.

3          My question for you is, since we have two

4    defendants, you could have a larger number of people

5    excused if you want, in which case the government's

6    challenges, the government's -- these are called preemptory

7    challenges, the ones that you can excuse both for no reason

8    or any reason at all.  Is ten an adequate number for you,

9    or do you want that increased, in which case the

10   government's challenges will also increase?

11         MR. FELSON:  I'll respond to Tyreese.  Ten would

12   be sufficient.

13         DEFENDANT W. PUGH:  Ten.

14         THE COURT:  All right, fine.  Then we will go

15   with ten challenges for the defendants jointly and six

16   challenges for the government.

17         As I mentioned to you, the Court is going to

18   conduct the voir dire.  If you have questions that you

19   would like me to ask the panel, please submit those to me

20   in writing by Monday, and as long as there is not something

21   objectionable in them, I will be glad to ask the panel

22   those questions.

23         In addition to that, you're entitled to get juror

24   questionnaires, and those will be available about the

25   middle of next week.  You can get these -- your counsel and

1    Mr. Andrews can obtain those from the jury commissioner,

2    Linda Wilmoth.  I think they're generally available on

3    Tuesday or Wednesday, and I guess we need to figure out --

4    I'm trying to think what do we do when we have people in

5    jail that are acting as their own counsel?  I know we take

6    a lot of the information -- we take the names of the

7    prospective jurors out, and I believe we take out their

8    addresses, but you know about their educational background,

9    their age, their marital status, their employment history.

10   So you have got a pretty good idea who these folks are, you

11   know, what kind of folks they are.

12         What I would like you to do is refer to them by

13   number.  If you have any questions about them, I'll refer

14   to them by number, and I'll ask you to do that.  The

15   morning of trial, you will be given a list of the numbers,

16   of the people's numbers, and they will be seated in the box

17   in order of their numbers.

18         Steve, how are we going to do that now that we

19   have a bigger box?  Which way do you number from, the front

20   row first or back row?  Left to right?  Left to right.

21         So the front row will be one to six.  The back

22   row will be seven to 14.  And then the remaining people,

23   about how many more will we have, about 16 more or so?  We

24   will have a total 40 people so we will have 26 more in the

25   back behind you, and they will be sitting in order.  So, in

1    other words, if number 14 is here, then seated behind

2    Walter Pugh will be number 15 and go 15 through whatever,

3    and then all the rest in those rows so that you know who is

4    who.

5            Any questions on that?

6            DEFENDANT W. PUGH:  Excuse me.

7            THE COURT:  Go ahead.  Do you want to talk for a

8    minute?  That's fine.

9            (Defendants and counsel confer off the record.)

10           MR. ANDREWS:  Thank you, Your Honor.

11           THE COURT:  Once the questioning of the

12   prospective panel is completed, I'll excuse all the

13   prospective jurors, and I'll ask you -- I'll tell you first

14   who all I'm going to excuse for cause, who I find can't be

15   a fair or impartial juror or can't sit for some health

16   reason or whatever.  Then I'll ask both -- I'll ask all

17   parties if you have any additional challenges for cause,

18   anybody that I haven't excused for cause for a reason that

19   they can't be fair and impartial that you believe should be

20   excused for that reason.

21           Once we have completed all the challenges for

22   cause, then we will start doing the preemptory challenges.

23   And the way we do the preemptory challenges is we start

24   with the defendant.  It goes defendant, government, and the

25   defendant gets two challenges first, then the government

1    one, defendants two, government one, until we get down to

2    an even number that are left, and then from then on it's

3    defendant one, government one until you both have used up

4    all your challenges.

5         You can challenge the jurors in any order you

6    want.  It doesn't have to be the first 14.  If you want to

7    start with number 16, that's fine, and then excuse number

8    two, that's fine.  You go in numerical order back and

9    forth.  I don't care.  They don't have to be the people

10   just in the box.  They can be the people behind the rail.

11   You can do it in any way you want.

12        Are there any questions on the challenges?

13        DEFENDANT W. PUGH:  No, ma'am.

14        THE COURT:  Did I miss anything?  All right.

15   Once we have -- everyone has used up all of their

16   challenges, we will take a recess.  My courtroom deputy

17   Steve Snyder will bring the final jury in, and they will be

18   in the box for us to proceed, and I'll excuse the remaining

19   folks.

20        If we need to do sidebars, if we need to do

21   something outside the presence of the jury, I'll excuse the

22   jury, have them go into the jury room, so I can talk to you

23   in open court.

24        We will do all questioning from counsel table.  I

25   think for the trial I'm either going to have you all

1  standing or sitting.  I don't want you doing both things.

2  I think it makes it easiest if I just have you sitting.  I

3  don't know.  How does everybody feel about that?  Any

4  preference here?

5          MR. FELSON:  I don't have a preference.

6          THE COURT:  Ms. Cross?  Mr. Thapar?

7          MS. CROSS:  We have no preference, Your Honor.

8  We were just going to go along with whatever the defense

9  wanted.

10         THE COURT:  I think what I'm concerned about is,

11  with the microphone on the table, if you're standing it may

12  not pick your voice up.  You know, if we had a different

13  kind of microphone.

14         MR. ANDREWS:  Your Honor, we did have a question.

15  Would you want opening and closing done seated, as well as

16  questioning or --

17         THE COURT:  What do -- you know, Mr. Snyder

18  reminded me what we did in the Waagner case was we have a

19  little podium thing that we can put right on counsel table.

20  So you can stand behind that and address the jury right at

21  counsel table.

22         MR. ANDREWS:  That would be fine.

23         THE COURT:  Mr. Rich, my law clerk, has asked if

24  we want -- if I want to allow supplemental questions to be

25  submitted after you take a look at the questionnaires, and

1  the answer is yes.  If there is anything after you get the

2  questionnaires, if there is anything that you see in the

3  questionnaires that makes you want to ask any additional

4  questions of a particular juror, you can go ahead and

5  submit those to the Court.  If you would do it as soon as

6  possible, that would be great.

7          I would say, I guess, we need to have Linda get

8  them, the questionnaires, by about Tuesday, because I would

9  like to get that by at least Thursday of next week so that

10  we have got a chance to add those into my questions by

11  Friday, because then we have got the holiday, and then we

12  have got trial that Tuesday morning.  So if you could get

13  those to me by Thursday, the 29th, we will incorporate

14  them, if we think they're appropriate, into my questions.

15          We have talked about marking exhibits.  I think

16  we have talked about just about everything.

17          Any questions by anybody?

18          MR. THAPAR:  Your Honor, can I raise one?  There

19  was one related issue just regarding discovery pursuant to

20  Rule 16(b), I guess.  We have complied with the defendants'

21  discovery requests as mentioned before.

22          Today it has come to our attention through this

23  final pretrial conference that the defendants intend to

24  offer documents and tangible objects possibly as evidence

25  or as exhibits.  In addition, Mr. Tyreese Pugh, we

1    understand, possibly has an expert witness.

2         Pursuant to 16(b)(1)(A) and (B), we request the

3    documents, tangible objects and reports of examinations.

4    We have made this request before in writing to the

5    defendants.  In addition, pursuant -- we have provided our

6    expert report pursuant to 16(a)(1)(E), and we will request

7    the same pursuant to 16(b)(1)(C) of Mr. Tyreese Pugh, his

8    expert report, and that he comply with everything under

9    16(b)(1)(C).  Thank you.

10        THE COURT:  Thank you, Mr. Thapar.

11        Mr. Felson, do you have a response?

12        MR. FELSON:  I think we actually had a motion

13   hearing on my expert a few weeks ago.

14        THE COURT:  Was that before I was involved?

15        MR. FELSON:  No.  You ruled on it.  You gave me

16   the finances to hire an identification expert.

17        MR. THAPAR:  That is correct, Your Honor.  You

18   gave him the finances, but that doesn't mean we have

19   received a report.

20        MR. FELSON:  Okay.  All right.

21        MR. THAPAR:  It's not an issue with regards to

22   finances, just so I'm clear.

23        THE COURT:  No.  I understand that.  You want the

24   report.

25        Do you have a report, Mr. Felson?

1          MR. FELSON:  No, I don't yet.  I'm -- he's really

2    just going to testify to -- I mean, you probably heard

3    these experts before.  They're from around the country.

4    They're going to testify on the difficulty of making an eye

5    witness identification when you have a brief look under

6    stress and that kind of thing.  It's not really specific

7    to -- he's not going to do an interview or voir dire of

8    this particular witness.  It's just sort of a general

9    concept.  So there is not a report, per se, I don't think.

10   There is general writings on the subject maybe.

11         MR. THAPAR:  I think I'm misspeaking, Your Honor.

12   Maybe that's causing the confusion.  I guess what we

13   wanted -- and perhaps that's the extent of it, and, if

14   that's the extent of it, we don't have any objection to him

15   not putting it in writing.  I'm just going to read the

16   rule:  Under the following circumstances, the defendant

17   shall, at the government's request, disclose to the

18   government a written summary of testimony that the

19   defendant intends to use under rules 702, 703 or 705 of the

20   Federal Rules of Evidence at trial.  And then it goes on.

21         But that's what we're asking for.  That's the

22   total of what we're asking for.  And if all it is is that

23   identifications are difficult to make and that's all we're

24   going to hear at trial, then we don't have an objection to

25   him not providing us a written summary.

1      We would like to see a curriculum vitae at some

2 point, and we understand that can come at a later day.  But

3 and then the documents --

4      THE COURT:  Mr. Felson, can you provide a

5 curriculum vitae?

6      MR. FELSON:  Yes.  Just for the record, Tyreese

7 Pugh's motion for expert witness fees was granted on --

8      THE COURT:  No.  We're not disputing the fact

9 that it's being paid for.  They're just asking under the

10 rule that, if there is a report, that it be provided to

11 them.

12      MR. FELSON:  I understand.  There is no report

13 per se.

14      THE COURT:  All right.  Mr. Andrews?

15      MR. ANDREWS:  As to Mr. Walter Pugh and I have

16 discussed as to the tangible documents he may use, he'd --

17      THE COURT:  Can you talk to me, Mr. Andrews,

18 because I can't hear you?

19      MR. ANDREWS:  I'm sorry, Your Honor.  At the time

20 when we provide that to the Court, which I understand is

21 Monday, we will also provide a copy of those documents.

22 Even though some of those are also included in the

23 government's own list of exhibits, we will provide those to

24 the government as well.

25      MR. THAPAR:  That's perfectly acceptable by us.

1    If Mr. Tyreese Pugh has any, if that works for them, we

2    will appreciate that.

3            THE COURT:  Mr. Felson, is that agreeable with

4    you?

5            MR. FELSON:  Yes.

6            THE COURT:  All right.  Anything further,

7    counsel?

8            All right.  Then the Court will see you on

9    September the 3rd.  Yes?

10            DEFENDANT W. PUGH:  Giving him his pen back.

11            THE COURT:  Okay.  The Court will see you all on

12    September 3rd.  If there are any problems next week, please

13    let my law clerks know.

14            Mr. Rich is going to be the primary law clerk on

15    this case, but Ms. Stang is also going to be assisting.  So

16    counsel can contact either one of my clerks if you have got

17    a question.

18            Thank you, everyone.

19            PROCEEDINGS CONCLUDED AT 3:30 P.M.

20            C E R T I F I C A T E

21        I, Betty J. Schwab, the undersigned, do
     hereby certify that the foregoing is a correct

22    transcript from the record of the proceedings in
     the above-entitled matter.

23

24    *Betty J. Schwab*
     BETTY J. SCHWAB, RPR
     Official Reporter

25