CONNAUGHTON - DIRECT

1    pointing at me.  But he did have a stocking mask on his
2    face, so I really couldn't, you know, give you the
3    features, except that he was as tall as me or taller.
4    Q.    Okay.  And after he left, let's go back to that now.
5    What did you see or what did you do?
6    A.    When I heard him hit the door and leave, I kind of
7    peaked over to my side there to make sure that they were
8    gone.  When I realized they were gone, I kind of got on my
9    knees, went over and hit the alarm.  After that, I got up
10   and I walked up to -- we have a rail that separates the
11   lobby from my office.  I went up there so I could get a
12   better look at the car.
13        When I got up there, I could see a guy in the back
14   seat, and I could see that the car was just starting to
15   take off.  So I saw what kind of car it was.
16        After they had left, I had one of the girls check on
17   the girl who was in the vault, and I got on the phone and
18   called 911.
19   Q.    Can you tell us what kind of car it was?
20   A.    Best of my knowledge, it was a maroon Oldsmobile,
21   probably late '80s or early '90s.
22   Q.    I want to talk to you about video surveillance within
23   the bank.  Is there any?
24   A.    Yes.  We have a number of cameras.
25   Q.    How do the cameras operate?

CONNAUGHTON - DIRECT

| | |
|---|---|
| 1 | A.   Well, they go continuously.  They're on continuously |
| 2 | all day long.  And they take, like, little snap pictures, |
| 3 | and they alternate from one camera to the other.  So all |
| 4 | cameras don't, you know, don't show the pictures, just they |
| 5 | take turns.  And it probably takes maybe ten seconds to go |
| 6 | through five cameras. |
| 7 | Q.   So, if there is five cameras, you don't mean that |
| 8 | they're each snapping pictures continuously.  They each |
| 9 | take a turn? |
| 10 | A.   Take turns, right. |
| 11 | Q.   Can you explain to the ladies and gentlemen of the |
| 12 | jury what dye packs are? |
| 13 | A.   It's a combination of tear gas and also marked money, |
| 14 | but it's about that thick, and a device -- you take it off |
| 15 | a plate and you go through a field going out the door, it |
| 16 | will set it off when it gets outside that field. |
| 17 | Q.   Okay.  Can you explain to the ladies and gentlemen of |
| 18 | the jury what bait money is? |
| 19 | A.   Bait money is bills that we will have on the money, |
| 20 | and we have the serial numbers recorded in case if they |
| 21 | would get caught, that it could be evidence. |
| 22 |         MR. THAPAR:  With the Court's indulgence, may I |
| 23 | speak with co-counsel for a second? |
| 24 |         THE COURT:  Of course.  You don't need to ask |
| 25 | permission. |

| | |
|---|---|
| 1 | MR. THAPAR:  Okay.  Thank you. |
| 2 | (Mr. Thapar conferring with Ms. Cross.) |
| 3 | Two more questions. |
| 4 | BY MR. THAPAR: |
| 5 | Q.   When you heard them go out the door and one of them |
| 6 | and/or both of them said "don't move for 20 seconds," I |
| 7 | guess my first question is:  Did you hear one or both of |
| 8 | them say that? |
| 9 | A.   Just one. |
| 10 | Q.   Could you tell if it was the one by you or the other |
| 11 | one? |
| 12 | A.   It sounded close, so I just thought it was the guy who |
| 13 | was on me, but, again, I couldn't tell you for sure. |
| 14 | Q.   Okay.  And of the two bank tellers that you had there, |
| 15 | you mentioned that one was crying.  Was one crying, or were |
| 16 | both crying? |
| 17 | A.   I think just one. |
| 18 | Q.   Could you tell which one it was? |
| 19 | A.   Yes. |
| 20 | Q.   Who was it? |
| 21 | A.   It was Jenny, the one who was being taken into the |
| 22 | vault. |
| 23 | Q.   What's her last name, if you know? |
| 24 | A.   I'm blank. |
| 25 | Q.   Okay. |

CONNAUGHTON - CROSS

| | |
|---|---|
| 1 | MR. THAPAR:  Thank you, Your Honor. |
| 2 | THE COURT:  Thank you, Mr. Thapar. |
| 3 | Mr. Felson, do you wish to cross-examine this |
| 4 | witness? |
| 5 | MR. FELSON:  Yes. |
| 6 | THE COURT:  You may proceed. |
| 7 | MR. FELSON:  I guess I'll just stay right here. |
| 8 | CROSS-EXAMINATION |
| 9 | BY MR. FELSON: |
| 10 | Q.  Okay.  Sir, you have worked in the banking industry |
| 11 | for how long? |
| 12 | A.  Thirty-four years.  Well, actually it's longer than |
| 13 | that, but 34 years at that bank. |
| 14 | Q.  All right.  Now, have you ever been involved in a |
| 15 | situation with another robbery? |
| 16 | A.  Not personally. |
| 17 | Q.  Have you had some training about what to do when a |
| 18 | robbery takes place? |
| 19 | A.  Yes, we have. |
| 20 | Q.  Tell me a little bit about the training you were |
| 21 | supposed -- the things you're supposed to do. |
| 22 | A.  Well, number one, you do exactly as the robber says so |
| 23 | we don't endanger anybody's life. |
| 24 | Q.  Could I ask you just to put your hand down so I can |
| 25 | hear you just a little bit better?  Thank you. |

CONNAUGHTON - CROSS

```
 1            THE COURT:  Mr. Felson, hang on one second.

 2            Can you turn the microphone just a little more

 3    towards you?  Just aim it a little bit.  Good.  Thank you.

 4            MR. FELSON:  Thank you.  I appreciate that.

 5    BY MR. FELSON:

 6    Q.    Okay.  Do what the robber says, right?  Correct?

 7    A.    Um-hum, right.

 8    Q.    What else?  How about getting a description and that

 9    kind of thing?

10    A.    Yes.  We have sheets that we fill out when they leave

11    while it's right there after it happened, so it's still

12    fresh.  So we can, you know, jot down some things.

13    Q.    Did you do that in this case?

14    A.    Not really, not at that time, because the girl who was

15    in hysterics and wanting to call the police, and, instead

16    of actually filling out the form, I was talking to the

17    person on 911 and giving her a description to the best we

18    could.

19    Q.    All right.  Did you write the description down

20    anywhere?

21    A.    Not at that time.

22    Q.    How about later?

23    A.    When they came to interview us one on one, we didn't

24    write it down, but we described it to the police officer.

25    Q.    Okay.  Now, you said that, I guess, there were two
```

1   tellers involved, and one was Pam?  Is that one, Pam
2   Philpot?
3   A.   Right.
4   Q.   Does that sound like one of them?  Was she crying?
5   A.   She was crying, and the other was Jenny Tettenhorst.
6   Q.   Was Jenny crying?
7   A.   Yes.
8   Q.   So they were both crying?
9   A.   They both were hysterical, but Jenny was the one I
10  heard, because she was in the vault.
11  Q.   Okay.  Now, one of the robbers stayed by you; is that
12  right?  You have to answer out loud for the court reporter.
13  A.   Yes.  I'm sorry.
14  Q.   And the other robber jumped the counter?
15  A.   Yes.
16  Q.   Let's describe the one.  What was the one wearing who
17  jumped the counter?
18  A.   I really don't know.  I had about a flash of like
19  that, because he told me to get down that quick.  So I
20  couldn't tell you.
21  Q.   How about the one that was near you, can you describe
22  what he was wearing?
23  A.   Dark clothes, I think.  And I was looking mostly at
24  the gun and his stocking face at that time.
25  Q.   He had something covering his face?

CONNAUGHTON - CROSS

1   A.    Um-hum.

2   Q.    You said he was a black man.  How do you know that?

3   A.    He appeared -- through the thing, it was dark.  He was

4   dark.

5   Q.    It was a black mask?

6   A.    No, it wasn't a black mask.

7   Q.    Was there something covering his face?

8   A.    Like a nylon stocking-type mask.

9   Q.    And through the nylon stocking you're saying he looked

10  like he was African-American?

11  A.    Yes.

12  Q.    Okay.  Now, did you hear him speak?

13  A.    Other than what he just said, what I told you already,

14  that's the only thing I heard.

15  Q.    Can you give me a quote of what he said, or is what

16  you said sort of an approximation?

17  A.    He told me to get my finger off of the alarm.  He told

18  me to get down on the ground, face down with my hands

19  extended.  He told me a couple times not to move.  Couple

20  times he said, "The mailman's coming."  And that's all that

21  I remember him saying.

22  Q.    Now, you saw he had a shotgun?

23  A.    Yes, sir.

24  Q.    Do you have familiarity with guns?  I mean, do you

25  know what a shotgun is?

CONNAUGHTON - CROSS

1   A.   Yes.

2   Q.   You know what a handgun is?

3   A.   Yes.

4   Q.   Are you an NRA member?  Do you have any special

5   knowledge of weapons?

6   A.   No, sir.

7   Q.   But a shotgun, what is your definition of a shotgun?

8   A.   One that's longer, generally has a pump action.  And

9   he had his hand, like this, on it, and I could see the

10   barrel of it.

11   Q.   You saw the barrel of it?

12   A.   Um-hum.

13   Q.   Okay.  What else did you see about the gun?  Anything

14   unusual about the gun?

15   A.   No.

16   Q.   Okay.  Now, if there was something -- oh.  Aren't you

17   trained to look for something unusual about somebody?  If

18   somebody is six foot six, you would make a note of that,

19   right?

20   A.   Um-hum.  Like I said, I just had a flash, because he

21   told me that quick to get down.

22   Q.   But you did get a good look at the gun?

23   A.   Yes.

24   Q.   Now, the gun, was it a dark colored gun?  I guess, if

25   it was painted purple, you would probably notice that?

CONNAUGHTON - CROSS

1   A.    It was dark colored.

2   Q.    Okay.  A typical metal gun?

3   A.    Black metal and wood.

4   Q.    Okay.  Wood, what color wood?  Just regular?

5   A.    Dark.  Dark.

6   Q.    But you saw the metal part, and you saw the stock and

7   the different -- you saw the wood, the handle?

8   A.    Um-hum.

9   Q.    Yes?

10  A.    Yes.

11  Q.    Okay.  Now, once you did that, of course, you told the

12  police there was a shotgun involved, right?

13  A.    Yes.

14  Q.    Okay.  Did you describe the shotgun to the police?

15  A.    Yes.  When we were interviewed one on one, I did.

16  Q.    Did the police look like they were writing it down,

17  what your description was of this shotgun?

18  A.    I believe so.

19  Q.    Did you get a brand name from the shotgun?

20  A.    No.

21  Q.    Tell me about the pistol.  Was there one or two

22  handguns involved that you know?

23  A.    Well, the guy who jumped up on the counter, I could

24  see he had a gun.  It wasn't a shotgun.  It was a regular

25  gun you hold in one hand.  But, again, it was just a flash

CONNAUGHTON - CROSS

1   of a second.

2   Q.    Okay.  Were either of the people accused of the --

3   well, I'm going to withdraw that.  Were either of the

4   people that went in the bank, that committed this robbery,

5   did either of them smoke?

6   A.    They weren't at that time that I know of.

7   Q.    Did either of the people that went into the bank take

8   off any -- were they wearing gloves?  I'll ask you that.

9   Were they wearing gloves, either of them?

10  A.    I couldn't answer that.  I don't know.

11  Q.    You don't know whether they were or not?

12  A.    Uh-uh.

13  Q.    Okay.  Now, I guess you were pretty much pinned, your

14  eyes were pinned to that shotgun.  I imagine that was

15  pretty scary for you.

16  A.    For probably a second, yes.

17  Q.    All right.  So, do you know whether either of them

18  touched anything other than -- in other words, the guy near

19  you had the shotgun in his hand, and you said at one point

20  you felt the shotgun.  I assume you thought it was the

21  shotgun touching you.  Was that a "yes"?

22  A.    Yes.  I'm sorry.

23  Q.    Did you actually see the shotgun touch you?

24  A.    No.

25  Q.    Okay.  Do you know if any of them touched anything?

CONNAUGHTON - CROSS

1    When they came in, did they touch the door handle, either

2    of them?

3    A.    I didn't see it.  The first time I saw them, they were

4    already in the lobby.

5    Q.    Does the door open automatically?

6    A.    No.

7    Q.    So someone would have to touch it physically to open

8    it?

9    A.    Um-hum, yes.

10   Q.    Unless somebody opened it for them?

11   A.    Yes.

12   Q.    Do you know whether either of the people that went in

13   the bank to rob the bank -- I know one guy jumped up on the

14   counter, right?

15   A.    Yes.

16   Q.    Do you know if the police, did they dust for prints?

17   Did you see them?  In other words, did you see some of the

18   investigation after the robbery took place?

19   A.    No.

20   Q.    Did you leave the bank at that time after the robbery,

21   close down and just let the police do their work in there?

22   A.    Well, we let the police do their work.  They were

23   interviewing us, took us one by one in the back room and

24   interviewed us.

25   Q.    How many police were there working at the scene of the

1   crime?

2   A.   I don't know.  Maybe five, six.

3   Q.   How many were interviewing you?

4   A.   Two different ones did, two different times.

5   Q.   How about the girls, how about Pam, how many

6   interviewed her?

7   A.   Same thing, interviewed by a couple different ones.

8   Q.   But not at the same time?

9   A.   No.

10  Q.   Jenny the same thing?

11  A.   Yes.

12  Q.   I guess what I'm asking, were there other police

13  officers there doing work other than the interviews?

14  A.   Yes.

15  Q.   What kind of work were they doing?  What did you see

16  them doing?

17  A.   They roped it off.  They were looking at footprints

18  that were on the counter.  That much I know.

19  Q.   How about footprints that weren't on the counter?  In

20  other words, just on the counter or everywhere?

21  A.   As far as I know, because I didn't see the whole

22  investigation, it was just on the counter.

23  Q.   I'm just asking you what you saw, okay, or what you

24  heard.  All right?

25  A.   Yes.

CONNAUGHTON - CROSS

1   Q.   You saw several officers conducting an investigation

2   in the bank, right?

3   A.   Um-hum, yes.

4   Q.   Yes.  And they roped it off, right?

5   A.   Yes.

6   Q.   And they closed it for business?

7   A.   Right.  Yes.

8   Q.   How long were they in there doing an investigation of

9   these various things that they were doing?

10  A.   Well, including the interviews?

11  Q.   Yes.  In other words, how long was it?

12  A.   Three hours maybe, two or three hours.

13  Q.   Okay.  Were you there the whole time?

14  A.   Yes, I was.

15  Q.   Did you eventually get to go home?

16  A.   Yes, I did.

17  Q.   Send yourself home early?  Take the day off?

18  A.   Not early, no.  It was later than usual.

19  Q.   All right.  What time did you finally get home?  From

20  the bank I'm talking about, not getting something to eat or

21  something.  In other words, how long were at the bank

22  before you went home?

23  A.   I would estimate five o'clock.

24  Q.   Same with Jenny and Pam?

25  A.   Yes.

CONNAUGHTON - CROSS

1   Q.   The officers, were they there when you left?

2   A.   A couple of them stayed there until we left.

3   Q.   All right.  Did you see them dusting for prints?

4   A.   No, I didn't.

5   Q.   Okay.  You don't know if they weren't; you just didn't

6   see them?

7   A.   Right.

8   Q.   How about, I mean, did they have any, like, electronic

9   gadgets they were using?  Did you see any of their

10  instruments that they were using?

11  A.   No, I didn't.

12  Q.   Okay.  Is it because you didn't pay attention or you

13  were just doing something else?

14  A.   I really wasn't paying attention to that.  I was busy

15  with interviews and talking to people at the bank.

16  Q.   And of course you had to figure out how much money was

17  missing?

18  A.   I didn't have to figure that out.

19  Q.   Somebody did?

20  A.   Right.

21  Q.   Well, whose job was that?

22  A.   Security.

23  Q.   Were they there, too?  Did they come at that time?

24  A.   They came.  They came eventually, yes.

25  Q.   Was anybody, while the police were conducting their

CONNAUGHTON - CROSS

1    investigation and looking at the footprints and various

2    other things that you're not sure they were doing, but you

3    know they were doing something, did they let anybody who

4    was not a police officer into the area where they were

5    conducting the investigation?  In other words, did security

6    come in while the police were doing their investigation?

7    A.    Well, yes.

8    Q.    Okay.

9    A.    But their investigation lasted a while, so security,

10   as soon as they got there, we let them in.

11   Q.    Okay.  So they were not subject to -- in other words,

12   they roped it off, but they didn't rope off the security

13   people; they let the bank security people come on in?

14   A.    Yes.

15   Q.    Now, security, I assume, had to go into the tellers'

16   drawers and into the vault and around the bank to determine

17   what was missing?

18   A.    Yes.

19   Q.    Is that right?  Do you know, were they wearing gloves?

20   What was stopping them from messing up the evidence that

21   the team of officers was trying to gather?

22   A.    I guess they told them they were finished; they didn't

23   need her.

24   Q.    Do you know that for a fact, or are you just assuming?

25   A.    They don't go into the windows until they are given

1    the okay to go into the windows.

2    Q.    Okay.  And so you're assuming they were given the

3    okay?

4    A.    Right.

5    Q.    How much after the robbery did they -- were the

6    security guys from the -- these are bank employees, right?

7    A.    Yes.

8    Q.    Security people are from the bank.  We're not talking

9    about the officers.  They're security in a different way.

10   A.    They're security.

11   Q.    Okay.  But how much time did the officers spend doing

12   an investigation before you saw the security people

13   actually going into the windows and doing their job?

14   A.    It was a while.  I'm again just estimating.

15   Q.    Couple hours?

16   A.    Maybe an hour and a half, hour.  I don't know.

17   Q.    That's fair enough.  Okay.  How about the vault?  Now,

18   you were shown a -- was there a picture of the vault?  Have

19   we showed that picture yet?  Is that the vault where the

20   actual robber went into?

21   A.    Yes.

22   Q.    Does that vault have any unusual safety features?

23   A.    Like what do you mean?

24   Q.    Can you take photos in that vault?

25   A.    If you had a camera.

CONNAUGHTON - CROSS

1  Q.   There is no camera all the way in there already?

2  A.   No.

3  Q.   Now, you saw the pictures that were presented and you

4  identified.  You saw the pictures that you identified, and

5  you identified different shots of the bank, of the inside,

6  the vault and all that stuff?

7  A.   Yes.

8  Q.   Were there other pictures that you happened to have

9  seen during the course of discussing matters with the

10 prosecution and with the police officers?  Were there other

11 pictures that you haven't identified of the bank?

12 A.   I don't think so.

13 Q.   Okay.  How many -- do you know how many pictures there

14 were of the two robbers that came into the bank, how many

15 different pictures there were?

16 A.   No, I don't.

17 Q.   Who was in charge of getting the pictures from the

18 bank's camera in order to present them to the police?

19 A.   I think I popped it out.

20 Q.   Popped it out, what do you mean?

21 A.   Pressed a button to eject the tape, and then the

22 officer took it.

23 Q.   Okay.  Is there one tape?

24 A.   Just one tape.

25 Q.   You popped it out, gave it to the officer, right?

CONNAUGHTON - CROSS

1    A.    Popped it out.

2    Q.    Now, this particular tape covers how many different

3    cameras?

4    A.    Five.

5    Q.    Five different cameras.  And does it repeat itself, or

6    does it -- it takes five different pictures one at a time,

7    right?

8    A.    Right.

9    Q.    And then it repeats five different pictures one at a

10   time starting from the beginning?

11   A.    No.

12   Q.    I'm guessing.  You tell me how it works.

13   A.    It takes five pictures.  It doesn't rewind the tape.

14   It just continues on the tape.  The tape lasts for a week.

15   Q.    Okay.  So during the course of -- how long does it

16   take to take five pictures?

17   A.    I would estimate about close to about ten seconds I

18   would say.

19   Q.    So you're saying ten seconds, 60 seconds in an hour.

20   It goes five cycles, 25 pictures per minute.  60 seconds in

21   a minute, 25 pictures in a minute; is that safe to say?

22   A.    That's fair, yes.

23   Q.    Okay.  And how many minutes were the robbers in, in

24   the bank, actually in the bank?

25   A.    I don't know, but it seemed like they were in there

1   two, three minutes.

2   Q.   Okay.  So theoretically there could be about 50,

3   maybe, pictures of the bank robbers?

4   A.   Yes, theoretically.

5   Q.   Maybe 75 if they were in for three minutes?

6   A.   Yes.

7   Q.   And these would be different angles of the bank

8   robbers, front, back, side?

9   A.   Yes.

10  Q.   Now, let's see.  You say you saw three people in the

11  motor vehicle as it was leaving.  But I think -- I'm not

12  sure you actually said you saw three.  You said you saw

13  somebody in the back seat?

14  A.   I saw someone in the back seat.

15  Q.   So you assume there was three?

16  A.   I assumed there was three, since he was in the back

17  seat.

18  Q.   Of course, if someone just got in the driver's seat

19  and somebody just hopped in the back seat for whatever

20  reason, then you would be wrong; there wouldn't be three;

21  there would be just two?

22  A.   Right.

23  Q.   Okay.  And the car was -- what was it?  What kind of

24  car did you see?

25  A.   I believe it was a Oldsmobile, late '80s or early

1    '90s, and the only reason I think that is because I had a

2    '92 Buick, and the Buick back ends and the Oldsmobile back

3    ends were similar in those years.  And I knew it was a

4    maroon color.

5    Q.    Was it a beat-up car, good shape?

6    A.    Far as I could tell, it wasn't beat-up.  It was

7    average shape.

8    Q.    Looked like it was well cared for?

9    A.    Average.

10    Q.    Not in a big accident?

11    A.    Um-hum.

12    Q.    Okay.  Did the robbers have any discussion between

13    themselves, either coming in or going out at any time?

14    A.    Only the fact that he says, "Hurry up.  The mailman's

15    coming."  That's the only discussion I heard.

16    Q.    That was "Hurry up.  The mailman's coming"?

17    A.    Um-hum.

18    Q.    Is that "yes"?

19    A.    Yes.

20    Q.    There was actually a mailman coming into the bank?

21    A.    I don't know.  I didn't see a mailman.

22    Q.    Did a mailman ever show up in the bank?

23    A.    No.

24    Q.    Had your mail ever been delivered that day?

25    A.    Not to my knowledge.

| 1 | Q. | Is the mail usually delivered in the afternoon? |
| 2 | A. | Yes. |
| 3 | Q. | About what time? |
| 4 | A. | About the middle of the afternoon usually. |
| 5 | Q. | That's what time this occurred? |
| 6 | A. | Yes. |
| 7 | Q. | So it's possible that one of the robbers did see a |

8  mailman or see your mailman?

| 9 | A. | Yes. |
| 10 | Q. | Okay.  All right.  Now, did you discuss with Pam and |

11  Jenny what you saw?  In other words, did the three of you

12  discuss what you saw and try to put together a synopsis of

13  what happened for the police?  Or did you all --

| 14 | A. | We didn't talk among ourselves, no. |
| 15 | Q. | How -- |
| 16 | A. | We were busy at that time.  Pam was attending to |

17  Jenny, making sure she was okay, and she was in shock.  I

18  was busy on the phone talking to the 911 until the police

19  got there.

| 20 | Q. | Now, Jenny was the one that took one of the robbers |

21  back to the vault, right?

| 22 | A. | Correct. |
| 23 | Q. | And you're saying she was upset.  But apparently she |

24  did a pretty good job doing what she was supposed to do.

25  She took them where she was supposed to take then, and she

CONNAUGHTON - CROSS

1    held up petty well, as far as I understand.

2    A.    If you call being in shock pretty well.

3    Q.    She took them back there, right?

4    A.    She was hysterical.

5    Q.    Nobody got hurt, right?

6    A.    Nobody got hurt.

7    Q.    Okay.  All right.  And she did what she was trained to

8    do; isn't that right?

9    A.    Yes, she did what she was told to do.

10   Q.    Good.  All right.  Now, as far as identifying the

11   different robbers, were you given a lineup or a group of

12   pictures to look at?

13   A.    No, I wasn't.

14   Q.    No?

15   A.    No.

16   Q.    Never?

17   A.    No.

18   Q.    Later by the police?

19   A.    No.

20   Q.    Okay.  Did you get a look at the robber that jumped

21   over the counter?

22   A.    No.

23   Q.    All right.  Were you given a picture of shotguns to

24   look at or handguns or anything else that the robbers might

25   have been wearing to determine if that was the gun or if

CONNAUGHTON - CROSS

1    that was the clothes?

2    A.    No.  I didn't see any kind of pictures of any guns.

3    Q.    You weren't shown any by the police?

4    A.    They just asked me.  They didn't show me anything.

5    Q.    Either later?

6    A.    Right.

7    Q.    How about in preparation for your testimony today?

8    A.    No.  They didn't show me anything.

9    Q.    All right.  Did you have some discussions about your

10   testimony today with the prosecutors and police officers?

11   A.    Today?

12   Q.    Yes.  I mean about your testimony.

13   A.    No, not really.

14   Q.    Okay.  All right.  How big is the bank?  Could we get

15   some idea of, you know, of the size of the building that

16   we're talking about?

17   A.    Probably the lobby area, the teller area and my office

18   area is probably as big as this room if these things were

19   perfectly square.

20   Q.    How many feet were you from the teller and the

21   gentleman that jumped over the counter?  How many feet away

22   were you from him?

23   A.    Probably about 15 yards.

24   Q.    Fifteen yards, okay.  All right.  But you were right

25   next --

CONNAUGHTON - CROSS

1    A.    Or less.

2    Q.    But you were right next to the other guy?

3    A.    Yes.

4    Q.    You heard his voice.  Was there anything unusual in

5    his voice?

6    A.    Not unusual.

7    Q.    Could you tell if he was an older man, a younger man?

8    A.    No.

9    Q.    I guess it wouldn't help you to look at these

10   gentlemen.  You can't identify them, can you, either one of

11   these guys?

12   A.    I wish I could, but I can't.  Didn't see them.  I mean

13   just a flash.

14   Q.    Very good.  Tell me about dye packs.  Were dye packs

15   put in any of this $150,000?  Did any of this $150,000

16   contain a dye pack?

17   A.    No.

18   Q.    Okay.  Did any of the 150 or 153 -- when I say 150, I

19   mean the money stolen.  None of it contained a dye pack.

20   Did any of it contain bait money?

21   A.    No.

22   Q.    All right.  Did any of it contain any money that

23   wasn't in clean money that would be, I guess, processed in

24   regular commerce?

25   A.    No, no.

CONNAUGHTON - CROSS

1          MR. FELSON:  Let me see if there is anything
2    else.  I think I'm about done with this witness.
3          That's all I have.  Thank you.
4          THE COURT:  Thank you, Mr. Felson.
5          Mr. Walter Pugh, do you wish to ask any
6    questions?
7                    CROSS-EXAMINATION
8    BY DEFENDANT W. PUGH:
9    Q.   Sir, can you hear me?
10   A.   Yes.
11   Q.   Is this your statement that you gave to the police on
12   the 24th?
13         THE COURT:  I think we need -- he needs to better
14   look at it than from there.
15         Mr. Snyder, can you hand that to the witness,
16   please?
17         You want to show it to the government first,
18   Mr. Snyder, and make sure they have seen it?
19         (Handing a document to the witness.)
20         Do you want that marked?  Do we have any exhibit
21   numbers for Mr. Walter Pugh already or Defendant?
22         THE WITNESS:  That's the one I gave him.
23         THE COURT:  This will be Defendant's Exhibit SS.
24         You can go ahead and ask a question about it,
25   Mr. Pugh.

CONNAUGHTON - CROSS

1  BY DEFENDANT W. PUGH:

2  Q.   Sir, in your statement --

3          THE COURT:  I think you need to ask the first

4  question first.  You want to ask him if he's seen this

5  before?

6          DEFENDANT W. PUGH:  Yes.  Is it true?

7          THE COURT:  Is that your statement, sir?

8          THE WITNESS:  Yes, that looks like the one I gave

9  him.

10 BY DEFENDANT W. PUGH:

11 Q.   To the best of your knowledge?

12 A.   Yes.

13 Q.   In your statement, there is some conflict of

14 interests.  Please understand I don't practice the law.

15 Starting today, my practice is facts.  If it's not facts --

16 in Government Exhibit 5.1 and 5.2, it's concerning your

17 statement, 5.1 and 5.2.

18         MR. THAPAR:  Your Honor, I'm just going to

19 object, because I don't think they're in evidence yet, and

20 I don't think this witness has seen them.

21         THE COURT:  Yes.  He doesn't know what you're

22 talking about.  Do you want him to look at 5.2?

23         DEFENDANT W. PUGH:  Yes.  I want them on the

24 stand.

25         THE COURT:  Well, first, they have to be

1    admitted.  First somebody has to identify what 5.1 is.

2                DEFENDANT W. PUGH:  5.1 is the --

3                THE COURT:  Not you.  A witness.  You can't

4    testify.  We need a witness to do that.  You can ask a

5    question about the exhibit of the witness.

6    BY DEFENDANT W. PUGH:

7    Q.  Okay in, Government Exhibit 5.1, it appears --

8                THE COURT:  Wait.  You have to -- you know, I

9    don't think he's got 5.1 in front of him.  I think 5.1 is a

10   videotape.

11               DEFENDANT W. PUGH:  Yes, ma'am.

12               THE COURT:  Okay.  Is that Government Exhibit

13   5.1, Steve?

14               We have put in front of the witness what has been

15   marked as Government Exhibit 5.1, which appears to be two

16   videotapes.

17   BY DEFENDANT W. PUGH:

18   Q.  In Government Exhibit 5.1 and 5.2, it appears that the

19   alleged robbers entered the bank along at 2:21 and 27

20   seconds?

21               THE COURT:  Mr. Pugh, I'm sorry to interrupt you

22   again, but you have got to do what's called laying a

23   foundation.  First you have to establish this witness knows

24   something about the exhibit you're asking him.  So you have

25   got to ask him if he's ever seen these videotapes before.

CONNAUGHTON - CROSS

1        Sir, are you familiar with the videotapes?

2             THE WITNESS:  I never saw the videotapes.

3    BY DEFENDANT W. PUGH:

4    Q.   In your statement --

5             THE COURT:  Now, are you referring back to your

6    Exhibit SS?

7             DEFENDANT W. PUGH:  Yes.

8    BY DEFENDANT W. PUGH:

9    Q.   In your statement, you stated the car was a mid- '80s

10   Oldsmobile maroon in color.  It was decent shape, clean.

11   There where no stickers on it.  I did not look -- it did

12   not look wrecked.  You thought you saw a guy in the back

13   seat, which tells me there were three people in the car.

14        My point was, "the guy -- the guy with the shotgun

15   that stayed with me the whole time, the guy stayed with me

16   the whole time."  If I could have showed you 5.1 and 5.2,

17   it shows that the guy in that bank was not with you the

18   whole time.

19   A.   I couldn't see.

20   Q.   You said you kept looking up at him and seen him.

21   A.   No.  I couldn't keep looking up at him.  I looked

22   straight down.

23   Q.   Did you talk to Special Agent Morgan -- Moran?

24   A.   Yes.

25   Q.   Did you give him your statement?  This what you gave

CONNAUGHTON - REDIRECT

1   him?

2   A.    He was one of them I gave it to.  I gave it to a

3   couple.

4            DEFENDANT W. PUGH:  Thank you, sir.

5            THE COURT:  Thank you, Mr. Pugh.

6            Any redirect examination by the government?

7            MR. THAPAR:  Yes, Your Honor.

8                    REDIRECT EXAMINATION

9   BY MR. THAPAR:

10  Q.    I'm going to direct your attention first to the

11  questions Mr. Felson was asking, and Mr. Felson asked you a

12  number of questions about identification.  And I want to

13  ask you, when this armed robbery was occurring, how did you

14  feel?

15  A.    I was a little scared.

16  Q.    Okay.  And were you more concerned with your safety

17  and the safety of the tellers or who was committing the

18  robbery?

19  A.    I was concerned about our safety, especially the one

20  in the vault.

21  Q.    Okay.  And so did that affect -- I mean, did that

22  affect your ability to identify the robbers?

23  A.    I don't think so.  I just didn't get to look at them

24  long enough.  If I had got a little bit longer look at

25  them, I probably, you know -- but the only one I had a

CONNAUGHTON - REDIRECT

1  chance to see, the other one was just a flash, you know.

2  And this one in front of me, you know, he told me real

3  quick to get down. So, and I was looking at the gun,

4  because it was right there.

5  Q.  And after the robbery, were you still shaken up?

6  A.  Yes.

7  Q.  Okay. And so were you concerned with what the police

8  was doing?

9  A.  Well, I mean --

10  Q.  Let me ask you a different way. Strike that. Was it

11  your responsibility to worry about how the investigation

12  was conducted?

13  A.  No, it wasn't.

14  Q.  How many people, if you can recall, from bank security

15  came into your office, to the branch?

16  A.  From bank security was just one. We got three people

17  in bank security. One was out of town, and one had to stay

18  at the office. But we had a couple people from branch

19  administration come down, my boss in particular, and then

20  her boss. So they helped conduct the audit of the money.

21  Q.  And is that all they did is an audit of the money, to

22  your knowledge?

23  A.  Of the bank people, yes.

24  Q.  Now, let me ask you this again. I'm sorry to jump

25  around a little. We're back to the identification. Did

CONNAUGHTON - REDIRECT

1   you see either of the robber's faces?

2   A.    I saw the face with the mask over it.

3   Q.    Okay.  And that's all you saw of the faces of the

4   robbers?

5   A.    Right.

6   Q.    So, if you were shown a lineup or a photo spread,

7   would you have been able to identify the robbers?

8   A.    Probably not.

9   Q.    While you were in the back, did you hear either of the

10  robbers refer to dye packs or bait money?

11  A.    No, I didn't.

12  Q.    One final question, or I guess I have two questions.

13  I'm sorry.  How many people came in the bank to rob the

14  bank?

15  A.    Two.

16  Q.    And did Jenny take a robber to the vault, or did the

17  robber take Jenny to the vault?

18  A.    I couldn't see.

19  Q.    Okay.  No further questions.

20  A.    I knew they were both back there.  That's all.

21          MR. THAPAR:  No further questions, Your Honor.

22          THE COURT:  Thank you, Mr. Thapar.

23          Mr. Felson, do you have any additional

24  cross-examination?

25          MR. FELSON:  Yes.  Clear one thing up.

1               RECROSS-EXAMINATION

2   BY MR. FELSON:

3   Q.    You said you were concerned with your safety, and I

4   think you said, instead of looking at the robbers, you were

5   looking at the gun.  Is that what you testified, that you

6   saw more of the gun than the robbers?  Is that a fair

7   statement?

8   A.    I guess.

9               MR. FELSON:  Okay.  That's all I have.  Thank

10  you.

11              THE COURT:  Mr. Walter Pugh, do you have any

12  additional questions?

13              DEFENDANT W. PUGH:  No ma'am.

14              THE COURT:  Okay.  Mr. Connaughton, the Court

15  appreciates very much your coming here, and you are

16  excused, sir.

17              It's about 4:30, so I think we will recess for

18  the day.  I'm going to ask that you be back here tomorrow

19  morning, ladies and gentlemen, at 8:45.

20              Steve, do they go to 917 to check in?

21              You go up to 917 to the big jury room upstairs to

22  check in, and then you will come down here to room 828.

23  And we should have doughnuts for you and coffee in the

24  morning.

25              We'll start promptly at nine o'clock tomorrow

1   morning, and we will go, as I mentioned before, from
2   approximately nine to noon and then 1:30 to 4:30 to five
3   with a couple of breaks.
4           Since we're about to take our recess, I want to
5   tell you that, during this recess or any other recess, you
6   must remember not to discuss this case with anyone,
7   including your fellow jurors, members of your family,
8   people involved in the trial or anyone else.  If anyone
9   tries to talk to you about the case, please let me know
10  about it immediately.
11          Do not read, watch or listen to any news reports
12  of the trial.  And, finally, keep an open mind until all
13  the evidence has been received and you have heard the views
14  of your fellow jurors.
15          I may not repeat these things to you before every
16  recess, but please keep them in mind throughout the trial.
17          We'll see you tomorrow morning.
18          (Jury excused from the courtroom.)
19          THE COURT:  Ms. Cross and Mr. Thapar, who are you
20  intending to call tomorrow, and approximately how long do
21  you think the witnesses are going to be?
22          MS. CROSS:  We intend to call the two bank
23  tellers, who we provided Jencks for and Giglio information
24  for.  Mr. Wolfe, who is the Ser Tech Investigations person
25  that made the copy of the video, who we provided

```
1    information about.  Donna Caudell, who is the bank security
2    officer that went into the bank.  We provided Jencks and
3    Giglio for that person as well.  And I think we probably
4    will get through Jim Calhoun, Detective Jim Calhoun, which
5    they will be provided the Jencks and Giglio for today when
6    the Court recesses.
7             THE COURT:  And you think that will pretty much
8    fill the day?
9             MS. CROSS:  We may be able to get a property
10   officer and maybe Deputy Matthew Wittich.
11            THE COURT:  Is he Hamilton police?
12            MS. CROSS:  Hamilton County Sheriff's Office.
13            THE COURT:  When are you intending to finish your
14   case in chief?  On Thursday?
15            MS. CROSS:  We may get through most of it
16   tomorrow, but I think Thursday.
17            THE COURT:  Thursday you will get done.  Okay.  I
18   just wanted some idea.
19            Anything to come before the Court before we
20   recess?
21            MR. FELSON:  Just maybe an admonition to the
22   witnesses not to talk about their testimony.  Only one
23   testified.  I'm not sure if Mr. -- if this gentleman who
24   testified today knows that he's not supposed to tell the
25   other tellers what he was talking about on the stand.
```

```
 1              THE COURT:  I'll instruct the government to
 2    advise all of their witnesses of that.
 3              MR. FELSON:  Thank you.
 4              THE COURT:  Anything further before we recess?
 5              I would like to have counsel in the courtroom at
 6    a quarter of nine tomorrow just in case there is anything
 7    you want to bring to the Court's attention.  You just need
 8    to contact Mike or Aly or Steve, and they will let me know,
 9    and we will deal with it before nine o'clock so we can get
10    the jury promptly in the box at nine a.m.
11              Thank you everyone.
12              COURT IN RECESS AT 4:30 P.M.
13
14
15
16              C E R T I F I C A T E
17              I, Betty J. Schwab, the undersigned, do
18    hereby certify that the foregoing is a correct
19    transcript from the record of the proceedings in
20    the above-entitled matter.
21
22              BETTY J. SCHWAB, RPR
23              Official Reporter
24
25
```