```
 1                    UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF OHIO        [illegible]

 3                        WESTERN DIVISION
                             -  -  -

 4
     UNITED STATES OF AMERICA,    :  CRIMINAL ACTION CR-1-02-054
 5                                :
                Plaintiff,        :  Cincinnati, Ohio
 6                                :  Wednesday, September 4, 2002
          -vs-                    :
 7                                :
     WALTER PUGH, JR, and         :  Day 2 of jury trial
 8   TYREESE PUGH,                :
                                  :
 9              Defendants.       :  9:00 a.m.

10                             -  -  -

11                           VOLUME II

12                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE,
13                            AND JURY

14                             -  -  -

15   For the Plaintiff:   Wende Cross, Esq.
                          Amul Thapar, Esq.
16                        Asst. U.S. Attorney
                          Atrium II, Suite 400
17                        221 East Fourth Street
                          Cincinnati, Ohio  45202
18
     For the Defendant:   Pro Se
19    (Walter Pugh, Jr.)
                          J. Robert Andrews, Esq.
20    (Legal advisor)     Schuh & Goldberg
                          2662 Madison Road
21                        Cincinnati, Ohio  45208

22    (Tyreese Pugh)      Edward J. Felson, Esq.
                          Felson & Felson
23                        CBLD Center, Suite 1650
                          36 East Seventh Street
24                        Cincinnati, Ohio  45202.
     Law Clerk:  Mike Rich
25   Courtroom Deputy:  Steve Snyder
     Court Reporter:  Betty Schwab
```



```
1                          I N D E X

2    WITNESS FOR THE GOVERNMENT:    DIRECT    CROSS    RD    RC    FD

3    ROBERT W. WOLFE, JR.
        (by Ms. Cross)            173
4       (by Mr. Felson)                      179

5    DONNA CAUDELL
        (by Mr. Thapar)          183                206
6       (by Mr. Felson)                      193            208
        (by Mr. Andrews)                     200
7
     JENNIFER TETTENHORST
8       (by Ms. Cross)           209                242
        (by Mr. Felson)                      223,240        242
9       (by Mr. Andrews)                     226

10   PAM PHILPOT
        (by Mr. Thapar)          243                274          278
11      (by Mr. Felson)                      253            276
        (by Mr. Andrews)                     265            278
12
     JAMES CALHOUN
13      (by Ms. Cross)           282                360
        (by Mr. Felson)                      312            365
14      (by Mr. Andrews)                     349            368

15   ROBERT C. PAYNE
        (by Ms. Cross)           371
16      (by Mr. Felson)                      374
        (by Mr. Andrews)                     378
17
     STEPHANIE LUSTER
18      (by Ms. Cross)           381

19
     GOVERNMENT EXHIBITS:        ADMITTED:
20   No. 4.1 - 4.4                 178
     No. 5.1 and 5.2              287
21   No. 6, 7, 8                  190
     No. 13                       373
22

23

24

25
```

PROCEEDINGS

THE COURT: Good morning, everyone. I just wanted to cover a couple of things that occurred to me overnight.

Mr. Felson, let me ask you a question about your expert. You mentioned he's not available Wednesday, or I can't remember.

MR. FELSON: Okay. He's testifying today in another court somewhere in this area. Tomorrow, I think he said he's got some other things to do. Friday would be the perfect day for him.

THE COURT: Is he available tomorrow?

MR. FELSON: He may be. I'll have to talk to him. I didn't ask him specifically what time tomorrow he will be available. I'll ask him on the break.

THE COURT: That would be great. I think it's likely we could get to him tomorrow afternoon, so I think that's probably the ideal time for him. All right.

And, Mr. Walter Pugh, if you have any more exhibits that you haven't marked yet and you know you're going to use them, we will be glad to go ahead and premark them for you. Steve can, you know, sticker them for you and make copies so that we don't have a delay if you've got a new document that you haven't used before that's not premarked.

```
 1              DEFENDANT W. PUGH:  I was just confused
 2   yesterday, Judge.  Today I am not confused.
 3              THE COURT:  No, no.  I'm just saying, if we can
 4   help you premark your exhibits, we would be glad to do
 5   that.
 6              DEFENDANT W. PUGH:  I'm okay.  Thank you.
 7              THE COURT:  I just wanted to give you a quick
 8   lesson in evidence about how to lay a foundation, unless
 9   you and Mr. Andrews have already talked about that.  Did
10   you all have any discussion about that, Mr. Andrews?
11              MR. ANDREWS:  We did this morning.  Mr. Pugh
12   indicated to me that he is aware of how to have an exhibit
13   identified and, you know, and lay a foundation.  But --
14              Is that correct, Mr. Pugh?
15              DEFENDANT W. PUGH:  Yes, sir.
16              THE COURT:  All right.  Then I guess we're about
17   ready.
18              Is the jury in, Steve?  We will see if we have 14
19   jurors.  If so, we'll get started.
20              Who's the government's next witness?
21              MS. CROSS:  Robert Wolfe.  We're having to call
22   him out of order.
23              THE COURT:  That's fine.  I'm just going to have
24   Bill get him so we've got him ready.
25              MR. THAPAR:  Your Honor, is it okay if he's in
```

```
1   the courtroom?
2              THE COURT:  Sure.  He's going to hear himself
3   testify?  No, I don't anticipate anything happening except
4   bringing in the jury.  If I were Judge Rubin, Mr. Thapar, I
5   would already have him in the witness box.  He didn't waste
6   a minute.
7              (Jury present.)
8              THE COURT:  Good morning to everyone.
9              Who is the government's next witness?
10             MS. CROSS:  The United States calls Robert Wolfe.
11             (Witness sworn by the courtroom deputy.)
12             MS. CROSS:  Your Honor, for the record, we would
13  be introducing Government Exhibits 4.1 through 4.4 and 5.1
14  and 5.2.
15             THE COURT:  Thank you, Ms. Cross.
16                  ROBERT W. WOLFE, JR.
17                  DIRECT EXAMINATION
18  BY MS. CROSS:
19  Q.  Good morning, sir.  Will you please state your name
20  for the members of the jury?
21  A.  Robert William Wolfe, Jr.
22  Q.  Where and how are you employed?
23  A.  I'm employed with Ser Tech Investigations, Inc. as a
24  private investigator.
25  Q.  Will you generally describe what the nature of your
```

WOLFE - DIRECT

1   work is?

2   A.   Ninety percent of what I do is actually surveillance

3   involving cameras and camera equipment.

4   Q.   Does part of your duties include tape editing?

5   A.   Yes, it does.

6   Q.   What type of tapes?

7   A.   Most of what I get through is 8 millimeter tapes which

8   our investigators shoot during the course of surveillance.

9   A lot of stuff we get VHS tapes from banks, and sometimes

10  police officers come in wanting us to look at tapes from

11  them and make video prints.

12  Q.   So are you talking about audio and videotapes?

13  A.   We don't necessarily work too much with audio.  Most

14  of what we do is video.

15  Q.   How long have you been employed as a private

16  investigator?

17  A.   Nine years.

18  Q.   Prior to that, what did you do?

19  A.   I was with another company actually called Central

20  Intelligence Services Division.  It was another private

21  investigation company.

22  Q.   Focussing on this case, were you sent any videotapes

23  in this case?

24  A.   Actually, a couple of Hamilton police officers came

25  over and brought a tape with them.

WOLFE - DIRECT

1   Q.   How many?

2   A.   Just one.

3   Q.   And what kind of tape was it?

4   A.   It was a VHS tape.

5   Q.   Did the videotape that you received from the Hamilton

6   police officers contain any sound?

7   A.   I don't recall.

8   Q.   Did you view the videotape in its entirety before you

9   made a decision to edit it in any way?

10  A.   No, I did not.

11  Q.   Were you given any instructions as to what to do with

12  the videotape?

13  A.   Yes, I was.

14  Q.   What were your instructions?

15  A.   The police officers told me there was a certain

16  segment of the videotape in which a robbery was conducted,

17  and I was to make a slowed-down copy and just disregard the

18  rest of the tape.

19  Q.   Were you given any additional facts about the case

20  before you handled the videotape?

21  A.   Any additional facts?

22  Q.   Other than the fact that it was going to show part of

23  a robbery?

24  A.   Oh, no.

25  Q.   Were you told who the suspects potentially were in the

| | |
|---|---|
| 1 | case? |
| 2 | A.    No, I was not. |
| 3 | Q.    Did you make a copy of the videotape? |
| 4 | A.    I did. |
| 5 | Q.    So, when you made the copy of the videotape, you |
| 6 | didn't know any factual specifics of the case, did you? |
| 7 | A.    No, I did not. |
| 8 | Q.    Did you edit any part of the videotape? |
| 9 | A.    Did I edit any part of the original? |
| 10 | Q.    Yes. |
| 11 | A.    I didn't do anything with the original. |
| 12 | Q.    You just made a copy of it? |
| 13 | A.    Correct. |
| 14 | Q.    And how many copies did you make? |
| 15 | A.    Just one. |
| 16 | Q.    In what manner, if any, does the copy differ from the |
| 17 | original? |
| 18 | A.    It's just a slowed-down version.  If I might explain? |
| 19 | Q.    Please. |
| 20 | A.    The tape that I received is something called |
| 21 | time-lapse videotape, which the time lapse video recorder |
| 22 | has the ability to make one VHS tape last from 24 hours all |
| 23 | the way up to 960 hours on one tape if you want.  So what |
| 24 | it does is there are frames missing.  It only takes a |
| 25 | picture every so often to extend the life of the tape.  So |

WOLFE - DIRECT

1  the tape that I had was actually a time-lapse videotape
2  such as that. So to do it, it was playing back very fast,
3  so you have to play it back in the mode which it was
4  recorded at so that it would actually show like a realtime
5  format, then reproduce a copy of the realtime format. So
6  that way you don't need a special tape deck to watch the
7  videotape.
8  Q.  So the copy that you made was simply a slowed-down
9  version of the original?
10  A.  Correct.
11  Q.  Do both the copy and the original depict exactly the
12  same thing?
13  A.  Yes, they do.
14  Q.  After you made the copy of the videotape, of the
15  original videotape, was -- did you do anything else with
16  regard to this case?
17  A.  I did.
18  Q.  What did you do?
19  A.  I actually made video prints, which are pictures taken
20  right from the videotape. I don't recall how many though.
21  Q.  I'm going to show you, if I could have the assistance
22  of Mr. Snyder, Government Exhibits Numbers 4.1, 4.2, 4.3
23  and 4.4. As he is handing that to you, Mr. Wolfe, do you
24  recognize those government exhibits?
25  A.  I do.

WOLFE - DIRECT

```
1   Q.    What are they?

2   A.    Those are the video prints that I produced from the

3   videotape.

4   Q.    You made those?

5   A.    Yes, I did.

6   Q.    Are they altered in any way?

7   A.    No.

8           MS. CROSS:  Your Honor, at this time, if there is

9   no objection, I would move to admit Government Exhibits 4.1

10  through 4.4.

11          THE COURT:  Any objection?

12          MR. FELSON:  No.

13          DEFENDANT W. PUGH:  No.

14          THE COURT:  Okay.  Government Exhibits 4.1

15  through 4.4 are admitted.

16          MS. CROSS:  Thank you.

17  BY MS. CROSS:

18  Q.    I would like to show you also Government Exhibits 5.1

19  and 5.2, Mr. Wolfe.  I'll show it to the witness.

20  Mr. Wolfe, as Mr. Snyder has handed you Government Exhibits

21  5.1 and 5.2, I'll ask you to look at them.  Do you

22  recognize those?

23  A.    I do.

24  Q.    What do you recognize those exhibits to be?

25  A.    I believe this to be the first, the original tape, and
```

1   this to be the copy that I produced.

2   Q.   Will you take each of the videotapes out of the

3   jacket?  And you will see a government number.

4   A.   Yes.

5   Q.   Which one are you holding right now?

6   A.   5.1.

7   Q.   And you recognize that to be?

8   A.   The original.

9   Q.   Okay.  And then the other?

10   A.   The other one is labeled 5.2.  And I believe this to

11   be my copy.

12          MS. CROSS:  Your Honor, that's all the questions

13   I have for Mr. Wolfe at this time.  Thank you.

14          THE COURT:  Are you moving for the admission?

15          MS. CROSS:  Yes.

16          THE COURT:  Do you wish to cross-examine,

17   Mr. Felson?

18          MR. FELSON:  Just a couple questions.

19          THE COURT:  Why don't you pull the mike over.

20   Thank you.

21                    CROSS-EXAMINATION

22   BY MR. FELSON:

23   Q.   Mr. Wolfe?

24   A.   Yes, sir.

25   Q.   I'm Ed Felson.  I represent Tyreese Pugh.  This tape

WOLFE - CROSS

1   that you're talking about, how many photos were on it?

2   A.   How many photos were on the tape?

3   Q.   Yes.   Or how many different -- you were shown four, I

4   think.   You were shown four exhibits.   Was that all that

5   was on the tape?

6   A.   These are just pictures that I created, sir.

7   Q.   You created these pictures?

8   A.   Yes, sir.

9   Q.   But you took it off the tape?

10  A.   Off the videotape, correct.

11  Q.   But isn't this a videotape that takes a picture from

12  five different locations, something like 25 photos an hour?

13  A.   It really kind of depends on how --

14  Q.   I mean 25 a minute.   I'm sorry.

15  A.   No.   I believe it was faster than that.

16  Q.   Okay.   How many photographs -- but they take still

17  photographs, right?

18  A.   No.   It's a videocam.

19  Q.   It's a videocam?   So it records it just like it's

20  happening, right?

21  A.   Yes, sir.

22  Q.   And does it record from one location or more than one

23  location?

24  A.   I don't recall how many cameras were on that

25  particular videotape.

1    Q.   Okay.  How many different photographs are possible?  I

2    see you made four of them.  How many could you have made?

3    A thousand?

4    A.   An indefinite number, yes, sir.

5    Q.   Why did you pick those four?

6    A.   They were the only ones that showed the actual robbery

7    suspects within the videotape.

8    Q.   And none of the other photos did; none of the other

9    shots did, I guess?

10   A.   No, sir.

11   Q.   Did some of the other -- did the video camera continue

12   to record even as the officers came in afterwards to do

13   their duties, whatever it was, to take prints and all that

14   stuff?

15   A.   Sir, I did not watch the entire videotape.

16   Q.   Okay.  How long were the robbers in the store?

17   A.   I don't recall that either, sir.

18   Q.   But you have the videotape from what minute to what

19   minute?

20   A.   I would have to view the videotape.

21   Q.   Can we view the videotape?  Is it able to be viewed on

22   video camera?

23   A.   If you have a VHS, you can view the copy, yes, you

24   can.

25   Q.   But you don't know how long it's going to take?

WOLFE - CROSS

1   A.    The copy is only going to take about a minute or two.

2   Q.    How about the actual original?

3   A.    Oh, you would sit here, whatever mode it was in, you

4   would have to sit here for 24 hours to watch the videotape.

5   Q.    But you could speed it up?

6   A.    Yes, sir.

7           MR. FELSON:  Okay.  No further questions.

8           THE COURT:  Mr. Walter Pugh, did you wish to

9   cross-examine the witness?

10          DEFENDANT W. PUGH:  Excuse me.

11          (Defendant W. Pugh conferring with Mr. Andrews.)

12          DEFENDANT W. PUGH:  No, Your Honor.

13          THE COURT:  I'm sorry.  Yes, Mr. Pugh?

14          DEFENDANT W. PUGH:  I have no questions.

15          THE COURT:  Okay.  Thank you.

16          Do you have any redirect?

17          MS. CROSS:  No, Your Honor.  This witness may be

18   excused.

19          THE COURT:  Thank you.  The Court appreciates

20   very much your being here, Mr. Wolfe, and you are excused.

21   Thank you.

22          Who is the government's next witness?

23          MR. THAPAR:  Your Honor, at this time the

24   government calls Donna Caudell, and, Mr. Snyder, we are

25   going to ask that she look at Government Exhibit 6, 7 and 8

CAUDELL - DIRECT

1   during her testimony. I think she can look at them

2   straight out of the book if that's okay.

3              (Witness sworn by the courtroom deputy.)

4                          DONNA CAUDELL

5                       DIRECT EXAMINATION

6   BY MR. THAPAR:

7   Q.   Good mourning, Ms. Caudell. Could you please

8   introduce yourself to the jury and spell your last name for

9   the record?

10  A.   Yes. I'm Donna Caudell, and it's C-a-u-d-e-l-l.

11  Q.   Ms. Caudell, where do you work?

12  A.   I work at First Financial Bank.

13  Q.   Okay. And was First Financial Bank formerly known as

14  another bank?

15  A.   Yes, sir.

16  Q.   What was it known as?

17  A.   It was known as First Southwestern.

18  Q.   What do you do for First Financial Bank?

19  A.   I'm a security investigator for First Financial.

20  Q.   Can you describe your role as a security investigator

21  for the jury?

22  A.   As a security investigator, I am involved in any types

23  of fraud incidents that the bank has to deal with. I am

24  also called out after a robbery has taken place. I have to

25  go in and speak to the tellers, speak to the managers, do

1   that type of thing.  I also have to find out the amount of

2   money that was taken during the robbery in a type of

3   accounting way, and I speak with law enforcement concerning

4   the issues that have taken place, and I usually give them

5   the totals of whatever has taken place.  I also coordinate

6   with the FBI.

7   Q.   Okay.  And when you do all this coordination with the

8   FBI and speak with law enforcement, is it your goal to

9   support them and provide them what they need, or is it

10  something else?

11  A.   Yes.  It's providing them what they need, as well as

12  trying to be a support to the tellers that have been

13  through a traumatic situation.

14  Q.   So is it fair to say that your focus is dual in both

15  supporting them and supporting the employees of the bank

16  that has just been robbed?

17  A.   Yes.

18  Q.   Okay.  And, in that dual focus, I guess, do you focus

19  on things that -- like fingerprints and other such things,

20  or do you just focus on the tellers and the amount of money

21  taken?

22  A.   I focus on the tellers and the amount of money that

23  has been taken.  I try to keep everyone out of the area so

24  that the police can do their investigation.

25  Q.   Okay.  I want to direct your attention to April 24th

| | |
|---|---|
| 1 | of this year, if I may.  On April 24th, did your bank at |
| 2 | any location suffer a robbery? |
| 3 | A.    Yes.  Our University Branch on Peck Boulevard. |
| 4 | Q.    In what city is that located? |
| 5 | A.    Hamilton, Ohio. |
| 6 | Q.    And how did you come to find out about that robbery? |
| 7 | A.    We were actually notified by our branch |
| 8 | administration.  Our current security officer was out of |
| 9 | town -- we have other affiliates -- and he was taking care |
| 10 | of some situations out of town.  So we were notified by |
| 11 | branch administration at that point. |
| 12 | Q.    So does that mean the specific branch that was robbed |
| 13 | or something else? |
| 14 | A.    No.  The branch made a call to our main office, and |
| 15 | they called us. |
| 16 | Q.    And what did you do after you received that call? |
| 17 | A.    After I received the call, I immediately called the |
| 18 | branch. |
| 19 | Q.    And what happened when you called the branch? |
| 20 | A.    I asked to speak to the tellers, because they usually |
| 21 | are having a hard time at that point, and to let them know |
| 22 | that I'm on the way to come.  I spoke to Pam, and I -- |
| 23 | first.  She answered the phone. |
| 24 | Q.    And Pam is who? |
| 25 | A.    One of the tellers that was involved. |

CAUDELL - DIRECT

1   Q.   Okay.

2   A.   And I asked to speak to the head teller at that point,

3   because I like to speak with whoever, you know, is the head

4   teller at that point or the branch manager.  And I spoke --

5   she said that -- what was said was that, "If I can get her

6   up off the floor, you can speak with her."  But at that

7   point she was laying on the floor crying.

8   Q.   Okay.  Did you eventually speak to the other teller?

9   A.   Jennifer, yes, I spoke to Jenny.

10  Q.   And how were both of the tellers acting when you spoke

11  to them?

12  A.   Pam seemed to be a little bit in shock I guess, more

13  so than anything.  She wasn't real frantic.  But Jenny was

14  real emotional.  She was crying.  It was difficult to

15  understand her at first when I spoke with her.  She -- she

16  settled down after a little while, but she was still very

17  distressed.

18  Q.   And what did you do after you got off the phone with

19  the tellers?

20  A.   I left my office and went to the University Office.  I

21  also contacted the FBI and was -- and I also -- well,

22  before that, I spoke to Jim as well.  And he was upset as

23  well.  Jim was the branch manager.

24  Q.   And when you left your office and went to the

25  University Office, you mean this branch that was robbed?

CAUDELL - DIRECT

| 1  | A.  | Yes. |
| 2  | Q.  | What did you do once you got there? |
| 3  | A.  | Once I got there, law enforcement had already arrived, |

3   so I actually let them conduct their investigation, and I

4   went back and I spoke to Jenny and the other tellers.  I

5   spoke to law enforcement briefly, that's local law

6   enforcement, and basically spent a lot of my time, at that

7   point, with the tellers, because they were upset.

8   Q.  So, with regards to this particular robbery, is it

9   fair to say that your main focus at the time you arrived

10  was on the tellers?

11  A.  Yes.

12  Q.  Did you do anything after, I guess, you worked with

13  the tellers?

14  A.  After I had spoken with the tellers and the police had

15  conducted their investigation and they gave us the okay,

16  then we did a -- what we call a cash audit of the affected

17  areas of the robbery.

18  Q.  When you say the police gave you their okay, can you

19  just explain to the jury what you meant by that?

20  A.  The police were finished with their investigation as

21  far as retrieving film, as far as securing the area, as far

22  as fingerprinting.  They also had taken pictures and that

23  type of thing.  So they had finished their investigation.

24  Q.  Okay.  And did you watch everything the police was

CAUDELL - DIRECT

1   doing or --

2   A.   I can't say 100 percent of the time, no.

3   Q.   When you went into what you described as, I guess,

4   seeing how much money was taken, what did you do?  Can you

5   tell us what you did with regard to that?

6   A.   The teller machines have a beginning and ending total

7   every night.  They start out with a beginning cash, and

8   they have an ending cash.  The machine calculates how much

9   cash came into the window.  It calculates how much cash

10  goes out of the window.  And those totals show up on the

11  screen.  So we start with the -- and through the process of

12  the day as they're running transactions, it's a current

13  balance.  So from that point forward, I took whatever

14  balance was in there, in the cash drawers, that the machine

15  was showing, and we count the cash to see what's left in

16  the drawers or the vault or whatever area was affected.

17  And we -- the difference between those two, the difference

18  of the cash total and the difference of what the machine

19  says is what we come up with the amount for the robbery.

20  Q.   Okay.  And do you do this in every instance where

21  there is a robbery?

22  A.   Yes.

23  Q.   Okay.  And what I'm going to do now is I'm going to

24  show you Government's Exhibits 6, 7 and 8, if you could

25  look at those exhibits, please.  Can you tell me what those

CAUDELL - DIRECT

1    exhibits are?

2    A.    These are audit cash sheets that were done at the

3    University Office once we were allowed to go into the

4    window to audit.  These are the totals that we came up

5    with.

6    Q.    And these are from where?

7    A.    The University Office.

8    Q.    I'm sorry.  I need to be more specific.  From where

9    within the University Office?

10   A.    This Exhibit 6 is from a teller window.  Exhibit 7 is

11   a teller window, and Exhibit 8 is the vault.

12   Q.    Okay.  And are these kept -- are these exhibits kept

13   in the same course of business that it would ordinarily be

14   kept in when a robbery occurs?

15   A.    Yes.

16   Q.    Okay.  And is it the responsibility of the person who

17   actually drafts these to draft these when a robbery occurs?

18   A.    I'm sorry?

19   Q.    I should speak English.  Is it the responsibility of

20   the person who sits down and writes all these numbers in,

21   is it their responsibility to do this after a robbery

22   occurs?

23   A.    It's audits or security's responsibility.

24   Q.    Who did it in this instance?

25   A.    Trish Neelly and I did Jenny's window.  Trish Neely

1    and Angela Moore did Pam's window, and Trish Neely and I

2    did the vault.

3              MR. THAPAR:  Your Honor, at this time the

4    government would offer into evidence Exhibits 6 through 8

5    as business records.

6              THE COURT:  Any objection, Mr. Felson?

7              MR. FELSON:  No.

8              DEFENDANT W. PUGH:  No.

9              THE COURT:  Government Exhibits 6, 7 and 8 will

10   be admitted.

11             MR. THAPAR:  Thank you, Your Honor.

12   BY MR. THAPAR:

13   Q.   Showing you Government Exhibit 6, now, why don't you

14   explain to the jury, and why don't we go in more detail

15   with this one, and then we'll do it briefly with the

16   others, what this is and how it works and how you came up

17   with the total again using these numbers?

18   A.   Okay.  Actually, you can't really see it very well on

19   that screen, but what we do is this sheet is dropped into

20   our printer or validater, and the totals are set down at

21   the bottom of what the ending -- what the cash should be in

22   the first validation.  There is a first validation on there

23   that's kind of difficult to see, but basically it's your

24   starting cash, your ins, your outs, and your net total of

25   what you should have in that drawer.

1    Then, from that, we begin to count the cash.  And we
2    count them in specific increments of whatever.  We start
3    with hundreds, fifties, twenties, tens, and we apply all
4    that to the sheet down to pennies or cash items which may
5    be in the drawer.
6        A cash item could be a voucher of some sort that
7    somebody got for mileage working in that office or
8    something and they haven't been turned into the office yet.
9    So that's why you see the cash item area over here has
10   66.69 in it.  That's not actual cash.  That's cash that was
11   given out of the window to someone who has mileage or had
12   to pay something for the bank's benefit.
13       We then take that total, add it up, and subtract it
14   from the net cash which you will find at the bottom of the
15   first validation.  That gives us our outage or shortage
16   which, in this case in Exhibit 6, is $3,241.
17   Q.   So $3,241 is the amount the robbers stole from that
18   teller drawer?
19   A.   Yes.
20   Q.   Can we now look at Government's Exhibit 7?  Can you
21   tell me just is this also a teller drawer shortage?
22   A.   Yes.
23   Q.   And what is the shortage in this teller drawer?
24   A.   $4,439.01.  The one cent I don't know about that.
25   Q.   Okay.  And now look at Government Exhibit 8, and why

CAUDELL - DIRECT

1  don't you describe this, what this is, to the jury and tell
2  us what the shortage is?

3  A.    This is the vault sheet, and the vault sheet is a
4  little bit different.  It does not get a validation.  It's
5  kind of a running total.  Every day you record the ending
6  cash from the previous day.  So the starting cash that's
7  there is the ending cash from the day previous to the
8  robbery.  So we took whatever vault tickets that were
9  run -- that means the tickets that came, perhaps a teller
10 purchased money from the vault or a teller turned in money
11 to the vault that day.  That's the 13,900, where they had
12 too much money in their drawer so they'd have to take it to
13 the vault to turn that money in so that they keep their
14 drawers at a certain level.  That's where you see the
15 13,900.

16     The shortage for the vault that day, after we added
17 those vault tickets that the tellers turned in -- it's kind
18 of like, like your checkbook.  You have a starting balance,
19 and then you write checks, and you subtract those off, and
20 you make a deposit, and you add that back on.  A teller
21 drawer basically works the same way.  And that's what we
22 have done here.  And the shortage that day was $145,509.

23          MR. THAPAR:  Your Honor, I have no further
24 questions for this witness.

25          THE COURT:  Thank you, Mr. Thapar.

CAUDELL - CROSS

1          Mr. Felson, do you wish to cross-examine this

2    witness?

3          MR. FELSON:  I do have a couple questions.

4                    CROSS-EXAMINATION

5    BY MR. FELSON:

6    Q.   Did you watch the police officers --

7          THE COURT:  Wait.  Mr. Felson, get the microphone

8    in front of you.

9    BY MR. FELSON:

10   Q.   Did you watch the police officers do their

11   investigation?

12   A.   My attention was focused a little bit on that, but I

13   did not.  Most of my attention was toward the teller that

14   day, the tellers.

15   Q.   Have you been involved in other bank robberies?

16   A.   Yes, sir.

17   Q.   Did you notice that the police were doing similar

18   things that they have done at other times and everything

19   looked normal to you, as far as normal on the day of a bank

20   robbery?

21   A.   Yes, sir.

22   Q.   And were they looking for prints; do you know that?

23   A.   I don't recall.

24   Q.   You know if they were -- I mean, did they cordon off

25   the area?

1    A.    They didn't cord off the area, but part of what we do

2    when I arrive on the scene or whoever gets there first from

3    our office will normally -- normally, everybody is taken

4    out of that area and taken back to a break room or that

5    type of thing so that they're not involved in any of the

6    police investigation.

7    Q.    Okay.  Did that occur on this day?

8    A.    Yes, sir, as far as I know.

9    Q.    How many police officers were doing an investigation

10   in the bank?

11   A.    Well, that's a difficult question, because there were

12   some in and out.  There were some outside.  I can't really

13   give you an exact answer.

14   Q.    Were they all uniformed officers, or could you tell

15   there were some people that were from the lab and that kind

16   of thing?

17   A.    Some had plain clothes on, and some had uniforms.

18   Q.    Safe to say there were at least a half dozen officers

19   wandering around doing something or appearing to do

20   something?

21   A.    Possibly, yes.

22   Q.    And do you know if they brought any, we'll say,

23   gadgets or mechanical things in; in other words, things to

24   do tests with, that kind of thing?

25   A.    Offhand, I cannot answer that, because it's been a

CAUDELL - CROSS

1  while ago to be quite honest, but I know what normally goes
2  on, but I don't want to make a statement that isn't true.
3  Q.  What have you seen in the past, just typically?
4  A.  In the past, I have seen pictures taken.  They have
5  sometimes a photographer in there taking pictures at
6  various angles of the branch.  I have seen fingerprinting
7  done.  I have seen where they dust for that type of thing.
8  Just kind of everybody has to stay out of that area.
9  Mainly, my focus is usually on the teller, to be quiet
10 honest.
11 Q.  Did the tellers do what they were trained to do under
12 these difficult circumstances?
13 A.  As much as could be expected, yes.
14 Q.  What would be expected other than what they did?  Did
15 you expect them to do or should they have done something
16 different?
17 A.  Well, procedure is to do what the robber tells you to
18 do, because their life is more valuable than any cash that
19 is in the bank.
20 Q.  And they did that?
21 A.  Yes.
22 Q.  Okay.  Obviously, this was a traumatic experience.
23 Did you discuss with the tellers about getting
24 identifications of the bank robbers or identification of
25 the guns or the clothing, things like that?

| 1 | A. | They fill out a robbery sheet, and I usually ask what |
|---|---|---|

2  the robber may have had on and that type of thing.

3  Q.  Now, these robbery sheets, are they turned over to the

4  police, or do you keep a copy?

5  A.  The police usually have it, and we sometimes retain a

6  copy.

7  Q.  Did you retain a copy this time?

8  A.  Oh, I don't have that file.  My superior officer has

9  that file, and they may be in that file.  I don't know.

10 Q.  Is it possible to get that file?  How much trouble

11 would it be?

12 A.  Well, it's about an hour away, so --

13 Q.  So it could be gotten with a little bit of trouble?

14 A.  Right.

15 Q.  And do you know whether there are these -- typically,

16 if you do that, that would have been done in this case?

17 A.  Usually, yes, typically.

18 Q.  And is robbery, you're talking about a robbery sheet

19 you call it?

20 A.  Well, it's basically an identification type of thing.

21 It's not -- it has pictures of guns on it.  It has pictures

22 of facial features and just different information that, as

23 much as they can remember under the circumstances, and it's

24 very difficult for them sometimes, when they go through a

25 difficult situation like that, to remember exactly what

CAUDELL - CROSS

1    somebody's nose looks like.  So -- but we do have those on

2    file.  We try to keep those as much as possible.

3    Q.  Who would we issue a subpoena to in order to bring

4    that file here?

5    A.  First Financial Bank, Jude Haslinger.

6    Q.  You're going to have to spell the name for me.

7    A.  H-a-s-l-i-n-g-e-r.

8    Q.  First name?

9    A.  Jude.

10   Q.  J-u-d-e?

11   A.  Um-hum.

12   Q.  What address would that be kept at or would Jude be,

13   where Jude would be to secure that file?

14   A.  1304 Sunset Street.

15   Q.  Sunset Street?

16   A.  Um-hum.

17   Q.  Which city is that?

18   A.  Middletown.

19   Q.  Okay.  And that's why you're saying it's an hour away,

20   depending on the traffic I guess?

21   A.  Um-hum.

22   Q.  Okay.  And what's the ZIP code out there?

23   A.  45042.

24   Q.  All right.  There is a whole file on this robbery out

25   there?

CAUDELL - CROSS

1   A.   Well, it's basic information.

2   Q.   Fair enough.

3   A.   I have not reviewed the file, so I can't comment as to

4   what's in that file exactly.

5   Q.   Who does review the file?

6   A.   Jude keeps it there in his office.  He is the head

7   security officer; however, he was not called out on this

8   robbery.  That's why I -- he was out of town, as I

9   explained earlier.

10  Q.   What else did you do?  I'm just trying to get an idea

11  for the folks in the jury what is it you actually do.  When

12  you say you're in charge of the tellers or you see to the

13  tellers, you talk to them?  Do you see if they need

14  counseling?

15  A.   Yes.

16  Q.   I'm just curious as to what you do.

17  A.   Basically, they're an emotional wreck by the time I

18  get there, and I usually am off in a room somewhere with

19  them aside from where the police are conducting their

20  investigation.  And I just try to comfort and console them,

21  you know, try to bring up other subjects, talk about

22  something else to try to get their mind off of what they

23  have been through.

24  Q.   Now, did they miss work, these tellers?  Did they come

25  back to work the next day, or are they offered time off?

CAUDELL - CROSS

| | |
|---|---|
| 1 | A.   Yes.   And we also offer counseling. |
| 2 | Q.   All right.   Do you know if they took you up on that? |
| 3 | A.   Yes. |
| 4 | Q.   And forget about the counseling.   Did they take time |
| 5 | off? |
| 6 | A.   Yes. |
| 7 | Q.   Okay.   All right.   Now, were they also interviewed by |
| 8 | the police? |
| 9 | A.   Yes. |
| 10 | Q.   Did you see that with your own eyes? |
| 11 | A.   I saw them go into the room, and I did not see the |
| 12 | actual interview itself. |
| 13 | Q.   Okay.   Did you -- were you aware of what type of |
| 14 | weapons were used in this particular robbery? |
| 15 | A.   No, not the exact type of weapon. |
| 16 | Q.   Did you view the videos or the photographs taken of |
| 17 | the robbers? |
| 18 | A.   No. |
| 19 | Q.   All right.   Now, do you also have a camera of the |
| 20 | outside area?   Do you know if there is a camera that |
| 21 | videotapes the outside of the bank?   I know there is one |
| 22 | inside. |
| 23 | A.   Not that I'm aware of.   There possibly could be, but |
| 24 | sometimes it could possibly be an ATM, but the only time |
| 25 | some of those are activated is if somebody is actually |

```
1   using them.
2   Q.   I see.  But I assume somebody checked to see if there
3   was some video of the outside?
4   A.   Yes.
5             MR. FELSON:  All right.  And that's all I have.
6             Thank you.
7             THE COURT:  Thank you, Mr. Felson.
8             Mr. Pugh, do you wish to ask any questions?
9             DEFENDANT W. PUGH:  No, ma'am.
10            THE COURT:  All right.  Do you have any redirect
11  examination, Mr. Thapar?
12            DEFENDANT W. PUGH:  Could we have just one
13  minute?
14            THE COURT:  Sure.
15            (Defendant W. Pugh and Mr. Andrews confer.)
16            MR. ANDREWS:  Your Honor, my client or Mr. Pugh
17  has asked me if I would ask one or two questions on his
18  behalf.
19            THE COURT:  All right.  That's fine, Mr. Andrews.
20                      CROSS-EXAMINATION
21  BY MR. ANDREWS:
22  Q.   Ma'am, you were the first person to talk to the
23  tellers about the identification of the individuals who
24  robbed the bank, correct?
25  A.   I can't say that I was the first person.  I do not
```

1    know that for a fact.
2    Q.   You were at the bank within probably 30 minutes of the
3    robbery, correct?
4    A.   Thirty to 45 minutes, yes.
5    Q.   At the time when you first talked to Pam, she
6    described Jenny as being on the floor hysterical?
7    A.   Yes.
8    Q.   And you said Pam, as best you could tell from the
9    phone conversation, was in shock?
10   A.   She just was very removed.  She was quiet, but she was
11   not emotional.
12   Q.   You have been to a number of bank robberies.  Can you
13   estimate how many?
14   A.   Probably about five different ones.
15   Q.   Okay.  Had you been to any prior ones at this branch?
16   A.   No.  I was not called out to the branch at that last
17   robbery.
18   Q.   There had been prior bank robberies at this branch?
19   A.   Yes.
20   Q.   Matter of fact, that branch as now been closed as a
21   result of prior bank robberies, or at least that's what the
22   press release said; is that correct?
23   A.   I can't make it.
24   Q.   Okay.  Now, when you arrived, did you find these two
25   tellers still emotionally distraught?

CAUDELL - CROSS

```
 1   A.   Yes.
 2   Q.   Was Jenny still crying hysterically?
 3   A.   She was crying.  Her eyes were swollen and red.  And
 4   she was sitting in a room with her head down and her hand
 5   like this on the table.
 6   Q.   And as to Pam, still in a shocking-type condition?
 7   A.   Which is the way that most appear to be.  Everybody
 8   responds differently.
 9   Q.   Oh, of course.
10   A.   And most of the time they're pretty numb after
11   something like that's happened.
12   Q.   One of the commonest things that people learn in law
13   enforcement about robberies is, when you have a gun trained
14   on you, you have a tendency to watch the gun; isn't that
15   correct?
16   A.   I can't comment on that.  I'm not in law enforcement.
17   Q.   Okay.  You have been to a number of robberies,
18   correct?
19   A.   Yes.
20   Q.   You have found that is factually correct, isn't it,
21   that people watch the gun, because it presents the most
22   immediate threat?
23   A.   Actually, I have never discussed that with them,
24   because I feel they have been through enough already that I
25   don't really broach that subject, to be honest.
```

CAUDELL - CROSS

Q.   Do you go into identification with your people?

A.   There is training done throughout the year on that type of thing.

Q.   Do you do that yourself?

A.   I do not, no.

Q.   You do not do anything as to identification of the people who perpetrated whatever crime may have been perpetrated?

A.   I'm not quite understanding your question.  I don't actually do training classes myself.

Q.   No, I don't mean that.  When you go out and meet with the tellers, do you question them as to the identity of the people who, say in this case, robbed the bank?

A.   Yes.

Q.   Okay.  So you are the first person that does any questioning that you know of on the identification of the people who perpetrated the robbery?

A.   I can't say that I am the first person, again, because law enforcement may arrive on the scene previous to me getting there, and so I can't make that assumption.  Sorry.

Q.   Okay.  You sit down with them, though, for a period of time?

A.   Yes.

Q.   How long typically?

A.   It depends on the situation.

1  Q.  How long on this occasion?

2  A.  I was with Jenny probably for about -- they were

3  actually both in the room, in and out of the room, but

4  Jenny and I was there probably a good -- as far as nonstop,

5  I can't say nonstop.

6  Q.  That's fine.

7  A.  But actually, when I arrived there, probably a good

8  two hours at least just trying to console her.

9  Q.  Do you make may recommendations as to follow-up care

10  for tellers or other bank personnel who go through a bank

11  robbery?

12  A.  Yes, sir.

13  Q.  Were any of those -- either of these two tellers

14  recommended for follow-up care?

15  A.  Yes, sir.

16  Q.  Which or both?

17  A.  Both were recommended, as far as -- I know that Jenny

18  for sure got it.  I'm not sure about the other lady.  I

19  can't speak on her behalf.

20  Q.  So this was a traumatic enough of a situation that,

21  you know, they needed follow-up care in your opinion?

22  A.  Yes.

23  Q.  How about the bank manager, have you talked to him as

24  well, the branch manager?

25  A.  Yes.

CAUDELL - CROSS

| | |
|---|---|
| 1 | Q.    And did you make any recommendations as to -- |
| 2 | A.    The recommendation is made at every robbery that all |
| 3 | the staff and we -- and someone does come in from an |
| 4 | outside counseling source and speak to everyone in the |
| 5 | entire branch.   Then there are optional follow-ups after |
| 6 | that. |
| 7 | Q.    And you're aware of the term PTSD, correct? |
| 8 | A.    Excuse me? |
| 9 | Q.    PTSD, Post Traumatic Stress Disorder? |
| 10 | A.    I'm really not aware of how it all works, no. |
| 11 | Q.    You know that's what the people who do the follow-up |
| 12 | psychologically are looking for, don't you? |
| 13 | MR. THAPAR:   Your Honor, at this point I'm going |
| 14 | to object to this, because she's not a expert in this area. |
| 15 | THE COURT:   Speak louder, Mr. Thapar.   Just raise |
| 16 | your voice. |
| 17 | MR. THAPAR:   Okay.   I'm going to object to this, |
| 18 | because she's not an expert in this area.   She's said she |
| 19 | doesn't know how it affects people, so I don't see the |
| 20 | point of the continuous line of questioning. |
| 21 | THE COURT:   I'm going to overrule the objection, |
| 22 | but I'm not going to give you much more rope, Mr. Andrews. |
| 23 | MR. ANDREWS:   Actually, I only had one more |
| 24 | question in that direction. |
| 25 | BY MR. ANDREWS: |

CAUDELL - REDIRECT

1   Q.    You are aware -- I think my last question was you are
2   aware that's what they are looking for.
3   A.    I am aware that they go through certain emotions that
4   need to be worked through and that they need a professional
5   counselor in order to help then get through that.
6             MR. ANDREWS:  Thank you.  Thank you very much.
7             THE COURT:  Do you have any redirect, Mr. Thapar?
8             MR. THAPAR:  Yes.
9             THE COURT:  You may proceed.
10                      REDIRECT EXAMINATION
11  BY MR. THAPAR:
12  Q.    I'm going to talk to you first, just to make it easy,
13  about Mr. Andrews' questions, and then I'm going to talk to
14  you about Mr. Felson's.  So I'm going to work in reverse
15  order.  But with regards to the overall investigation and
16  talking to the tellers, who got to the bank first on this
17  particular occasion, you or the police?
18  A.    The police.
19  Q.    Now, you mentioned that the first thing you did when
20  you found out about the robbery is called the bank.  Was it
21  your -- were you more concerned with the health and
22  well-being of the tellers or trying to identify the
23  robbers?
24  A.    Primarily, I was concerned about the tellers at that
25  point, but also a secondary is to find out, you know,

CAUDELL - REDIRECT

1    what -- to find out about the robbers as well, but my
2    primary is to make sure that the tellers are okay.
3    Q.    And along that line, is it the primary responsibility
4    of security to solve the crime, or is that the primary
5    responsibility of the police and the FBI?
6    A.    That is the primary responsibility of the police and
7    the FBI.
8    Q.    I now want to move to some of Mr. Felson's questions,
9    and I'll ask you to recall that he asked you what employees
10   do when a robbery recurs and what are their
11   responsibilities.  And I want to talk to you about tellers
12   and managers and the like.  What is their responsibility
13   when they're being robbed?  What are they instructed to do
14   by the bank?
15   A.    They are instructed to do whatever the robber says.
16   Q.    And are they required -- do you know what bait money
17   and dye money is?
18   A.    Yes.
19   Q.    Are they required to give the robbers bait and/or dye
20   money?
21   A.    We ask that they do that; however, with the way -- if
22   there is a gun to your head and someone tells you not to,
23   that's kind of a life and death decision that you have to
24   make, and, if they don't, it's worth their life not to do
25   that.

```
 1   Q.   Okay.  Now, I want to talk to you -- Mr. Felson talked
 2   to you briefly about the cameras and the videos within the
 3   bank.  With regards to those, does someone -- is it the
 4   responsibility of someone, when a robbery occurs, to go to
 5   the tape at some point?
 6   A.   Yes.
 7   Q.   Okay.  Whose responsibility is it?
 8   A.   Normally, someone that works at that office will go to
 9   the tape, because not all of our recorders function the
10   same way.  There are different types of ways to stop the
11   tape and eject it and that type of thing in different
12   offices.  So, normally, someone at that office will do
13   that, unless security arrives, and then we usually go back
14   there with whoever is at that office to get the tape.
15   Q.   And what do they do to make sure the tape isn't
16   recorded over?
17   A.   They take out the tape.
18   Q.   And do they show that tape to the police?
19   A.   Yes.
20             MR. THAPAR:  Court's indulgence.
21             No further questions, Your Honor.
22             THE COURT:  Mr. Felson, do you have any recross.
23             MR. FELSON:  Just a couple questions on that.
24                      RECROSS-EXAMINATION
25   BY MR. FELSON:
```

TETTENHORST - DIRECT

```
 1   Q.    Did they give a bait or dye pack to these robbers, or
 2   were they all accounted for?
 3   A.    They did not give out any baits or dye packs.
 4   Q.    And the only other question is:  Did you turn your
 5   file on this robbery over to the police or a copy of it?
 6   A.    Yes, copies I believe.  Or, to be honest, I don't know
 7   if they received the originals or copies.
 8   Q.    Or FBI.  When I say police I mean --
 9   A.    Law enforcement.
10             MR. FELSON:  Law enforcement.  Okay.
11             Thank you.  That's all I have.
12             THE COURT:  Mr. Andrews or Mr. Pugh?
13             DEFENDANT W. PUGH:  No, ma'am.
14             THE COURT:  Anything further, Mr. Thapar?
15             MR. THAPAR:  No, Your Honor.
16             THE COURT:  Ms. Caudell, the Court appreciates
17   very much your coming here, and you are excused.  Thank
18   you.
19             Who is the government's next witness?
20             MS. CROSS:  The United States calls Jennifer
21   Tettenhorst.
22             (Witness sworn by the courtroom deputy.)
23                      JENNIFER TETTENHORST
24                        DIRECT EXAMINATION
25   BY MS. CROSS:
```

TETTENHORST - DIRECT

1   Q.   Good morning, ma'am.  Will you please tell the members
2   of the jury what is your name and spell your last name?
3   A.   My name is Jenny Tettenhorst.  It's
4   T-e-t-t-e-n-h-o-r-s-t.
5   Q.   Ms. Tettenhorst, in what area do you live?
6   A.   Summerville, Ohio.
7   Q.   And what us your educational background?
8   A.   I graduated from Edgewood High School.  I am currently
9   seeking a degree at Miami University in Hamilton.
10  Q.   Where are you currently employed?
11  A.   First Southwestern, it's now known as First Financial
12  Bank in southwest Ohio.
13  Q.   And what is your position with the bank?
14  A.   I was a teller.  Now I am in the customer service
15  department.
16  Q.   As a customer service person, representative, what do
17  you do?
18  A.   Answer telephones, guide them with any kind of
19  problems that they're having and just try to resolve any
20  type of situation if there is any, help them the best that
21  I can.
22  Q.   Did your duties in customer service entail physical
23  interaction with the public?
24  A.   Yes.  As a teller, I was required to --
25  Q.   Your current position.  I'm sorry.

1    A.    My current one, no.  It's just phones only.

2    Q.    And how long have you been in customer service with

3    the bank?

4    A.    Since two weeks after the robbery.

5    Q.    Now, prior to working in the customer service

6    department at First National Bank, where did you work?

7    A.    I worked at the University Branch as a teller, or

8    actually they call that customer service representative.

9    I'm now a customer service specialist, but I was actually

10   basically a teller.

11   Q.    And the University Branch where you worked as a

12   teller, where is it located?

13   A.    It's on Peck and Williams, on that corner in Hamilton,

14   Ohio.

15   Q.    How long were you a teller at the University Branch of

16   First National Bank?

17   A.    I was only there for about eight months.

18   Q.    Did you work as a teller for that bank in any other

19   location?

20   A.    No.

21   Q.    How long have you been working in the banking

22   industry?

23   A.    For six years.

24   Q.    Is this your first time you have testified in court?

25   A.    Not exactly.  There was a prior robbery that I was

TETTENHORST - DIRECT

1   involved in, but it was, like, civil I think, but it wasn't
2   as big as this one.
3   Q.   Okay.   I'm going to direct your attention to a day in
4   April, 2002.   Do you recall working at the bank when a
5   robbery occurred?
6   A.   Yes.
7   Q.   And what hours were you working that day?
8   A.   I came in at 8:30, and it was until 2:30 in the
9   afternoon.
10  Q.   And --
11  A.   Approximately.
12  Q.   How long had you been working that day when this
13  robbery occurred?
14  A.   All day until that time, since 8:30 in the morning.
15  Q.   Okay.   Approximately what time did the robbery occur?
16  A.   Approximately 2:30.
17  Q.   In your capacity as a teller at the University Branch,
18  were you familiar with any of the customers?
19  A.   Yes.   Just about everyone that came in, I knew them by
20  their faces.
21  Q.   When this robbery occurred at approximately 2:30 in
22  the afternoon, where were you?
23  A.   At my teller station.
24          MS. CROSS:   Your Honor, if I may have Government
25  Exhibit Number 1.   There are several photos that make up

TETTENHORST - DIRECT

| 1 | Government Exhibit Number 1 if I could have that. |
|---|---|
| 2 | BY MS. CROSS: |
| 3 | Q. Ms. Tettenhorst, I'm going to show you what's been |
| 4 | admitted into evidence as Government Exhibit 1.4. You |
| 5 | recognize that? |
| 6 | A. Yes. |
| 7 | Q. What is that a picture of? |
| 8 | A. The front counter line. |
| 9 | Q. Do you see your teller station in this photograph? |
| 10 | A. Yes. |
| 11 | Q. Where is your teller station? |
| 12 | A. I am the third one from the right-hand side. |
| 13 | Q. Is this the first station here? |
| 14 | A. Yes. |
| 15 | Q. Second? |
| 16 | A. Yes. |
| 17 | Q. Third? |
| 18 | A. I'm right there. |
| 19 | Q. This is where you would have been during the robbery? |
| 20 | A. Yes. |
| 21 | Q. Were there any other tellers working along with you at |
| 22 | the time? |
| 23 | A. Yes. |
| 24 | Q. Who was it, and where were they? |
| 25 | A. There was one teller. Her name is Pam. She was right |

```
 1    beside me on my right-hand side if I was inside of there.
 2    So she would have been on the left-hand side of me.
 3    Q.   So if this is you, is this where Pam would have been?
 4    A.   Yes.
 5    Q.   Who else was in the bank working in the bank at that
 6    time?
 7    A.   Our manager, Mr. Connaughton.
 8    Q.   And where was he during the time of the robbery?
 9    A.   He was at his desk.
10    Q.   I'm going to show you Government Exhibit 1.6.  Do you
11    recognize that picture?
12    A.   Yes.
13    Q.   And will you describe what that picture depicts?
14    A.   That's the vault right there that you see the big
15    door.  On the left-hand side is Jim's desk area.
16    Q.   In this area?
17    A.   Yes.
18    Q.   That's where Jim Connaughton was?
19    A.   Yes.
20             THE COURT:  If this will help you, this is an
21    infrared pointer.  You depress that and point it at that.
22    See if that works.
23             MS. CROSS:  Thank you.
24    BY MS. CROSS:
25    Q.   Tell the members of the jury what happened.  What do
```

TETTENHORST - DIRECT

1  you recall happening at the bank when this robbery

2  occurred?

3  A.   Okay.  This is really hard to me.  Okay?  Okay.  What

4  happened was it happened on April 24th, and I was just at

5  my desk.  I was studying for my accounting degree, so I was

6  studying for an accounting -- I'm sorry.  I'm crying

7  already.  I'm sorry.

8  Q.   That's okay.  Take your time, ma'am.

9          THE COURT:  Would you like some water?

10         (Witness crying.)

11         THE WITNESS:  I'm sorry.

12         THE COURT:  Would you like to take a break?  Why

13  don't let's take a ten-minute break.

14         (Recess at 10 o'clock a.m.)

15                  AFTER RECESS

16         THE COURT:  You may proceed, Ms. Cross.

17         MS. CROSS:  Thank you, Your Honor.

18  BY MS. CROSS:

19  Q.   Ms. Tettenhorst, when we broke, I had asked you if you

20  could tell the members of the jury what you recall

21  happening the day of the robbery.  Please take your time.

22  A.   Okay.  I was sitting there studying for my accounting

23  exam when I heard the door open, and I looked up to see who

24  it was, and I immediately got a little edgy, because I

25  didn't recognize the person's face, and, you know, since I

TETTENHORST - DIRECT

1   know all the customers, that kind of notified me right

2   there and made me start feeling uncomfortable. So I said

3   okay. And he hit the first set of doors that I can see,

4   and the person wasn't wearing a mask. Then he went through

5   the second set of doors, and that's when I saw the man with

6   the mask, and I froze.

7        What happened after that was the man that had the mask

8   on went straight over to Jim's side, which is the manager,

9   and the other guy came towards me. At this time, they were

10  both yelling "Get down on the ground. Get down on the

11  ground." And I was frozen, and I couldn't move. So I just

12  stood there. The whole time I'm just going like this,

13  because I'm just scared to death and I can't move.

14       And then he came. The guy without the mask came

15  towards us, and he jumped over my counter, which scared me

16  even worse. So I mean I just couldn't move at all. And he

17  ran over and got the trash can. He took the liner out of

18  the trash can and came toward Pam with the trash can

19  saying, "Give me all your money. Give me all your money."

20  So she started unloading her stuff for, you know, unloading

21  her money into the trash can.

22       After that, he came around towards the back of me, and

23  he was saying, "Move it, Bitch. Move it." So it snapped

24  me from what I was doing. Since I was frozen, it actually

25  got me moving since, you know, he scared me. And then

1  that's when I went over to my drawer and started unloading
2  the money from my drawer into the trash can.  The whole
3  time he's yelling at us, "No dye packs.  No dye packs."  So
4  I did not give him a dye pack since that's what he told me.
5  Q.   Ms. Tettenhorst, I'm going to go back just a little
6  bit.
7  A.   Okay.
8  Q.   When you first saw the first man come through the
9  doors, did you say he had a mask on or he didn't have a
10  mask on?
11  A.   The first gentleman that came through the door did not
12  have a mask on.
13  Q.   Do you recall what race the man was?
14  A.   He was black, African-American.
15  Q.   And do you recall what he had on?
16  A.   At that time, no.  It wasn't until he jumped the
17  counter at me.  They were both holding guns, so the only
18  thing that I was focused on was the gun.  So that's when I
19  noticed that he had a black and white checkered shirt on.
20  And, when he jumped the counter, I was able to see his
21  shoe, which was a black and white shoe.  That's the only
22  thing that I remember as far as description-wise.
23  Q.   Do you recall if the person that came toward you
24  without the mask had any facial hair?
25  A.   I believe he had a mustache, but even that I'm not

TETTENHORST - DIRECT

 1   quite sure on.  I was so in shock that I didn't get a

 2   really good description of him.

 3   Q.   Did you get a look at the gun that he had?

 4   A.   I did.  It was a long -- it had a long-nose barrel to

 5   it, whatever you call that.  But that's the only thing I

 6   got from that, because most of the time I was staring down

 7   the barrel of the gun.  I wasn't looking at the actual gun

 8   itself.

 9   Q.   At any point did you have an opportunity to see the

10   other robber?

11   A.   Yes.  When they first came through the door, I noticed

12   he had a really big gun, looks like --

13   Q.   Really big gun, do you mean a real big revolver?

14   A.   Well, it was to where he had to hold it like this.

15   (Indicating.)  I believe he was all dressed in black, but

16   with that I'm not even quite sure myself either.  I just

17   don't remember too much about what they were wearing.

18   Q.   Do you recall the race of the other robber that had

19   the mask on?

20   A.   His arm was showing, so I was able to tell that he was

21   also an African-American.

22   Q.   Now, I stopped you at the point where you were talking

23   about the robber that came toward you.  Correct?

24   A.   Right.

25   Q.   I'm going to show you what's been admitted into

TETTENHORST - DIRECT

1   evidence as Government Exhibit 4.1 and 4.2. You see that,

2   Government Exhibit 4.1, that photograph? Do you recall the

3   robbers being in the bank the way it's depicted there?

4   A.   Yes.

5   Q.   The person without the mask who's pointing a gun,

6   where are you?

7   A.   I'm behind the counter. You can't see me in that

8   picture. I think I was backed up away from the actual

9   chair. And that's when I was just sitting there frozen

10  like this.

11  Q.   Is that robber pointing that gun at you?

12  A.   Yes, he is.

13  Q.   I'm going to show you Government Exhibit 4.2. We can

14  see one of the robbers in that picture vaulting a counter,

15  teller counter. Is that your teller counter?

16  A.   Yes.

17  Q.   We can see a person's head at the end of the picture

18  here. Is that you?

19  A.   Yes.

20  Q.   Describe your feelings at that point in the picture

21  that we're looking at, 4.2?

22  A.   I was horrified.

23  Q.   You said that this robber here said, "No dye packs.

24  No bait money."

25  A.   They both were screaming at us.

TETTENHORST - DIRECT

1   Q.   So you did what you were told?

2   A.   I did what I was told, yes.

3   Q.   After the robber came and vaulted your teller counter

4   in that way, describe for the members of the jury what

5   happened.

6   A.   After he came over the counter, he ran immediately

7   over to the trash can and took the liner out of the trash

8   can.   The trash can was beside Pam's window on the opposite

9   side of me.   After that, he went to Pam's station and told

10  her to put all the money into the trash can.   He was

11  yelling, "Put the money in the trash can."   So she emptied

12  out all the money in there.

13       After that, he came behind me and stood behind me and

14  said, "Move, Bitch, move."   So that basically made me move

15  to where I was able to put the money into the trash can

16  like he told me to.   After that, he was yelling at me to go

17  to the other teller drawers, and I said they were locked.

18  I can't get them open.   He said, "Well, we're going to the

19  vault then."   So I went over to get the keys.

20       At this time, he was behind -- stayed behind to Pam,

21  and I'm not quite sure what he was doing at that time, but

22  I had ran over to the vault and was trying to get it open

23  with the keys.   I wasn't doing very good, because my hand

24  was shaking like crazy.   So it wasn't going in the key hole

25  very well.   So it was taking me a while.

TETTENHORST - DIRECT

1    After that, when I got the door open, he ran behind
2    me, and he grabbed my arm, my left arm, and then he held
3    the gun up to my head when we were in the vault, and we
4    went to the second set of the vault and I opened that one.
5    I was able to, managed to get that open faster than the
6    first one.  And we went inside, and the vault wasn't
7    locked.  We keep it unlocked, and all I had to do was twist
8    the handle and open it up.  And then I just started
9    throwing everything in there.
10   Q.   I'm showing you Government Exhibit 1.6, which has
11   already been admitted into evidence.  This is a photograph.
12   Is that a photograph of the vault that you opened for the
13   robber?
14   A.   Yes.
15   Q.   Okay.
16   A.   Inside there is a second set of doors, and I had to
17   unlock the second set as well.
18   Q.   I'm going to show you what has been admitted as
19   Government Exhibit 1.8.  What is that a picture of?
20   A.   The inside of the actual vault.  The first part's
21   where the safe deposit boxes are kept.
22   Q.   These are safe deposit boxes here?
23   A.   Yes.  Inside there, there is a shelf, and on the
24   left-hand side of the shelf there is the vault.
25   Q.   This is where you and the robber were?

TETTENHORST - DIRECT

1    A.    Yes.

2    Q.    Who else was in there?

3    A.    Nobody.

4    Q.    Is that a large area or small area?

5    A.    A very small area.  The first area is much larger than

6    the second area, which is like really, really tiny.

7    Q.    He takes you in there at gunpoint?

8    A.    Yes.

9    Q.    And you start emptying the money?

10   A.    Yes.

11   Q.    What happens after that?

12   A.    After that, when I'm emptying the money into the trash

13   can, my hands are just shaking all over the place.  So some

14   of it is falling to the ground.  When I managed to get

15   everything in there, he yelled at me to lay down on the

16   ground, and that wasn't actually possible to do, so I just

17   crouched down like in the fetus style, and I put my hands

18   over my head, and he locked the vault on me.  And that's

19   all I remember.

20   Q.    Ma'am, do you recall whether or not, when you emptied

21   the money from the vault and gave it to the robber, whether

22   or not there were any dye packs or bait money in the vault?

23   A.    I thought I gave him the bait money.  And there was no

24   dye packs, because we don't keep that in the vault.

25   Q.    At some point later, did you learn whether or not you

1   had in fact given him bait money?

2   A.    I gave him two-dollar bills instead of the bait money.

3   Q.    You said that the robber locked you in this small

4   room?

5   A.    Yes.

6   Q.    Could you hear or see anything else?

7   A.    I was in shock.  I don't remember anything.  I don't

8   know how long I was in there or anything.  All I was

9   thinking was whether or not I was going to live to see my

10  three year old again.

11  Q.    Do you recall, ma'am, who helped you out of the vault?

12  A.    Pam opened it.  That's all I remember.

13  Q.    You no longer work as a teller, correct?

14  A.    No.  Never.

15  Q.    Are you saying you will never work as a --

16  A.    I'll never work as a teller again.

17  Q.    Is it because of this incident?

18  A.    Yes.

19          MS. CROSS:  Thank you, ma'am.  I appreciate it.

20          THE COURT:  Mr. Felson, do you wish to

21  cross-examine this witness?

22                    CROSS-EXAMINATION

23  BY MR. FELSON:

24  Q.    I know this is traumatic.  Is everything all right?

25  Can I ask you a couple questions?

|    |                                                           |
|----|-----------------------------------------------------------|
| 1  | A.   I'm all right.  Yes.                                  |
| 2  | Q.   Did you give a description?  Did you talk to the     |
| 3  | police about who did this to you?  Did you have a         |
| 4  | discussion with the police about who did this?            |
| 5  | A.   I'm sorry.  I don't understand what you're asking.   |
| 6  | Q.   About who the robbers were, did you talk to the      |
| 7  | police?  Did you interview?                               |
| 8  | A.   I interviewed with the police, yes.                  |
| 9  | Q.   How many different police officers did you interview |
| 10 | with?                                                     |
| 11 | A.   There was one police officer and then the FBI.       |
| 12 | Q.   And then did you also talk to people from the bank,  |
| 13 | the investigators from the bank?                          |
| 14 | A.   No, not during the robbery or after it.  I'm sorry.  |
| 15 | Q.   Some later time did you?                             |
| 16 | A.   No.  I don't recall ever talking with any of the bank. |
| 17 | Q.   Did you give a description the best you could under  |
| 18 | the circumstances?                                        |
| 19 | A.   Yes.                                                 |
| 20 | Q.   Do you recall what you told the police?              |
| 21 | A.   Yes.  I said one of them had on a black and white    |
| 22 | checkered shirt and black and white shoes.  And then I    |
| 23 | described the guns to the best that I could, but I don't  |
| 24 | know too much about guns.                                 |
| 25 | Q.   All right.  So did you know that one of the guns was a |

1   shotgun?  Are you aware of that?  Do you know what a

2   shotgun is?

3   A.    I wasn't familiar with what it actually was.  To me,

4   it looked like something Arnold Schwarzenneger would carry.

5   It was big.  The one that did not come to me, I'm sorry; I

6   want to clarify that.  The one that went to Jim was the one

7   with the big gun.

8   Q.    Okay.  As far as the face, did they have you pick out

9   people from a lineup or anything like that?

10  A.    No.

11  Q.    Did they show you any pictures of potential suspects

12  for you to pick out?

13  A.    No.

14  Q.    Did you see the police doing their work, their

15  investigation after the robbery?

16  A.    No.  All I saw them was reviewing the security tapes

17  afterwards.

18  Q.    Okay.  You didn't see them dusting for prints, that

19  kind of stuff?

20  A.    No.

21            MR. FELSON:  That's all I have.  Thank you.

22            THE COURT:  Thank you, Mr. Felson.

23            Mr. Pugh, do you wish to ask this witness

24  anything?

25            MR. ANDREWS:  Mr. Pugh has asked that I ask a few

1    questions.

2              THE COURT:  All right.

3                        CROSS-EXAMINATION

4    BY MR. ANDREWS:

5    Q.   Ma'am, after the robbery, did you sit down with the

6    woman in the second row here in the dark suit and talk to

7    her for some period of time?

8    A.   I don't recall.  I don't remember.

9    Q.   You don't remember?

10   A.   No.  I'm sorry.

11   Q.   You don't remember going to the break room and

12   spending some period of time with her right after the

13   robbery?

14   A.   All I remember was her comforting me.

15   Q.   Okay.  You don't remember talking to her about really

16   anything?

17   A.   No.  No.

18   Q.   And do you remember talking to a Hamilton police

19   detective named Markam that afternoon?

20   A.   No.  I believe the one that I talked to, his name was

21   Cifuentes.

22   Q.   And now, after this was over, you were extremely

23   upset?

24   A.   Yes.

25   Q.   And I would suspect this probably was the most

TETTENHORST - CROSS

1   traumatic event you have gone through in your life?

2   A.   Yes.

3   Q.   And the bank provided you with counseling; isn't that

4   correct?

5   A.   Yes.

6   Q.   And you would agree that your memory of the whole

7   event in the bank is somewhat clouded by how scared you

8   were?

9   A.   Only the description.  I relive that day every night

10  in my nightmares.  So, no, I did not forget nothing what

11  happened.

12  Q.   I understand.  Matter of fact, sometimes during the

13  day you have flashbacks to those things, don't you?

14  A.   Yes.

15  Q.   I know that in my own personal experience -- I went

16  through a tornado.

17          THE COURT:  Will you pull the microphone just a

18  little closer to you, Mr. Andrews?

19  Q.   I went through a tornado, and I ended up with some

20  rather irrational fears and problems coming out of that

21  experience.  I rather assume you have, too; isn't that

22  correct?

23  A.   I don't understand what you're asking.  I'm sorry.

24  Q.   Your memory of the event or everything surrounding the

25  event becomes somewhat clouded by all the, if you will,

TETTENHORST - CROSS

1   emotional things that went on with the fear of death;

2   wouldn't you agree with me on that?

3   A.    No.

4   Q.    No?  So you really remember each and every thing that

5   took place?

6   A.    To the best of my knowledge, yes.

7   Q.    Now, did you ever talk to the U.S. attorney,

8   Ms. Cross, about identifying anybody out of a newspaper

9   article or anything?

10  A.    Yes.

11  Q.    Okay.  And you believe that one of the individuals in

12  that newspaper article was one of the people in this

13  robbery?

14  A.    Yes.

15  Q.    Okay.  And you identified that person as being the one

16  who came over the counter?

17  A.    Right.

18  Q.    Okay.  And that was not the person with the long gun,

19  the big gun?

20  A.    Yes.  I got them confused.

21  Q.    So you got confused as to who was who?

22  A.    Right.  I didn't get a very good description of them.

23  Q.    And even today you don't have a very good description

24  of them?

25  A.    No.  I didn't do too good at that part.

1  Q.  Okay.  And this is not meant as being repetitious or

2  anything, ma'am, but you were staring at the end of the

3  gun?

4  A.  Right.

5  Q.  More than anything else; isn't that correct?

6  A.  Yes.

7  Q.  Because that posed the most immediate danger to you?

8  A.  Yes.

9  Q.  And I'm sure, even in your nightmares today, if you

10  were able to talk to us a moment after seeing that in the

11  nightmare, you would tell us every crack and crevice on

12  that gun; isn't that correct?  It's pretty well burnt into

13  your memory?

14  A.  Just the barrel of the gun is basically, yes.

15  Q.  That's the thing that posed the most danger to you?

16  A.  Right.

17  Q.  And it's been described to me that, after this all

18  took place, you were on the floor literally so emotionally

19  distraught you couldn't talk to anyone; is that correct?

20  A.  Yes.

21  Q.  I don't mean that as a criticism.  Don't take it that

22  way.  That's the description that's been given here.  And

23  you certainly, within, say, 15 minutes after -- excuse me,

24  17 minutes after the robbery would not have been in a

25  position to have given a real accurate statement of what

1    took place?

2    A.    Probably not.

3    Q.    And you don't remember even that day giving -- did you

4    give a statement to the police that day?

5    A.    Yes.

6    Q.    Did you fill out the forms that you're supposed to for

7    the bank after a robbery?  Do you recall that?

8    A.    I'm not sure what you mean.  What forms?

9    Q.    There is a pack that you get as a teller that has

10   forms in it that you fill out after there has been a

11   robbery.

12   A.    No.  We did not fill out those forms.

13   Q.    Robbery report, you don't have a form like that?

14   A.    We have those forms, but I did not fill out those

15   forms.

16   Q.    You did not fill out those forms?

17   A.    No.

18   Q.    And that's because of your emotional state?

19   A.    Yes.

20   Q.    When did you talk to law enforcement after this?

21   A.    I honestly can't answer that question, because I

22   wasn't sure what time it was.

23   Q.    You talked to them again that day?

24   A.    Yes.

25   Q.    Have you talked to them since the 24th of April?

TETTENHORST - CROSS

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Talked to them many times? |
| 3 | A. | Clarify "many." |
| 4 | Q. | More than five? |
| 5 | A. | I would say it's probably around five. |
| 6 | Q. | And in that you talked to Agent Moran, who is sitting |
| 7 | | here in the courtroom today, correct? |
| 8 | A. | I'm sorry. Which one is that? |
| 9 | Q. | Agent Moran, sitting at counsel table there? |
| 10 | A. | Oh, yes. Yes. I'm sorry. I just know his first |
| 11 | | name. |
| 12 | Q. | And you have talked to Ms. Cross? |
| 13 | A. | Um-hum. |
| 14 | Q. | You have talked to other police officers from the |
| 15 | | Hamilton police? |
| 16 | A. | Yes. |
| 17 | Q. | And they have shown you pictures, correct, prior to |
| 18 | | today? |
| 19 | A. | Yes. |
| 20 | Q. | They showed you, matter of fact, the pictures they put |
| 21 | | up on the board? |
| 22 | A. | Yes. |
| 23 | Q. | And you have seen those more than once? |
| 24 | A. | Yes. |
| 25 | Q. | And you have seen them at the FBI office in Hamilton, |

1    correct?

2    A.    Yes.

3    Q.    You have seen them at the U.S. Attorney's Office here

4    in Cincinnati, correct?

5    A.    I'm not sure.  I don't remember.

6    Q.    Okay.  But you have seen them several times?

7    A.    Yes.

8    Q.    Okay.  And you would agree with me that, at the time

9    all this took place, you -- strike that.  You thought this

10   really an emotional time, and I don't mean to make light of

11   this.  You meant to grab for a bait pack; isn't that

12   correct?

13   A.    Yes.

14   Q.    And you grabbed the two-dollar bills?

15   A.    Right.

16   Q.    And I guess you thought you had actually put a bait

17   pack in?

18   A.    Yes.  They look the exact same.

19   Q.    And probably kept in a fairly similar area?

20   A.    Right.

21   Q.    So it's a natural mistake to make, but one, if you had

22   not been under that kind of emotional pressure, you would

23   have never made, correct?

24   A.    Yes.

25              MR. ANDREWS:  I have nothing else at this time.

```
 1              THE COURT:  Thank you, Mr. Andrews.
 2              Ms. Cross, do you have anything?
 3              MS. CROSS:  Your Honor, may counsel approach
 4   regarding a matter before I do redirect?
 5              THE COURT:  Why don't we take our morning break
 6   at this point in time?  Let's take a break until 11, and we
 7   can handle it during the recess.
 8              (Jury excused from the courtroom.)
 9              THE COURT:  I have told the witness that she
10   doesn't need to remain here, and it's probably better if
11   she didn't.  So she just needs to be back here at 11 as
12   well.
13              Yes, Ms. Cross?
14              MS. CROSS:  Your Honor, through the
15   cross-examination, I believe that Defendants have opened
16   the door as to the identification that Ms. Tettenhorst made
17   of -- well, the United States provided a copy of a
18   newspaper article that Ms. Tettenhorst viewed and
19   misidentified Mr. Tyreese Pugh as coming over the counter
20   as opposed to Walter Pugh.  And they have opened the door
21   as to that misidentification.  We would like to now clarify
22   that for the record, ask her some questions about her
23   identification.
24              She saw these two pictures.  I don't want to put
25   the whole newspaper article into evidence, but we would
```

like to make a copy of these two pictures that she looked at and said basically that it was Tyreese Pugh. She thought it was Tyreese Pugh that came over the counter when she looked at the pictures of the defendants.

THE COURT: All right. Mr. Felson, do you object?

MR. FELSON: I actually would like to ask her some questions about her misidentification as well.

THE COURT: All right. So you have no objection?

MR. ANDREWS: Your Honor, I think I opened the door, so I obviously have no real problem as long as we keep it on the up and up that it's all a misidentification.

THE COURT: All right. Do you have the ability, Ms. Cross, to make --

MS. CROSS: We will go do that now.

MR. ANDREWS: We do have an additional problem this morning, and I just wanted to address the Court on this. My client asked me to issue some subpoenas for some people in Atlanta, Georgia. I have issued those subpoenas. They have now called the court. I had no idea whether or not they would respond or not. I did not make any kind of accommodations to have these people brought to the court, not knowing whether or not we would even find them.

Well, apparently, according to Mr. Snyder, not only did the subpoenas find them, but they have now found

```
 1   us and are calling.  My client obviously is indigent, does
 2   not have the means to have these people brought here, and I
 3   would -- quite honestly, I'm not even sure what the
 4   procedure would be at this point in getting them brought
 5   here, other than I know in the past the federal government
 6   has had the means by which to use, through their travel
 7   department, the ability to get cheaper airline tickets and
 8   move people around.  But other than that, I'm, quite
 9   candidly, not certain what the procedure is.
10             THE COURT:  Ms. Cross?
11             MS. CROSS:  Your Honor, we don't have the
12   ability -- well, we have the ability, but we don't make
13   travel arrangements for people that are not our witnesses,
14   especially at the government's expense.
15             At this point, we don't intend to call anybody
16   from Atlanta, Georgia, and the government should not have
17   to pay for anyone that's not our witness to come here.
18             MR. ANDREWS:  Actually, I was thinking more of
19   the CJA fund.
20             THE COURT:  How many witnesses?
21             MR. ANDREWS:  There are three, Your Honor.  And,
22   candidly, Mr. Pugh has indicated to me these are people who
23   actually are more of a rebuttal nature to a witness we were
24   not certain would appear who we understand now has been
25   subpoenaed and is present in the court, so we assume she
```

1    will testify.

2            THE COURT:  All right.  Before we even consider

3    bringing people from Atlanta, who are you anticipating that

4    they would be rebuttal to?  I want to make sure that this

5    is even a possibility.

6            MR. ANDREWS:  It would be rebuttal testimony to

7    Stephanie Luster, who we understand has been brought before

8    the Court.

9            MS. CROSS:  Stephanie Luster has been subpoenaed

10   to testify, and we expect her to testify.

11           THE COURT:  All right.

12           MR. ANDREWS:  And, candidly, I'll tell you, when

13   we issued the subpoenas, Mr. Pugh indicated to me it was at

14   the last known address.  He had no idea it would even reach

15   these people.  And I must say I'm probably 50 percent

16   surprised it actually got to them, so --

17           THE COURT:  All right.  I don't really know the

18   procedure for paying for witnesses for indigent defendants.

19   Let me check during the break, and when we reconvene at

20   11 --

21           MR. ANDREWS:  Candidly, I don't think it's

22   obviously going to be a problem until Friday or after.

23           THE COURT:  I think you will be in the defense

24   case tomorrow.

25           MR. FELSON:  You asked me to ask Dr. Fulero, and

1    he can show up tomorrow afternoon.

2              THE COURT:  Yes.  All right.  We will check.

3              (Recess at 10:50 a.m.)

4                         AFTER RECESS

5              THE COURT:  Counsel, here's what we found out

6    during the break.  I think there are two possibilities with

7    regard to the witnesses from Atlanta.  One is that we might

8    be able to video conference them in.  We would have them go

9    to the courthouse in Atlanta where they have video

10   equipment, and they have a video conference room here.  We

11   would have to move the trial down to the video conference

12   room, but you could examine them on the video.

13             You know, it's simultaneous.  I have done some

14   other court proceedings, and it works well.  That would

15   probably be my preference, just because we have such a

16   short amount of time.  I'm not sure it's possible to get

17   folks up here from Atlanta by tomorrow.  The marshal

18   advises me that, if we put on an order, that we can -- then

19   the payment isn't a problem.  We can get them government

20   rates and everything.  I'm just not sure how quickly --

21             Do they make the arrangements?  Who makes the

22   arrangements, Chris?  I didn't see you sitting behind.

23             DEPUTY MARSHAL RILEY:  We would make the

24   arrangements.  They would have to pick the tickets up.

25   Generally, we do an E ticket, but we provide them a certain

```
 1   amount of cash for the travel, and they would have to pick
 2   that up at the marshal's office, and we would have to have
 3   that done obviously by close of business today.
 4            THE COURT: So that's where we are.
 5            MR. ANDREWS: We were just discussing the
 6   individuals video conferencing first.
 7            Your Honor, Mr. Pugh would like them brought here
 8   if at all humanly possible. He understands video
 9   conference is available if that is not possible. There are
10   three witnesses.
11            And the names again, Walter?
12            THE COURT: Do you have copies of subpoenas?
13            (Off the record.)
14            MR. ANDREWS: Your Honor, it will take me a
15   moment. I know they were issued, since we were being
16   called.
17            THE COURT: Tell you what, we'll break at noon.
18            Mr. Riley, if he gets those to you at noon, would
19   that be sufficient? Why don't we do that?
20            DEPUTY MARSHAL RILEY: We'll do our best.
21            THE COURT: Rather than holding up the trial now.
22            MR. ANDREWS: We agree.
23            THE COURT: Bring back in the jury.
24            Would you get the witness back for us?
25            MS. CROSS: And, Your Honor, just to let you
```

```
 1   know, the United States will not have any redirect for
 2   Ms. Tettenhorst.
 3              THE COURT:  Okay.
 4              MS. CROSS:  We thought we would.  Upon
 5   reconsideration, we don't.
 6              THE COURT:  Oh, all right.  I guess we don't
 7   really need her back then.
 8              MR. THAPAR:  Did Your Honor want to dismiss her
 9   in front of the jury, or are you comfortable doing it in
10   front of the record and letting us move on?  We have no
11   problem with you doing this on the record, if the defense
12   doesn't, and letting us call the next witness.
13              THE COURT:  I don't think I really need to do it
14   on the record.
15              MR. FELSON:  Actually, then, it means I have to
16   call her.  I did want to ask her a couple questions about
17   that from his questions about that.  I guess I can subpoena
18   her for my case in chief as opposed to putting her back on
19   for two questions.
20              (Jury present.)
21              THE COURT:  Ms. Cross, I think we decided during
22   the recess that the government has no additional questions
23   of this witness.  Is that correct?
24              MS. CROSS:  That is correct, Your Honor.
25              THE COURT:  And, Mr. Felson, you said you have a
```

TETTENHORST - CROSS (Cont.)

1   couple?

2            MR. FELSON:  Yes.

3            THE COURT:  You may proceed.

4            MR. FELSON:  Thank you.

5                    CROSS-EXAMINATION (Cont.)

6   BY MR. FELSON:

7   Q.   You said in your earlier testimony that you made some

8   sort of mistake in the identification.  Can you just fill

9   that in for me a little bit?  You said you misidentified.

10  A.   When they were showing me the pictures in the

11  newspaper, I had --

12  Q.   Who was showing you pictures of the newspaper?

13  A.   Wende Cross was, and she told me to point to which one

14  I thought it was.

15  Q.   That's this woman right here, the state attorney, the

16  U.S. attorney?

17  A.   And I pointed to the wrong one evidently.

18  Q.   Did she show you any other pictures, other than those

19  two?

20  A.   No.

21  Q.   And what was her question to you, "Which one was it"?

22  A.   Yes.

23  Q.   Did she say there was a possibility it could be

24  neither one?

25  A.   No.

1   Q.   Okay.  All right.  And you pointed to the wrong one?

2   A.   Yes.

3   Q.   That's all.  Thank you.  Which one did you point to?

4   I'm sorry.  Which one did you point to?

5   A.   I pointed to Tyreese -- I don't know how to say his

6   name.

7   Q.   Tyreese?

8   A.   Yes.

9   Q.   Well, how did you know that wasn't the right one?  I

10  guess pursuant to Wende Cross' identification of who was

11  the right one?

12  A.   I assumed it was a young person, since they jumped

13  over the counter like that.  For all I know, it might not

14  have been any one of them.  I mean, I have no way of

15  knowing that, because I did not get an accurate description

16  of who it was.

17  Q.   Then why did you point to one of them?

18  A.   Because that's who I honestly thought it was.  I am

19  just going by, at that time, I honestly thought it was him.

20             MR. FELSON:  All right.  Thank you.

21             THE COURT:  Anything further as a result of

22  Mr. Felson's questions, Mr. Andrews?

23             MR. ANDREWS:  Nothing, Your Honor.

24             THE COURT:  Ms. Cross, anything further as a

25  result of Mr. Felson's questions?

1              MS. CROSS:  Yes, Your Honor.  One moment.

2              THE COURT:  All right.

3                    REDIRECT EXAMINATION

4    BY MS. CROSS:

5    Q.   Ms. Tettenhorst, the newspaper that you saw that I

6    discussed with you, the first time you saw that newspaper,

7    did I show it to you?

8    A.   No.  I saw it in the local newspaper.

9    Q.   Before you even met me?

10   A.   Yes.

11   Q.   And did you bring that newspaper in to show it to me?

12   A.   Yes.

13   Q.   And do you recall, when you saw those two pictures in

14   the newspaper, that you thought those were the robbers at

15   the bank?

16   A.   Yes.

17             MS. CROSS:  Okay.  Thank you.  No further

18   questions.

19             THE COURT:  Mr. Felson?

20                    RECROSS-EXAMINATION

21   BY MR. FELSON:

22   Q.   Were you aware that one of the robbers was wearing a

23   mask over his entire face?

24   A.   Yes, sir.

25   Q.   Yet you thought both were the robbers.  Did you see --

PHILPOT - DIRECT

```
 1   A.    Honestly, I didn't know myself.  I mean, I just went
 2   by what I was told in the local newspaper.
 3   Q.    All right.  But you thought they were both the robbers
 4   in the bank?
 5   A.    Yes.
 6   Q.    Even though you didn't see one of their faces at all?
 7   A.    I understand.
 8   Q.    Is that true?
 9   A.    Yes.
10           MR. FELSON:  Okay.  Thank you.  That's all.
11           THE COURT:  Anything further, Mr. Pugh or
12   Mr. Andrews?
13           DEFENDANT W. PUGH:  No.
14           THE COURT:  Ms. Cross?
15           MS. CROSS:  No, Your Honor.
16           THE COURT:  Ms. Tettenhorst, the Court
17   appreciates very much your coming here, and you are
18   excused.
19           Who is the government's next witness?
20           MR. THAPAR:  Your Honor, at this time the United
21   States calls Pam Philpot.
22           (Witness sworn by the courtroom deputy.)
23                      PAM PHILPOT
24                   DIRECT EXAMINATION
25   BY MR. THAPAR:
```

PHILPOT - DIRECT

| 1  | Q. | Good morning, Ms. Philpot. Can you introduce yourself |
| 2  | to the jury and spell your last name for the record, |
| 3  | please? |
| 4  | A. | My name is Pam Philpot. P-h-i-l-p-o-t. |
| 5  | Q. | Ms. Philpot, where do you work? |
| 6  | A. | Now I work at a day care. |
| 7  | Q. | How long have you been working at a day care? |
| 8  | A. | For about three months. |
| 9  | Q. | Okay. And where did you work before that? |
| 10 | A. | I worked at First National Bank. |
| 11 | Q. | Okay. And what did you do at First National Bank? |
| 12 | A. | I was a teller. |
| 13 | Q. | When did you stop working at First National Bank? |
| 14 | A. | My last day there was the day that we got robbed. |
| 15 | Q. | I want to talk to you about that robbery. In |
| 16 | directing your attention to that, was that April 24th of |
| 17 | this year? |
| 18 | A. | Yes. |
| 19 | Q. | Can you -- what I'm going to do now is I'm going to |
| 20 | have Ms. Cross put on the screen Government Exhibit 2, |
| 21 | which has already been admitted. And you're going to |
| 22 | have -- |
| 23 | | THE COURT: Excuse me for one moment, |
| 24 | Ms. Philpot. You have also got a picture of it in the |
| 25 | exhibit book in front of you if it's easier for you to look |

PHILPOT - DIRECT

1  at that than up on the screen.  See where the number "2 is

2  behind that tab?  There you go.

3              MR. THAPAR:  Thank you, Your Honor.  Does she

4  also have that neat pen you gave her?

5              THE COURT:  See the little pen by the microphone?

6  It's actually an infrared pointer.  If you push that thing

7  down, if you depress that, you can point things out on the

8  chart up there.

9  BY MR. THAPAR:

10 Q.   You feel comfortable using that?

11 A.   I'll try it.

12 Q.   Why don't you try it?  If not, Ms. Cross will use her

13 pen.  Why don't you tell me about the robbery, and if you

14 could describe to me what happened by using this chart?

15 A.   Okay.  Jenny and I were at our work stations, and I

16 can't really -- are these here our work stations?

17             THE COURT:  Do you want to step down off the

18 witness stand and go over there?  Would that be easier for

19 you?

20             MR. THAPAR:  That would be great, Your Honor.

21             THE COURT:  Do we have a pointer somewhere,

22 Steve?

23             MR. THAPAR:  Ms. Philpot, if this is difficult

24 for you, we'll get out pictures.  I thought you might use

25 this if you can tell how it is set up.

| | | |
|---|---|---|
| 1 | A. | Okay. The way I'm seeing it, this is -- |
| 2 | | THE COURT: You have got to keep your voice up so |
| 3 | the jury can hear you. Okay? |
| 4 | A. | This is the lobby, and back here is our work stations. |
| 5 | Q. | Okay. |
| 6 | A. | You want me to tell you what happened? |
| 7 | Q. | Yes. I think -- where is the lobby again? |
| 8 | A. | Right here is the lobby. |
| 9 | Q. | What does it say above it? |
| 10 | A. | Teller line. So they're back over here. |
| 11 | Q. | Okay. Why don't you show us where the vault is? |
| 12 | A. | Over here. |
| 13 | Q. | And the manager's office? |
| 14 | A. | It's back here. |
| 15 | Q. | Where it says "office"? |
| 16 | A. | Yes. |
| 17 | Q. | Okay. So why don't you describe for us what happened? |
| 18 | A. | Okay. When they come in the door, Jenny and I was |
| 19 | back up -- |
| 20 | Q. | Speak up. |
| 21 | A. | When they come in the door, Jenny and I was back at |
| 22 | our teller lines. And Jenny said, "Oh, my God." And I |
| 23 | didn't see them at first. And she said, "We're being |
| 24 | robbed." And it was two black guys, and one of them went |
| 25 | back this way, and one of them jumped back over the teller |

PHILPOT - DIRECT

1   line.

2   Q.   You say it was two African-American individuals.   How

3   did you know that?

4   A.   How did I know they were black?

5   Q.   Yes.

6   A.   I could see their faces.

7   Q.   Could you see the face of both individuals?

8   A.   Yes, to the best I can remember.

9           THE COURT:   Mr. Thapar, wait one moment.  We're

10  going to give you a microphone, make it a little easier for

11  you.

12          THE WITNESS:   Okay.

13  BY MR. THAPAR:

14  Q.   And they came in, and you said one of them vaulted the

15  teller line?

16  A.   Yes.

17  Q.   What happened next?

18  A.   He said, "Give me your money."  And he went for the

19  garbage can that was behind my teller station and opened

20  the bag up, and he said, "No dye."  So I emptied my drawer

21  and put my money in the garbage bag, and then he told me to

22  lay on the floor.

23  Q.   Okay.  And what happened next?

24  A.   I laid on the floor, and he told Jenny he wanted more

25  money, and she said she didn't have any more money, and he

| | | |
|---|---|---|
| 1 | | said to take him to the safe. So he took Jenny back to the |
| 2 | | vault. |
| 3 | Q. | Did you see how he took her to the safe? |
| 4 | A. | No. |
| 5 | Q. | And why not? |
| 6 | A. | I was laying on the floor. |
| 7 | Q. | Okay. What happened when he went into the vault? |
| 8 | A. | The other guy on the other side -- |
| 9 | Q. | Where was he; why don't you point out? |
| 10 | A. | Here's the office. He was down here, but I couldn't |
| 11 | | see him. |
| 12 | Q. | Because you were laying on the floor? |
| 13 | A. | Because I was laying on the floor back here. |
| 14 | Q. | And -- |
| 15 | A. | But I could hear him telling Jenny to give him the |
| 16 | | money. |
| 17 | Q. | Hearing who telling Jenny? |
| 18 | A. | The guy that took her back to the vault, to give him |
| 19 | | the money. And over on this side I heard him say, "Here |
| 20 | | comes the mailman." |
| 21 | Q. | Who did you hear say "Here comes the mailman?" |
| 22 | A. | The guy here, here at the office. "Here comes the |
| 23 | | mailman. You need to hurry up." |
| 24 | Q. | And then what happened? |
| 25 | A. | It didn't seem long after that that he came out, and |