that they showed.

THE COURT: Is that a question, Mr. Felson? You know --

MR. FELSON: Not really. It should be.

THE COURT: You can't lecture to the witness. You're going to have to phrase it in the way of questions.

MR. FELSON: Forgive me. Let me try again.

BY MR. FELSON:

Q. Your goal in taking -- what was your goal in taking the box of those cigars out of the car and marking them as evidence?

A. Just to show they smoked Black & Mild cigars.

Q. But you don't know which one, two or all smoked Black & Mild cigars, do you?

A. According to the statements that I received, all three.

Q. I'm talking about your personal knowledge.

A. No, sir. I never socialized with them and don't know what they do in public, no, sir.

Q. Now, you had the ability to find out exactly who smoked those cigars, didn't you?

A. Who smoked that one particular tip, yes.

Q. But you didn't do that. You didn't take on that responsibility to find out, did you?

A. I didn't see a need to, sir.

Q. Now, did you find anything else in anything in either of those cars that would place my client Tyreese Pugh in either vehicle?
A. No, sir.
Q. Now, you talked about a trip to Atlanta. Did you contact anybody in Atlanta at the Travelodge?
A. Yes, sir.
Q. Okay. Are any of them here to testify?
A. No, sir.
Q. All right. You said there was a parking permit dated 4/25 and 4/26, both days?
A. Yes, sir.
Q. Found in the Cadillac?
A. Correct.
Q. And that Cadillac is registered to Walter Pugh?
A. Correct.
Q. But that parking permit had the name Lovett on it?
A. Yes, sir.
Q. What is, just for my sake, where was that word Lovett? What did that mean, Lovett? L-o-v-e-t-t, you're talking about that?
A. That's another woman that Mr. Walter Pugh was dating, Tenikia Lovett.
Q. You never saw them date?
A. Again, sir, that's information I received through my

statements.

Q. I'm trying to find out some information that maybe you did from, you know, you saw yourself. You don't know that to be a fact then, right? You don't know that?

A. No, sir.

Q. Again, that's just hearsay and inuendo?

A. That's what others have told me, yes, sir.

Q. All right. Now, the name Lovett was -- this parking permit was from Atlanta, Georgia?

A. The Travelodge downtown Atlanta, Georgia, yes, sir.

Q. Did somebody named Lovett stay there?

A. I don't know, sir. That's what I would assume.

Q. All right. You know who, if anybody, borrowed Bessie Pew's car on a monthly basis or here and there every now and then?

A. Only what I have been told in rumor and inuendo, sir.

Q. All right. Now, there is a recording you say, and this recording has a voice on it you said, right?

A. Two voices.

Q. Two voices. Now, have you ever, before this recording, had you ever spoken to either Tyreese or Walter?

A. Before I listened to it or before the recording was made?

Q. Before you listened to it?

A. Yes, sir.

Q. Before the recording was made?

A. No, sir.

Q. Now, did you take this recording to -- I guess you have labs that you can take it to knock down or break down the voices and to have some kind of a graph as to the sound of people's voices so you can be sure who they are?

A. I'm sure there are somewhere, sir. I have never used one. Don't know how to use them.

Q. You just go by your trained ear, right?

A. I just listen.

Q. Let's talk about that. What kind of special training do you have in forensics, for example?

A. When we're promoted to the rank of detective, we receive a course in evidence collection and processing put on by BCI, Bureau of Criminal Investigation, which is Ohio's -- that's the lab that I use in Columbus, how they want evidence packaged, processed and so forth. We go to several in-service trainings covering topics from processing homicide scenes, sexual assault scenes, taking photographs, continuing in-service schools that we go to twice a year. I have been through officer involved in shooting schools, crash investigation schools. I would have to go back through my personnel file to be able to pull everything that I have been through.

Q. Fair enough. But you have had some training on how to

package and send up evidence for the lab to take a look at?
A. Yes, sir.
Q. Did you package these items up in this way?
A. In accordance with their guidelines, yes, sir.
Q. What is it, you just didn't send them up, or you sent them up and just didn't get the answer you wanted?
A. No, sir. They were never sent.
Q. Then you testified a little later that you went onto this street called Wilcontin and you saw a guy or you saw a guy come out of the house and go back in. Is that right?
A. I don't know where Wilcontin is, sir. I went to Wincanton.
Q. I'm sorry. Wincanton. I can't read my own handwriting. Wincanton. Okay. Now, when you first -- you were surveilling Wincanton; is that right?
A. A particular house, yes, sir.
Q. And you were watching this house, and somebody came in and somebody came in and out of the house, and you saw a black male; is that right?
A. I saw Shanell Holston pull up in her vehicle. I watched her go to the door. I watched a male subject come out, as I testified to before. I never said black male. I don't know who the male was. It was dark. I couldn't make out a face.
Q. At that moment, you had an arrest warrant in your hand

or available to you; is that right?

A. For Walter Meade Pugh, yes, sir.

Q. Well, I would assume then, if -- you thought you were surveilling that place for Walter Meade Pugh right?

A. Correct.

Q. Well, why didn't you just walk up to the guy and ask him if he's Walter to get a good and better look at him? You had an actual warrant for him.

A. Based upon the video surveillance of the bank, we believed they were armed and dangerous. We weren't -- at that point in time, we believed the other subject to be Tyreese, and I was not going to place myself in harm's way there. We only had one subject outside. It's not a sound tactic.

Q. Fair enough. But you left there?

A. After Hamilton County Sheriff's Office had surveillance on the house, had the house surrounded.

Q. Who made the arrest? Who went inside the house?

A. The Hamilton County Sheriff's Department SWAT team.

Q. Did you not go in the house?

A. No, sir, I did not.

Q. Now, what time of day or night did the SWAT team go in?

A. 2:30, 3 o'clock in the morning, maybe a little later, maybe a little earlier. I'm not sure, because we had been

there a while.

Q. Was that when Tyreese was arrested?

A. Yes, sir.

Q. And Walter, was Walter arrested at the house?

A. Walter was arrested when he left the house in the vehicle with the woman and the other man.

Q. What other man?

A. A man by the name of Cortes Renfro.

Q. Now, Cortes Renfro, isn't he the owner or the renter of the house?

A. That's my understanding, yes, sir.

Q. And Mr. Renfro, does he have a record?

MS. CROSS: Objection.

THE COURT: Sustained.

Q. Okay. Mr. Renfro was with a female. What was the female's name who was in the car when Walter was arrested?

A. I believe her first name is Kim or Kimberly. I don't remember the last name. I would have to check the Hamilton County Sheriff's Department records.

Q. Okay, all right. So you were not -- you did not enter the house during the arrest process of Tyreese; is that right?

A. I already stated no, sir.

Q. Which officers actually made that arrest?

A. The Hamilton County Sheriff's Department SWAT team,

sir.

Q. They have a name. Give me a name.

A. I don't know who all. They have a large list of officers that were there, sir. I don't know who was the one that particularly laid hands on Mr. Pugh.

Q. How many officers were there?

A. I couldn't even tell you, sir.

Q. Like a dozen?

A. More.

Q. Twenty, 30?

A. I would say probably in the range of 20, but I'm again not sure.

Q. It wasn't 1,000?

A. No, sir.

Q. It was just more than -- okay, got you. Okay. Now, were you the lead investigator on this case, or were you --

A. Yes, sir.

Q. Did you get together with anybody from the bank and compare notes?

A. Anyone --

Q. Security people?

A. No, sir.

Q. Do you know if the bank conducted their own investigation?

A. It's my policy in working with First Southwestern that

the investigation is left to us.

Q. Okay. You know if they even keep a file on this robbery?

A. I can't speak to their practices, sir. I don't know.

Q. You didn't speak to anybody from the bank security. You didn't speak to any bank security people; is that right?

A. They supplied me with the count of the money.

Q. Anything else?

A. No, sir.

Q. Did you show a lineup to anybody?

A. No, sir.

Q. Now, this informant, Shanell Holston, you're saying she was the informant. Did she wear a wire when she made that recording, or was it a telephone recording?

A. It was recorded over the telephone.

Q. All right. And she was living with Walter Pugh at this time; is that what you're saying?

A. That was my understanding, yes, sir.

Q. And what was -- so what, you just visited her and said will you tape record this conversation, and she said okay?

A. No, sir.

Q. How did that come down?

A. She came to us the night of the 2nd and said I'm to meet Walter and Tyreese with all this stuff that was in her

trunk and give it to them. And she said I want to take you to them, because I know you're looking for them.

Q. Okay. Now, do you know, have you met her before?

A. No, sir, never met her before.

Q. Do you know if she was reliable or anything about her?

A. No, sir.

Q. You know if she had an ax to grind in any way?

A. As I said, sir, I didn't know her.

THE COURT: Mr. Felson, how much longer is your cross-examination?

MR. FELSON: It could be -- you want to take a break, Judge?

THE COURT: Yes. I think it would be a good -- is this a convenient time for you?

MR. FELSON: Absolutely.

THE COURT: Ladies and gentlemen, we're going to take our afternoon break. We will be in recess for 15 minutes, until 3:15.

(Jury excused from the courtroom.)

THE COURT: Counsel, Deputy Marshal Riley has a status report on a subpoena for Walter Pugh.

Deputy Riley, you want to tell them what you found so far?

DEPUTY MARSHAL RILEY: Was it Watson Adkins --

THE COURT: Can you keep your voice up?

DEPUTY MARSHAL RILEY: They informed my administrative assistant that they were not coming to Cincinnati whether we provided transportation for them or not.

MR. ANDREWS: How about Evlyn?

DEPUTY MARSHAL RILEY: We have been unable to make contact.

MR. ANDREWS: And did you inquire as to whether or not they would make themselves available at the courthouse in Atlanta?

DEPUTY MARSHAL RILEY: Did not do that.

MR. ANDREWS: I will call them on the break and see where we stand.

THE COURTROOM DEPUTY: Atlanta District Court Clerk's Office had an electrical surge, and it blew out most of their video conference equipment. So that is not available. The only option that we know of is to contact the circuit court and see if they have any equipment.

So that's what I have got so far there.

MR. FELSON: Is that for good or until tomorrow?

MR. ANDREWS: With the government, it's for good, at least as far as we are concerned.

THE COURTROOM DEPUTY: It's long enough range not to be done before this trial.

MR. ANDREWS: That was not meant as a slam, and

I'll explain why I say that. My wife works in finance for a federal agency. I know how long it takes to get something done.

THE COURT: No, no. I'm not thinking about that. Did we cover all the witnesses that you had subpoenaed?

MR. ANDREWS: Yes. I'm going to have to get ahold of Evlyn, and we'll talk to the Watsons and see what, if anything, can be done.

THE COURT: All right. Then let's stand in recess.

MS. CROSS: Your Honor, may I bring up one other matter?

THE COURT: Yes.

MS. CROSS: I'm sorry. As you know, Jenny Tettenhorst testified this morning, and, after she was excused, the government had no intentions of recalling her whatsoever. She sat in the courtroom, and we turned around, and we saw her crying. And we asked her to leave. When she left, she notified Special Agent Moran that she recognized Walter's voice, because he had asked questions, not of her, but while she was sitting in the courtroom. I would like to recall her, because she recognized his voice as the person that robbed the bank and that assaulted her.

We understand about the Rule 615 and the purpose of excluding witnesses. We will not call her regarding any

testimony. We will call her only for the sole purpose of the recognition of the voice of the defendant Walter Pugh.

MR. ANDREWS: Your Honor, A, let me just start out by saying Walter has said almost nothing today. I have handled all the questioning. So I find this highly improbable. Number two, what the heck was she doing in here on a separation anyway?

THE COURT: No. She was in here because she had been excused. Once they've excused a witness, they're allowed to be in the courtroom.

MR. ANDREWS: That's fine, Your Honor, except when the government is going to try to drag them back in to make an identification they couldn't make otherwise.

THE COURT: I don't know that that violates the separation. What I'm looking for is if there is any other reason why you object.

MR. FELSON: Let me make one point, Judge. This is the same woman, unless I'm mistaken, that identified two pictures from the newspaper and got the wrong one as the one that jumped over the --

THE COURT: That's fine, but that's things to bring up in cross-examination. Those are all issues for cross-examination. I'll permit you to recall her.

MR. ANDREWS: Your Honor, note our vehement, vehement exception to this.

MR. FELSON: Yes, Your Honor.

THE COURT: It's noted for the record, gentlemen. No problem.

MS. CROSS: And thank you, Your Honor.

(Court in recess at 3:05 p.m.)

AFTER RECESS

THE COURT: You may proceed, Mr. Felson.

BY MR. FELSON:

Q. Now, the first time you went to the home of Mr. Renfro, and that's where Tyreese was arrested, right?

A. Correct.

Q. And what date was that?

A. When we first arrived there, it was May the 2nd late at night.

Q. Okay. And you had surveillance on the premises, right?

A. Correct.

Q. Is that when the surveillance began, May 2nd late at night?

A. Yes, sir.

Q. And then you saw somebody came out of the house and did something and then went back in; is that right?

A. Correct.

Q. And then somebody left in a car?

A. Are you asking or telling?

Q. I'm asking. Is that what happened next?
A. Yes, sir.
Q. Who was in the car? Did the car get stopped?
A. We did stop the car away from the house, actually almost in front of the Hamilton County Sheriff's Department by the time we got deputies there. I do not remember the name of the gentleman that was in the car.
Q. But it wasn't either of these gentlemen?
A. No, sir.
Q. Okay. And did you investigate that gentleman at all?
A. No, sir.
Q. All right. And then you went back. What did you do after you stopped that car?
A. Went back to the house.
Q. Okay. Then how long were you there before you made an arrest?
A. Before an actual arrest was made, several hours. Probably three, four, I don't know, maybe five hours. I didn't watch the watch.
Q. Okay. And at some point you arrested Walter?
A. Walter was brought to me in the back of a sheriff's department cruiser, yes, sir.
Q. You weren't involved in his arrest; is that right, in Walter's arrest?
A. No, sir. I was not there when they stopped the car.

Q. All right. You mentioned that these people went down there. You believe they went down to Atlanta, Georgia; is that right? Do you have any evidence other than inuendo and rumor that they did? I mean, you didn't see them down there, right?

A. No, sir. I never went to Atlanta.

Q. Atlanta, of course, has a police department. Did you ask them to investigate or arrest these people down in Atlanta?

A. Actually, we contacted the Columbus, Georgia, FBI.

Q. Did they arrest anybody down there or did they -- do you have any witnesses from there that saw my client Tyreese down in Atlanta?

A. Let's see. For your first question, no. To my knowledge, they didn't arrest anyone --

Q. Is anybody going to testify --

THE COURT: Mr. Felson.

MR. FELSON: I'm sorry, but I don't want to ask about hearsay. I just want to ask if anybody is going to testify.

THE COURT: Mr. Felson, you have got to let the witness answer the questions you ask.

Do you recall the question, Mr. Calhoun?

THE WITNESS: The first question was about the FBI making any arrests, and, no, they did not make any

arrests. As far as the Atlanta police talking to people, I can't speak to what they did down there.

BY MR. FELSON:

Q. Now, okay. Bessie Pew owned the car -- or are you saying Bessie Pew owned the car that was involved in the robbery; is that right? Is that what you're saying?

A. Yes, sir.

Q. Did you show that car or did Mr. Connaughton know or either the bank or anybody from the bank take a look at that car? Did you show them a picture of that car?

A. No, sir, I did not.

Q. Was there anything found in the car that was from the bank?

A. I believe you have already asked that, and I said no, sir.

Q. All right. And, actually, that wasn't the only Cutlass that you were investigating. Wasn't there a stolen one that you were also investigating from the Dayton area?

A. Yes, sir.

Q. Tell us about that. You knew there was a stolen car from the Dayton area, right?

A. That's the objection you made earlier about the teletype, yes, sir.

Q. Okay. And what happened, I mean what happened back or how -- with that car or how did you exclude that?

A. Whenever we received the teletype that the car was -- there was a car possibly matching that description stolen in the Dayton area right around the airport. All kinds of possibilities were flying through our minds at that point in time. We didn't know who we were looking for. We didn't have a name. We didn't have anything at that point in time. So we couldn't exclude any possibilities. As more information developed, things began to point to Mr. Walter Pugh, to Ms. Bessie Pew's car again through statements of people, through interviewing witnesses and so forth. That's how that car was excluded.

Q. Was that car ever found? Was the car located, the one up in Dayton?

A. I don't know, sir.

Q. Did you ever find out who was in it?

A. I don't know if the car was ever located, sir. You would have to contact Dayton PD.

Q. The woman named Stephanie Lester or Luster, are you familiar with that name?

A. Yes, sir.

Q. Now, that woman is apparently going to testify here today. You know that to be true?

A. I believe she's on the witness list, yes, sir.

Q. Actually, according to some notes that I read that you may have written, you thought she was the driver of the

getaway vehicle; is that correct?

A. We believed she might have been at one point in time, yes, sir.

Q. You changed your mind about that?

A. Yes, sir.

Q. Do you believe there were three people or two people involved in this?

A. Personally, sir, I believe two.

Q. You're not sure though?

A. Sir, I said I believe two.

Q. You're aware that the bank manager believed that there might have been a driver of the vehicle in addition to the two bank robbers?

A. From what I understood, and again we are into hearsay and rumor and inuendo, as you objected to before, sir, the bank manager understood that one of them jumped in the back seat. That's why he made the statement about possibly being three people.

Q. You got a written statement from Stephanie?

A. Yes, sir.

Q. And Stephanie is Tyreese and Walter's girlfriend?

A. Tyreese.

Q. That's what she told you?

A. Yes, sir.

Q. And do you have the letters that they wrote back and

forth?

A. They're in the police property room.

MR. FELSON: That's all I have. Thank you.

THE COURT: Thank you, Mr. Felson.

CROSS-EXAMINATION

BY MR. ANDREWS:

Q. Now, officer, let's back up just to your training again a moment. Where were you trained on BCI?

A. My original police training?

Q. No. Your to be a detective, to do forensic collection.

A. I been trained at several agencies. I attended training from BCI at satellite training facilities, also at the OPOTA facility at Columbus, Ohio. I have been through training by the Ohio Public Agency Training Council.

Q. Let me stop you right there. When you say Columbus, Ohio and BCI and OPOTA, that's incorrect, isn't it?

A. Actually, it's London. We think --

Q. Okay. Which is some 20 to 30 miles closer to where you start from than Columbus is?

A. Probably. I don't know the exact distances.

Q. And, matter of fact, you can mail in or overnight things to BCI to be analyzed, can't you?

A. It's my understanding that they do not want DNA evidence, those types of things, overnighted. The only

things we have ever sent in have been fingerprint cards.
Q. Okay. Now, you also, on this investigation, couldn't help but noticing we have another agency involved in this case, and that would be the FBI, correct?
A. Yes, sir.
Q. And it's my understanding, from both public or mainly public sources, they have a laboratory and a crime lab in Washington, D.C.; is that correct?
A. I would assume. I don't know where the FBI lab is, sir.
Q. That would have been available to you since this case was being investigated jointly by Hamilton and by the FBI, correct?
A. I would assume, sir. I have never used their facility.
Q. All you have to do is ask Moran over here if he would submit something, and I'm sure he would have, wouldn't he?
A. I would assume if I asked him to, yes, sir.
Q. Now, you started out on the first day of the investigation, which would have been the 24th of April, looking for my client's Cadillac; isn't that correct?
A. No, sir, I did not.
Q. Now, you recall signing an affidavit supporting a search warrant of that vehicle?
A. Yes, sir.

Q. And you recall you wrote out your belief and then signed it, correct?
A. Yes, sir.
Q. I believe we have this in our exhibit book at CC-1. Excuse me. DD-1. Is that your search warrant that you executed in this case on the Cadillac?
A. Yes, sir.
Q. And you will read about halfway down in your affiant's belief as based on the following facts?
A. Yes, sir.
Q. Sentence starting, "Hamilton police have been looking for the Cadillac since the date of the robbery," that's what you said, isn't it?
A. Yes, sir.
Q. You said that under oath?
A. Yes, sir.
Q. But that was not true?
A. No, sir.
Q. Okay. And you have said numerous times you never found any cash. Isn't it a fact that, in searching, I believe, the Cadillac, you found some $56 in cash in that vehicle which you took it -- excuse me. Back up. You did take some money from Walter Pugh; isn't that correct?
A. I never took any money from Mr. Pugh, no, sir.
Q. Would you look at Exhibit LL-3?

THE COURT: I'm sorry. What did you say, Mr. Andrews?

MR. ANDREWS: LL-3.

Q. Which is a property form, correct, showing the chain of custody?

THE COURT: Mr. Andrews you're going to need to keep your voice up or --

MR. ANDREWS: I'm sorry.

BY MR. ANDREWS:

Q. You see that?

A. Yes, sir.

Q. And you note that you took or logged in $56 in cash from my client?

A. I note that there is $56 in cash logged in. I don't see an owner listed.

Q. That is a property slip produced by the federal government to us showing that.

A. That there was $56 in cash received in. Under "owner," it just says "HP property room."

Q. But this case number is on that slip; is that correct?

A. Yes, sir.

MR. ANDREWS: If I could have one moment, Your Honor.

THE COURT: Yes.

(Mr. Andrews confers with Ms. Cross.)

BY MR. ANDREWS:

Q. Now, you indicated that in 4.2, which is the picture of an individual going over the counter at the bank, that that is a picture in which you can see the Black & Mild tip in my client's or in somebody's mouth, but you're saying my client's mouth; is that correct?

A. Actually, it's in 4.2 and 4.1, sir.

Q. You can see that in 4.2?

A. Yes, sir.

Q. Seems to me that the "24" of "April 24" is kind of over the face of whoever that is.

A. If you look right beside the 4/24/02, right beside the 02, you can see it sticking out of his mouth, sir.

Q. Oh, okay. And you can clearly see that in there?

A. It appears to be part of a cigar, yes.

Q. And of course it has to be a Black & Mild?

A. No, sir.

Q. So, as far as you know, there is no relationship between whatever that tip is in that person's mouth and the tip and the empty cigar box found in Bessie Pew's or Walter Pugh's car, is there?

A. No, sir.

Q. Okay. Now, you on the -- originally, you were talking about the night of the 2nd of May. Your entries in your log indicate the 3rd of May?

A. Correct.

Q. That's because you went past midnight, no real magic there. You wrote them at the end of doing all the work you did that night; isn't that correct?

A. Correct.

THE COURT: Mr. Andrews, would you just lean closer to the mike?

MR. ANDREWS: I'm trying, Your Honor. After 24 years of standing at a podium, this is difficult.

THE COURT: Would you be more comfortable if we put the podium on the end there?

MR. ANDREWS: No. I'll try as best I can. But it seems unnatural.

BY MR. ANDREWS:

Q. Now, on that evening, you went to various locations in Hamilton County?

A. On the 2nd?

Q. On the 2nd.

A. On the 2nd, yes, sir. Well, we went to two locations, the Hamilton County Sheriff's Department and the Wincanton Road address.

Q. Okay. Now, you worked with an Officer Koo I believe you indicated earlier?

A. That was one name that I -- yes.

Q. And he was with this other person that there was a

tape made of, correct?

A. Yes.

Q. And Officer Koo is with the Regional Enforcement Narcotics Enforcement Unit; isn't that correct?

A. I do not what know what his assigned duties are, sir.

Q. You don't know his assigned duties, and you had no direct contact with him?

A. Other than to receive the tape, no, sir.

Q. And you did not listen in on the tape being made?

A. No, sir.

Q. And prior to that date, you had not met Walter Pugh?

A. Correct.

Q. And prior to that date you hadn't met the young lady who was, you say, also on the tape?

A. That is correct.

Q. And after that you went to this location out in Mt. Healthy, correct?

A. After what, sir?

Q. After you were at the sheriff's department, at the sheriff's office?

A. We went to the sheriff's office first and then went to the house on Wincanton, yes, sir.

Q. And you did surveillance?

A. Correct.

Q. And nothing happened?

A. No, sir.

Q. At some later date, you had the cavalry come in, so to speak. You had all the officers of SWAT, et cetera, and they extracted Tyreese Pugh from that house at a later point?

A. Correct.

Q. Prior to that point, my client had been stopped in a motor vehicle or in the back seat of a motor vehicle being driven down the road?

A. Correct, sir.

Q. Now, prior to that date, you had never had contact with either of these individuals at any time; is that correct?

A. Not that I can remember, sir, no.

Q. Okay. It's been pointed out before you have submitted nothing to either BCI labs or FBI labs; is that correct?

A. Yes, sir.

Q. And you -- how many pairs of Mr. Pugh's shoes did you take during your investigation?

A. I don't know, because I don't know which shoes are Mr. Pugh's.

Q. Okay. Would it be fair to say that you at least took five to six pairs of shoes?

A. I don't know, sir. I would have to go back through our property log to see how many pairs of shoes we actually

took. And, as far as whether they belonged to Mr. Walter Pugh or Mr. Tyreese Pugh, I don't know.

Q. But you took a number of pairs; is that a correct characterization?

A. I can think of two. I don't know of more. There may have been. I don't know.

Q. Okay. And it is correct that you held up a pair and you thought it matched something you had found at the bank?

A. At first glance, yes.

Q. But nothing else has been done with reference to that item?

A. Oh, no. I took those shoes back to the office, and, as I said before, I lifted the print on a transparent sheet. I placed that print on the bottom of the shoe, and it did not match.

Q. Did not match?

A. Correct.

Q. Okay. So all the shoes you collected ended up not matching what you had found in the bank?

A. There was only one pair that I believe might have been close, but it didn't.

Q. It didn't match?

A. No.

Q. Matter of fact, in your various recoveries of items, you ended up, whether you wanted to be or not, owning or

having possession of almost all of my client's clothes; isn't that correct?
A. We have a variety of clothing items, yes, sir. I don't know who they belong to.
Q. Several large garbage bags full?
A. I believe there was a suitcase and possibly two bags.
Q. None of those clothes -- you went through them all?
A. Yes, sir.
Q. None of them match what these people were supposed to be wearing in this bank, were they?
A. No, sir. These appear to be brand new clothes with tags still on.
Q. Some were older clothes, were they not? A lot were new, but a lot were old?
A. I wouldn't characterize it as a lot were old. I think most of the majority were brand new.
Q. Other than buying your assertion that my client had bought some new clothes, he had nothing else of great value on him; is that correct?
A. No, sir.
Q. No jewelry?
A. No, sir.
Q. No new car?
A. No, sir.
Q. No -- I mean nothing that would show any extravagance?

A. Nothing that would indicate a large expenditure of cash at that time, no, sir.

Q. He was not staying at the Peach Tree Ritz in Atlanta. He was staying in a Travelodge, right?

A. I assume that, yes, sir. And, if you're telling me that, I would believe that.

Q. In the evidence you found, he very simply, there was nothing that showed this is a man who had access to $153,000 in cash, was there?

A. I don't know what he had access to, sir. I can't speak to that.

Q. There was nothing of extravagance shown in any of those, was there, sir?

A. Nothing of extravagance no, sir.

Q. He was driving an almost 20-year-old Cadillac?

A. No, sir. The Cadillac was not 20 years old.

Q. What year was it?

A. '89.

Q. So it was a 1989 Cadillac; does that sound right?

A. I would have to look back through at the registration.

Q. You can look at Exhibit DD-1.

A. If that's what it says in the search warrant, then that's what it would be.

Q. So a 1989 Cadillac. He was staying in Travelodges. Other things you found, you found a receipt from

Blockbuster. So he's watching videos at home. There is nothing of extravagance shown in any of this, is there?

A. Correct, sir. Quite to the contrary, it would show that possibly someone may be laying low, driving an old car, staying in an inexpensive motel.

Q. Or somebody who just didn't have much?

A. That's possible also, yes.

MR. ANDREWS: I have nothing further of this witness.

THE COURT: Ms. Cross, anything further of this witness?

MS. CROSS: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. CROSS:

Q. Detective Calhoun, Mr. Andrews asked you about Defendant's Exhibit DD-1, which is your affidavit for the search warrant of, I believe, Walter Pugh's car.

A. Yes, ma'am.

Q. He asked you specifically about a statement in your affidavit which says that Hamilton police had been looking for the Cadillac since the day of the robbery.

A. Correct.

Q. I believe you testified on cross that that was not a true statement?

A. Upon further reflection, it is a true statement. I

particularly was not looking for that car. Other Hamilton police officers who are familiar with Mr. Pugh and who had also placed his picture on my desk had been looking for any registered vehicle, any vehicle registered to him to try to locate him in connection with this bank robbery. I personally was not, but other Hamilton officers were.

Q. So it is a true statement in your affidavit?

A. That is correct.

Q. Now, Mr. Felson asked you several questions about forensics. You recall that line of questioning?

A. Yes, ma'am.

Q. Do you recall him asking you questions about your ability to send and have analyzed hair particles?

A. Yes, ma'am.

Q. And have analyzed skin particles?

A. Yes, ma'am.

Q. In this case, in this investigation, did you find any hair particles?

A. No, ma'am.

Q. Based on your review of the bank surveillance video and the photographs, what do you recall as to the hair of these bank robbers?

A. Well, I've actually got the pictures here. In the picture marked 4.1, it appears that Mr. Walter Pugh has a hair net or something over his head, and also Tyreese in

the background has a baseball cap over his head.

MR. FELSON: Object to that.

THE COURT: I'm sorry. Where did the objection come from?

MR. FELSON: Assuming a fact not in evidence. This is saying that was Tyreese in the back. There was no evidence presented that Tyreese is the one in the back.

THE COURT: I'll sustain the objection and --

MR. ANDREWS: Can we join in that as well?

THE COURT: I'm sustaining the objection. I'm going to direct the jury to disregard this witness' testimony about the identification of individuals in Government Exhibit 4.1.

MS. CROSS: Thank you, Your Honor.

BY MS. CROSS:

Q. You would agree, Detective Calhoun, that the bank robbers both had something over their heads --

A. Yes, ma'am.

Q. -- over their hair? You didn't find any hair particles in your investigation?

A. No, ma'am.

Q. To even have sent to a lab to be analyzed?

A. No, ma'am.

Q. Did you find any skin particles that you could send to a lab to be analyzed?

A. Nothing that I could see, no.

Q. Did you find any fingerprints that you could send to any lab to be analyzed?

A. No, ma'am.

Q. In the bank, did you find or in or around the bank did you find any cigar or Black & Mild tips that you could send to be analyzed for DNA?

A. No, ma'am.

Q. So you didn't do any of that because you didn't have any evidence to send to a lab, correct?

A. Nothing directly related --

MR. FELSON: Objection. Leading.

THE COURT: Somebody objected.

MR. FELSON: Leading question.

THE COURT: Overruled.

A. Nothing directly related to the bank robbery, no, ma'am.

Q. I believe you were asked a question about the glove that you found in Bessie Pew's car. Do you recall finding the glove?

A. Yes, ma'am.

Q. Is it Bessie Pew's glove?

A. To my knowledge, no, it's not.

Q. Did you ask her?

A. Yes, I did.

MR. FELSON: Objection based on hearsay.

MS. CROSS: I'm not asking what she said. I'm asking did he ask her.

THE COURT: Overruled.

BY MS. CROSS:

Q. Did you ask her?

A. Yes, I did.

Q. And, finally, I believe Mr. Felson asked you a question about Stephanie Luster, and at one point you believed that she may have been the getaway driver of this bank robbery, correct?

A. Yes, ma'am.

Q. And I believe it was your testimony -- correct me if I'm wrong -- that, during the course of your investigation, you changed your mind on that fact?

A. Yes, I did.

Q. Why?

A. After interviewing her, talking with her and just in general reviewing all the circumstances surrounding the bank robbery, I don't believe she was the getaway driver.

MS. CROSS: Thank you, Your Honor. That's all of the questions I have.

THE COURT: Anything further, Mr. Felson?

MR. FELSON: Yes.

RECROSS-EXAMINATION

BY MR. FELSON:

Q. Now, you ever watch these forensic shows on television?

A. I don't have time to watch a whole lot of TV, sir, no.

Q. Well, bear with me a minute. I saw one of these shows, and tell me if this sounds reasonable. My understanding is you take the item that might have some microscopic hair and microscopic fibers on it and then put it on almost like a clothes line, and underneath they have a collector, and they whack it and just see if anything falls out. Because what they're really looking for is microscopic, isn't it?

A. I don't know what they do when they get it to the lab, sir. I just package it and send it.

Q. Have you ever seen them do this type of thing?

A. No, sir, I have not.

Q. Do you understand the concept that you could get microscopic items off of a piece of evidence that you might not be able to see with your eyes?

A. Yes, sir.

Q. And that's what they do. They take a look at -- one of the things they do is they knock it off into a pan of some sort and look at it and --

MS. CROSS: Objection, Your Honor. He said he does not know.

THE COURT: It's asked and answered. Sustained.

MR. FELSON: I apologize.

BY MR. FELSON:

Q. How about your training; were you ever trained to know how they do that kind of thing?

A. No, sir. I'm trained to package the evidence and submit it.

Q. In your training, weren't you ever told that sometimes you can't see the evidence and if you find something, just because you can't see it, if it was at the crime scene, grab it and bag it anyway?

A. Your key words were, sir, "at the crime scene." This was not at the crime scene.

Q. The car wasn't part of the crime scene?

A. The glove was not at the crime scene. The glove was in the car.

Q. Well, you're saying the car was used in the crime?

A. Yes, sir.

Q. Okay. That's not a crime scene, then?

A. That's an instrument or a tool that was used to commit the crime. It's not the crime scene itself, sir.

Q. All right. Aren't you trained that, if a getaway car or getaway plane or getaway motorcycle is used, that you're supposed to cordon that off and take that in for inspection to see if there is anything in there that might be used

against them as evidence?

A. That was the idea behind the consent to search, sir. I was not going to hang onto the car and deprive Ms. Pew of her car for an unreasonable amount of time. To do what you suggest would take days, if not months.

Q. Well, you impounded the Cadillac, right?

A. Yes, sir.

Q. And that was for the purpose of gathering evidence, right?

A. Yes, sir.

Q. But the Cadillac wasn't even used. You have no evidence the Cadillac was used in the robbery, right?

A. No, sir.

Q. But you didn't impound the Cutlass?

A. That is correct. Ms. Pew brought the Cutlass to us.

Q. You didn't keep it after she brought it to you. After looking through it, you didn't keep it, right?

A. Correct. Same with the Cadillac.

Q. When you went through it, did you use any special tools? Just your hands?

A. Looked, eyes, that's it. Flashlight.

Q. Try to sweep anything, gather any evidence? Let me ask you this. With the glove, did you pick it up with your hand?

A. No. I believe I used another rubber glove.

Q. Okay. And what other items were in that car that you --

A. There were clothing items. There was a gas can. It was a well-used car. There was a lot of junk in the car.

Q. Well, Black & Milds, I see those everywhere. Those are sold everywhere, right?

A. I have no idea, sir. I don't smoke.

MR. FELSON: Okay. That's all I have. Thank you.

THE COURT: Thank you, Mr. Felson.

Anything further, Mr. Andrews?

RECROSS-EXAMINATION

BY MR. ANDREWS:

Q. Do you know who Sergeant Tom Kilgour is?

A. Yes, I do.

Q. He issued a press release on this case. Do you recall that?

A. I don't know. I don't know what Sergeant Kilgour released on the case, sir.

Q. Did he have any hand in investigating this case at all?

A. No, sir. He's our public affairs sergeant.

Q. For Hamilton?

A. Yes, sir.

Q. And you, of course, read the article that came out in

relation to this case?

A. Not really, sir. I tend to stay away from newspapers.

Q. So you didn't know that in one of these articles he had talked about a third man being involved as the driver and did not know whether or not you were going to issue further warrants for that person?

A. No, sir.

Q. That was not cleared with you, obviously?

A. No, sir. Sergeant Kilgour never consulted with me on anything to do with the case.

Q. So he just gave that to the reporter kind of out of the blue?

A. I don't know if he consulted with my investigations lieutenant or some other, sir, but he never consulted with me on the case.

Q. And you're the lead investigator?

A. That is correct.

THE COURT: You wanted something marked?

MR. ANDREWS: Yes, please. I don't know what we're up to.

THE COURT: That comes out TT, double T.

Has the assistant United States attorney seen this exhibit?

MR. ANDREWS: I gave it to her. I'm sure they have seen it.

THE COURT: All right.

BY MR. ANDREWS:

Q. Have you seen that article before sir?

A. No, sir.

THE COURT: Mr. Andrews, you have got to keep your voice up.

Q. You have never seen it before?

A. No, sir, I haven't.

Q. Okay. So the information from Officer Kilgour that's contained in there was released without asking you anything about it?

A. Yes, sir.

MR. ANDREWS: Okay. I have no further questions.

THE COURT: Ms. Cross, anything further of this witness?

MS. CROSS: No, Your Honor.

THE COURT: Mr. Felson?

Thank you very much, Officer Calhoun. You're excused.

Who is your next witness?

MS. CROSS: Your Honor, the United States calls Robert Payne.

(Witness sworn by the courtroom deputy.)

THE COURT: You may proceed, Ms. Cross.

MS. CROSS: Thank you, Your Honor.

ROBERT PAYNE

DIRECT EXAMINATION

BY MS. CROSS:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Will you please tell the members of the jury what your name is and spell your last name for the record?

A. Sure. My name is Robert Payne, P-a-y-n-e, police officer for the City of Hamilton.

Q. And how long have you been a police officer with the City of Hamilton?

A. Eleven-and-a-half years.

Q. What is your current position?

A. I'm the property and evidence officer.

Q. Officer Payne, will you please explain to the members of the jury how evidence is maintained at the Hamilton Police Department?

A. From, like, start to finish?

Q. Yes, sir.

A. Okay. If an officer brings in evidence when I'm working, he would hand it directly to me. If it's after hours, we have evidence lockers. They will secure the evidence in a locker, take the key out, drop it in a drop safe. Then the next morning when I come to work, I'll retrieve those keys and empty those lockers.

Q. Where are the property lockers located?
A. Just outside the evidence room.
Q. And can an officer retrieve an item of evidence once they have placed the evidence into the locker and put the key in the drop box?
A. No, they cannot.
Q. Who has access to enter the drop box or the drop safe?
A. Myself and Officer Jim Caldwell, who is my backup property officer.
Q. Just the two of you are the property officers of Hamilton Police Department?
A. That is correct.
Q. I'm going to show you what's been previously marked as Government Exhibit Number 13. I think that's in front of you.
A. Yes, it is.
Q. Do you recognize that exhibit?
A. Yes, I do.
Q. What is it, and how do you recognize it?
A. Well, I have never seen the item that's inside this. This is just the package that Detective Jim Calhoun handed me on April the 26th.
Q. And will you explain how you received it?
A. At the time, he just walked up to my door and handed it to me.

Q. In what condition was that exhibit when you received it?

A. It would be just as it is shown here, except it did not have the bar code label nor the red writing.

Q. And who placed the red writing and the bar code label on it?

A. Myself.

Q. What day did you receive that exhibit?

A. April 26, 2002.

Q. And has that exhibit remained in the custody and control of the Hamilton Police Department until this trial?

A. Yes, it has.

Q. To your knowledge, is there anything about that exhibit today that is different than when you received it into evidence on April 26, 2002?

A. No, ma'am.

MS. CROSS: Your Honor, at this time I would move to admit into evidence Government Exhibit Number 13.

THE COURT: Any objection?

MR. FELSON: No objection.

DEFENDANT W. PUGH: No objection.

THE COURT: Government Exhibit 13 will be admitted.

MS. CROSS: Thank you, Your Honor. No further questions.

THE COURT: Any questions of this witness?

MR. FELSON: A couple questions.

CROSS-EXAMINATION

BY MR. FELSON:

Q. In that, what is in that package, 13?

A. According to the description, part of a torn latex glove.

Q. And is there -- are there any place-marked instructions on what to do with the glove or the evidence that's in the bag?

A. No, sir.

Q. Is it just plain? Is there any writing on the outside of that, other than that?

A. There is just a government exhibit sticker on one side. The other side is taped to the card. I cannot tell.

MR. FELSON: Your Honor, can I inspect that item? I haven't seen the actual outside. I won't open it.

THE COURT: Certainly.

BY MR. FELSON:

Q. Okay. Now, this glove came to you directly from whom?

A. Detective Jim Calhoun.

Q. Do you know whether the glove had been tested by a lab?

A. I have no idea, sir.

Q. Is there a place -- do you ever send stuff up to the

lab?
A. Quite often.
Q. So a lot of times officers might drop off a piece of evidence to you, and then they say we have to get it up to the lab; is that how it works?
A. Yes.
Q. So what do you do? Just tell the jury the procedure.
A. That officer will submit a notice or a letter to the detective bureau. They will fill out a submission sheet. The detective's office will sign out the evidence and do the transport.
Q. Who actually takes it up there?
A. Just depends on who is going up to the lab at the given time.
Q. Okay. I guess -- where is the lab?
A. There are several. They use Miami Valley in Dayton. There is a lab here in Hamilton County. There is a BCI in London. Just depends on where they want to go.
Q. How about to analyze a glove and hair follicles or a microscopic particle?
A. I do not know, sir. That would be up to them.
Q. All the labs do all kinds of different work?
A. Yes, they do.
Q. Now, this particular glove, did you actually see it, or was it always in the --

A. It's always been in that bag. I have not seen the glove itself.

Q. Okay. Is there a place on the back of the tag to mark whether a piece of evidence is supposed to go to the lab? Or in other words, how do you know to send it to the lab?

A. I would get a letter, either through my e-mail, or they will call me on the phone, tell me to get an item ready.

Q. But it's not marked on the envelope itself?

A. There is a place for the chain of custody on the back for officers. When they sign it out, they will date it and put the location that they're going to with it.

Q. Okay. So that could have -- you could see the word "lab" on the back of that?

A. Yes. And most of the labs that we deal with will also apply a new bar code label to it to show that they handled it. But that piece of evidence did not go.

Q. Okay. But this thing didn't go to the lab?

A. No, sir.

Q. All right. Now, have you received stuff from this Officer Calhoun, is it?

A. Detective Calhoun.

Q. Have you received evidence from him before?

A. Yes, I have.

Q. Has he ever asked you to take stuff to the lab, or

does he ever have stuff go to the lab that he brings in?

A. Often.

Q. All right. Did he bring any other evidence in to you?

A. Not that day.

Q. How about another day?

A. There was another day when I was off taking a holiday that more evidence came in, but I did not handle that.

Q. Did you handle any of the other evidence for this case?

A. I think there might be one more piece that came in when I was working. I don't believe it's one of the government's exhibits.

Q. Okay. Now just tell me the connection between the FBI. This is obviously we're in federal court here. Typically, you might testify in state court; isn't that right?

A. Yes.

Q. Okay. But how does the FBI fit into this mix? Do they come and get the evidence from you, or do you ship it to them, or are there letters back and forth? Just explain that.

A. To my knowledge, with this case, the FBI dealt with our detective bureau, and our detective bureau came to me.

Q. Okay. Do you keep this, this particular item, have you kept that the entire time?

A. That was kept in my property room until yesterday when it was turned over to the court.

MR. FELSON: Thank you very much.

THE COURT: Any questions, Mr. Andrews?

MR. ANDREWS: Just a couple.

CROSS-EXAMINATION

BY MR. ANDREWS:

Q. Officer, Hamilton has a fairly serious drug problem; isn't that correct?

A. Yes, I would say so.

Q. Where do you take the drugs?

MS. CROSS: Objection, Your Honor. I don't understand where this line of questioning -- this is irrelevant.

MR. ANDREWS: Can you give me a tad of leeway?

THE COURT: All right. Overruled.

BY MR. ANDREWS:

Q. All those alleged drugs have to be analyzed, don't they?

A. Yes, they do.

Q. And they're taken to which of the three labs you named?

A. Our vice section transports all the drugs for testing. They go to Miami Valley in Dayton and the Hamilton County Coroner's Lab.

you?

A. No.

MR. THAPAR: No further questions, Your Honor.

THE COURT: Anything further, Mr. Felson, Mr. Pugh, Mr. Andrews?

MR. FELSON: No.

MR. ANDREWS: No.

THE COURT: All right. The Court appreciates very much your coming today. Thank you. You're excused.

We will take our lunch recess. At this time, ladies and gentlemen of the jury, I just want to remind you of the instruction I gave you earlier. During this recess or any recess, you must not discuss this case with anyone including your fellow jurors, members of your family, peopled involved in the trial, or anyone else. If anyone tries to talk to you about the case, please let me know about it immediately. And, finally, keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors.

We will stand in recess until 1:30.

Mr. Andrews, I just need you to give Mr. Snyder the names of the witnesses, and I'll sign an order immediately, and the marshal's office will get on that.

MR. ANDREWS: Actually, I'm going to have to run down to the clerk's office and just get copies of the

Q. And also BCI for some?

A. I have never seen any drugs go to BCI.

Q. How many times a week do you take things to be analyzed to BCI?

A. I personally do not.

Q. Okay. How many times are things transported per week for analyzation?

A. Rarely have they gone every week to take something. It will be every so many weeks, once a month or so.

Q. How about Miami Valley?

A. Well, when vice was going up there to test drugs, they go once a week, once every other week maybe.

Q. How about Hamilton County Corner's Lab?

A. They have just started going back to that lab, and it's about every week to two weeks.

Q. So it's certainly not out of the way to take an additional all exhibit or an additional bit of evidence to any of these labs, is it?

A. No, sir.

Q. And you have had various items sent to the FBI crime lab in Washington before, have you not?

A. I personally have not logged anything out to that lab, but it could have happened.

MR. ANDREWS: Okay. Thank you very much, Officer.

THE COURT: Ms. Cross, anything further of this witness?

MS. CROSS: No, Your Honor.

THE COURT: The Court appreciates your coming here, sir. You are excused.

Who is the government's next witness?

MS. CROSS: United States calls Stephanie Luster.

Your Honor, we have had to call witnesses out of order and --

THE COURT: That's fine.

MS. CROSS: -- we have not provided Jencks for this witness.

THE COURT: Oh.

MR. ANDREWS: And obviously, particularly with this witness, I think we are entitled.

MS. CROSS: And I have it here, and it's very short.

THE COURT: All right.

MR. ANDREWS: Might I suggest, due to it being 4:10, not that we couldn't go later, I would like a little time to look at the Jencks material before we go anyway.

THE COURT: Let me see how long it is.

MS. CROSS: It's a one-page statement.

MR. THAPAR: Your Honor, do you want her to step outside?

THE COURT: She can stay there, Mr. Thapar.

Well, technically, Jencks material does not have to be given over until the conclusion of the witness' direct testimony.

Let's see where we are, what time it is. It may be that this will be into tomorrow. I don't know. Go ahead with the witness.

MR. FELSON: Note my objection for the record.

THE COURT: Your objection is noted.

DEFENDANT W. PUGH: Object for the record.

THE COURT: Yes, sir.

(Witness sworn by the courtroom deputy.)

STEPHANIE LUSTER

DIRECT EXAMINATION

BY MS. CROSS:

Q. Good afternoon, ma'am.

A. Yes, ma'am.

Q. Will you please tell the ladies and gentlemen of the jury -- keep your voice up -- what your name is and spell your last name?

A. My name is Stephanie Luster, L-u-s-t-e-r.

Q. Ms. Luster, you're here today pursuant to a federal subpoena; is that correct?

A. Correct.

Q. You didn't volunteer to be here; is that correct?

A. Correct.
Q. How old are you?
A. Nineteen.
Q. Are you married or single?
A. Single.
Q. Do you have any children?
A. Yes, I do.
Q. How many children do you have?
A. Two.
Q. What are their ages?
A. Four and two.
Q. Where were you born and raised?
A. I was born in Ft. Campbell, Kentucky, mostly raised in Hamilton, Ohio.
Q. And where did you go to high school primarily?
A. Big Blue.
Q. Is that in Hamilton?
A. Yes.
Q. Do you know Walter Pugh and Tyreese Pugh?
A. Yes, I do.
Q. And do you see them in the courtroom today?
A. Yes, I do.
Q. Will you please identify, if you see him, Walter Pugh, by stating where he's sitting and what he has on?
A. Walter is sitting right there with the, I guess, the

gold suit on.

Q. Is he the gentleman with the glasses or without glasses?

A. Yes, with the glasses.

MS. CROSS: Your Honor, may the record reflect she's identified the defendant Walter Pugh?

THE COURT: Any objection?

Yes, the record will so reflect.

MS. CROSS: Thank you.

BY MS. CROSS:

Q. And do you see Tyreese Pugh in the courtroom?

A. Yes, I do.

Q. And will you please identify him by where he's sitting and what he's wearing?

A. He's sitting next to Walter in the cream colored suit.

MS. CROSS: Your Honor, may the record reflect that she's identified the defendant Tyreese Pugh?

THE COURT: Yes, the record will so reflect.

BY MS. CROSS:

Q. Ms. Luster, how do you know the defendants? And let's start with Tyreese Pugh. How do you know him?

A. We dated.

Q. And how long did you date Tyreese Pugh?

A. Approximately four months.

Q. From when to when?

A. From December to May.
Q. May of this year?
A. Yes.
Q. So December of 2001?
A. Last year, yes.
Q. So do you know Tyreese Pugh by any other names?
A. Yes, I do.
Q. What other name do you know him by?
A. Butter.
Q. Is that his nickname?
A. Yes.
Q. You said you have two children. Is Tyreese Pugh the father of either of your children?
A. No, he's not.
Q. Will you -- you said you dated him. Will you describe your relationship to Tyreese Pugh?
A. Normal boyfriend/girlfriend relationship.
Q. Have you ever lived together?
A. No.
Q. When you were dating him, where did you live?
A. I stayed at 511 Front, Front Street.
Q. Is that an apartment or a house?
A. An apartment.
Q. In Hamilton?
A. Yes.

Q. And how long did you live there?
A. I lived there for three years.
Q. And during the course of the time you were dating Tyreese Pugh, would he visit you there?
A. Yes.
Q. Were there occasions when he would spend the night there?
A. Yes.
Q. To your knowledge -- first of all, do you smoke?
A. Yes.
Q. What do you smoke?
A. Black & Milds.
Q. And Black & Mild, what is that?
A. A cigar.
Q. To your knowledge, does Tyreese smoke?
A. Yes.
Q. What does he smoke?
A. Black & Milds.
Q. Do you drive? Can you drive?
A. Yes, I can drive.
Q. Do you have a car?
A. Yes.
Q. What kind of car do you have?
A. An '84 Buick LeSabre.
Q. What color?

A. Some would say green. Some would say gray.

Q. Does Tyreese know how to drive?

A. Yes.

Q. Does he have a car?

A. No.

Q. When you have seen him driving, what car have you seen him driving?

A. My car.

Q. During the time that you were dating Tyreese from December, 2001, to May, 2002, do you know if he had a job?

A. No. I don't remember him having a job.

Q. Walter Pugh, how long have you known Walter?

A. For as long as I have known Tyreese.

Q. And who do you know Walter to be?

A. Tyreese's father.

Q. And describe your relationship with Walter.

A. Just normal relationship, me dating his son, therefore -- you know.

Q. Okay.

THE COURT: Can you hear? I don't think the jury can hear. Can you pull the mike known a little closer to you?

Ms. Cross, why don't you ask that last question, or let me just -- I'll just have Betty.

Would you read back the last question and answer?

(The last question and answer were read.)

BY MS. CROSS:

Q. During the time that you were dating Tyreese, how often in any given week would you see Walter?

A. At least three or four times a week.

Q. And was that in Hamilton?

A. Yes.

Q. Did you and Tyreese ever spend time together with Walter?

A. Yes.

Q. And describe, tell the members of the jury, those occasions, describe the occasions that you and Tyreese would spend time together with Walter.

A. Well, mainly it would be over his house. Mainly when we would go over there, they would go into his, Walter's, room.

Q. So you and Tyreese would spend time with Walter at Walter's house?

A. Um-hum.

Q. And where did Walter live?

A. On Knightsbridge.

Q. Knightsbridge Street in Hamilton?

A. Um-hum.

Q. Who did he live with?

A. Shanell.

Q. Were there times when Walter would visit and spend time with you and Tyreese at your apartment?
A. Yes.
Q. Were there ever any other occasions or any other places that you and Tyreese would spend time together and Walter was there?
A. Yes.
Q. Where?
A. In Fairfield.
Q. And where in Fairfield?
A. The Heritage Glen.
Q. Who lived there?
A. One of his female's mother.
Q. Okay. Whose?
A. One of Walter's female's mother.
Q. One of Walter's girlfriends?
A. Um-hum.
Q. What is her name?
A. Tenikia.
Q. Now, you have been around Walter Pugh. Do you know whether or not he smokes?
A. Yes.
Q. Does he smoke cigarettes?
A. Cigars.
Q. What kind of cigars?

A. Black & Milds.

THE COURT: Can you try to keep your voice up?

THE WITNESS: Okay.

THE COURT: Thank you.

BY MS. CROSS:

Q. And have you ever seen Walter drive?

A. Yes.

Q. What have you seen him drive?

A. I seen him drive a Cadillac, a Mazda, and a -- I don't really know the make of the other car.

Q. This third car, who owns the Mazda?

A. Walter.

Q. Who owns the Cadillac that you have seen him drive?

A. Walter.

Q. And this other car, who owns that?

A. His sister.

Q. What's his sister's name?

A. Bessie.

Q. When you were dating Tyreese and Walter was around, describe their relationship, the two of them to each other.

A. Well, the father and son, but Walter is a little domineering over Tyreese.

Q. I'm going to turn your attention to a day in April, 2002. Do you remember April 24th, Wednesday, April 24th?

A. Yes.

Q. And why is it that you remember that day?
A. Because this is the day in question.
Q. Okay. Is there anything that you did that day to remember that day?
A. Not anything significant, no.
Q. Well, let's --
MR. FELSON: I didn't hear that. Sorry.
MS. CROSS: Keep your voice up, please.
A. Not anything significant.
Q. Now, will you describe what you did when you woke up that morning?
A. We woke up that morning. We went to Fairfield.
Q. Who is "we"?
A. Me and Tyreese.
Q. Okay.
A. We went to Fairfield with Walter.
Q. And how did you get to Fairfield?
A. In the Mazda. I recall the Mazda.
Q. Who was driving the Mazda?
A. Walter.
Q. Did Walter come and pick you and Tyreese up?
A. Yes.
Q. From your apartment?
A. Yes.
Q. And you went to Fairfield why?

A. My understanding was to visit.
Q. Who were you visiting?
A. With him and his girlfriend.
Q. Is that Tenikia?
A. Yes.
Q. Approximately what time did Walter come and pick you and Tyreese up?
A. I don't know the exact time, but it was in the morning.
Q. And in what vehicle did he pick you up in?
A. Mazda.
Q. What did you do when you went to Tenikia's house when you got there?
A. Ate a little breakfast.
Q. And how long did you stay?
A. For several hours.
Q. How long did Walter and Tyreese stay?
A. Not long. Not even an hour.
Q. Did they stay to eat breakfast?
A. No. I believe that Walter had already eaten, and Tyreese, I think he ate a little bit.
Q. So when you get to Tenikia's house, you stay for several hours, but Walter and Tyreese leave?
A. Um-hum.
Q. What was your understanding as to where they were

going?

A. We didn't have an understanding of where they were going.

Q. What did they say as to where they were going?

A. They didn't say. They said they would be back.

Q. Did you have an understanding as to when they would be back?

A. No.

Q. And this was in the morning?

A. Um-hum.

Q. On April 24th?

A. Um-hum.

Q. Will you describe, if you recall, what Tyreese was wearing that morning?

A. I would say black sweat pants and black shirt.

Q. Black pants and black shirt?

A. T-shirt.

Q. And do you recall what Walter was wearing that morning?

A. Jeans and a work shirt.

Q. You say a work shirt?

A. Um-hum.

Q. Can you describe it a little more for the members of the jury?

A. A T-shirt, just like an old T-shirt.

Q. Okay. How long were Walter and Tyreese gone?
A. I don't know exactly how long.
Q. Well, when they came back, was it still morning?
A. No, it wasn't morning.
Q. Was it lunchtime?
A. It was after lunchtime. It was afternoon time.
Q. Afternoon. Do you know approximately how many hours?
A. No, I do not. Several, but I am not sure.
Q. Did they come back to Tenikia's house?
A. Yes, they did.
Q. Okay. And when they came back to Tenikia's house, what happened?
A. They said it was time to go.
Q. Who said that?
A. Walter.
Q. And who was he talking to?
A. He was talking to me and Tenikia.
Q. Said it was time to go?
A. Um-hum.
Q. What was your understanding as to where you were going?
A. We didn't have an understanding.
Q. Did you ask?
A. No, I did not.
Q. Where did you go?

A. We went to Tennessee.

Q. And when you say "we went to Tennessee," tell the ladies and gentlemen of the jury who left.

A. It was me and Tyreese, Walter and Tenikia, and our children.

Q. How many children does Tenikia have?

A. One.

Q. Your two children, Tenikia's child, you, Tenikia, Walter and Tyreese leave?

A. Yes.

Q. You go to where did you say?

A. Tennessee.

Q. How did you get there?

A. Car, two cars.

Q. Okay. What car were you riding in?

A. I was in the Cadillac.

Q. Walter's Cadillac?

A. Yes.

Q. And who was in the car with you?

A. Tyreese and my children.

Q. And where was Walter?

A. He was in the Mazda, the other car.

Q. And who was in the car with him?

A. Tenikia and her children.

Q. Did you go to Tennessee immediately upon leaving

Tenikia's house that afternoon?
A. Yes.
Q. And what was your understanding as to why you were going to Tennessee?
A. I didn't have an understanding.
Q. Did you ask?
A. No.
Q. Did you know you were going out of town?
A. Well, yes, I knew we were going out of town.
Q. How did you know that?
A. Well, as we started driving, I seen that we were leaving, you know, where we were at.
Q. Now, when they came back to Tenikia's house and said let's go, did you have time to pack any clothes?
A. No.
Q. Did you have time to pack any clothes for your children?
A. No.
Q. What about Tenikia?
A. No.
Q. Did you have any money on you?
A. I had a little bit of money.
Q. How much is a little bit of money?
A. About 25, 30 dollars.
Q. Did you have time to call anybody and let them know

you were getting ready to leave?

A. No.

Q. Were you in a rush to leave, or did you have time to do some things and then leave?

A. It wasn't really a rush, but it was, you know, it was time to go.

Q. Walter said it was time to go?

A. Yes.

Q. Let me ask this. When they came back to Tenikia's house, Tyreese and Walter Pugh, do you recall what they had on, what kind of clothes they were wearing?

A. The same thing that they had left in.

Q. So Tyreese still had on all black?

A. Um-hum.

Q. And Walter had on jeans and some type of T-shirt?

A. Um-hum.

Q. What was their demeanor? Do you know what I mean by demeanor?

A. How they acted when they --

Q. Yes.

A. Just the same as any other time.

Q. Calm? Excited?

MR. FELSON: Objection.

BY MS. CROSS:

Q. I'm just trying to give you -- will you describe --

you said "how they always acted." How did they always act?

THE COURT: Overruled. You may answer.

A. They were calm. They weren't overly excited or anything like that.

Q. Approximately what time did you leave going to Tennessee?

A. I do not recall the time.

Q. Did you drive straight from Tenikia's house in Fairfield to Tennessee?

A. Yes.

Q. How long did it take you to get from Tenikia's house to Tennessee?

A. Several hours.

Q. Several hours. When you arrived, was it daylight or dark outside?

A. It was dark.

Q. And when you say several hours, approximately how many do you mean?

A. I'm not sure. I'm not sure how many hours it was.

Q. Two, three?

A. More than three.

Q. So it took you three hours to drive from Fairfield to Tennessee, and it was dark by the time you got there?

A. Yes.

MR. FELSON: I would object to this, because I

don't think that's what the witness said. She said she wasn't sure about three, and then she said more than three. Now it's three.

THE COURT: Okay. I'll sustain. It's sustained.

BY MS. CROSS:

Q. Was it dark or light outside when you arrived in Tennessee?

A. Dark.

Q. And it took you approximately how many hours to get there?

A. Anywhere from -- I really don't -- I just know it was several hours. I don't know exactly how long it took.

Q. And when you were riding, was there any time that you were riding in the dark, when it was dark out?

A. Yes.

Q. About how long was it dark outside that you were riding before you got to Tennessee?

A. A good hour maybe.

THE COURT: Ms. Cross, how much more direct examination do you have of this witness?

MS. CROSS: Your Honor, it might be a great time for a break, because we have quite a bit of ways to go.

THE COURT: All right. Then I think we will break for the day.

Ladies and gentlemen of the jury, I want to

remind you that during this recess or any other recess, you must not discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else. If anyone tries to talk to you about the case, please let me know about it immediately. And, finally, keep on open mind until all the evidence has been received and you have heard the views of your fellow jurors.

Just to give you some idea of our progress, the government has gone through, looks like to me, about eight witnesses, and they have only got 14 folks on their witness list. I anticipate the government is going to finish tomorrow.

MS. CROSS: That is our intention, Your Honor.

THE COURT: Okay. So I feel relatively certain that the case will go to you sometime on Friday. I don't know how long the defense's case will take, but we seem to be on schedule.

See you all back in the injury room at 8:40, and we will start at promptly at 9 o'clock tomorrow morning in the courtroom.

(Jury excused from the courtroom.)

THE COURT: Ms. Cross or Mr. Thapar, what are you intending to cover tomorrow, the remainder of your witnesses?

MS. CROSS: Yes, Your Honor.

THE COURT: Is it he everyone on the rest of your witness list, or have you struck anyone?

MS. CROSS: It's everyone on the rest of our witness list.

THE COURT: Okay. All right. I'm missing somebody.

MS. CROSS: Ed Felson.

DEPUTY MARSHAL NIEMER: He said he had to go to the bathroom, Judge, and he took off.

THE COURT: All right. Let me ask Mr. -- well, I better wait for him then.

MS. CROSS: Your Honor, I'm going to turn over the rest of the Jencks now.

THE COURT: Great.

MR. ANDREWS: Great.

THE COURT: I guess, Mr. Andrews, we can talk with you. What are we doing about Atlanta?

MR. ANDREWS: On Atlanta, I talked to Bertha twice now. Bertha seems to indicate she may -- Bertha and Curtis may not be totally necessary witnesses. We have yet to get ahold of Evlyn, who is the one witness who apparently is the most important. And we haven't talked to her even yet. I keep calling. The U.S. Marshals have called. I'm just going to have to keep working with them

and have her here if humanly possible. But it looks like Curtis and Bertha are not going to be necessary, because they were not privy to the conversation that's pertinent.

THE COURT: As a fallback, do you want us -- are we checking with the court of appeals in Atlanta?

THE COURTROOM DEPUTY: I haven't yet.

THE COURT: Well, we'll check with the court of appeals in Atlanta to see if they have video conferencing abilities, but that's sort of a longshot.

MR. ANDREWS: My client advises me, if you want to send us all down there, we are more than happy to go there. He kind of likes Atlanta.

THE COURT: A little field trip.

MR. ANDREWS: A little field trip.

MS. CROSS: Your Honor, I'm handing --

THE COURT: Wait for Mr. Felson.

MR. FELSON: I apologize. If you have to go, you have to go.

THE COURT: Okay. Go ahead, Ms. Cross.

MS. CROSS: Your Honor, for the record, I'm handing to Mr. Andrews and Mr. Felson both Bessie Pew and Shanell Holston's Jencks and Giglio information, and they already have Stephanie Luster's information.

THE COURT: All right. Do you anticipate finishing before the end of the day tomorrow?

MS. CROSS: Oh, that is our intention, Your Honor.

THE COURT: Approximately what time? I just want to give the defense some idea of how much time they're going to have tomorrow, just approximately.

MS. CROSS: We have a couple of witnesses that will just take ten minutes, 15 minutes.

THE COURT: Do you think you will finish by lunch?

MS. CROSS: No, not with Stephanie Luster and Shanell Holston.

THE COURT: So maybe around two?

MS. CROSS: I think that is reasonable.

THE COURT: Two or 2:30. I think the defense can count on a couple hours for the defense's case tomorrow.

Are you going to have your expert tomorrow, Mr. Felson?

MR. FELSON: Well, Your Honor, the one thing that I would hope to avoid is having him one day and then come back the next day. Then you really start talking money.

THE COURT: How long do you think his testimony is going to last?

MR. FELSON: Probably a couple hours, depending on the cross. My part of it is probably only an hour.

MR. THAPAR: I'm sorry. How long?

MR. FELSON: Maybe an hour for my side.

MR. THAPAR: And we anticipate no more than 20 minutes.

MR. FELSON: So that might work.

THE COURT: Yes. I think we will easily get him in, and I would be glad to keep the jury a little later, too. We don't seem to have anybody who has young children on the jury.

Does that then push Atlanta back until Friday?

MR. ANDREWS: Which would probably work best, because we can still do that Friday morning nice and early.

THE COURT: Mr. Felson, are you anticipating any other witnesses for the defense?

MR. FELSON: No, I'm not. And also let me make this point, that so far -- I mean, I think -- well, we're not so sure. I'm not sure what they're presenting, but the expert may not have to testify. It depends on what we hear there. I'm not even saying that's a certainty.

THE COURT: I understand. No problem.

And, Mr. Walter Pugh and Mr. Andrews, are you anticipating much in the way of defense?

MR. ANDREWS: One or -- Evlyn and possibly one more. Probably one or two.

THE COURT: All right. Well, it sounds to me like the case is going to get to the jury then for sure on

Friday. I'll ask you tomorrow probably how much time you would like for argument, so you might want to think about that.

Anything further to come before the Court today?

All right. Well, I'll ask that you all be in the courtroom tomorrow at a quarter of nine so, if there are any problems, we can handle them then and put the jury in the box promptly at nine a.m.

Thank you, everyone.

COURT IN RECESS AT 4:45 P.M.

C E R T I F I C A T E

I, Betty J. Schwab, the undersigned, do hereby certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

Betty J. Schwab

BETTY J SCHWAB, RPR
Official Reporter