UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

02 JUL 21 PM 2:00

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION CR-1-02-054 |
| Plaintiff, | : | Cincinnati, Ohio |
| | : | Thursday, September 5, 2002 |
| -vs- | : | |
| WALTER PUGH, JR, and TYREESE PUGH, | : | Day 3 of jury trial |
| Defendants. | : | 9:00 a.m. |

- - -

VOLUME III

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE,
AND JURY

- - -

For the Plaintiff: Wende Cross, Esq.
Amul Thapar, Esq.
Asst. U.S. Attorney
Atrium II, Suite 400
221 East Fourth Street
Cincinnati, Ohio 45202

For the Defendant: Pro Se
(Walter Pugh, Jr.)

(Legal advisor) J. Robert Andrews, Esq.
Schuh & Goldberg
2662 Madison Road
Cincinnati, Ohio 45208

(Tyreese Pugh) Edward J. Felson, Esq.
Felson & Felson
CBLD Center, Suite 1650
36 East Seventh Street
Cincinnati, Ohio 45202.

Law Clerk: Mike Rich
Courtroom Deputy: Steve Snyder, Vicki Penley
Court Reporter: Betty Schwab

83

# I N D E X


| GOVERNMENT WITNESSES: | DIRECT | CROSS | RD | RC | FD | FC |
|---|---|---|---|---|---|---|
| STEPHANIE LUSTER | | | | | | |
| (by Ms. Cross) | 406(cont) | | 506 | | | |
| (by Mr. Felson) | | 429 | | 512 | | |
| (by Mr. Pugh) | | 493 | | 515 | | |
| MATTHEW WITTICH | | | | | | |
| (by Ms. Cross) | 518 | | 551 | | | |
| (by Mr. Felson) | | 530 | | | | |
| (by Mr. Andrews) | | 550 | | | | |
| JAMES CIFUENTES | | | | | | |
| (by Mr. Thapar) | 554 | | 583 | | 592 | |
| (by Mr. Felson) | | 562 | | 587 | | |
| (by Mr. Andrews) | | 573 | | 591 | | 592 |
| JAMES COLWELL | | | | | | |
| (by Mr. Thapar) | 594 | | 604 | | | |
| (by Mr. Felson) | | 597 | | 606 | | |
| (by Mr. Andrews) | | 601 | | | | |
| BESSIE PEW | | | | | | |
| (by Mr. Thapar) | 611 | | 641 | | 651 | |
| (by Mr. Felson) | | 621 | | 646 | | 652 |
| (by Mr. Pugh) | | 631 | | | | |

| GOVERNMENT EXHIBITS: | ADMITTED: |
|---|---|
| Nos. 9.1 and 9.2 | 612 |
| Nos. 10,11,12,14,15,16,18,19 | 596 |
| Nos. 20,23,24,25,26,27 | 596 |
| No. 17 | 428 |
| Nos. 11-A and 12-A | 606 |

JURY CHARGE CONFERENCE: 656

PROCEEDINGS

THE COURT: Good morning to everyone.

I believe you were in the middle of Ms. Luster's testimony. You may proceed, Ms. Cross.

MS. CROSS: Thank you, Your Honor.

STEPHANIE LUSTER

DIRECT EXAMINATION (Cont.)

BY MS. CROSS:

Q. Good morning, Ms. Luster.

A. Good morning.

Q. Yesterday, you were testifying, and I think we stopped at or we were talking about the day that you traveled to Tennessee with the defendants. Do you remember that?

A. Yes, I do.

Q. Okay. Now, I believe you testified that you left from Fairfield, Ohio, correct?

A. Yes.

Q. And at whose house were you at?

A. At Sonia Lovett's.

Q. I think yesterday did you say a person by the name of Tenikia?

A. Yes, I did.

Q. And what is her last name?

A. Lovett.

Q. And what relation is she to Sonia Lovett?

A. Her daughter.
Q. Now, did you start your day at Tenikia or Sonia Lovett's house, or did you start your day at your apartment?
A. I started my day at my apartment.
Q. And you traveled there with the defendants, correct?
A. Correct.
Q. Now, let's start at where you traveled to Tennessee.
A. Um-hum.
Q. I believe you stated that it was sometime in the afternoon, but you don't recall the time?
A. Correct.
Q. And that you said it took several hours to travel there?
A. Correct.
Q. When you arrived, was it dark or light outside?
A. Dark.
Q. Were did you go in Tennessee?
A. To a motel.
Q. Do you recall the name of the motel?
A. No, I do not.
Q. How do you know it was in Tennessee?
A. I believe I was reading a sign on the interstate.
Q. What happened when you, all of you, arrived at the motel?

A. We checked in.
Q. Who checked in?
A. Tenikia and I.
Q. And where were the defendants?
A. Still outside in the car.
Q. And under whose name did you check in?
A. Her name and my name.
Q. How many rooms did you get?
A. Two.
Q. Who paid for the rooms?
A. Tenikia.
Q. How did she pay for it?
A. Cash.
Q. Did you have any money on you?
A. Yes, I did.
Q. How much money did you have?
A. Twenty-five or 30 dollars.
Q. Did Tenikia pay for both rooms?
A. Yes.
Q. What were the room arrangements?
A. Tyreese and I and my children in one room, and Walter and Tenikia and her child in another.
Q. Were the rooms next door to each other or close to each other?
A. They were close. They weren't next door.

Q. Were you on the same floor?

A. Yes.

Q. How long did you stay at that motel?

A. One night.

Q. Tell the ladies and gentlemen of the jury what happened at the hotel when you got there and after you checked in.

A. Well, we got settled in or whatever, and Tyreese was gone to Walter's room for a while. And, after waiting for so long, I then went to Walter's room.

Q. Looking for Tyreese?

A. Yes.

Q. And when you got there, who was present in the room?

A. Tyreese, Walter and Tenikia.

Q. What happened when you got to the room, Walter's room?

A. I opened the door and saw money on the bed.

Q. You saw money on the bed?

A. Um-hum.

Q. What kind of money?

A. Cash.

Q. Coins? Dollars?

A. Dollars.

Q. Did you get an opportunity to see the denominations of the dollars?

A. By denomination, you mean?

Q. The amounts?
A. Not clear, no.
Q. Could you see whether they were one-dollar bills or 20-dollar bills?
A. Well, I couldn't determine.
Q. About how much money did you see? I know you didn't know as far as the amount, but could you indicate for the ladies and gentlemen of the jury how much money you saw on the bed in terms of it being laid out on the bed?
A. It would cover, like, the corner, like the majority of the corner of the bed.
Q. Did you ask any questions when you saw the money?
A. I said kind of like what, you know, what's going on, what is that.
Q. And what, if anything, did the defendants say?
A. Walter stated that they had hit a lick.
Q. They hit a lick?
A. Um-hum.
Q. And what was your understanding as to what that meant?

MR. FELSON: Objection.

MR. ANDREWS: Objection.

THE COURT: Overruled.

BY MS. CROSS:

Q. What was your understanding as to what that meant?
A. That means, to me, that either they did a robbery or

got over in some way.

THE COURT: They did a robbery or what?

THE WITNESS: Got over in some way.

THE COURT: Got over in some way? What does that mean?

THE WITNESS: Just like getting over on somebody or something.

THE COURT: Oh, thank you.

BY MS. CROSS:

Q. Do you mean take advantage of someone?

A. Yes.

Q. After Walter said they hit a lick, what else, if anything, did he say?

A. He just went on to say something to the effect that -- something to the effect about them having the teller open the vault.

Q. Okay. And did he say anything about Tyreese?

A. He said --

MR. FELSON: Objection. Hearsay. It's not against the self interest.

THE COURT: Ms. Cross?

MS. CROSS: It's a statement against both of their interests. And it's a coconspirator's statement as well, Your Honor.

THE COURT: Overruled.

BY MS. CROSS:

Q. What, if anything, did he say about Tyreese?

A. He said something about Tyreese manning the door.

Q. After you heard Walter say they hit a lick and taking the teller to the vault and that Tyreese manned the door, what else happened? Did you ask any more questions?

A. No, I did not.

Q. And what, if anything, did Tyreese say when Walter was making these statements?

A. Nothing.

Q. At this point after hearing that, what were you thinking?

A. I was scared. I really didn't know what to think.

Q. What happened next?

A. I went back to the room.

Q. You left Walter's room?

A. Um-hum.

Q. Where did you go?

A. Back to our room.

Q. Alone?

A. Well, yes. But, like, Tyreese was right behind me.

Q. So Tyreese left the room with you?

A. Not with me. Just like a couple minutes after I left, he left. He was right behind me.

Q. Did you discuss what you had heard and seen with

Tyreese when you got back to your room?

A. No.

Q. When you saw the money on the bed in Walter's room, was it just thrown about the bed, or --

A. Some, yes. Other in rubber bands.

Q. Some of the money was in rubber bands?

A. Um-hum.

Q. After you went back to your room and Tyreese came back to the room, what else happened that evening?

A. Went to sleep.

Q. Nothing eventful?

A. No.

Q. When did you leave that hotel?

A. In the morning.

Q. About what time?

A. I don't recall what time. It was early though.

Q. And where did you go?

A. I believe we went to McDonald's.

Q. To get something to eat?

A. Um-hum.

Q. Did you stay in Tennessee or what you thought was Tennessee?

A. No.

Q. Where did you go?

A. To Georgia.

Q. What part of Georgia?
A. Atlanta.
Q. And how did you get to Atlanta, Georgia?
A. In the same two vehicles.
Q. The same riding arrangements as when you got to Tennessee?
A. Yes. Yes.
Q. At any time during your travel from Tennessee, the hotel in Tennessee, to Atlanta, Georgia, did you make any stops, or did you travel straight through?
A. Straight through.
Q. Were the occupants of the two vehicles able to communicate to each other in any way during the travel?
A. No.
Q. Were did you go in Atlanta, Georgia?
A. To Walter's family home.
Q. Is that where you went first?
A. No, no.
Q. Where did you go?
A. To a hotel in downtown.
Q. To a hotel in downtown Atlanta?
A. Um-hum.
Q. Do you recall the name of the motel?
A. I believe it was the Travelodge.
Q. And what did you do when you got to the Travelodge in

downtown Atlanta?

A. Got two rooms.

Q. Who checked in?

A. Tenikia.

Q. Tenikia Lovett?

A. Um-hum.

Q. And who paid for the rooms?

A. Tenikia.

Q. How did she pay for the rooms?

A. Cash.

Q. What did you do in Atlanta, Georgia?

A. Well, we went out for things that we needed, like underwear and clothing.

Q. Did you eat?

A. Yes.

Q. So you ate and shopped?

A. Yes.

Q. Did you make any other purchases other than for underwear and clothing?

A. Not while at the hotel.

Q. When?

A. When we were at the family rooms. Well, I didn't make any purchases, but the purchases were made.

Q. By whom?

A. By Walter and Tenikia, I believe.

Q. Now, you had your children with you, correct?
A. Correct.
Q. And I believe you testified that you hadn't packed any clothes?
A. Correct.
Q. Did your children keep on the same clothing?
A. No, they did not.
Q. Tell the members of the jury how they got different clothing.
A. Well, like I said, we went shopping.
Q. And who paid for clothes for your children?
A. Tyreese.
Q. How did he pay for it?
A. Cash.
Q. Were you given any cash?
A. No, I was not.
Q. How long did you stay at the Travelodge in downtown Atlanta?
A. Two days, one night.
Q. You get there one day?
A. Um-hum.
Q. You stay that night and then the next day?
A. Um-hum.
Q. Okay. And where did you go from there?
A. To Walter's family member's home.

Q. Where is that?
A. I believe it's in Decatur.
Q. And do you know the name of his uncle?
A. I do not recall.
Q. Who stayed at Walter's uncle's house?
A. His uncle's house?
Q. I'm sorry. Did you say you all traveled there?
A. Yes. At the family member's home.
Q. Who? You said "we."
A. Oh, all of us.
Q. How long did you stay?
A. Couple days, I believe.
Q. While you were at Walter's relative's house in Georgia, did you ask any questions about what you had heard in the hotel in Tennessee?
A. No, I did not.
Q. Did you hear or observe anything regarding what you had heard in the hotel in Tennessee?
A. Yes. I observed them retelling the story, a little bit of it.
Q. And who did you hear telling the story?
A. Walter.
Q. And what did you hear Walter say?
A. Just the same thing that they had related.
Q. And who was he telling this to?

A. His family members, I believe.
Q. And was Tyreese present?
A. Yes, he was.
Q. And did you hear him say anything?
A. Just something to the effect of how he was holding the gun.
Q. Was he talking about holding the gun, or was he physically demonstrating?
A. Physically demonstrating.
MR. FELSON: Objection.
THE COURT: What's the basis?
MR. FELSON: Leading.
THE COURT: Overruled.
BY MS. CROSS:
Q. Now, were you present when you heard Walter telling this story about hitting a lick and seeing Tyreese physically demonstrating how he was holding the gun?
A. No. I was present, but I wasn't in their presence.
Q. Tell the members of the jury about that. How was it that you were present but not --
A. I was eavesdropping.
Q. So you could see them?
A. Um-hum.
Q. Could they see you, to your knowledge?
A. No. No.

Q. Where was Tenikia?
A. Tenikia was outside.
Q. You said you were -- you all stayed in Georgia at the relative's house for a couple of days?
A. Um-hum.
Q. At any time while you were in Georgia, did you see any weapons?
A. No.
Q. At any point while you were with the defendants, Walter Pugh and Tyreese Pugh, did you see any weapons?
A. Yes.
Q. Tell the ladies and gentlemen when?
A. The first weapon I saw was in a shoe box -- what do you mean, like --
Q. Yes. Well, I'm going to ask you what you saw, but when did you see weapons?
A. In Hamilton.
Q. In Hamilton. Before you went to Georgia or after?
A. After.
Q. So you're in Georgia for a couple of days, and then you come back to Hamilton?
A. Yes.
Q. Who came back?
A. Tyreese, myself and Walter.
Q. What about Tenikia Lovett?

A. She stayed.
Q. What about your children?
A. They went with my auntie and my uncle. They stayed in Columbus.
Q. In Columbus, Georgia?
A. Um-hum.
Q. So just the three of you returned from Georgia?
A. Um-hum.
Q. When you first returned, where did you go?
A. We stopped in Fairfield at a pay phone.
Q. What was your understanding as to why?
A. I didn't know. I wasn't sure.
Q. How did you travel back from Georgia to Fairfield?
A. In the Cadillac.
Q. Walter's Cadillac?
A. Yes.
Q. What about the other car?
A. It broke down in Georgia.
Q. Is that the Mazda?
A. Yes.
Q. Did you stop at any time from Georgia before you got to Fairfield, Ohio?
A. I believe we stopped to use the restroom or something like that one time.
Q. So you get back to Ohio, correct?

A. Correct.
Q. Tell the ladies and gentlemen of the jury when you first saw weapons when you were with the defendants.
A. When they were going from the Cadillac to Shanell's car.
Q. Can you describe what you saw?
A. I saw a shotgun or a pump and --
Q. Do you recall what color?
A. Black in color.
Q. And where did you see it?
A. Outside, from the car to Shanell's car.
Q. It was being transferred from Walter's car?
A. Um-hum.
Q. To Shanell's car?
A. Um-hum.
Q. Who transferred it?
A. Tyreese.
Q. Is that the only weapon that you have seen?
A. No. I seen another gun, a revolver-type gun, in a shoe box.
Q. And who did you see with the shoe box?
A. Walter.
Q. How is it that you saw the shoe box?
A. Well, being nosey.
Q. Was that all you saw in the shoe box was that gun?

A. And money.
Q. Cash?
A. Yes.

MS. CROSS: Your Honor, at this time I would like to show Ms. Luster Government Exhibit Number 10.

BY MS. CROSS:
Q. Ms. Luster, do you see that exhibit, Government Exhibit Number 10?
A. Yes, I see it.
Q. Do you recognize it?
A. Yes, I recognize it.
Q. What do you recognize it to be?
A. The shotgun I described.
Q. The shotgun you just testified about?
A. Um-hum.
Q. Who did you see with that gun?
A. Tyreese.

THE COURT: Can you keep your voice up a little bit?

Q. Thank you. Thank you. Now, when you first arrived in Ohio, you went to Fairfield -- where did you go?
A. Well, we stopped at Fairfield where Walter used the pay phone.
Q. And then from there where did you go?
A. To the back of the Hamilton police station.

Q. And what did you all do there?

A. Well, Walter got out of the car and was -- I don't know how to put it into words, but just at the camera like, you know, here I am, you know, pointing to the ground and stuff.

Q. There is a camera behind the Hamilton police station?

A. I do believe so.

Q. Did you get out of the car?

A. No, I did not.

Q. Did Tyreese get out of the car?

A. No, he did not.

Q. How long were you behind the Hamilton police station?

A. About five minutes, maybe three minutes, five minutes.

Q. And then what did you all do?

A. We drove to Beckett Street.

Q. Why?

A. That's where we got in the car with Shanell.

Q. We talked about Shanell, I believe you testified, Walter's girlfriend?

A. Um-hum.

Q. You got into Shanell's car, correct?

A. Correct.

Q. Were do you go?

A. To what I thought was Fairfield, but it was Mt. Healthy.

Q. To where?
A. A man name Corkey's house, what I know him as Corkey.
Q. What did you do with -- what was done with Walter's Cadillac?
A. Left on Beckett Street.
Q. In Hamilton?
A. Yes.
Q. Do you recall approximately what time you arrive at Corkey's house in -- where did you say it was?
A. Mt. Healthy.
Q. Mt. Healthy?
A. No, I do not recall.
Q. Do you know if it was day or night or morning?
A. It was day.
Q. What was your understanding as to why you went to Corkey's house in Mt. Healthy?
A. Didn't have an understanding.
Q. Did you ask?
A. No.
Q. How long did you stay?
A. Well, we got there that day, and we were apprehended that night.
Q. At that residence?
A. Yes.
Q. What did you do while you were there?

A. Nothing. We watched TV. Nothing really.
Q. Who was present at Corkey's house while you were there?
A. It was myself, Tyreese, Corkey, Walter, and a man by the name of Dion.
Q. Did you observe any weapons while at Corkey's house?
A. The same weapon.
Q. Did you observe any money?
A. In the shoe box, yes, ma'am.
Q. Where did you see the weapons and the money?
A. The basement.
Q. Now, at some point, were you arrested while there?
A. Yes.
Q. Tell the ladies and gentlemen of the jury how that happened?
A. Well, I was asleep, and I thought I had heard Tyreese fall out of the bed, but, when I opened my eyes, I seen all sorts of infrared beams or whatever, and they placed me in handcuffs.
Q. So you were in bed at the time you were arrested?
A. Um-hum.
Q. And was Tyreese in bed with you?
A. Yes.
Q. Where were you sleeping in the house?
A. Upstairs.

Q. In the bedroom?
A. Yes.
Q. And did you go to the bed at the same time that night?
A. Yes and no.
Q. Explain that for the ladies and gentlemen?
A. Well, I was in the bed first, and then Tyreese came up shortly after.
Q. Were you asleep or awake when he came up?
A. I believe I was still awake.
Q. When you -- you said you thought you heard Tyreese fall out of the bed?
A. Um-hum.
Q. Did you ever see him after you were arrested?
A. Yes.
Q. What did you see?
A. I saw them picking him and the shotgun you just showed me off the floor.
Q. Ms. Luster, I'm going to show you Government Exhibit Number 17. Do you recognize Government Exhibit 17?
A. Yes, I do.
Q. What are they?
A. Keys to Walter's Cadillac.
Q. And how do you know those are keys to Walter's Cadillac?
A. Because they -- they -- they are. I mean, he --

Q. At any time did you ever have them in your possession?

A. Yes, I did.

Q. When?

A. On the ride back from Georgia to Hamilton, Ohio.

Q. Okay. Well, on the ride back from Georgia to Hamilton?

A. Um-hum.

Q. Were you riding in that Cadillac?

A. Yes, I was in the Cadillac.

Q. So the keys were in the ignition?

A. No. Those keys were in my purse.

Q. Upon your arrest, were those keys still in your purse?

A. Yes, they were.

MS. CROSS: Your Honor, at this time I would move to admit Government Exhibit Number 17.

THE COURT: Any objection?

DEFENDANT W. PUGH: No objection.

THE COURT: Mr. Felson?

MR. FELSON: No.

THE COURT: Government Exhibit 17 will be admitted.

MS. CROSS: One moment, Your Honor.

Thank you, Ms. Luster.

That's all the questions I have, Your Honor.

THE COURT: Mr. Felson, do you wish to

cross-examine?

MR. FELSON: Yes.

MR. ANDREWS: Your Honor, may we have about -- you don't need to stop the proceedings. Mr. Pugh, acting as his own attorney, can go ahead, but I need to go out and talk to a couple of witnesses.

THE COURT: Certainly.

Is that all right with you, Mr. Pugh?

DEFENDANT W. PUGH: Yes, ma'am.

THE COURT: All right. You may proceed, Mr. Felson.

MR. ANDREWS: Thank you.

CROSS-EXAMINATION

BY MR. FELSON:

Q. Okay. Ms. Luster, how long have you known Tyreese?

A. I've known him since childhood really, but I didn't start dating him until last year, December.

THE COURT: Mr. Felson, will you just move the mike? You don't have to lean down. Just move it over. That's great, right in front of you.

MR. FELSON: How about this? Is this better?

THE COURT: But you don't have to lean down. It will catch your voice.

BY MR. ANDREWS:

Q. Do you have any children with him?

A. No, I do not.

Q. And you were, the night of his arrest, you were actually sleeping in his bed; is that right?

A. Correct.

Q. And subsequent to, after his arrest, you came to visit him actually at the Butler County Jail, I think, didn't you?

A. Yes.

Q. And when you -- how many times have you come to visit him?

A. Once.

Q. And at that time you came to visit, you said something sort of unusual. You said "They're playing me," didn't you?

A. Who's playing?

Q. Well, that's what I was going to ask you about. Didn't you tell him that?

A. No.

Q. Didn't you say the government was putting pressure on you of some sort?

A. No.

Q. Well, you came to visit him. What did you come to talk about?

A. Nothing really.

Q. Now, you're aware of a woman named Ra-Shay Patterson?

A. Yes, I am.
Q. Now who is Ra-Shay Patterson?
A. Tyreese's child's mother.
Q. And Ra-Shay actually has been here a couple times. Have you seen her out in the hall?
A. No, I have not.
Q. Have you seen Tyreese's child out in the hall?
A. No, I have not.
Q. But, in any event, you don't have a very good relationship with her, do you?
A. No.
Q. You have actually had some fights with her, haven't you?
A. No.
MS. CROSS: Objection, Your Honor.
THE COURT: What's the relevance, Mr. Felson?
MR. FELSON: Motive.
THE COURT: Overruled.
A. No.
Q. Hasn't Tyreese had to get in between the two of you getting ready to start a fight?
A. No. He's had to stop her from trying to run up on me, if anything, but we have never gotten in each other's face.
Q. But she was trying to run up on you. What does that mean?

A. Well, I was walking, and she was trying to run up from behind, I guess to hit me.
Q. All right. Needless to say, you're not good friends with her?
A. No, not good friends with her.
Q. Okay. Matter of fact, you don't like her at all, do you?
A. I never said that.
Q. Does she like you, you think?
A. Well, she speaks. She speaks to me.
Q. Now, does it bother you that he's had a child with her?
A. No.
Q. Does it bother you that she's still in his life?
A. No.
Q. All right. Now, you made a written statement, or I see you made a statement to a police officer about this case; is that correct?
A. Yes. Well, FBI agent.
Q. Right. And it was about on May 8, 2002, Detective Calhoun.
A. Okay.
Q. Do you recall that?
A. Yes, I recall.
Q. Let's see. You're also a -- okay. Well, let me

just --

MR. FELSON: May I mark this, Your Honor?

THE COURT: Certainly.

MR. FELSON: Actually, I was going to do it before.

THE COURT: Do you have some copies?

MR. FELSON: Everybody has a copy. This was provided in Jencks material.

THE COURT: Just so you have an extra copy for the witness.

MR. FELSON: Oh, yes, we have an extra copy.

THE COURT: Are you going to be moving for the admission?

MR. FELSON: Probably not, but I want to see what she says.

THE COURT: What's the exhibit?

THE COURTROOM DEPUTY: B.

THE COURT: This will be marked as Defense Exhibit B.

BY MR. FELSON:

Q. Just take a minute. Look at this statement. You recall making this statement? I think it probably wasn't typed up by you, but your signature is at the bottom, correct?

A. Correct.

Q. All right. Now --

THE COURT: Have you had an opportunity to look at it?

THE WITNESS: Yes, ma'am.

THE COURT: Okay.

BY MR. FELSON:

Q. Now, first of all, I want to go over -- you got arrested for being part of that robbery. Did you get arrested as well?

A. Not as being part of the robbery, no.

Q. Why were you arrested? I think you said you were arrested. Why?

A. Well, they just got me when they got them.

Q. Now, when you went to sleep, what time did you go to sleep that night that you were arrested?

A. I don't know what time it was.

Q. What time did the police come in and arrest you?

A. I don't recall what time that was.

Q. Did you go to sleep at nighttime?

A. Yes.

Q. Was it late at night like --

A. It was nighttime.

Q. When you went to sleep, were you awake when Tyreese came into the room?

A. Yes. The first time, yes.

Q. What do you mean "the first time"?
A. He was coming in and out.
Q. When Tyreese finally laid down to go to sleep, were you awake when that happened? Did you say good-night to him?
A. No. I don't remember saying good-night to him.
Q. You don't remember?
A. No.
Q. Was there a gun in the bed?
A. Not to my knowledge.
Q. You saw the gun on the floor?
A. Yes, when they put me in handcuffs.
Q. Now, who lives in that house?
A. Corkey.
Q. It wasn't your house?
A. No.
Q. It wasn't Tyreese's house?
A. No.
Q. Who is Corkey?
A. I don't know him.
Q. How many nights have you stayed at this house?
A. We didn't make it through the night.
Q. That was the first night?
A. Um-hum.
Q. And did you see -- you saw some weapons in other parts

of the house?
A. The basement.
Q. And did Tyreese have any clothes at that house?
A. No.
Q. I mean, he didn't live there?
A. No.
Q. He wasn't a tenant there of any sort?
A. No.
Q. You just happened to stay there that night, right?
A. Yes.
Q. He has an apartment somewhere, doesn't he?
A. Not to my knowledge.
Q. Well, do you have an apartment?
A. Yes.
Q. Okay.
A. Well, I had an apartment.
Q. Did Tyreese stay with you sometimes?
A. He spent the night.
Q. Every night?
A. Not every night, but frequently.
Q. Right. He stayed sometimes with his baby's mama; is that right?
A. I have no idea.
Q. Would that have bothered you if he stayed with her?
A. No.

Q. Now, you weren't just sleeping in the same bed with Tyreese. You were also intimate with him, weren't you?

A. Not that night, no.

Q. Not that night, but recent past?

A. Yes.

Q. And you considered yourself his girlfriend, didn't you?

A. Yes, I did.

Q. And you considered yourself his exclusive girlfriend, didn't you? In other words, you didn't think he had other girlfirends?

A. As far as I knew.

Q. Just you, right?

A. As far as I know.

Q. And that turned out not to be true, didn't it?

A. Now that you're bringing it to my attention.

Q. All right. All right. So your statement is, when you went to visit him, did he tell you that he was still seeing his other girlfriend, or did you ask him about that?

A. No.

Q. Did you mention anything about the talking to the government or talking to the police about the case?

A. No. I don't recall mentioning anything about it.

Q. But you may have?

A. I don't recall mentioning anything about it.

Q. But by the time you had come to see him -- you don't remember the date you visited him at Butler County Jail?
A. I don't remember the date.
Q. Remember the day of the week?
A. No.
Q. By that time, you had already talked to the police, isn't that right, or they would already interviewed you?
A. Well, yes.
Q. Okay. And you had actually talked to them prior to giving this statement. The statement that you're looking at, that wasn't the first time you went to see the police?
A. This was the first time that I was interviewed by the police.
Q. You gave this statement the first time? You didn't talk to the police before that?
A. Well, yes, I talked to them, but I didn't talk to -- not like this.
Q. Right. You didn't make a statement the first time you talked to them?
A. No.
Q. Right. The first time you talked to them, you denied knowing anything; isn't that right?
A. Not entirely, no.
Q. Somewhat? Well, you just said you didn't talk to them like this. Does that mean you didn't give them all this

information the first time?

A. True.

Q. Okay. So the first time, the information you gave them was a lot less than this, right?

A. I don't recall.

Q. And when you gave them -- well, the first time you met them, did you realize, did you know that you were a suspect or did you believe that you were a suspect?

A. No.

Q. Okay. And but the first time you met them, do you recall what you told them?

A. No, I do not.

Q. Is it safe to say you told them you didn't have anything to do with it and you didn't know anything?

A. It's safe to say I said I didn't have anything to do with it.

Q. And did you say you didn't know anything about it?

A. I don't think I said that.

Q. But you might have?

A. I don't think I said that.

Q. Well, do you remember what you said?

A. No. I don't recall.

Q. Now, you say you saw a lot of money. Well, here, let me just ask you something. The first time you say you saw money, my notes indicate you got two rooms; you were in

Tennessee. Right? You're staying with Tyreese, right?

A. Correct.

Q. And Tyreese then left and went to Walter's room. Is that right?

A. Correct.

Q. Then you -- I guess maybe you got bored or something, and you wanted to go where they were, so you left your room and you went to the room where Walter, Tenikia and Tyreese or where you thought they were. Is that right?

A. I went to where they were.

Q. Okay. And you said you opened the door and saw the money?

A. On the bed.

Q. Is that right?

A. Yes. Correct. On the bed.

Q. And where was Tyreese when you walked in?

A. In the room.

Q. Was he over by the bed?

A. I don't recall the position.

Q. Where was Walter?

A. I don't recall the positioning.

Q. How about Tenikia?

A. I don't recall the positioning.

Q. What, you just turned the handle, came in, and there was the money?

A. Well, I didn't just turn the handle and come in. They had to open. You can't open it from the outside.
Q. Did you knock?
A. Did I who?
Q. You said you opened the door and came in, didn't you?
A. Well, that -- I mean --
Q. Did you not open the door and come in?
A. No. I didn't just open the door and come in.
Q. But you did say that, right?
A. I might have said that.
Q. Okay. That was not true then?
A. I did not open the door and just come in.
Q. All right. You knocked. You say you knocked on the door?
A. Yes.
Q. And somebody let you in?
A. Yes.
Q. And who let you in?
A. Tyreese opened the door.
Q. I thought you said you didn't remember where he was?
A. I mean, I don't know exactly where he was in the room.
Q. Well, he must have been over by the door, I guess?
A. As I said, he was on the other side of it.
Q. I thought you said he opened the door?
A. I did say he opened the door.

Q. Wasn't he right next to the door then?
A. How would I know?
Q. Okay. So you're saying Tyreese opened the door, and then you came in and saw the money?
A. Um-hum.
Q. And did anybody say who's at the door?
A. No.
Q. Did you have to identify yourself before you came in?
A. No.
Q. Where were the guns when you came in?
A. I didn't see any guns.
Q. Now, you said that the room was paid for by Ms. Lovett?
A. Um-hum.
Q. Yes?
A. Yes.
Q. Okay. What's Ms. Lovett's first name?
A. Tenikia.
Q. Tenikia. But you said you and her went in and each got a room?
A. Um-hum.
Q. So the room would be registered to you, right?
A. One room.
Q. You said there were two rooms.
A. Um-hum.

Q. One you went in and registered for, and the other one Tenikia registered for, right?
A. Um-hum.
Q. You have to answer "yes."
A. Yes.
Q. And where were these rooms?
A. In the hotel.
Q. Okay. Well, what city, what town, what exit? Do you know?
A. I believe Tennessee.
Q. That's the closest you can come to, state of Tennessee?
A. Yes.
Q. Do you have any evidence of your registration?
A. No, I do not.
Q. Any receipt for your paying?
A. No, I do not.
Q. Did you have to show them a credit card?
A. No, I did not.
Q. Did you have to show them any kind of, you know, you're driving a car. Did you have to write down the car license plate, that kind of stuff?
A. I don't recall, sir.
Q. Did they ask you if you had a car?
A. No.

Q. And what was it, a Travelodge? What hotel?
A. I don't know what type of hotel it was.
Q. Motel 6?
A. I don't know what type of motel it was.
Q. I'm not talking about the type of motel. I'm talking about the name of the motel.
A. I don't know.
Q. Okay. You don't know the name. Do you know what town it was in?
A. No.
Q. Do you know if it was near the Tennessee border? Was it in the middle of Tennessee?
A. I just know it has to be Tennessee. That's what I knew that it was.
Q. Now, are you having trouble remembering because of -- well, you don't seem to remember where you were that night except at some hotel. You don't know any place that you might have passed, like maybe Nashville. Were you near Nashville?
A. I don't remember any exact name. I recall remembering it to be Tennessee.
Q. How many hours were you in the car?
A. I'm not sure.
Q. Okay. And then the hotel administration, they didn't ask you -- did they ask you for ID?

A. No.

Q. Did they ask you for a credit card?

A. No.

Q. They didn't ask you for a driver's license?

A. No.

Q. They didn't ask you to write down any information on your car? No? Right?

A. Right.

THE COURT: Are you asking and answering the questions, Mr. Felson?

MR. FELSON: Both. Not on purpose.

THE COURT: Why don't we let the witness answer the questions?

MR. FELSON: I agree, Judge. I apologize.

BY MR. FELSON:

Q. Okay. Then they just gave you the keys to their motel room, and you just moved in?

A. Did not move in.

Q. You know, bring your stuff in?

A. Um-hum, yes.

Q. Did they ask you who else was staying there in the room with you?

A. No they did not.

Q. Did they ask you how many keys you wanted?

A. No, they did not.

Q. All right. Then you left the next morning, right?
A. Correct.
Q. What time did you leave?
A. Morning time.
Q. You don't know what time?
A. No.
Q. Do you have a watch?
A. Yes, I do.
Q. You have a watch on right now?
A. Yes.
Q. Is that your personal watch? How long have you had that?
A. Since the end of May or beginning of June.
Q. Did you have a watch before that?
A. No, I didn't.
Q. Did you all get high that night?
A. What night?
Q. In the hotel, did you get high on marijuana that night at the motel?
A. I don't recall getting high.
Q. It's possible?
A. No. I don't think so.
Q. Well did you have marijuana with you?
A. No.
Q. Did anybody have marijuana?

A. I didn't.
Q. Did anybody offer you any?
A. No.
Q. Had they had, do you smoke it?
A. I used to.
Q. You don't anymore?
A. No, I do not.
Q. When did you stop?
A. Briefly after the incident.
Q. After this incident?
A. Um-hum.
Q. Which incident are we talking about, the actual robbery?
A. I'm talking about after the time when we got arrested in Mt. Healthy.
Q. All right. Now, the money was in Walter's room, you said, right?
A. Correct.
Q. Any money in Tyreese's room?
A. No.
Q. Did you have any money with you?
A. Twenty-five or 30 dollars.
Q. What did Tyreese have?
A. I don't know.
Q. All right. And you said you saw the money, but you

didn't ask where they got the money. Did you ask where they got the money?

A. I didn't exactly say where.

Q. Now, you said that "Walter told me they hit a lick." Is that right?

A. Correct.

Q. Could he could he have said, "I hit a lick"?

A. I believe it was "they." Well, "we." Out of his mouth, "we."

Q. Did he mean Tenikia?

A. I didn't think that he would mean Tenikia.

Q. Does Walter have other sons?

A. Yes, he does.

Q. Did he say, "Tyreese and I hit a lick"?

A. No, he did not.

Q. Did you ask him what he meant by that?

A. No, I did not.

Q. So you don't know who he was talking about?

A. No. I don't know, no.

Q. And a "lick" doesn't necessarily even mean a bank robbery, does it?

A. No, not exactly, no.

Q. It could mean any good luck, couldn't it? What if somebody hit the lottery, I hit a lick; would it mean that?

A. Yes. It could mean that. Slang terminology, yes.