LUSTER - CROSS

1    A.    No, they didn't.

2    Q.    Police tell you that there was a way out of you

3    getting in trouble; you could avoid being indicted?

4    A.    No.

5    Q.    By helping them?

6    A.    No.

7    Q.    They didn't tell you that?

8    A.    No.

9    Q.    Did they tell you something like that?

10   A.    No.

11   Q.    You saying you saw 20's and 10's and you didn't see

12   any large bills?

13   A.    No.

14   Q.    Are you aware there were many, many hundreds?  Did you

15   see any hundreds?

16   A.    I don't recall.

17   Q.    Now, you said it took up the corner of the bed?

18   A.    Yes.

19   Q.    Like how big was the bed?  Like as big as this table?

20   A.    The bed was, I believe, a full or queen size.  I'm not

21   sure.

22   Q.    And a corner of it?

23   A.    Um-hum.

24   Q.    Corner of it would be a couple of feet by a couple of

25   feet maybe?

LUSTER - CROSS

| | | |
|---|---|---|
| 1 | A. | I'm not sure. |
| 2 | Q. | Well, just from the end here, like this much of it, |
| 3 | | just like this? |
| 4 | A. | Some. |
| 5 | Q. | I'm going about two feet by two feet? |
| 6 | A. | I can't determine from that. |
| 7 | Q. | Could you just show us with your hands how much of the |
| 8 | | corner of the bed it took up? |
| 9 | A. | I can't.  I don't know.  It's like the corner of the |
| 10 | | bed.  I didn't actually take measurements as to how, you |
| 11 | | know, much was covered. |
| 12 | Q. | Probably you were looking at the money, weren't? |
| 13 | A. | Yes, I looked at it. |
| 14 | Q. | Do you know how high it was stacked? |
| 15 | A. | No. |
| 16 | Q. | So were there any singles, any one-dollar bills? |
| 17 | A. | I'm pretty sure there were. |
| 18 | Q. | And you said it was wrapped in rubber bands? |
| 19 | A. | Some. |
| 20 | Q. | You saw the rubber bands? |
| 21 | A. | Yes. |
| 22 | Q. | Did the rubber bands have any writing on them? |
| 23 | A. | No. |
| 24 | Q. | And some of them weren't wrapped.  Some of it was |
| 25 | | loose? |

LUSTER - CROSS

1   A.   Yes.

2   Q.   So you have some wrapped in rubber bands and some

3   loose, correct?

4   A.   Correct.

5   Q.   And when it was wrapped in rubber bands, how thick

6   were the packets?

7   A.   I didn't observe like that.

8   Q.   Well, okay.  Was it wrapped in any other wrappings,

9   cellophane, tinfoil, any other wrapping like a bag of some

10  sort?

11  A.   No.

12  Q.   It was just out on the bed in rubber bands or loose?

13  A.   And loose.

14  Q.   I'm sorry?

15  A.   And loose.

16  Q.   Rubber bands?

17  A.   You said "or loose."

18  Q.   I assume some of it, if it wasn't in rubber bands, it

19  was loose?

20  A.   Yes.  But you said "in rubber bands or loose," and I'm

21  saying in rubber bands and loose.

22  Q.   Can you describe the rubber bands a little bit?  I

23  mean, were they thick rubber bands, thin ones, two or three

24  around?

25  A.   I can't recall.

LUSTER - CROSS

1   Q.   All right.  Now, let's see.  After you got back to
2   Hamilton, you didn't stop for the evening, right, coming
3   back from Georgia?
4   A.   Not the evening.
5   Q.   You didn't stop to sleep?
6   A.   No.
7   Q.   First place you went, it says, was the police station.
8   You're talking about, after getting back, the first place
9   you went before you stopped any place, at home or to drop
10  your stuff off, you went to this police station, right?
11  A.   Well, we stopped in Fairfield at a pay phone.
12  Q.   You stopped at a pay phone?
13  A.   Um-hum.
14  Q.   What did you do?  Who did you call?
15  A.   Walter called someone.
16  Q.   Didn't he still have his cell phone?
17  A.   Walter used the pay phone.
18  Q.   Did Tenikia have the cell phone then?  Oh, Tenikia
19  wasn't with you?
20  A.   No.
21  Q.   Do you know who he called?
22  A.   No.
23  Q.   Did he mention who he called?
24  A.   No.
25  Q.   On the trip back, was he talking about -- anybody talk

LUSTER - CROSS

1    about anything unusual?

2    A.    No, not -- no.

3    Q.    Did you ask any questions about anything on the trip

4    back?

5    A.    No.

6    Q.    About where he got the money or what happened in the

7    robbery?

8    A.    No.

9    Q.    Or what happened, you didn't ask any questions at all?

10   A.    No, I did not.

11   Q.    Weren't you curious about what happened?

12   A.    Of course, yes.

13   Q.    But you didn't ask.  Actually, you eavesdropped

14   sometimes I think you testified, right?

15   A.    Um-hum.

16   Q.    Yes?

17   A.    Yes.

18   Q.    And you looked in -- I'm sorry.

19   A.    Once.

20   Q.    Okay.  And you looked in the boxes, in some of their

21   boxes, and saw --

22   A.    In one box.

23   Q.    Because you're nosey, I think you said, right?

24   A.    I was being nosey, yes.

25   Q.    But you didn't ask any questions?

LUSTER - CROSS

1   A.   No.

2   Q.   Okay.  Now it says Walter parked his car.  This says

3   then we went to Mt. Healthy and Walter parked his car on

4   Beckett Street.  And you don't know why -- do you know why

5   now?  It says that you didn't know why at the time.

6   A.   Yeah, I didn't know why at the time.

7   Q.   Do you have any idea now why he parked the car on

8   Beckett Street?

9           MS. CROSS:  Objection, Your Honor.  Calls for

10  speculation.

11          THE COURT:  Sustained.

12  BY MR. FELSON:

13  Q.   How far is Beckett Street from the house where you

14  eventually stayed?  I'm talking about the location of the

15  parking of the car.

16  A.   Far.

17  Q.   Far.  Like a mile?

18  A.   Excuse me?

19  Q.   Walking distance?

20  A.   No.

21  Q.   What town is Beckett Street in?

22  A.   Hamilton, Ohio.

23  Q.   Oh, okay.  And then Shanell, you're saying, gave you a

24  ride to Mt. Healthy?

25  A.   Yes.

1    Q.    All right.

2              THE COURT:  Mr. Felson, are you close to wrapping

3    up?

4              MR. FELSON:  I think so.  Yes.  I think so.

5    Should I -- I mean, I would like to maybe confer.  I'm

6    pretty much done.

7              THE COURT:  Why don't you confer?

8              MR. FELSON:  I'm almost at the bottom here.

9    BY MR. FELSON:

10   Q.    Now, I want to talk about what you saw when you woke

11   up the night of your arrest.  You said you saw the little

12   red laser lights?

13   A.    Um-hum.

14   Q.    Is that from the guns of the SWAT team?

15   A.    Yes.

16   Q.    Were they pointed at you?

17   A.    I think so.

18   Q.    Were they pointed at Tyreese?

19   A.    I think so.

20   Q.    Okay.  And he was on the bed with you, right?

21   A.    Yes.

22   Q.    Okay.  And was there any indication when you went to

23   sleep that there was a gun underneath you or him on the

24   bed?

25   A.    No.

LUSTER - CROSS

1    Q.    The gun was on the floor; is that right?

2    A.    When they got me out of the bed, that's where I saw

3    it.

4    Q.    And he was thrown to the floor, right?

5    A.    I don't know about him being thrown to the floor.    I

6    just know they were picking him and the gun off the floor.

7    Q.    You said you "heard Tyreese fall off the bed, but I

8    found out later he was pulled off by the sheriffs."    Who

9    told you that?

10   A.    I just found that out.

11   Q.    You know how?

12   A.    No.

13   Q.    Okay.    And then you saw them then picking him up and

14   the gun off the floor?

15   A.    Yes.

16   Q.    Now, how far from the bed was he when they picked him

17   up?    I assume the room was a bedroom size, maybe 10 by 12

18   or something like that?

19   A.    I will say a foot maybe, maybe two.    I don't know.

20   Q.    But, as far as you know, the gun was not in the bed?

21   A.    As far as I knew, yes.

22   Q.    Okay.    All right.    Did you talk to any of the

23   detectives about the gun?    Did they ask you where it came

24   from?

25   A.    I don't recall, sir.    I don't recall.

```
 1   Q.    Did you talk to -- I'm talking about that night.  Any
 2   of the other officers, did you talk about the gun, the
 3   location of the gun?  Did they ask you if the gun was in
 4   the bed with you?
 5   A.    No.
 6   Q.    They didn't ask you that?
 7   A.    No.
 8                MR. FELSON:  That's all I have.  Thank you.
 9                THE COURT:  Thank you, Mr. Felson.
10                Mr. Pugh or Mr. Andrews, any questions?
11                MR. ANDREWS:  I believe Mr. Pugh.
12                THE COURT:  I'm sorry, Mr. Andrews, I can't hear
13   a word you're saying.
14                MR. ANDREWS:  I'm sorry, Your Honor.  Mr. Pugh is
15   going to do this himself.
16                THE COURT:  All right.  You may proceed,
17   Ms. Pugh.
18                          CROSS-EXAMINATION
19   BY DEFENDANT W. PUGH:
20   Q.    Hi, Ms. Luster.
21   A.    How you doing?
22   Q.    Ms. Luster, you know perjury is a serious offense.
23   Are you aware of that?
24   A.    Yes, I am.
25   Q.    Okay.  On April 24th, 2002, sad thing that the bank
```

1    was robbed.  You said I came to your apartment and got you

2    and Tyreese, correct?

3    A.    Correct.

4    Q.    What time did you say it was?

5    A.    In the morning.

6    Q.    What time?

7    A.    I don't know the time.

8    Q.    Did you just get up or something?  Did I wake you up?

9    A.    I don't remember.

10   Q.    Don't remember.  You can't recall, right?

11   A.    No.

12   Q.    Be fair to say about 8:30, 9 o'clock?

13   A.    I don't remember.

14   Q.    But you remember me taking you to Sonia Lovett's

15   apartment?

16   A.    Yes, I do.

17   Q.    What's your kid's names, Ms. Luster?

18   A.    Nykera (phontic) and Maurice Lovett.

19   Q.    Thank you.  Um-hum.  You said we had breakfast there

20   that morning?

21   A.    I remember eating breakfast there.

22   Q.    And then you went to sleep?

23   A.    At some point.

24   Q.    And me and Tyreese left?

25   A.    Yes.

LUSTER - CROSS

1    Q.   That morning?

2    A.   Sometime around that time, around the time a little

3    after we got there.

4    Q.   This your statement?  You read your statement?

5    A.   Yes, I did.

6    Q.   Is it accurate?

7    A.   Yes.

8    Q.   It says here you made this statement on the 8th?

9    A.   I guess so.

10   Q.   And you stated to -- you stated that you didn't make

11   no other statement.  You didn't make no statement to the

12   sheriff's department; you didn't make no statement to the

13   FBI when you were arrested?  Not arrested.  Excuse me.

14   When Tyreese and I was arrested, you didn't make no

15   statement?

16   A.   No.

17   Q.   You said you didn't make no statement?

18   A.   No.

19   Q.   Are you sure about that?

20   A.   Yes, I am sure.

21   Q.   Are you sure, Ms. Luster?

22   A.   Yes.

23   Q.   You didn't make no statement to the FBI or Detective

24   Calhoun the night of the --

25   A.   This is the statement that I made.

LUSTER - CROSS

1   Q.   That's the only statement you made?

2   A.   Yes.

3   Q.   Okay.  It's good.  That's good.  You stated, "We went

4   to Atlanta, but we -- on our way to Atlanta we stayed in

5   Tennessee that night."  Correct?

6   A.   We stayed in Tennessee when we left out of town, yes.

7            THE COURT:  Keep your voice up a little.

8   Q.   Once we woke up that morning, you said we got

9   breakfast, and then from that point we went to Atlanta?

10  A.   Correct.

11  Q.   And we stayed in a motel for two days, correct?

12  A.   Correct.

13  Q.   And from the motel we went and stayed at my brother's

14  for two days, right?

15  A.   Correct.

16  Q.   And then from that we came back to Hamilton, correct?

17  A.   Correct.

18  Q.   What happened to the three days, Ms. Lovett?  There's

19  three days missing.

20  A.   Ms. Luster.

21  Q.   Yes.  It's three days.

22  A.   I don't know anything about three days missing.

23  Q.   We left on the 24th.

24  A.   We left on the --

25  Q.   We left on the 24th.  We stayed in Tennessee on the

LUSTER - CROSS

| 1 | 25th -- I mean on the 24th.  The 25th we went to Atlanta. |
| 2 | We stayed in a motel in Atlanta on the 25th, night of the |
| 3 | 25th.  And the 26th, we stayed at the motel the 26th, two |
| 4 | days, 25th and 26th. |
| 5 | A.    Not to my knowledge, we didn't. |
| 6 | Q.    You just said we stayed in Atlanta for two days. |
| 7 | A.    Oh, okay.  I thought you were talking about Tennessee. |
| 8 | Q.    We stayed in Atlanta for two days, the 25th and 26th. |
| 9 | Are you denying that? |
| 10 | A.    The dates, yes.  I don't know anything about the |
| 11 | dates. |
| 12 | Q.    Okay.  You said we stayed in Atlanta two days, right? |
| 13 | A.    Yes. |
| 14 | Q.    The 25th, 26th, okay.  Two days we stayed at my |
| 15 | brother's, 27th, 28th, correct? |
| 16 | A.    Your dates I'm not -- |
| 17 | Q.    But two days? |
| 18 | A.    Two days, yes. |
| 19 | Q.    Where is the other three days?  This is the 25th, |
| 20 | 26th, 27th, 28th.  We left -- |
| 21 | A.    Those are your dates.  I'm not saying -- I don't know |
| 22 | the dates.  Those are your dates.  That's you're saying |
| 23 | that I am implying. |
| 24 | Q.    But, Ms. Luster, we stayed there.  You said we stayed |
| 25 | there for two days in the motel.  We stayed in Decatur for |

1   two days.  Where is the other three days?  We left on the

2   1st.  You say we came back to Ohio, to Hamilton, Ohio.  We

3   was arrested on the 3rd.  We got back on the 2nd.  We got

4   back on the 2nd.  What happened to the three days?

5   A.    I don't know anything about the three days.

6   Q.    I tell you what happened to those three days,

7   Ms. Luster.  We stayed at one-one.  Didn't we stay at

8   one-one?  Did we or did we not stay at one-one?

9   A.    I don't know about one-one.

10  Q.    You don't know about one-one?  You don't know the

11  address we stayed at?  You don't know about the house we

12  stayed at?  Are you telling this Court --

13              THE COURT:  Wait, wait.  One question at a time.

14  You ask a question, and she'll give you an answer.

15  BY DEFENDANT W. PUGH:

16  Q.    You're telling this jury that you don't know nothing

17  about the house that we stayed in.  Is that what you're

18  telling this --

19              THE COURT:  Wait.  Give her a chance to answer

20  this question.

21  A.    I'm telling this Court that I remember staying at your

22  aunt and uncle's house, your family member's house.

23  Q.    Okay.  So you don't know anything about one-one

24  Hillcrest?

25  A.    No.

1    Q.    The house we rented?

2    A.    No.

3    Q.    And you said you came back -- you stayed there all

4    that time for seven days, and you came back; you stated you

5    came back to Ohio.

6    A.    I think that we were gone five days, were we not?

7    Q.    Five days?

8    A.    That's to my understanding.

9    Q.    Well, there is three days missing from the time that

10   we left.

11   A.    Well, I don't know anything about three days.

12   Q.    What happened to your toothbrush?  You said you came

13   back and you didn't have no toothbrush.  Didn't you leave

14   your toothbrush in Atlanta at the house?

15   A.    I don't know nothing about a toothbrush.  I said that

16   either I didn't have a toothbrush or I don't know if it was

17   in that bag or not.

18   Q.    Do you remember that -- well, do you remember going to

19   the house of Mr. Renfro in the morning?

20   A.    I don't remember his name.

21   Q.    Mr. Renfro in Mt. Healthy?

22   A.    Oh, yes, I remember going there.

23   Q.    As soon as we got back to Ohio, you said I made a

24   phone call.  I made a telephone call at a telephone booth,

25   correct?

LUSTER - CROSS

1   A.    Correct.

2   Q.    Why I didn't use my cell phone?  I had two cell

3   phones.

4   A.    I can't answer that for you.

5   Q.    And you said -- you say we went to the back of the

6   police station, correct?

7   A.    Correct.

8   Q.    I didn't talk to no one in the police station, back of

9   the police station?

10  A.    No.

11  Q.    What was our purpose for coming back to Ohio?

12  A.    I just don't know --

13  Q.    You don't know?

14  A.    -- what the purpose was.

15  Q.    The police confiscated briefcases from us, didn't

16  they?

17  A.    I'm not sure.

18  Q.    You stated, when we left, we didn't have no

19  briefcases.

20  A.    I don't remember any briefcases.

21  Q.    Excuse me for a minute.

22  A.    I didn't state that.

23  Q.    Ms. Luster, we got arrested on 5/3/2002, that morning,

24  early morning.

25              THE COURT:  Is that a question?

1          DEFENDANT W. PUGH:  Yes.

2    A.    I believe so.  I don't remember the date.

3    Q.    You don't remember the date?

4    A.    No.

5    Q.    Where did you stay the night before that and the night

6    before that then?  We got arrested on May the 3rd.

7    A.    I just told the Court where we stayed in Atlanta.

8    Q.    You also told the Court that you didn't give no

9    statement.

10   A.    I don't remember giving a statement on the 3rd.

11   Q.    You said you didn't?

12   A.    That's what I'm saying.

13   Q.    This shoe box, how much money did you see in this shoe

14   box, Ms. Luster?

15   A.    Not much.

16   Q.    How much is much?  Was the shoe box size 10?  Size 12?

17   Size 4?  Size 6?

18   A.    I don't know what size the shoe box was.

19   Q.    Was it a lot of money that you seen in Tennessee at

20   the motel?

21   A.    No.

22   Q.    And I told you that we hit a lick?

23   A.    Correct.

24   Q.    At a bank?

25   A.    You didn't say at a bank.

LUSTER - CROSS

1   Q.   You said we went in the vault?

2   A.   Yes, but you didn't say at a bank.

3   Q.   Who -- okay.  We hit a lick.  We robbed someone, we

4   said, in a vault.  What was you thinking?  A vault?  A

5   vault, what is a vault?

6   A.   A bank.

7   Q.   Okay.  Bank?

8   A.   But you didn't say that.

9   Q.   That's what it says in one statement that you said.

10  A.   Not that you said anything about a bank.

11  Q.   But you said it in a statement.  It's in your

12  statement.  It's another statement that I got.

13  A.   I don't know anything about that.

14          MS. CROSS:  Objection, Your Honor.  Would he like

15  to show her the statement he's asking her about?

16  Q.   Was you interviewed May the 3rd, 2002, by Detective

17  Calhoun and the FBI Agent Moran?

18  A.   I wouldn't say interviewed.

19  Q.   You didn't give no statement?

20  A.   No.

21  Q.   And you didn't tell them nothing about the bank, you

22  said.  You didn't tell them nothing about the bank?

23  A.   No.

24  Q.   Is that correct?

25  A.   Correct.

LUSTER - CROSS

1   Q.    When you visit Tyreese when we was in the county jail,

2   you visited Tyreese, did you tell Tyreese that you had an

3   appointment to go see Detective Calhoun and the FBI agent?

4   A.    I don't recall telling that.

5   Q.    But you went and gave a statement, correct, after

6   that?

7   A.    After I had went to visit him, are you saying?

8   Q.    Yes, ma'am.

9   A.    Yes, I did have an interview with him.

10  Q.    Ms. Luster, have I ever done anything to you?

11  A.    As far as what?

12  Q.    As far as you could come in here and make such a

13  statement against me.

14  A.    You have never done anything to me.

15  Q.    So the only statement that you made was May the 8th to

16  Detective Calhoun?

17  A.    The Exhibit B here that I have, this is the only

18  statement that I recall making.

19  Q.    Ms. Luster, you still cannot account for the three

20  days that's missing?

21  A.    I have -- I really don't know where the three days are

22  coming from.

23  Q.    Okay.  We left on May -- April the 24th.  That's the

24  day we left.  I'm giving you the date.  That's the day we

25  left.  You left with me.  You said you followed me in my

1    Mazda, and you and Tyreese in the Cadillac.  You said that

2    you followed me, correct?

3    A.    Correct.

4    Q.    That was April the 24th.  April 24th, it got night.

5    You stated it got night.  That's the night.  It got night.

6    So you pulled over at a motel, correct?

7    A.    Correct.

8    Q.    And we got two rooms, correct?

9    A.    Correct.

10   Q.    Then me and Tenikia and Lee-Lee in one room, you

11   Tyreese and Maurice in another room, and your daughter,

12   right?

13   A.    Right.

14   Q.    This was on the 24th.  The 25th we get up and we go to

15   Atlanta.  We go to Atlanta, we go and get a room.  That's

16   the 25th now, that morning.  This is the 25th.

17              THE COURT:  Is that a question?

18              DEFENDANT W. PUGH:  No, ma'am.

19              THE COURT:  You've got to do it in the form of a

20   question.

21              DEFENDANT W. PUGH:  Okay.

22              THE COURT:  Can you answer the question?

23              THE WITNESS:  What was the question?

24              THE COURT:  I think the question was then the

25   next morning did you go to Atlanta.

LUSTER - CROSS

1       THE WITNESS:  Yes, after leaving Tennessee, yes.

2   BY DEFENDANT W. PUGH:

3   Q.   I didn't hear that.

4   A.   Yes.  After leaving Tennessee, yes, we went to

5   Atlanta.

6   Q.   We stayed there two days in the motel?

7   A.   Correct.

8   Q.   And from those two days, we went to Decatur, you said,

9   and stayed with my family members?

10  A.   Correct.

11  Q.   Thirteen people stayed in that house?

12  A.   I don't remember 13 people.

13  Q.   I don't even remember staying in that house,

14  Ms. Luster.

15       MS. CROSS:  Objection, Your Honor.

16       THE COURT:  You can't make -- you can't testify

17  at this point.  You have to ask questions.

18       DEFENDANT W. PUGH:  Excuse me.

19  BY DEFENDANT W. PUGH:

20  Q.   Okay.  Two days in Atlanta and two days in Decatur.

21  That was the 25th and 26th and 27th and 28th.  And then

22  you're saying we came back.  We left then and came back to

23  Ohio, correct?

24  A.   Correct.

25  Q.   So then that put us back in Ohio on the 29th.  Okay.

LUSTER - REDIRECT

1   On the 29th, you said we drove straight through?

2   A.   I'm not saying on any date.

3   Q.   Ms. Luster, you're confusing me.  There are some days

4   missing.

5   A.   Not to my knowledge.

6            THE COURT:  Mr. Pugh, I'm giving you some

7   latitude because you're representing yourself, but I think

8   you covered this area twice now.

9            DEFENDANT W. PUGH:  Thank you, Ms. Luster.

10           THE COURT:  Ms. Cross, any redirect of this

11  witness?

12           MS. CROSS:  Yes, Your Honor, and it won't be

13  long, just a couple of points.

14                      REDIRECT EXAMINATION

15  BY MS. CROSS:

16  Q.   Ms. Luster, were you involved in a bank robbery?

17  A.   No, I was not.

18  Q.   Did you drive any getaway war from a bank robbery?

19  A.   No, I did not.

20  Q.   You have talked to the police; is that correct?

21  A.   Correct.

22  Q.   And you have talked to myself and Mr. Thapar, as well

23  as Special Agent Terry Moran, correct?

24  A.   Correct.

25  Q.   And did you feel any pressure by the government to say

LUSTER - REDIRECT

1   anything that wasn't the truth?

2   A.    No.

3   Q.    In fact, what did we tell you?

4   A.    To tell the truth.

5   Q.    At Corkey's house in Mt. Healthy --

6   A.    Um-hum.

7   Q.    -- did you see any other guns in that house other than

8   the two that the defendants brought in?

9   A.    No.   I don't -- no.

10  Q.    Will you describe what Corkey looks like?

11  A.    He is a light, fair skinned man with an element, like,

12  on one of his arms.  I wouldn't say cut off, but something

13  bad.

14  Q.    So he has only one functional arm?

15  A.    Yes.  Well, he can function the arm, but he -- but

16  just, you know, it's just like he can't pick anything up

17  with it.

18  Q.    Okay.  Mr. Felson asked you questions about the money

19  that you saw on the bed in the hotel in Tennessee.  Do you

20  remember?

21  A.    Yes.

22  Q.    Did Tyreese ever tell you he won the lottery?

23  A.    No.

24  Q.    Did Walter ever say he won the lottery?

25  A.    No.

LUSTER - REDIRECT

1  Q.  Have you ever seen Walter or Tyreese with that much
2  cash before?
3  A.  No.
4  Q.  How long did you see the money on the bed?
5  A.  I'm not sure.  It was maybe five minutes maybe.
6  Q.  Five minutes?
7  A.  Maybe, yes.
8  Q.  You said you saw some dollar bills?
9  A.  Yes.
10  Q.  But you couldn't be exactly sure as to how much money
11  was there, correct?
12  A.  Yes.  Correct.
13  Q.  Could there have been one-hundreds?
14  A.  There could have been.
15  Q.  Could there have been 50-dollar bills?
16       MR. ANDREWS:  Objection.  Speculating what could
17  have been, not what she actually saw is worthless.
18       THE COURT:  Sustained.
19  BY MS. CROSS:
20  Q.  When Walter made the statement to you "we hit a lick"
21  and you told the jury what you thought that meant, did you
22  say that Tyreese was present?
23  A.  Yes.
24  Q.  Did Tyreese ever say, "He's not talking about me"?
25  A.  No.  He never said that.

LUSTER - REDIRECT

1   Q.   There were a lot of questions asked about what did you

2   see on the way to Tennessee or driving to Atlanta.  Before

3   you left, did you have an opportunity to get any child

4   seats for your kids?

5   A.   No.

6   Q.   And so your kids were in the car without child seats,

7   correct?

8   A.   Yes.  Without child seats, yes.

9   Q.   Were you driving?

10  A.   No.

11  Q.   Were you paying attention to the road, or were you

12  paying attention to your children in the car?

13  A.   Both.

14           MR. ANDREWS:  Objection.

15           THE COURT:  What's the basis?

16           MR. ANDREWS:  We're talking a 12-hour drive.

17           THE COURT:  Overruled.

18  BY MS. CROSS:

19  Q.   You were asked questions about what purchases were

20  made when you got to Atlanta and went shopping, right?

21  A.   Um-hum.

22  Q.   Did you pay for any clothes?

23  A.   No.

24  Q.   Who did?

25  A.   Tyreese.

LUSTER - REDIRECT

1  Q.  So would you have any receipts for any clothes?

2  A.  No, I would not.

3  Q.  Who would?

4  A.  I don't know who would have them now.

5  Q.  When you saw the clothes being purchased, who did you

6  see receive the receipts?

7  A.  I think they were placed in the bag I want to say.

8  Q.  In the bag with the clothes?

9  A.  With the clothes, yes.

10  Q.  Now, you have dated the defendant Tyreese Pugh for

11  several months, correct?

12  A.  Correct.

13  Q.  And you, did you observe him buying clothes in

14  Atlanta?

15  A.  Yes.

16  Q.  What type of clothes does he buy?

17       MR. ANDREWS:  Objection.  Relevance.

18       THE COURT:  Overruled.

19  A.  Jeans, baggy jeans, not sweat shirts but, like, a

20  T-shirt or something.

21  Q.  You say baggy jeans.  Does he buy his clothes to fit

22  or oversized?

23  A.  A little bigger.

24  Q.  Did you have any say as to when it was time to leave

25  Ohio and travel to Tennessee?

1   A.   No.

2   Q.   Did you have any say on when it was time to leave

3   Tennessee and go to Atlanta?

4   A.   No.

5   Q.   Did you have any say over when it was time to leave

6   Atlanta and go to Decatur?

7   A.   No.

8   Q.   Did you have any say over when it was time to leave

9   Georgia and come back to Ohio?

10  A.   No.

11  Q.   Who was calling the shots?

12  A.   Walter.

13  Q.   I believe you stated that your children's last name is

14  Lovett?

15  A.   Correct.

16  Q.   You also testified that Tenikia's name is Lovett?

17  A.   Correct.

18  Q.   Will you explain that for the members of the jury?

19  A.   I have two children by her brother, Maurice Lovett.

20  Q.   And, finally, Mr. Felson here asked you a question

21  about whether or not you were -- why didn't you ask any

22  questions.  You were with them; why didn't you ask any

23  questions.  Do you remember that?

24  A.   Yes, I remember.

25  Q.   And you stated -- you remember stating that you were

LUSTER - RECROSS

```
1    somewhat afraid and somewhat not afraid?

2    A.    Yes, I remember.

3    Q.    Explain what you meant by that to the members of the

4    jury.

5    A.    Well, I was somewhat afraid, meaning that, you know,

6    that the idea of that, actually what happened, scared me.

7    And not afraid meant that I felt like I was close to these

8    two people.

9              MS. CROSS:   Thank you, Ms. Luster.

10             That's all the questions, Your Honor.

11             THE COURT:   Thank you, Ms. Cross.

12             Do you have any recross, Mr. Felson?

13             MR. FELSON:   Yes.

14             THE COURT:   You may proceed.

15                      RECROSS-EXAMINATION

16   BY MR. FELSON:

17   Q.    You're saying you felt close to those two people, yet

18   here you are testifying against them, correct?

19   A.    Correct.

20   Q.    Now, you're saying you have nothing against either one

21   of them, right?  You're not angry at either of those two

22   men, right?

23   A.    I'll say I'm not angry.

24   Q.    Your mother is still alive, right?

25   A.    Yes, she is.
```

```
 1   Q.    And she was in some trouble very recently?

 2              MS. CROSS:  Objection, Your Honor.  Relevance.

 3              MR. FELSON:  Motive.

 4              MS. CROSS:  And it's beyond the scope of

 5   redirect.

 6              THE COURT:  Sustained.

 7   BY MR. FELSON:

 8   Q.    You say you saw money on the bed for about five

 9   minutes; is that right?

10   A.    Correct.

11   Q.    Did you talk to, at that moment, you talk to Tyreese,

12   and were you talking to Tyreese and Walter and Tenikia?

13   Were you conversing with them, or were you just looking at

14   the money?

15   A.    Not just looking at the money.  I was, like, looking

16   at them, like, you know, what was going on.  I didn't know

17   what was going on.

18   Q.    Did you ask Tenikia what was going on?

19   A.    No.

20   Q.    Did you ask Walter or Tyreese?

21   A.    I didn't ask a direct question.

22   Q.    And then you left five minute later.  Did you say

23   good-bye or just walk out the door?

24   A.    Just went out.

25   Q.    I'm sorry?
```

LUSTER - RECROSS

1    A.    Yes, I left.

2    Q.    And you went back to your room?

3    A.    Correct.

4    Q.    Now, you said that you took -- well, the clothing that

5    you bought was for you and your kids, right, in Atlanta?

6    A.    That Tyreese bought?

7    Q.    Yes.

8    A.    Correct.

9    Q.    And that it was placed in -- was the clothing placed

10   in a bag?

11   A.    Excuse me?

12   Q.    Was the clothing placed in a bag?

13   A.    Yes.

14   Q.    Were you given the bag since it was for you and your

15   kids?

16   A.    Yes.

17   Q.    Okay.  So the receipts were placed in the bag as well,

18   right?

19   A.    Correct, I believe so.

20   Q.    So you, at least at some point, had possession of

21   these receipts, right?

22   A.    If you say that.

23   Q.    Okay.  Yet you don't know where they are now?

24   A.    No.

25   Q.    All right.  What's -- well, now, you're saying that

LUSTER - RECROSS

1   Tyreese buys oversized jeans.  Is that what you said?

2   A.   A little bit bigger than what he wears.

3   Q.   What does he wear?

4   A.   I don't recall.

5            MR. FELSON:  That's all I have.

6            THE COURT:  Thank you, Mr. Felson.

7            Mr. Pugh?

8            MR. ANDREWS:  Your Honor, with the Court's

9   indulgence, I'm going to do the redirect if that is --

10  typically, I know that's not the way it's done.

11           THE COURT:  Yes.  I'm not going to allow that.

12  Whoever questions a witness has to continue.

13                    RECROSS-EXAMINATION

14  BY DEFENDANT W. PUGH:

15  Q.   Ms. Luster, you stated that my car, 2000 Mazda, was

16  broke down.

17  A.   Yes.

18  Q.   A 2000 Mazda?

19  A.   Yes.

20  Q.   Can you explain to me the reason why we came back to

21  Ohio?

22  A.   I do not know the reason why.

23  Q.   Why did you get in the car with me and Tyreese then?

24  A.   I felt like I was just trying to be with Tyreese.

25  Q.   And you just left your children there with Tenikia,

1   correct?

2   A.   Correct.

3   Q.   And you didn't tell her when we was coming back,

4   correct?

5   A.   Correct.

6   Q.   And you just left your clothes and toothbrush and

7   shoes there, too, correct?

8   A.   No.   I had my clothes with me when we left.

9   Q.   You wasn't worried about the concern of your children?

10  A.   I, like I said previously, I had my uncle and my aunt

11  come and pick them up.

12  Q.   When?

13         THE COURT:   Mr. Pugh, recross-examination is to

14  cover any of the material that was covered in redirect by

15  the assistant U.S. attorney.   You can only ask questions

16  about what she just asked about in redirect.   You don't get

17  to go back to your original cross-examination and do it

18  again.

19         DEFENDANT W. PUGH:   Yes, ma'am.

20  BY DEFENDANT W. PUGH:

21  Q.   Did you see in the motel room in Tennessee 40

22  one-hundred dollar bills?

23  A.   I don't remember.

24  Q.   I mean 400.

25  A.   I don't remember.   I don't recall.

LUSTER - RECROSS

1    Q.    You stated that, when you knocked on the door of the

2    room, that me and Tenikia and Lee-Lee was in and Tyreese

3    was there, you came in.  You did not see Tyreese, correct?

4    A.    I didn't say I didn't see him.

5    Q.    Who opened the door for you?

6    A.    Tyreese.

7            DEFENDANT W. PUGH:  That's all.  Thank you.

8            THE COURT:  Thank you.

9            Anything further, Ms. Cross?

10           MS. CROSS:  No, Your Honor.

11           THE COURT:  Ms. Luster, the Court appreciates

12   your coming here, and you are excused.

13           Who is the government's next witness?

14           MS. CROSS:  Your Honor, at this time we would ask

15   the Court to read stipulation number 21, and then we would

16   call Matthew Wittich.

17           THE COURT:  Pete, could you get Mr. Wittich, or

18   is somebody going to get him?

19           Ladies and gentlemen of the jury, I previously

20   explained to you what a stipulation is.  This is the third

21   stipulation that I'm going to read to you, and these are

22   agreed upon facts by the government and the defendants.

23           The United States and Defendant Tyreese Dorran

24   Pugh agree and stipulate that Defendant Tyreese Pugh was

25   convicted of drug trafficking in case number CR-99 030312

1    in the Butler County Court of Common Pleas in Hamilton,

2    Ohio, which is a crime that is punishable by imprisonment

3    for a term exceeding one year as defined by Title 18 United

4    States Code, Section 921(a)(20).  Is this --

5                    MS. CROSS:  United States calls Matthew Wittich.

6                    (Witness sworn by the courtroom deputy.)

7                              MATTHEW WITTICH

8                            DIRECT EXAMINATION

9    BY MS. CROSS:

10   Q.    Good morning, sir.

11   A.    Good morning.

12   Q.    Will you please tell the ladies and gentlemen of the

13   jury what your name is and spell your last name for the

14   record?

15   A.    Its Matthew Wittich, W-i-t-t-i-c-h.

16   Q.    Where and how are you employed?

17   A.    I'm a deputy sheriff with the Hamilton County

18   Sheriff's Department.

19   Q.    And how long have you been so employed?

20   A.    A little over about nine-and-a-half years.

21   Q.    In your capacity as a deputy sheriff, are you a member

22   of the SWAT team?

23   A.    Yes, I am.

24   Q.    Were you involved in the investigation of two

25   individuals by the name of Walter and Tyreese Pugh?

WITTICH - DIRECT

1   A.    Not the investigation.  The arrest of those two

2   individuals.

3   Q.    And when were you involved?  When did the arrest

4   occur?

5   A.    I believe it was around two o'clock in the morning,

6   approximately.

7          MR. ANDREWS:  Your Honor, I hate to interrupt the

8   witness, but there is something I think we need to address

9   out of the view of the jury.  Something my client just

10  brought to my attention, which I think is correct.

11         THE COURT:  All right.  How long do you think

12  it's going to take?

13         MR. ANDREWS:  Five minutes.

14         THE COURT:  All right.  Ladies and gentlemen, you

15  will get a quick five-minute break.  I'll ask that you stay

16  in the jury room, but we'll take -- we'll ask the jury to

17  go back into the jury room.

18         (Jury excused from the courtroom.)

19         THE COURT:  Mr. Andrews?

20         MR. ANDREWS:  Your Honor, we were questioning

21  because we had been given the Jencks material, et cetera,

22  on all the witnesses yesterday, and we did not receive any

23  on this witness.  And before we got deep into it, I wanted

24  to make sure that was not an oversight.  And I'm being told

25  by the U.S. attorney at this point there is no material on

1  this witness.  He did not reduce his -- the subject of his

2  testimony to writing, so it's not subject to Jencks.  I

3  just wanted to make sure that is correct.

4         MS. CROSS:  This is correct, Your Honor.  But for

5  the record, I would like for counsel to ask the witness if

6  he had a written statement.

7         THE COURT:  All right.  Go ahead, Mr. Andrews.

8                VOIR DIRE EXAMINATION

9  BY MR. ANDREWS:

10 Q.   Did you ever make a written statement to anyone in

11 relation to what you're going to testify to here today?

12 A.   No, sir, I did not.

13 Q.   It's never been reduced to writing in any form by

14 yourself?

15 A.   No, sir, it's not.

16 Q.   In your presence?

17 A.   No, sir.

18 Q.   Over your signature?

19 A.   No, sir.

20 Q.   You have had discussions with various people about

21 what you're going to say today?

22 A.   With who?  Who are you talking about?

23 Q.   U.S. Attorney Ms. Cross?

24 A.   Not -- I've told her what I was going to say.

25 Q.   Okay.  You also did to her assistant?

WITTICH - VOIR DIRE

1   A.    No, sir.  I have never talked to him.

2   Q.    Agent Moran?

3   A.    Very little.

4   Q.    Okay.  But you did talk to him and tell him what you

5   were going to say?

6   A.    Very little.

7   Q.    And officer Calhoun of Hamilton County or Hamilton

8   City police?

9   A.    I didn't talk to him about what I was going to testify

10  to, no.

11  Q.    Okay.  Did you reduce -- is there a report as to the

12  use of the SWAT unit that evening?

13  A.    No.  We didn't -- we did no paperwork on the arrest

14  that night.  We did no paperwork.  We were just the

15  arresting.  All the paperwork and everything else was done.

16  We do have the -- if I could look at my notes.  Do you care

17  if I refresh?

18  Q.    No.

19  A.    We do have Kimberly Hinton gave a consent to search

20  her car, and also Cortes Renfro gave us the consent,

21  written consent, to search the home.

22          THE COURT:  Okay.  Mr. Andrews, I think we're

23  getting into testimony.

24          MR. ANDREWS:  I just want to ask one additional.

25          THE COURT:  All right.

WITTICH - VOIR DIRE

```
 1   BY MR. ANDREWS:
 2   Q.    You say you have notes there?
 3   A.    No, no.   They're not notes.   They're actual -- I got a
 4   copy of the consent to search the home.
 5   Q.    Okay.   That's all I'm saying.
 6   A.    No, no.
 7   Q.    I thought you said you had notes.
 8   A.    I have no notes.   I do -- if you want to look at what
 9   I jotted down.
10   Q.    I take you at your word, Officer, that those are not
11   notes, you know, reduced to writing of what you were going
12   to testify to.   Okay.   All I was interested -- that's all I
13   was interested in.   Thank you.
14             THE COURT:   All right.   Are we ready to bring the
15   jury back in?
16             MS. CROSS:   Yes, Your Honor.
17             MR. ANDREWS:   Sorry, Your Honor.
18             THE COURT:   I understand.   No problem.
19             MR. ANDREWS:   And it struck us one second into
20   it.
21             THE COURT:   No problem.
22             (Jury present.)
23             MR. FELSON:   My client informs me he has got to
24   use the bathroom.
25             THE COURT:   Okay.   Let's take another five-minute
```