CIFUENTES - CROSS

1   Q.   Well, there is also a Nokia?

2   A.   Hold on just a minute.  I'm trying to remember.  I

3   have a Nokia phone in this case and an Air Touch phone in

4   the brown case.  So that's two phones.

5   Q.   Okay.  You had worked on this case with Officer

6   Calhoun since the beginning, since its inception; is that

7   correct?

8   A.   Yes, sir.

9   Q.   Okay.  And you never -- when you took these items to

10  the property room, did you fill out or write a letter

11  requesting special testing of any of them?

12  A.   No.

13  Q.   So neither the phones nor the guns were ever printed

14  for fingerprints?

15  A.   No.

16  Q.   None of them were ever tested to find out if they are

17  fireable?

18  A.   Not by me, no.

19  Q.   And there is no evidence that you see contained with

20  them, reports, that would indicate they have ever been test

21  fired?

22  A.   That's true.

23  Q.   And you, yourself, did not test fire them?

24  A.   Correct.

25  Q.   And they're in the same condition as you left them

1   when you left them in the property room, as far as you can

2   tell?

3   A.   Yes, sir.

4   Q.   Which would be pretty clear evidence that they have

5   not been test fired?

6   A.   Well, I don't know what happened to those weapons

7   since they have been here in this courtroom since this

8   trial has convened.

9   Q.   Okay.  Fair enough.  Up to that point, yes, sir, they

10  have not been test fired.  This is an observation.  I don't

11  think we have test fired them in here, so --

12  A.   Okay.

13  Q.   As to telephones, you know of no records that have

14  ever been found that would attach to those cell phones?

15  A.   That is correct.

16  Q.   You never had the cell phones printed as to whose cell

17  phones they were?

18  A.   That is correct.

19  Q.   And you do indicate that contained within various

20  clothing bags there are clothes that would be what we would

21  traditionally consider women's clothing, some?

22  A.   I wasn't sure.  That is a possibility that there is.

23  Unless I open the bags now, it's mostly men's.

24  Q.   Is there any children's clothing?  I didn't notice

25  what you said.

1  A.   I don't believe I was asked that, and I'm not sure.

2  Q.   There were additional items also found beyond what you

3  have here on the search of the -- I can't think -- Cortes

4  Renfro's house?

5  A.   Yes, there are.

6  Q.   And they have not been entered into evidence, or you

7  haven't been asked about them?

8  A.   I haven't been asked about them.

9  Q.   And you took control of everything at Cortes Renfro's

10  house, correct?

11  A.   Yes.

12  Q.   And when the house was searched, the SWAT team was

13  still on site?

14  A.   Yes, they were.

15  Q.   They would find items, direct the items to your

16  attention, and you would then collect the item.  Do I have

17  the sequence correct?

18  A.   Not totally.  The pistol bag, like I said, was open.

19  It was unzipped.  That could have been found by a SWAT

20  officer.  It was pointed out to me the bags were open.  The

21  guns are readily observable.  So I don't know.  The box is

22  something I collected, because on top of that box was an

23  ID, Tyreese Pugh.  The bags --

24  Q.   Who was?

25  A.   Tyreese Pugh.

CIFUENTES - CROSS

1   Q.   Did you find one or two Air Jordan boxes?

2   A.   Ask me that again, sir.

3   Q.   One or two Air Jordan boxes?

4   A.   I found the one. And the clothing I was expecting to

5   find, I don't think the SWAT team was aware of it, and I

6   found it downstairs.

7   Q.   Okay. Did you find any other cell phones that you're

8   aware of?

9   A.   In the house?

10  Q.   Um-hum. Yes.

11  A.   No.

12  Q.   Did you find any in the car that Walter Pugh had been

13  riding in?

14  A.   I believe there was a cell phone in the car.

15  Q.   Do you know who it belonged to?

16  A.   No.

17  Q.   Did you find a cell phone on Stephanie Luster when you

18  searched -- when Stephanie Luster was searched at Cortes

19  Renfro's house, did she have a cell phone on her person?

20  A.   I did not search Stephanie Luster, and I don't know if

21  there was one in her purse or not. I don't recall.

22  Q.   You did not take custody of anything from her person?

23  A.   Yes, I did.

24  Q.   What did you take custody of from her person?

25  A.   I took custody of the set of car keys, Cadillac car

1   keys from Mr. Pugh's car.

2   Q.   Okay.  Did you go through her purse?  I assume these

3   were in a purse; is that correct?

4   A.   The keys were in a purse, yes.

5   Q.   Did you go through that purse, you, yourself,

6   personally?

7   A.   Yes, sir.

8   Q.   There was not a cell phone in that purse, I take it

9   then?

10  A.   Well, as I said, I do not recall if there was.

11  Q.   You did not take possession of one?

12  A.   I did not.

13  Q.   You searched the house thoroughly for money, correct?

14  A.   That was done.  I searched some of the house for

15  money.  I didn't search it all.  That was being done by

16  Hamilton County.

17  Q.   You, all of the Hamilton County officers, everybody

18  was looking for money?

19  A.   Yes.

20  Q.   Was any money found?

21  A.   Very small amount.

22  Q.   $56 on Walter Pugh?

23  A.   That sounds -- wasn't on Walter Pugh, no.

24  Q.   $56?

25  A.   $56 in the bedroom where Tyreese Pugh was arrested.  I

| 1 | believe that was on a table stand. |
|---|---|
| 2 | Q. Any other money? |
| 3 | A. Not that I'm aware. |
| 4 | Q. No money in a cardboard box in the basement? |
| 5 | A. Not that I'm aware of. |
| 6 | Q. You thoroughly searched the residence? |
| 7 | A. The residence was searched, yes. |
| 8 | Q. You and Officer Calhoun had the residence under |
| 9 | surveillance, you or Officer Calhoun most of that evening; |
| 10 | isn't that correct? |
| 11 | A. A lot of the evening. Some of the evening. When we |
| 12 | were relieved by the Hamilton County personnel, we were |
| 13 | relieved. |
| 14 | Q. It's safe to say that that residence was under |
| 15 | constant surveillance from early in the evening until the |
| 16 | SWAT team went in? |
| 17 | A. Well, the front of it was. |
| 18 | Q. Yes. Certainly the front. |
| 19 | A. I can't say the whole house, because I couldn't see |
| 20 | the back of the house from the side street. |
| 21 | Q. Far as you are aware from your surveillance and what |
| 22 | you were informed by the other officers surveilling that |
| 23 | scene, no one left that residence until Walter Pugh, Cortes |
| 24 | Renfro and the young lady driving left just before the |
| 25 | entrance was made of the Renfro residence; isn't that |

CIFUENTES - CROSS

```
1   correct?
2   A.   You asking me if anybody else left that residence at
3   all?
4   Q.   Left that residence that evening?
5   A.   Yes, there were.
6   Q.   Who?
7   A.   There was a gentleman.  Well, first there was Shanell
8   Holston.  She was the first person to leave.  Then there
9   was a gentleman that left, and I don't recall his name.  He
10  was stopped by the Hamilton County sheriff's officers, and
11  he was taken into custody, taken to the Hamilton County
12  Sheriff's Office.  And I'm not aware of his name.
13  Q.   Anyone that left was searched for money, correct?
14  A.   I can't say that, no.
15  Q.   Okay.  He was taken into custody?
16  A.   Yes, he was.
17  Q.   He was in a motor vehicle?
18  A.   Yes, he was.
19  Q.   Typically, one would search the person that you took
20  into custody, correct?
21          MR. THAPAR:  Your Honor, I'm going to object as
22  beyond the scope.
23          MR. ANDREWS:  Still part of the collection of
24  property at that location or around that location.
25          THE COURT:  Overruled.
```

1  BY MR. ANDREWS:

2  Q.  This gentleman that was stopped and taken into custody

3  would have been searched or his person would have been

4  searched, if only for the safety of the officers; isn't

5  that correct?

6  A.  He was.

7  Q.  Okay.  And the vehicle he was in would be searched for

8  the same reason; isn't that correct?

9  A.  I wasn't there for that.  There is a good chance that

10  it was.

11  Q.  Okay.  No money was brought to your attention coming

12  from that vehicle; isn't that correct?

13  A.  Well, that's not correct, no, it's not.

14  Q.  Well, there wasn't $153,000 or a large sum of money

15  resembling that found in that vehicle; isn't that correct?

16  A.  There wasn't that much money from the vehicle, no.

17  Q.  It's safe to say you were looking for fresh money in

18  nice banded bundles from a bank; isn't that correct?

19  A.  We were looking for a lot of money; that is correct.

20  Q.  You were looking for approximately four hundred

21  bundles of one-hundred-dollar bills, among other things;

22  isn't that correct?

23  A.  However it was, I don't know the increments.

24  Q.  $40,000 in one-hundred-dollar bills; isn't that

25  correct?

1    A.    It might be.

2    Q.    You don't know?

3    A.    I don't know.

4    Q.    You knew that there were large sums, a large number of

5    one-hundred-dollar bills, 50-dollar bills, 20-dollar bills,

6    correct?

7    A.    I really don't know the breakdown.   I knew there was a

8    lot of money taken, and it stands to reason that small

9    denominations and large denominations, but I don't know

10   what it was.

11   Q.    And you were looking for money that would be brought

12   from a bank, which would mean it was in the nice little

13   bank paper containers, correct, the little wrappers?

14   A.    It may or may not be in the wrappers.

15   Q.    If it had not been broken out of the wrappers, it

16   would be in the wrappers?

17   A.    Well --

18   Q.    I know that's speculative.   I'll withdraw that.   In

19   the whole evening after all was said and done, you found

20   the items you have indicated, correct?

21   A.    Yes, sir.

22   Q.    I mean these exhibits?

23   A.    Yes, sir.

24   Q.    Some other additional clothing items of no great

25   consequence, correct?   Things that are not being admitted

CIFUENTES - REDIRECT

1   into evidence today?

2   A.   Things that are not being admitted into evidence,

3   correct.

4   Q.   You found the guns you have testified to?

5   A.   Yes.

6   Q.   You found the phones that you have testified to?

7   A.   Yes.

8   Q.   You found $56 on an end table?

9   A.   Yes.

10  Q.   You did not find a large sum of money?

11  A.   I did not, no.

12  Q.   You found no large denomination bills, such as 50's or

13  100's?

14  A.   I did not, no.

15  Q.   You did not find money in a shoe box in the basement?

16  A.   That is correct.

17           MR. ANDREWS:   Thank you.   I have nothing further.

18           THE COURT:   Mr. Thapar, anything further?

19           MR. THAPAR:   Just a few questions, Your Honor.

20           THE COURT:   You may proceed.

21                    REDIRECT EXAMINATION

22  BY MR. THAPAR:

23  Q.   I'm going to direct you to some lines of questioning,

24  that line that you just ended with maybe to make it easier.

25  Was anything other than those items and maybe items that

1   were entered into evidence that you know about, was there

2   anything of consequence in your mind that's been left out

3   that was found there?  In other words, was anything else

4   found there that you think was significant?

5   A.   Say that again.  Are you talking about everything,

6   correct?

7   Q.   At that house.

8   A.   At that house?

9   Q.   By you.

10  A.   I believe we have everything that's significant right

11  here.

12  Q.   Okay.  You remember the questions about the gentleman

13  that left the house that Mr. Andrews asked you about?

14  A.   Yes.

15  Q.   And you started to say -- how much money was found on

16  that gentleman; do you recall?

17  A.   It was a lot, several hundred dollars at the minimum.

18  But I didn't stay for the whole count.  It was taken from

19  one of his pockets, and it should be in the possession of

20  the Hamilton County Sheriff's Office, because they also

21  took crack cocaine off of his person.

22  Q.   Okay.  In response to Mr. Felson's questions, you

23  talked about a photo ID of Tyreese Pugh.  Where was that

24  found?

25  A.   Sitting on top of this exhibit, exhibit -- I don't see

CIFUENTES - REDIRECT

1    the sticker anymore, this Nike box.

2    Q.    I think the sticker is on the box.

3    A.    Okay.   Exhibit 23.

4    Q.    Okay.   And was all of that evidence, other than the

5    shotgun, the majority of the evidence back there, was that

6    found together?

7    A.    All in the same room.   The clothing was off to one

8    side, and the weapons in the box and the ID were in one

9    area.

10   Q.    And Mr. Felson asked you about the clothing, and you

11   mentioned that you expected to find the clothing there.

12   Why did you expect to find the clothing there?

13   A.    Because I looked at it before it was delivered to the

14   house.   Shanell Holston had it in the trunk of her car, and

15   I looked in the bags and saw basically what she was going

16   to take inside.

17   Q.    Okay.   And, now, all of that evidence together, is

18   that in the same or similar condition as -- Mr. Andrews

19   asked you a question.   I just want to do it all at once.

20   Is it all in the same or similar condition as when you

21   found it that night?

22   A.    Yes, except for the unloading of the weapons, which I

23   testified to, and the bullets are packaged separately.   I

24   haven't done anything with anything else.   It's the same

25   condition.

CIFUENTES - REDIRECT

1   Q.   And you and Officer Colwell brought that evidence down
2   to the courthouse, correct?
3   A.   For the last three days, yes.
4   Q.   Okay.  Now, one final question.  Mr. Felson asked you
5   questions about sending stuff to the lab.  Why didn't you
6   send anything to the lab?
7   A.   Well, that's not a real easy answer.  Once evidence is
8   collected, it's also evaluated.  The purpose of sending
9   something to the lab is looking for a certain result.  And
10  it's not always necessary or it's not always -- you can get
11  a result which doesn't mean anything.  In this case, this
12  was actually a federal case.  We collected the evidence,
13  and I don't do anything with the evidence unless directed
14  to by a prosecutor or at the request of Agent Moran,
15  because this is essentially their case.  Something that --
16  we did discuss this several times what things to be sent to
17  a lab or not.  So it's not an easy answer.
18  Q.   I understand that, but explain to me why you
19  ultimately decided not to send any of those pieces of
20  evidence to the lab.
21  A.   Pertaining to the firearms, I had a bank robbery case
22  in this building last year.
23            MR. ANDREWS:  Objection.
24            THE COURT:  Basis?
25            MR. ANDREWS:  Your Honor, as to what happened

1   last year in this building, whichever court it may have

2   been under, what circumstances, I don't think is

3   necessarily relevant to today's trial.

4         THE COURT:   Overruled.

5   A.   And I test fired the weapon that was recovered in that

6   bank robbery.  Once that was done, I was not requested to

7   testify as to whether or not the weapon was operated or

8   not.  They wanted the Alcohol, Tobacco and Firearms agents

9   to do so, and that's what was done.  So with these weapons,

10  I'm not going to test fire them and use up a round of

11  ammunition when they're going to have their own agents do

12  it, essentially.

13  Q.   What about the remainder of the evidence.  Would there

14  have been any reason to send new clothes to the lab?

15  A.   No.  There was no reason to send any clothing or the

16  suitcase.  There was no reason to send that to the lab.

17        MR. THAPAR:   Thank you.  No further questions.

18        Thank you, Your Honor.

19        THE COURT:   Anything further, Mr. Felson?

20                RECROSS-EXAMINATION

21  BY MR. FELSON:

22  Q.   Did you make that decision -- when you decided or when

23  the decision was made not to send this stuff to the lab,

24  who was involved in that conversation or in that decision

25  process?  In other words, who were you talking to when you

1   made that decision?

2   A.   Well, at one time, I discussed things with Detective

3   Calhoun and Agent Moran, because, like, early on there was

4   a piece of latex glove that was recovered. What would be

5   the value of sending it to a lab? Do we need to do it, et

6   cetera? Each evidence is evaluated and, like I said, what

7   you're trying to show or what it can show, and not

8   everything always needs to be tested.

9   Q.   Did you -- was there a meeting as to each item?

10  A.   I wouldn't say a meeting. We just -- not a meeting

11  per se. There was no set meetings. If something came up,

12  we discussed it.

13  Q.   Okay. And that night after you got this stuff out of

14  the house, who did you meet with to make that decision?

15  A.   I have already said there was no meeting.

16  Q.   Okay. Discussed?

17  A.   These items here, the ones I'm testifying to that were

18  taken out of the house, that would all be the decision, as

19  far as I'm concerned, of Agent Moran or the federal

20  prosecutor. If they want something done, we'll do it. But

21  a lot of times they like to have their own testing done.

22  It just depends.

23  Q.   Right. But they didn't ask you to do that, right?

24  A.   I was not asked to do that.

25  Q.   And so did you decide on your own that it didn't need

CIFUENTES - RECROSS

1   testing?

2   A.    I just said I wasn't asked to do it, so I didn't make

3   the decision.

4   Q.    Did you ask anybody?

5   A.    I believe I said that there were discussions to this.

6   I wasn't present for every one, but an item come up and it

7   was discussed, do we test fire it or not.

8   Q.    All right.  Who did you discuss it with that night?

9   A.    That night, I don't believe I discussed it with

10  anybody.

11  Q.    Did you have any contact with this evidence before

12  that evening?

13  A.    No.

14  Q.    Did you have any contact with this evidence after that

15  evening?

16  A.    Up until three days ago, no.

17  Q.    So all you did was take the evidence to the property

18  room, basically transported it; unloaded it and transported

19  it, right?

20  A.    To my office, unloaded it, tagged it, transported it

21  to the property room, and that's where I put it, and that's

22  where I left it.

23  Q.    So, okay.  And you had no discussions about that

24  property with anybody else that evening?

25  A.    That is correct.

1   Q.   Okay.  So nobody told you not to send it to the lab;

2   therefore, you didn't?

3   A.   That's about it.

4   Q.   And you made that decision, but you didn't talk to

5   anybody?

6   A.   Not that night.  I wouldn't send it to the lab that

7   night either.

8   Q.   Got it.  Okay.  Now, you also stated -- let me see --

9   there was another gentleman arrested or another gentleman

10  with crack cocaine.  What was his name?

11  A.   I can't recall.

12  Q.   And which vehicle was he in?  Was he stopped in a

13  vehicle, or was he at the house?

14  A.   He was stopped in a vehicle after leaving the house on

15  Wincanton.

16  Q.   Okay.  And you don't know his name.  But who made his

17  arrest?

18  A.   Hamilton County Sheriff's Office.

19  Q.   All right.  And do you know how much money he had on

20  him?

21  A.   No, not specifically.  I know it was up to several

22  hundred dollars, I believe.  That was it.  It was a wad of

23  money in his pocket.

24  Q.   Did you do an inventory of -- what's an inventory,

25  your language, language of a police department?  If I ask

1   you to do an inventory, what do I mean by that?

2          MR. THAPAR:  Your Honor, at this point it's

3   beyond the redirect.

4          THE COURT:  I agree.  Sustained.

5   BY MR. FELSON:

6   Q.   Somebody asked about a photo ID on top of the Nike or

7   some box.  Photo ID, was there a photo ID?

8   A.   Yes, sir.

9   Q.   Okay.  Do you know, when you recovered that, had any

10  officers been in that room before you?

11  A.   Yes, they had been.

12  Q.   So you don't know how that ID got to this location, do

13  you?

14  A.   No, I don't.

15         MR. FELSON:  All right.  That's all I have.

16  Thank you.

17         THE COURT:  Anything further, Mr. Andrews?

18         MR. ANDREWS:  Yes.  Two questions, sir.

19                    RECROSS-EXAMINATION

20  BY MR. ANDREWS:

21  Q.   The purpose of testing for --

22         THE COURT:  I'm sorry.  I can't hear you.

23  BY MR. ANDREWS:

24  Q.   The purpose of testing for forensic evidence is not

25  only to find inculpatory evidence, but to find exculpatory

CIFUENTES - FURTHER DIRECT/CROSS

1  evidence, correct, to include as well as to exclude people

2  as suspects?

3  A.    That could be correct, yes.

4  Q.    And the purpose of test firing any weapon when it's

5  taken, used in a criminal case, is to show that it's

6  actually a functioning firearm within the meaning of the

7  law, correct?

8  A.    That is correct.

9          MR. ANDREWS:  Thank you.  I have nothing further.

10          THE COURT:  Mr. Thapar, anything further?

11          MR. THAPAR:  One more question.

12                FURTHER DIRECT EXAMINATION

13  BY MR. THAPAR:

14  Q.    When you have evidence in your property room, the

15  question Mr. Andrews just asked you, when you have evidence

16  in your property room, you make that evidence available to

17  the prosecution as well as to the defense if they want to

18  test fire it, don't you?

19  A.    That is correct.

20          MR. THAPAR:  No further questions, Your Honor.

21          THE COURT:  Anything further, counsel?

22          MR. ANDREWS:  One question.

23                FURTHER CROSS-EXAMINATION

24  BY MR. ANDREWS:

25  Q.    As to about half of the items seen behind you, the

1    decision for them to be used as evidence in this trial was
2    made today at the lunch break; isn't that correct, all the
3    clothing?
4              MR. THAPAR:  Objection, Your Honor.  He wouldn't
5    know that.  That's something that only Ms. Cross and I
6    would know.
7              THE COURT:  I'll let the witness answer if he
8    knows.  Overruled.
9    A.    I brought that evidence, like I said, since Tuesday,
10   Wednesday and today, because I was asked to bring it.  The
11   decision whether or if to use it is the prosecution's.
12             MR. ANDREWS:  Fair enough.  Thank you.  Have a
13   nice day.
14             THE COURT:  Anything further?
15             MR. THAPAR:  No thank you, Your Honor.
16             THE COURT:  Officer Cifuentes, the Court
17   appreciates very much your coming here, and you are
18   excused.
19             Who is the government's next witness?
20             MR. THAPAR:  Officer Colwell.
21             THE COURT:  Mr. Thapar, were you going to want
22   these things?
23             MR. THAPAR:  Yes, and 18, 19 and 20.
24             (Witness sworn by the courtroom deputy.)
25

| | |
|---|---|
| 1 | JAMES COLWELL |
| 2 | DIRECT EXAMINATION |
| 3 | BY MR. THAPAR: |
| 4 | Q.   Good afternoon, Officer.  Would you please introduce |
| 5 | yourself to the jury and spell your last name slowly for |
| 6 | the court reporter? |
| 7 | A.   My name is Officer Colwell, C-o-l-w-e-l-l.  I'm a |
| 8 | police officer for the City of Hamilton. |
| 9 | Q.   And what's your first name? |
| 10 | A.   James. |
| 11 | Q.   And, Officer Colwell, what's your job in the City of |
| 12 | Hamilton? |
| 13 | A.   I am the identification officer, and I also work in |
| 14 | the property room. |
| 15 | Q.   Okay.  And as a -- I want to talk to you as to your |
| 16 | role as a property officer.  What do you do with evidence |
| 17 | that is either handed to you or put in a locker? |
| 18 | A.   If it is placed into a locker, what they do is put it |
| 19 | in the locker, and then they drop the key into a safelock. |
| 20 | Q.   Who has access to that safelock? |
| 21 | A.   Only the property officers. |
| 22 | Q.   What happens when you go to that safelock and get the |
| 23 | key?  What do you do? |
| 24 | A.   We get the key.  We go to the lock.  We unlock it.  We |
| 25 | get the property out.  Then we take it into the property |

```
 1    room.   Then we log it into the computer and place it into
 2    the property room.
 3    Q.   Let's pick Exhibit 10, for example, which is behind
 4    you.   It's a black shotgun.   If you would look at the tag,
 5    what do you add to that tag that makes sure that you're the
 6    one who touched it?
 7    A.   What we do is, when we enter it into our computer, it
 8    prints out the label, and we initial it also.
 9    Q.   Okay.   Now, I want to direct your attention -- I'm
10    going to try to do it all at once and see if this works --
11    to the exhibits, and you can take a look at them.   Take
12    your time if you need to, or if you recall you can just say
13    so.   What are all behind you are, I believe, 10, 11, 12,
14    14, 15, 16, 18, 19, 20, 23, 24, 25, 26 and 27.
15              MR. THAPAR:   Ms. Penley, was he given 18 through
16    20?
17              THE COURTROOM DEPUTY:   Yes.
18              MR. THAPAR:   Thank you.
19              THE COURT:   Mr. Thapar, I have a question for
20    you.   My exhibit list only goes through 22.
21              MR. THAPAR:   That is correct, Your Honor.   23
22    through 27 are the exhibits we just marked.
23              THE COURT:   Oh, okay.
24              Mr. Thapar, I think the witness is ready.
25              MR. THAPAR:   Excellent.   Thank you, Your Honor.
```

COLWELL - DIRECT

```
 1   BY MR. THAPAR:
 2   Q.   Did you log all of that evidence in?
 3   A.   Yes, sir.
 4   Q.   Okay.  And since logging it, is it in the same or
 5   similar condition as when you logged it in?
 6   A.   Yes, sir, it is.
 7           MR. THAPAR:  Your Honor, at this time, I will
 8   offer Government's Exhibit 10.  You want me to say them
 9   all, Your Honor?
10           THE COURT:  Yes.
11           MR. THAPAR:  Okay.  10, 11, 12.
12           THE COURT:  Wait.  I need to check them off.
13           MR. THAPAR:  Also for the court reporter.
14           MS. CROSS:  14, 15, 16, 18, 19, 20, 23, 24, 25,
15   26, and 27.
16           THE COURT:  Any objection, counsel?
17           MR. FELSON:  None.
18           DEFENDANT W. PUGH:  No.
19           MR. ANDREWS:  No.
20           MR. FELSON:  Make sure I know what everything is.
21           THE COURT:  I'm sorry?
22           MR. FELSON:  I think we're fine.
23           THE COURT:  Government Exhibits 10, 11, 12, 13 --
24   I guess 13 was previously admitted.  10, 11, 12, 14, 15,
25   16, 17, 18, 19, 20, 23, 24, 25, 26 and 27 will be admitted.
```

COLWELL - CROSS

1       MR. THAPAR:  And, Your Honor, I believe 17 is the

2  keys that were previously admitted.

3       THE COURT:  You're right.  You're absolutely

4  right, Mr. Thapar.

5  BY MR. THAPAR:

6  Q.  Just a few more questions, Officer.  Now, other than

7  Ms. Cross and myself, did any lawyer come down and request

8  to see or test any of the evidence?

9  A.  No, sir.

10 Q.  Could anyone have come down and requested to see --

11 could anyone involved in this case, meaning Ms. Cross,

12 myself or any of the defense lawyers, come down and

13 requested to see and/or test the evidence?

14 A.  Yes, sir.

15      MR. THAPAR:  No further questions, Your Honor.

16      THE COURT:  Mr. Felson, do you have any questions

17 of this witness?

18      MR. FELSON:  Yes.

19                   CROSS-EXAMINATION

20 BY MR. FELSON:

21 Q.  My understanding is somebody, an attorney or another

22 person, could come down and say they wanted to take the

23 evidence.  What is the procedure for doing that?

24 A.  What would happen is we have a little room.  We would

25 show it to you, but one of the officers would stay with

COLWELL - CROSS

1   you.

2   Q.   Okay.  Well, what if you need to take it -- would you

3   allow it to go out to a lab?

4   A.   We have before, yes, sir.

5   Q.   Okay.  But I mean, you wouldn't do that without

6   talking to the prosecutor and --

7   A.   Yes, sir.

8   Q.   There is a chain of command, in other words?

9   A.   Yes, sir.

10  Q.   There is a whole series of events that must occur

11  before that would happen?

12  A.   Yes, sir.

13  Q.   You're not just going to give it out to somebody that

14  walks in the door and says I want to see it?

15  A.   No, sir.  If you just walk in off the street, I'm not

16  going to sign you out with a gun.

17  Q.   Okay.  And do you have the ability to test it right

18  there where you are?

19  A.   Test?

20  Q.   The gun, say, for example?

21  A.   We have a firing range.

22  Q.   Right where?  How far from where you are, your

23  station?

24  A.   Approximately five miles, if that.

25  Q.   Okay.  And that's routinely done?

COLWELL - CROSS

1   A.   That is usually done by the detectives.

2   Q.   Okay.  And did they do that in this case, do you know?

3   A.   I cannot answer it.  Not that I'm aware of.

4   Q.   Was the weapon checked out by anybody else?  Just tell

5   us who it was checked out by during the course of your

6   possession of it.

7          MR. THAPAR:  Just for clarity, Your Honor, which

8   weapon?  We have three of them.

9          MR. FELSON:  The shotgun, we will start with.

10  Let's talk about the shotgun.

11         THE COURT:  That's Exhibit 10.

12  BY MR. FELSON:

13  Q.   Ten.

14  A.   I believe the only time that I have logged it out

15  myself was to Cifuentes, detective.

16  Q.   Do you have the date on that?

17  A.   No, sir.  It should be all on there.

18  Q.   Okay.  Do you know how long he had it out?

19  A.   I cannot recall.

20  Q.   It's on a piece of paper somewhere?

21  A.   It should be on a piece of paper.

22  Q.   Do we have the paper on there?  Can we take a look at

23  it?

24         MR. THAPAR:  It's in our exhibit book, Exhibit

25  10.

COLWELL - CROSS

1    BY MR. FELSON:

2    Q.   Okay.  It's attached to the back here.  I have got it.

3    Could you take a look at the third sheet on page 10,

4    Exhibit 10 I mean?

5              THE COURT:  It's stapled to that sheet.  Just

6    break the staple.

7    Q.   Are you looking at that?

8    A.   Yes, sir.

9    Q.   Okay.  Just tell me who took it out from the time you

10   received it.  And let's just get the dates right.  You

11   received it on what date?

12   A.   I received it on 5/3.

13   Q.   Okay.  And after 5/3, did you release it to anyone for

14   any period of time?

15   A.   On -- looks like on 5/15 I released it to Cifuentes.

16   Q.   What time?  8:37 it looks like.

17   A.   Yes, sir.

18   Q.   In the morning?  Are you going by military time?

19   A.   Yes, that would be military time.

20   Q.   Then it was returned at 9:19?

21   A.   Yes, sir.

22   Q.   That's also in the morning, right?

23   A.   Yes, sir.

24   Q.   Then released again at 9:39.  But that was ten days

25   later.  Wait a minute.  That was a month and ten days

COLWELL - CROSS

```
1    later.  Okay.  So that was the only time in May that you
2    released it, right?
3    A.   Yes, sir.
4    Q.   Then it was released one other time, June 25th?
5    A.   Yes, sir.
6    Q.   Okay.  Where did you receive it back after that?
7    A.   It has not been back.
8    Q.   From June 25th?  Got it.  Okay.  You didn't perform
9    any tests yourself on it, right?
10   A.   No, sir.
11            MR. FELSON:  I guess that's all I have.  Thank
12   you.
13            THE COURT:  Thank you, Mr. Felson.
14            Anything from Mr. Pugh or Mr. Andrews?
15            DEFENDANT W. PUGH:  Mr. Andrews.
16                    CROSS-EXAMINATION
17   BY MR. ANDREWS:
18   Q.   So, Officer, it would be incorrect to say that that
19   shotgun has been in your property room until three days
20   prior to trial?
21   A.   That would be correct.
22   Q.   It's correct that it is incorrect?
23   A.   Right.
24   Q.   Okay.  You also worked full time in the property room.
25   Not full.  You do ID as well?
```

COLWELL - CROSS

1   A.    Yes.

2   Q.    But you work a lot in the property room?

3   A.    Yes, sir.

4   Q.    And you're aware of the proper procedure for sending

5   items out for examination of all kinds, correct?

6   A.    Yes, sir.

7   Q.    Matter of fact, you have things that go out almost on

8   a daily basis to the Miami Valley Lab, the Hamilton County

9   Sheriff's -- excuse me.  Strike that -- Hamilton County

10  Corners Office and the Bureau of Criminal Investigation in

11  London, Ohio.  You have items that go out to all three of

12  those labs on a daily basis; isn't that correct?

13  A.    Not normally on a daily, but those are the three that

14  we usually use.

15  Q.    Certainly on a weekly basis?

16  A.    Yes, sir.

17  Q.    Miami Valley Lab and Hamilton County Corner's are used

18  mainly for drugs, correct?

19  A.    Yes, sir.

20  Q.    BCI, which is in London, Ohio, is mainly used for

21  questioned evidence?

22  A.    Yes, sir.

23  Q.    And you have no problem sending items to any of those

24  labs; isn't that correct?

25  A.    That is correct, sir.

COLWELL - CROSS

1   Q.   And, as far as you know, none of the items that you

2   have just identified as part of the chain of custody have

3   ever been sent to any of those labs; isn't that correct?

4   A.   That would be correct, sir.  That is up to the

5   detectives.

6   Q.   There would be a notation on your sheets with the

7   exhibits to indicate if you had sent one of those items,

8   say, to BCI, correct?

9   A.   Yes, sir.

10  Q.   And there is no such notation that you're aware of on

11  any of these?

12  A.   No, sir.

13  Q.   As to the weapons, your detectives regularly test fire

14  weapons to show that they are functioning firearms; isn't

15  that correct?

16  A.   That is up to them and their cases.

17  Q.   Okay.  But when a detective has, for sake of

18  discussion, a carrying concealed firearm case where it is

19  necessary to show that it's an operable firearm, they take

20  that item out to your testing range, test fire it into a

21  55-gallon barrel of water, retrieve the slug, and bring it

22  back to you and put it all in the property room; isn't that

23  correct?

24  A.   Yes, sir.

25  Q.   And that is the procedure?

COLWELL - REDIRECT

| | |
|---|---|
| 1 | A.   Yes, sir. |
| 2 | Q.   That has not been done on any of these weapons? |
| 3 | A.   No, sir. |
| 4 | Q.   And, as far as the chain of custody as to the shotgun, |
| 5 | that item has two gaps in the chain of custody that you |
| 6 | cannot account for; isn't that correct?  You can account |
| 7 | for who had them, but you don't know why they were out of |
| 8 | your possession; is that correct? |
| 9 | A.   That is correct.  I can testify to who I released them |
| 10 | to, but that's it. |
| 11 | Q.   Right.  You released it to Cifuentes in May for about |
| 12 | an hour, give or take a little bit; isn't that correct? |
| 13 | A.   That is correct. |
| 14 | Q.   And then, since about mid-June, they have been totally |
| 15 | out of your possession? |
| 16 | A.   Yes, sir. |
| 17 | Q.   Out of the property, I don't mean yours personally, |
| 18 | but out of the property room; is that correct? |
| 19 | A.   Yes, sir. |
| 20 | MR. ANDREWS:  Thank you.  I have no further |
| 21 | questions. |
| 22 | REDIRECT EXAMINATION |
| 23 | BY MR. THAPAR: |
| 24 | Q.   I want to talk to you about that sheet.  Could you |
| 25 | look at that sheet again? |

```
1   A.    Yes, sir.
2   Q.    One thing, I want you to look at the upper left-hand
3   corner and tell me when that sheet was printed out.
4   A.    June the 25th.
5   Q.    So it wouldn't have anything after June the 25th on
6   here, would it?
7   A.    No, sir.
8   Q.    Okay.  The second thing I want to know is if you
9   recall Ms. Cross coming down there on June 25th and marking
10  all the exhibits?
11  A.    I recall her coming down, yes, sir.
12  Q.    Okay.  The final thing I want to know is when the
13  exhibit -- how did the exhibit shotgun, Exhibit 10 -- I'm
14  sorry -- get to court?
15  A.    I believe it came down with Officer Payne.  I'm not
16  for sure.
17            MR. FELSON:  Object.  He doesn't know.  No
18  personal knowledge of it.
19            THE COURT:  Overruled.
20  BY MR. THAPAR:
21  Q.    Okay.  If you look at the sheet, who's the last person
22  to log it out?  Was it you?
23  A.    It was last logged out by Officer Payne.
24            MR. THAPAR:  No further questions, Your Honor.
25            THE COURT:  Mr. Thapar, I have a question for
```

COLWELL - RECROSS

| | |
|---|---|
| 1 | you.  Since we separately marked the cylinders of the gun |
| 2 | 11-A and 12-A, do you mean to move for their admission as |
| 3 | well? |
| 4 | MR. THAPAR:  Yes.  I'm sorry, Your Honor. |
| 5 | BY MR. THAPAR: |
| 6 | Q.   Let me ask you very briefly, we marked the cylinders |
| 7 | of those guns 11-A and 12-A.  Are they in the same or |
| 8 | similar condition as when you received them? |
| 9 | A.   Yes, sir. |
| 10 | Q.   And did you log those in along with the guns? |
| 11 | A.   If they were inside the gun, yes, sir. |
| 12 | MR. THAPAR:  At this time, Your Honor, we move to |
| 13 | admit 11-A and 12-A. |
| 14 | MR. ANDREWS:  No objection. |
| 15 | DEFENDANT W. PUGH:  No objection. |
| 16 | MR. FELSON:  No objection. |
| 17 | THE COURT:  Government Exhibits 11-A and 12-A |
| 18 | will also be admitted. |
| 19 | MR. THAPAR:  No further questions, Your Honor. |
| 20 | Thank you. |
| 21 | THE COURT:  Anything further, Mr. Felson? |
| 22 | MR. FELSON:  Just a couple questions. |
| 23 | RECROSS-EXAMINATION |
| 24 | BY MR. FELSON: |
| 25 | Q.   June 25th, are you saying that these weapons were not |

COLWELL - RECROSS

1    in your possession after that date?

2    A.    According to this one, it was not.  But this paper was

3    written June 25th.  It may have been.  It could have been

4    logged in by the other property officer.

5    Q.    Where would be the property log that indicates where

6    the property was from June 25th to the present?

7    A.    It would be at our headquarters.

8    Q.    Okay.  Now, if the guns weren't at your property room,

9    if they were elsewhere, would you have a piece of paper on

10   it?  In other words, if they were just logged out and you

11   didn't have them anymore, there would be no reason to have

12   any other documents, would there?

13   A.    If we printed out a recent one, it should show

14   everything.

15   Q.    Okay.  Is it possible the guns weren't with you since

16   June 25th; they were elsewhere?

17   A.    I really can't say.

18   Q.    You don't know where they were?

19   A.    Right.

20          MR. FELSON:  All right.  That's all.

21          MR. ANDREWS:  One more.  Actually, it goes beyond

22   redirect.

23          THE COURT:  Nothing?

24          MR. ANDREWS:  No, Your Honor.

25          THE COURT:  Anything further, Mr. Thapar?

COLWELL - RECROSS

1          MR. THAPAR:  No, Your Honor.

2          THE COURT:  The Court appreciates very much your

3   coming, and you are excused.

4          Who is your next witness, Mr. Thapar?

5          MR. THAPAR:  Ms. Bessie Pew.

6          THE COURT:  How long do you anticipate her

7   testimony taking?

8          MR. THAPAR:  The direct?

9          THE COURT:  Yes.

10         MR. THAPAR:  Fifteen minutes.

11         THE COURT:  I think we'll take a break.  Let's

12  take our afternoon break at this point.  We will stand in

13  recess for 15 minutes.

14                         AFTER RECESS

15         (Jury not present.)

16         THE COURT:  Ms. Cross, I understand there is

17  something you wish to bring to the Court's attention.

18         MS. CROSS:  Yes, Your Honor.  As Your Honor

19  knows, we have had some problems with witness intimidation

20  in this case, and, to be frank, more than we have reported.

21  And this afternoon there are two key witnesses that have

22  relationships to the defendants that will be testifying.

23         I understand there are several people in the

24  gallery that are also family or friends of the defendants,

25  and we ask if the judge could admonish anybody that's

1    sitting in the gallery from trying to intimidate the
2    witnesses.
3            The one witness, Shanell Holston, we will call
4    this afternoon has been threatened, not only in this
5    courthouse, but outside the courthouse by people that are
6    here and not in the gallery now.
7            THE COURT:  I have no problem doing that.  In
8    fact, we talked about doing that yesterday.  My problem is
9    how do I get the people back in the courtroom to admonish
10   them before -- are they out there?
11           MR. THAPAR:  Yes, they're out there.
12           THE COURT:  You want to get them and bring them
13   in, and I'll talk to them.
14           (Pause.)
15           MR. THAPAR:  That's all I could find, Your Honor.
16           THE COURT:  All right.  Ladies and gentlemen in
17   the gallery, I understand that some of you may be related
18   or friends of the defendants.  I know from my experience
19   both as a prosecutor, a criminal defense attorney and a
20   judge, that emotions run very high in criminal cases.
21   However, the Court takes as seriously as it possibly can
22   the fact that witnesses should be allowed and must testify
23   to everything they know and that there cannot be any
24   intimidation of witnesses or anything, anything that even
25   hints of that.  I don't even want a witness in this

1  courthouse uncomfortable.

2           If I find that a witness in this courthouse or

3  outside of this courthouse has been made uncomfortable --

4  I'm not even talking about threats; I'm talking about just

5  gestures, anything like that -- I will not hesitate to have

6  the United States Marshal and the FBI investigate it.  And

7  I will hold those of you who commit such acts in contempt

8  of this Court, and you will go out of this courtroom to a

9  jail cell.  You won't pass go and you won't collect $200.

10           So I just want to put you on notice that I will

11  not permit that.  That is obstruction of justice.  I'm

12  sworn to uphold the law, and I plan to do that.

13           All right.  Are we ready for the government's

14  next witness?

15               MR. THAPAR:  Yes, Your Honor.

16               MR. ANDREWS:  Could I have one moment?

17               THE COURT:  I would appreciate it if any of you

18  family members or friends would pass that on to the other

19  spectators in the courtroom who aren't here at this moment.

20               (Jury present.)

21               THE COURT:  You may call your next witness.

22               MR. THAPAR:  Your Honor, at this time the United

23  States calls Bessie Pew.

24               (Witness sworn by the courtroom deputy.)

25               THE COURT:  Good afternoon.

PEW - DIRECT

```
1                              BESSIE PEW
2                          DIRECT EXAMINATION
3    BY MR. THAPAR:
4    Q.   Good afternoon, ma'am.  Would you please introduce
5    yourself to the jury?
6    A.   Bessie Pew.
7    Q.   Ms. Pew, you're here pursuant to a subpoena, aren't
8    you?
9    A.   Yes.
10   Q.   And you're not here --
11            THE COURT:  Mr. Thapar, just wait one moment.
12            Could you turn the mike so it's just at an angle
13   up more towards -- that's it.  Great.  It will catch your
14   voice better.
15   BY MR. THAPAR:
16   Q.   You're not here because you volunteered to be here,
17   are you?
18   A.   No.
19   Q.   Ms. Pew, where do you work?
20   A.   Glen Meadows Healthcare.
21   Q.   I'm sorry?
22   A.   Glen Meadows Healthcare.
23   Q.   How long have you been there?
24   A.   I have been there 15 years.
25   Q.   What do you do there?
```

PEW - DIRECT

1   A.    I was activities director.

2   Q.    I want to talk to you about April 25th of this year.

3   Do you recall going to the police station?

4   A.    Yes.

5   Q.    Okay.  And why did you go to the police station?

6   A.    Because, when I got to work a little bit before 9

7   o'clock, I received a call that the police was looking for

8   my car.

9   Q.    Okay.  I want you to look in your book.  There is a

10  tab 9.  There should be a black book in front of you.  And

11  please look at Government Exhibits 9.1 and 9.2.

12          MR. THAPAR:  Ms. Penley, we're going to need

13  those.

14  Q.    Showing you both Government Exhibits 9.1 and 9.2, what

15  is it?

16  A.    My car, picture of my car.

17  Q.    Is that a photograph of your car?

18  A.    Yes.

19          MR. THAPAR:  Your Honor, at this time the

20  government introduces 9.1 and 9.2.

21          THE COURT:  Any objection?

22          MS. CROSS:  No objection.

23          MR. ANDREWS:  No objection.

24          THE COURT:  Government Exhibits 9.1. and 9.2 will

25  be admitted.

PEW - DIRECT

```
 1   BY MR. THAPAR:
 2   Q.   Is this the car that you came to the police station to
 3   talk about?
 4   A.   Yes.
 5   Q.   Okay.  And as of April 25th, before that date, who was
 6   driving this car?
 7   A.   I don't know who was driving at the time, but my
 8   brother had it.
 9   Q.   Okay.  And who is your brother?
10   A.   Walter Pugh.
11   Q.   Is he in the courtroom today?
12   A.   Yes.
13   Q.   Can you identify him for us?
14   A.   Right there.
15   Q.   Why don't you describe an article of clothing he's
16   wearing?
17   A.   A suit, an orange-brownish suit there.
18              MR. THAPAR:  Your Honor, may the record reflect
19   that the witness has identified the defendant Walter Pugh?
20              THE COURT:  Any objection?
21              MR. FELSON:  No.
22              DEFENDANT W. PUGH:  No.
23              THE COURT:  Let the record so reflect.
24   BY MR. THAPAR:
25   Q.   Who is Tyreese Pugh?
```

PEW - DIRECT

1    A.    Tyreese is my nephew.

2    Q.    Is he in the courtroom today?

3    A.    Yes.

4    Q.    Can you identify an article of clothing he is wearing?

5    A.    He's wearing a cream colored suit.

6              MR. THAPAR:   May the record reflect that the

7    witness has identified the defendant Tyreese Pugh?

8              THE COURT:   Any objection?

9              MR. FELSON:   No.

10             MR. ANDREWS:   No.

11             THE COURT:   The record may reflect that the

12   witness has identified the defendant Tyreese Pugh.

13   BY MR. THAPAR:

14   Q.    Now, your brother Walter Pugh visits you a lot, right?

15   A.    Yes.

16   Q.    You see him often?

17   A.    Yes, when he's not -- when he wasn't working on the

18   road.

19   Q.    Okay.  And you grew up together, right?

20   A.    Yes.

21   Q.    Now, you said you lent him your car for the past, I

22   think -- did you say three weeks?

23   A.    Somewhere in there.  I'm not for sure exactly, but I

24   know he had it a while.

25   Q.    Okay.  And why did you lend him the car?

PEW - DIRECT

1    A.    I was having car problems, and Walter always would fix

2    my car for me.  He had put an alternator on for me, brakes

3    had went out, tune-ups and everything.  He also was having

4    problems.  Him and Shanell had some problems.  So I was

5    using one of his cars.

6    Q.    Which car were you using?

7    A.    The Cadillac, the Mazda, we switched back and forth.

8    I used both of them.

9    Q.    And did he return your car to you?

10   A.    Yes.

11   Q.    And when did he?

12   A.    He returned my car to me several times.

13   Q.    Okay.  On April 24th, which is the day before you went

14   to the police station, did he return your car to you?

15   A.    Yes.

16   Q.    Okay.  And did he actually bring the car to you?

17   A.    Did he bring the car to me?

18   Q.    Yes.

19   A.    No.

20   Q.    What happened?  Why don't you tell the ladies and

21   gentlemen of the jury what happened on that day?

22   A.    Came to my job and said he was picking his car up.

23             THE COURT:  Can you hear?

24             MEMBERS OF THE JURY:  No.

25             THE COURT:  This is not working.  Let's pull the

PEW - DIRECT

1    microphone, like, directly in front of you here, and let's

2    angle it a little more, and if you could lean closer to it.

3              (Adjusting microphone.)

4    A.   He came to my job and said he needed his car; he was

5    picking his car up.

6    Q.   Okay.  And do you remember what time he came to your

7    job?

8    A.   Not really.  I want to say it was before 3 o'clock,

9    because I think first shift was still there at the time.

10   Q.   Okay.  And how far before 3, do you recall?

11   A.   Not really.

12   Q.   And where is your job?  Where is Glen Meadows?

13   A.   In Fairfield.

14   Q.   Okay.

15   A.   Outside Hamilton, Ohio.

16   Q.   Hamilton, Ohio.  And how big is Hamilton Ohio?

17   A.   You mean how many population?

18   Q.   How long would it take to get from one end of

19   Hamilton, Ohio, to the other end at its longest point?

20   A.   I have no idea.  Are you asking me how long it would

21   take me to get from --

22   Q.   Let me ask you a more specific question.  You know

23   where the University Branch of First National Bank is or

24   was?

25   A.   Sure.

PEW - DIRECT

```
1    Q.    How long did it take you to get from your job to the
2    First National Bank?
3    A.    It depends on traffic.  I probably could get there in
4    10 or 15 minutes.
5    Q.    Okay.  And you said that your car was in the
6    apartments on Pleasant in a parking lot.  Where is that?
7    A.    That's in Fairfield.
8    Q.    Okay.  And how far from your job is that?
9    A.    Fifteen, 20 minutes, at least 20.
10   Q.    Okay.  And you remember that you talked to the police
11   on April 25th, correct?
12   A.    Yes.
13   Q.    And on that day you gave a statement to the police,
14   right?
15   A.    Yes.
16   Q.    Okay.  And is it fair to say that on that day, the day
17   after April 24th, your memory as to times would be more
18   accurate than it may be today?
19   A.    It's possible.  I just can't remember exact times.
20   Q.    If I show you that statement, will it help you
21   remember the time that you may have stated on that day?
22   A.    It's possible.
23            MR. THAPAR:  Okay.  Ms. Penley?
24            THE COURT:  This is going to be 28, Government
25   Exhibit?
```

PEW - DIRECT

1    MR. THAPAR:  Yes, Your Honor.  We're not going to

2    introduce it.  We're just going to use it to --

3    THE COURT:  Okay.  Okay.

4    BY MR. THAPAR:

5    Q.  Okay.  If it's easier, I'll tell you the second

6    paragraph, second big paragraph, the second to last

7    sentence or third to last sentence.  Let me ask you this.

8    This is your statement that you gave on April 25th,

9    correct?

10   A.  Yes.

11   Q.  Okay.  And what is it?  Does that help you remember

12   what time he came to the nursing home?

13   A.  I thought it was, like, before 3 o'clock.  It might

14   have been 3.  I'm not for sure.  I can't recall.  It could

15   have been 3 o'clock.  I know it was around first shift,

16   somewhere in there.

17   Q.  That statement, just to be clear, says a little after

18   3, correct?

19   A.  True, yes.

20   Q.  And you signed it, right?

21   A.  Yes.

22   Q.  And you initialed it?

23   A.  Yes.

24   Q.  Now, when he came to the -- when he came to get his

25   car, who was he with?

PEW - DIRECT

| | |
|---|---|
| 1 | A. He came inside.  Tyreese. |
| 2 | Q. Tyreese, meaning Tyreese Pugh, your nephew? |
| 3 | A. Yes. |
| 4 | Q. And how did they appear? |
| 5 | A. They both were hyper.  They both hyper, always have |
| 6 | been hyper so -- |
| 7 | Q. Did your -- does your brother smoke? |
| 8 | A. He was smoking, and he stopped smoking. |
| 9 | Q. And what was he smoking when he smoked? |
| 10 | A. He smoked cigarettes. |
| 11 | Q. Do you recall what brand? |
| 12 | A. No, I don't know what brand. |
| 13 | Q. Okay.  Do you smoke? |
| 14 | A. No. |
| 15 | Q. I'm going to show you now -- |
| 16 | MR. THAPAR:  Ms. Penley, I'm sorry.  Can you show |
| 17 | the witness exhibits -- actually, can you hand up, because |
| 18 | they're already admitted, Government Exhibits 4.1 through |
| 19 | 4.4? |
| 20 | BY MR. THAPAR: |
| 21 | Q. Before I show you this, when you came to the police |
| 22 | station, you met with Detective Calhoun, correct? |
| 23 | A. Yes. |
| 24 | Q. And you gave him consent to look in your car, right? |
| 25 | A. Yes. |

PEW - DIRECT

1    Q.    In your book there is behind the tabs -- pick tab 4,

2    and you should see some pictures.  And the one on the

3    screen is the one I want you to direct your attention to.

4    Can you see the screen?

5    A.    No, I can't.

6            THE COURT:  You're welcome to get down from the

7    witness stand and go take a look.

8            For the record, Mr. Thapar, which one have you

9    put on the screen?

10            MR. THAPAR:  Exhibit 4.1, Your Honor.  Thank you.

11            (Witness standing in the well of the courtroom.)

12            THE COURT:  Mr. Thapar, what was your question

13    again?

14    BY MR. THAPAR:

15    Q.    Have you ever seen this picture before?

16    A.    Yes.

17    Q.    Okay.

18    A.    Yes.

19    Q.    And who is that in the front holding the gun aimed

20    this way with, it appears, something in his mouth?

21            MR. FELSON:  Object.

22            THE COURT:  Who?  I can't see.

23            MR. FELSON:  I'm going to object to that.  That's

24    the province of the jury to know who that is.

25            THE COURT:  Overruled.

PEW - CROSS

```
 1   BY MR. THAPAR:

 2   Q.   Who is that?

 3   A.   It looks like my brother.

 4   Q.   Your brother, meaning Walter Pugh?

 5   A.   Yes.

 6           MR. THAPAR:  No further questions, Your Honor.

 7           THE COURT:  Mr. Felson, do you wish to

 8   cross-examine the witness?

 9           MR. FELSON:  Yes, I do.

10           THE COURT:  You may proceed.

11                     CROSS-EXAMINATION

12   BY MR. FELSON:

13   Q.   Okay, ma'am.  You own a 1988 Cutlass?

14   A.   Yes.

15   Q.   Okay.  And that's maroon in color, right?

16   A.   Yes.

17   Q.   And the police came to you, and they informed you that

18   this Cutlass might have been -- was suspected of being used

19   in a robbery?

20   A.   I went to them, yes.

21   Q.   And you saw -- did you see a description of the car or

22   something somewhere in the newspaper, something like that?

23   A.   There was -- when Shanell had called me, she told me

24   there was a description.

25   Q.   I didn't want to ask you what somebody else told you.
```

PEW - CROSS

| 1  | So you went to the police, and you said, "I have a car |
|----|--------------------------------------------------------|

1   So you went to the police, and you said, "I have a car

2   that's a maroon car."  Did they ask to seek permission to

3   search the car?

4   A.    Yes.

5   Q.    You gave them permission, right?

6   A.    Yes.

7   Q.    And are you aware that they found a glove in the car?

8   A.    Yes.

9   Q.    Okay.  And what type of glove was that?

10  A.    A rubber glove, just a regular glove.

11  Q.    Okay.  So one like they use in hospitals?

12  A.    Hospitals, yes, nursing homes.

13              THE COURT:  Can you speak up a little?

14  A.    Like they use in hospitals, nursing homes.

15  Q.    Okay.  All right.  And now we have got a situation

16  where they asked you does this look like your brother,

17  right?

18  A.    Right.

19  Q.    And is that the only picture they showed you?  Did

20  they get a close-up of it?

21  A.    They had a close-up one that came across a copy

22  machine.

23  Q.    They made a copy of this?

24  A.    It was a large print.  It was a large photo.

25  Q.    Made from this?

PEW - CROSS

```
1   A.   Yes.
2   Q.   Okay.  So I imagine it was even grainier than this?
3   A.   Yes.
4   Q.   All right.  And they actually also asked you if that
5   was Tyreese, didn't they?
6   A.   Yes.
7   Q.   And did you say that looks like Tyreese?
8   A.   I -- yes, I think I did say that.
9   Q.   Okay.  Well, does that look like Tyreese to you?
10  A.   It does.  I said I knew my nephew.  Really, I can't
11  say.
12  Q.   Can you even see the face on that picture?
13  A.   No.
14  Q.   Did they tell you that the person in the picture --
15  A.   I was so upset that day, I don't recall exactly what I
16  said.  I was in shock when I went there.  When I had went
17  up to the police station and they had told me my car was in
18  the paper and the police was looking for it, and when I
19  went up and the detective and them was questioning me, I
20  was nervous and crying.
21  Q.   Were you afraid?
22  A.   Crying, yes.
23  Q.   And, I mean, did they tell you not -- obviously, the
24  one person in the picture doesn't have a mask, but did they
25  tell you the other person was wearing a mask?
```

PEW - CROSS

1    A.    I believe they said something like a cap, a stocking,
2    yes.
3    Q.    And they still asked you to identify the face, even
4    though it was covered with a stocking mask or some sort of
5    mask?
6    A.    Yes.
7    Q.    And you still said it looked like Tyreese?
8    A.    I did.
9    Q.    Now, were you just trying to please them, or were you
10   afraid that they were going to do something to you?
11   A.    I was scared.    I was shocked, and I was scared.
12   Q.    Did they threaten that something could happen to you
13   or your car?
14   A.    No.    I was not threatened.    They didn't threaten me.
15   Q.    Okay.    But you were scared?
16   A.    I was scared.    I recall them saying something like, if
17   I -- if my brother got in touch with me or something like
18   that, they didn't want to hurt him or anything like that or
19   Tyreese, and, if he got in touch with me, to notify them
20   right away.
21   Q.    And did you --
22   A.    I never.
23   Q.    -- get in touch with him?
24   A.    Did I get in touch with who?
25   Q.    Tyreese or Walter?

PEW - CROSS

1   A.    No, I did not talk to Tyreese or Walter.

2   Q.    Okay.  When was the next time you saw Tyreese and

3   Walter?

4   A.    When I saw them at the Hamilton Justice Center on a

5   visit.

6   Q.    All right.  Now, you recall the date that you're

7   saying that Walter was fixing your car for you when stuff

8   would go wrong periodically, right?

9   A.    Yes.

10  Q.    And so he would fix it and bring it back and use it

11  for a while.  Sounds like you were sharing the use of it.

12  A.    We were.

13  Q.    Okay.

14  A.    He was always afraid I was going to be broke down on

15  the highway.

16  Q.    So he was concerned about you?

17  A.    Yes.

18  Q.    And the date, I guess, for the three weeks or a month

19  before this incident on April 24th, is that the period of

20  time when you're saying Walter had possession of your car

21  on and off, or did it extent even further back?

22  A.    It extended even further back.  He's had my car before

23  the three weeks.

24  Q.    And other members of your family sometimes use your

25  car, right?

PEW - CROSS

1  A.    Yes.

2  Q.    How many cars do you have?

3  A.    One.

4  Q.    But when a family member, like when Walter had your

5  car, he let you use his while he was fixing yours?

6  A.    Yes.

7  Q.    Okay.  And Walter even had another car.  Were you

8  aware of that?

9  A.    Yes.

10  Q.    So, if the car broke down, it's not like he wouldn't

11  have anything to drive.  He had another car to drive,

12  right?

13  A.    Right, he had another one.

14  Q.    All right.  So this particular time, what was wrong

15  with your car around this time?

16  A.    He had put an alternator on for me, and I was having

17  problems with my brakes also, and he had came out on my job

18  a couple weeks before and went and got a tune-up for me.

19  He had the oil changed.

20  Q.    All right.  And so, at some point, then he delivered

21  the car back to you; is that right?

22  A.    Yes.

23  Q.    Or actually he delivered it back to you several times,

24  I mean; is that right?

25  A.    Yes.  I broke down on the highway in Fairfield, and

PEW - CROSS

1   the officer had stopped to help, and I had called my
2   brother myself.  He had the car towed and had it repaired
3   for me.
4   Q.   Okay.  How many times would you say it broke down on
5   you?
6   A.   Constantly.
7   Q.   Could never predict or trust it, could you?
8   A.   No.
9   Q.   So, how long had he had the car before April 24th when
10  he brought it back to you, I guess, for the final time
11  before he was arrested and all that?
12  A.   Like I said, we had been switching off and on a good
13  three or four weeks with the cars.  I drove the Cadillac.
14  I drove the Mazda.  So we switched back and forth.  It's
15  like, when he brought it back, something else would go
16  wrong with it or it wouldn't start, or it kept cutting off
17  on me.  So I would call and tell him I was having car
18  problems, and I knew he had two cars, because he was having
19  problems with Shanell.
20  Q.   Okay.  So the bottom line is that -- well, let me just
21  ask this.  Before April 24th, when was the last time that
22  he had brought the car back and then taken it again?
23  A.   A few days before that.
24  Q.   Okay.  And was that typical that he would bring it
25  back, every few days he would bring it back to you and you

PEW - CROSS

1   would try it again, then something else would go wrong, and
2   then he would come and get it again?
3   A.    Yes.  It was like every time I would put gas in his
4   car, something went wrong with my car, and he had to come
5   back and get it again.
6   Q.    Okay.  Did he charge you for all this?
7   A.    No, he doesn't charge me.
8   Q.    All right.  So was this anything unusual that he
9   brought this car back at this time, or was this typical of
10  how things had been going on for the last few weeks or even
11  longer than that?
12  A.    It was typical.  I think I did ask him why was he
13  taking the car, but, yes, it was typical.  He was there a
14  lot.  He would come and see me two to three days a week
15  when he wasn't working.
16  Q.    When he maybe had some extra time to tinker with the
17  car?
18  A.    Yes.  He would come out.
19  Q.    Where was he working during that time?
20  A.    I don't know.  His job took him away, so he would go
21  on trips a lot.  He would be gone sometimes for a week,
22  three or four days in a week, and I wouldn't see him in
23  that period.  So, when he came back in town, then he would
24  stop by and see me.
25  Q.    Then maybe borrow your car or help you fix stuff up?

PEW - CROSS

1   Did he also help you fix stuff up around the house, that

2   kind of stuff?

3   A.    Yes.  He helped fix everything.

4   Q.    All right.  Okay.  So he brought -- when he brought

5   the car back on this date, was it the 24th that he brought

6   the car back, or could it have been the 23rd?

7   A.    I can't remember the exact day.  I can't recall the

8   exact day, the date.

9   Q.    Okay.  But, in any event, did some day -- the day or

10  two or some period, a short period of time later, you heard

11  that this car was being sought by the police or --

12  A.    Right.

13  Q.    And that's when you contacted the police?

14  A.    I received a phone call at work.

15  Q.    Do you know where Walter was staying at the time, with

16  whom he was staying?

17  A.    I know him and Shanell was having problems.  He had

18  been with Shanell until they was having problems.

19  Q.    You mean they weren't married?

20  A.    No.

21  Q.    But they were having personal problems?

22  A.    Right.

23  Q.    Relationship problems?

24  A.    Right.

25  Q.    Did you hear about the relationship problems from her

```
1          THE COURT:  All right.  I'll sustain the
2    objection.
3    BY MR. FELSON:
4    Q.   Okay.  Were you -- you were called as chain of custody
5    witness.  But you, in fact, unloaded the gun, these guns,
6    right?  I mean, you had more to do with this than just
7    taking the gun from one place to another; isn't that right?
8    A.   Part of the -- it's part of taking control of the
9    evidence, yes, sir.
10   Q.   All right.  Now, I forgot my last question.  Okay.
11   When you were done with the gun, I mean, where did you take
12   it?
13   A.   To the Hamilton police property room.
14   Q.   And that was after unloading it.  And I guess what
15   else did you do?  Did you test fire it, anything like that?
16   A.   No.  I put the evidence tag that you see on it, the
17   yellow tag, put it on with a wire fixture, and I did not
18   test fire it.  I bagged the shells separately, and I took
19   it to the property room.
20   Q.   Okay.  What is a Mossberg?
21   A.   As far as I know, it's a brand name of a shotgun.
22   Q.   Okay.
23   A.   Or not just shotgun, it's a manufacturer.
24   Q.   Is there a brand name on this shotgun?
25   A.   I believe so.
```

CIFUENTES - CROSS

| | | |
|---|---|---|
| 1 | Q. | What is it? |
| 2 | A. | I believe it's Mossberg. |
| 3 | Q. | Okay. |

4   A.   This is a Mossberg 12-gauge pump action shotgun.

5   Q.   Okay.  And the shells, does a Mossberg -- can a

6   Mossberg use any shell, or does it have to be a Mossberg

7   shell?

8   A.   I believe, if it's a 12-gauge shell, it can be fired

9   from it.

10   Q.   Okay.  So a lot of different companies make these

11   shells?

12   A.   Yes, sir.

13            MR. FELSON:  All right.  Thank you.  That's all I

14   have.

15            THE COURT:  Mr. Andrews or Mr. Pugh?

16            DEFENDANT W. PUGH:  Mr. Andrews.

17                      CROSS-EXAMINATION

18   BY MR. ANDREWS:

19   Q.   Officer, presumably, all the items that you found

20   belonged to either Tyreese Pugh or Walter Pugh, correct?

21   A.   Yes.

22   Q.   And that included two cell phones, correct?

23   A.   I have one cell phone, and I have one walkie-talkie.

24   Q.   Was there an Air Touch cell phone that was also found?

25   A.   It's found in this case.  I believe it's Air Touch.