1                    UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF OHIO    2    PM 2:00

3                         WESTERN DIVISION
                            - - -

4

   UNITED STATES OF AMERICA,    :   CRIMINAL ACTION CR-1-02-054
5                               :
            Plaintiff,          :   Cincinnati, Ohio
6                               :   Friday, September 6, 2002
      -vs-                      :
7                               :
   WALTER PUGH, JR, and         :   Day 4 of jury trial
8  TYREESE PUGH,                :
                                :
9          Defendants.          :   9:00 a.m.

10                            - - -

11                          VOLUME IV

12                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE,
13                          AND JURY

14                            - - -

15 For the Plaintiff:   Wende Cross, Esq.
                        Amul Thapar, Esq.
16                      Asst. U.S. Attorney
                        Atrium II, Suite 400
17                      221 East Fourth Street
                        Cincinnati, Ohio  45202
18
   For the Defendant:   Pro Se
19 (Walter Pugh, Jr.)

                        J. Robert Andrews, Esq.
20 (Legal advisor)      Schuh & Goldberg
                        2662 Madison Road
21                      Cincinnati, Ohio  45208

22  (Tyreese Pugh)      Edward J. Felson, Esq.
                        Felson & Felson
23                      CBLD Center, Suite 1650
                        36 East Seventh Street
24                      Cincinnati, Ohio  45202.
   Law Clerk:  Mike Rich
25 Courtroom Deputy:  Steve Snyder
   Court Reporter:  Betty Schwab

```
 1                        I N D E X

 2    GOVERNMENT WITNESSES:   DIRECT    CROSS     RD      RC      FD

 3    SHANELL HOLSTON
         (Testimony filed as Doc. 60)
 4
      GWEN GREGORY
 5       (by Ms. Cross)        688
         (by Mr. Felson)                 699
 6       (by Mr. Andrews)                706

 7    JAMES COLWELL
         (by Mr. Thapar)       709
 8       (by Mr. Felson)                 713

 9    DEFENSE WITNESSES:

10    DONNA CAUDELL
         (by Mr. Felson)       725
11       (by Mr. Andrews)               729
         (by Ms. Cross)                 731
12
      RA-SHAY PATTERSON
13       (by Mr. Felson)       732
         (by Mr. Pugh)                  737
14       (by Ms. Cross)                 739
         (by Mr. Andrews)                         749
15
      SEQUANA THOMPSON
16       (by Mr. Felson)       750
         (by Ms. Cross)                 753
17
      EVLYN GLEATON
18       (by Mr. Pugh)         756               766
         (by Mr. Thapar)                763
19

20

21    GOVERNMENT EXHIBITS:          ADMITTED:
      No. 28                         711
22

23

24

25
```

1                         PROCEEDINGS

2               THE COURT:  Good morning to everyone.  Who is the

3       government's next witness?

4               MS. CROSS:  The United States calls Shanell

5       Holston.

6               (Witness sworn by the courtroom deputy.)

7               THE COURT:  You may proceed, Ms. Cross.

8               MS. CROSS:  Thank you Your Honor.

9               (The testimony of Shanell Holston is filed under

10      separate cover at Document No. 60.)

11                            * * *

12                         AFTER RECESS

13              (Jury not present.)

14              MR. ANDREWS:  Your Honor, could we go through

15      something with the Court right now while we're here during

16      the break?

17              My understanding from the government is they

18      intend to call, after Shanell, two additional witnesses.

19      They are a property officer who was called yesterday, just

20      to update some records, and the person that identifies the

21      gun.

22              MS. CROSS:  ATF Agent Gregory.

23              MR. ANDREWS:  ATF agent to identify the guns.

24              Mr. Felson has this ID witness, which, at this

25      point, would become more or less irrelevant, because there

1    has not been any identification testimony.  Mr. Felson is

2    fearsome of calling off his witness for fear that something

3    else is going to pop out.  Okay.  And there was some

4    question of recalling Ms. --

5              MS. CROSS:  Tettenhorst.

6              MR. ANDREWS:  -- Tettenhorst as a witness as who

7    she heard in court.  It's my understanding the government

8    does not intend to do that at this point.

9              THE COURT:  Do you want the government's

10   assurance that they won't do it?

11             MR. ANDREWS:  Personally, they have given me

12   that.

13             THE COURT:  Do you want it on the record?

14             MR. ANDREWS:  And all I'm doing is there is some

15   evidence, some questions we might have asked a bank

16   witness, okay, but it doesn't have to be her, okay,

17   unrelated to this.

18             THE COURT:  You're saying in your case?

19             MR. ANDREWS:  In our case.  And I guess all I'm

20   trying to do is lay all this out on the record so that

21   everybody is on the same page.  I don't see any

22   identification testimony coming from the government at this

23   point beyond what there already is.  I don't think ID is an

24   issue that would be properly, at this point, be argued or

25   expounded upon by an expert.  And, as to the evidence that

1    Mr. Felson seeks from the bank, there are other sources
2    other than this Jenny Tettenhorst to get those.
3                And I am, quite candidly, just -- I don't want
4    Jenny Tettenhorst anywhere near the witness stand again if
5    humanly possible.  My client doesn't want her near that
6    witness stand.  And I am just trying to make sure that we
7    are all on the same page before we start back up.
8                And I know Mr. Felson feels that maybe he was
9    going to be hornswoggled, and, you know, I'm just trying
10   to get it all on the record so everybody knows where we're
11   at.
12               THE COURT:  Mr. Thapar, why don't you sit down?
13               Mr. Felson, you can stand up.
14               MR. FELSON:  My position is that my expert has to
15   come about -- he needs about an hour and a half to get
16   himself, maybe two hours, to get himself situated from his
17   office in Dayton, fighting the traffic, whatever that is on
18   Friday, getting here, finding his way up here, and that, if
19   I call him off now and they put on this identification
20   witness, either the one for the aural identification that
21   he's an expert in that too --
22               THE COURT:  Let me ask you this.  Well, what do
23   you want?  Do you want an assurance from the government
24   that they're not going to call anyone else in their case in
25   chief?

Case 1:02-cr-00054-DB   Document 84   Filed 07/21/2003   Page 6 of 111

1    MR. FELSON: Or else that, if they do, I'll be

2    able to get him back another day, assurance from the Court.

3    MR. THAPAR: Your Honor, as we discussed it

4    with -- and Mr. Andrews' representations were accurate.  We

5    assured Mr. Andrews and Mr. Felson that we had no intention

6    to recall Jenny Tettenhorst in our case in chief, and the

7    voice expert would be irrelevant and that, if he didn't

8    come on, we could avoid an additional two hours of

9    testimony. We didn't want to bring it before the Court,

10   because we felt we could solve it with the parties.

11   What I said was, if they bring in evidence of

12   alibi in Walter Pugh's case, alibi defense, we may then

13   bring her in rebuttal. That still has nothing to do with

14   the party -- in theory, has nothing to do with Mr. Tyreese

15   Pugh calling the expert, who is calling the expert in this

16   instance.

17   Of course, if we did that in rebuttal, I think we

18   would agree that they could then call the expert as a

19   rebuttal of the rebuttal, if that's an issue.

20   THE COURT: Right.

21   MR. THAPAR: The government would allow that to

22   occur to avoid the problem right now and possibly shorten

23   the trial by three hours.

24   THE COURT: At this point, it really is

25   irrelevant. I mean, it would make -- there has been no eye

1    witness or voice identification.

2           MR. FELSON:  I understand.

3           MR. THAPAR:  And to be fair, Mr. Felson said he

4    didn't -- he wasn't anticipating -- he said only if we call

5    her would he call him, and he also said I thought you were

6    calling her, because he wanted to ask a question about how

7    bank money was wrapped.  That's what he said.  That would

8    be beyond the scope of direct.

9           What we told him was, if he wanted to call her in

10   his case in chief, we would ask her to stay here.  But he

11   can ask that question, but that would be beyond the scope

12   of the ID of the voice of Mr. Walter Pugh.

13          MR. FELSON:  I thought they were calling her and

14   she was going to be staying here, and I have one question.

15   I thought I would save everybody a lot of time for the one

16   question.

17          MR. ANDREWS:  I then said, if he called her, I

18   would come over counsel bench and throttle him for doing

19   it.  So I think that makes my position on this as humanly

20   clear as I can.

21          THE COURT:  Mr. Felson, I would recommend to you

22   that you call your expert off.  I can't tell you to do

23   that.  I mean, that's your decision as counsel for

24   Mr. Pugh.  But what I will tell you I will do is that, if

25   the government, in rebuttal, puts on somebody and the issue

```
 1    of voice or visual identification becomes an issue, then I
 2    will allow you in surrebuttal to call your expert, and, if
 3    there is a delay because he has to come from Dayton, that's
 4    just too bad; we're going to have to wait for him.
 5              MR. FELSON:   That's fine.
 6              THE COURT:   I'll assure you that, if it becomes
 7    relevant, I'm going to allow you to have a witness like
 8    that.
 9              MR. FELSON:   Then would I also have an
10    opportunity to get one of the other bank employees to come
11    and testify about that one question?
12              THE COURT:   You can always, if it's appropriate
13    surrebuttal for your defense, you can do it.
14              MR. FELSON:   I just didn't have the opportunity
15    this morning to get a subpoena out, because I was expecting
16    something else to happen.   So that's all right.   As long as
17    I have the time to do it, I'm fine.
18              THE COURT:   All right.   There is another issue
19    that I need to bring to the attention of counsel, and first
20    I would like to clear the courtroom of anyone who's not a
21    court personnel.
22              Will all spectators please leave the courtroom?
23              Betsi, you don't need to.   Betsi, you're okay.
24              MR. FELSON:   Can my assistant stay?
25              THE COURT:   Yes.   As you know, as the junior
```

1    judge, I have the crummiest courtroom and the crummiest

2    chambers, and I'm also the only judge who doesn't have a

3    jury room upstairs on the ninth floor.  Unfortunately, our

4    jury room is across the hall from my chambers, and so the

5    jury traverses the hall.  They can't do anything but use

6    this hallway to get from the elevator to the jury room, and

7    that's also the way the prisoners are transported.

8         The marshals have done a wonderful job of trying

9    to prevent anyone from observing the defendants with

10   handcuffs on, but the marshals reported to me that, as they

11   were coming down the hall -- Chris, was it coming to the

12   courtroom or back to the courtroom?

13        DEPUTY MARSHAL RILEY:  No, Your Honor.  It was

14   while we were moving the defendant to the cell block.

15        THE COURT:  Okay.  As they were moving the

16   defendant to the cell block on the eighth floor here during

17   the break, a juror, a male juror, came out of the men's

18   room, which is halfway down the hall between my courtroom

19   and the elevators, and they were not sure if the juror saw

20   anything or not.

21        So, out of an abundance of caution, I would like

22   to call -- I'm going to call the juror in here by himself

23   and just ask him if he saw anything unusual in the hallway.

24   If he did, it's my intention to tell him -- then I will

25   inquire if he's mentioned it to anybody else on the jury,

```
 1   and, assuming he hasn't, I'll tell him not to discuss it,
 2   not even in deliberations.  And I will also give him a
 3   cautionary instruction, because the appropriate thing to do
 4   in such a circumstance, if a juror sees the defendant in
 5   handcuffs, is just to give an instruction that no inference
 6   is to be drawn from the fact that the defendant is in
 7   handcuffs.
 8               So I just want to make sure that we have done
 9   everything we need to do.  It's Juror Number 7.
10               Steve, would you ask him to come in?
11               (Juror 7 present.)
12               THE COURT:  Hi, sir.
13               JUROR NO. 7:  How you doing?
14               THE COURT:  I'm going to refer to you for the
15   record as Juror Number 7.  And -- sorry -- Counsel, could
16   we have it quiet in here, please?
17               I appreciate your being here, and I've just got a
18   quick question for you.  During the break, I know you were
19   out in the hallway.
20               JUROR NO. 7:  Yes, ma'am.
21               THE COURT:  Did you see anything unusual while
22   you were out there?
23               JUROR NO. 7:  No, ma'am.  I just went to the
24   restroom, and the deputy told me stay in the restroom,
25   because the restrooms were full in here.
```

1           THE COURT:  Got you.  Okay.  That's all I wanted

2    to know.  I appreciate your coming in.

3           JUROR NO. 7:  Okay.  Thank you.

4           THE COURT:  Thank you.

5           (Juror No. 7 leaves.)

6           THE COURT:  All right.  Problem averted.

7           Are we ready to bring back the jury?

8           MR. FELSON:  One second, Your Honor.  I was just

9    informed by my client that it was a couple days ago when

10   they thought this happened as well.  Now that they

11   understand it might be inappropriate, I don't know, Walter

12   Pugh was mentioning -- maybe the Court would want to

13   inquire of him.  He mentioned that, to me, he looked a

14   juror in the eye outside.

15          DEFENDANT W. PUGH:  When you came out with your

16   dogs, the juror was right there, a bunch of them were

17   standing in the hallway like.

18          MR. ANDREWS:  When he left the courtroom.

19          DEFENDANT W. PUGH:  Two days ago when they had

20   the door open and you was coming out with your dogs, they

21   all was standing there, right there.  I seen quite a few

22   jurors there.  I even told them.

23          MR. THAPAR:  Your Honor, if the defendant would

24   like, the United States would not object and the case law

25   supports the judge giving a cautionary instruction to all

1  of the jurors regarding this so that we avoid any possible
2  error.
3           THE COURT:  All right.  I agree.  Let me do that.
4           MR. THAPAR:  And I just ask the Court to inquire
5  whether that's what the defendants are requesting.
6           THE COURT:  What have you got there, Mr. Thapar?
7           MR. THAPAR:  Same thing you do, page 27.  It's
8  the same thing they use but a different cover on it.  They
9  probably charged the government twice for it.  Page 27.
10          THE COURT:  Is it "Juror seeing the defendant in
11 handcuffs"?
12          MR. THAPAR:  Yes.  And, just for the record, I'm
13 going to say what it is.  It's "Manual on Recurring
14 Problems in Criminal Trials," page 27, and the cases they
15 cite are DuPont v. Hall, which is a First Circuit case, 555
16 F.2d 15; United States v. Halliburton, 870 --
17          THE COURT:  Mr. Thapar, remember the court
18 reporter.  You have got to slow down for her.  You don't
19 want to upset the court reporter.
20          MR. THAPAR:  Sorry.  It's 870 F.2d 557, Ninth
21 Circuit 1989.  And then the case to the contrary -- that's
22 why I asked Your Honor to ask the defendants -- is US v.
23 Rutledge, 40 F.3d 879.  That's a Seventh Circuit case in
24 the '90s that says no instruction required where defendant
25 refused it.

1        THE COURT: All right. Do the defendants wish me
2    to give the jury a cautionary instruction?

3        MR. FELSON: For Tyreese Pugh, please read the
4    instruction.

5        DEFENDANT W. PUGH: Walter Pugh, yes.

6        THE COURT: We'll do that. We will bring the
7    jury back. I'll give them the instruction, and then we
8    will proceed with Ms. Holston's testimony.

9        Why don't we bring the jury back first? We will
10   leave the witness in the witness room. You can open the
11   room back up now to spectators, although -- wait. Let me,
12   just while we're talking about spectators, I have also got
13   a concern.

14       I know there were some more spectators in here
15   just now, and I know there's been an ongoing concern, and
16   it's on the record about possible intimidation of
17   witnesses. Is there any reason not to have some of the
18   spectators in at this point because of the witness that you
19   have got testifying?

20       MS. CROSS: No, Your Honor. But, if there are
21   any spectators that are going to testify, we would ask that
22   they stay out of the courtroom. And it's my understanding
23   that the young lady that had shorts on and the hat, I
24   believe that's Tyreese's little sister, and she will be
25   testifying.

```
1                    THE COURT:   Okay.
2                    MS. CROSS:   She's been in the court before.
3                    THE COURT:   Mr. Felson, you need to tell her she
4     can't be in the courtroom.
5                    MR. FELSON:   I just sent Francis to do that.
6                    THE COURT:   Great.   Because we do have a
7     separation of witnesses here.
8                    All right.   Let's bring the jury back in first.
9     You can let the spectators in, but I don't want the witness
10    yet.
11                   (Jury present.)
12                   THE COURT:   Ladies and gentlemen of the jury, I
13    think I mentioned to you that this is the first time I've
14    used my courtroom since it's been remodelled.   I've been on
15    the bench almost seven years.   The first eight months they
16    made me go sit in Columbus and Dayton, and the last six
17    years I have sat in Dayton and Cincinnati.   And finally we
18    have a new judge up in Dayton, so I'm here full time, but
19    I'm still the junior judge in Cincinnati.   There are three
20    other district judges that have more seniority than I do,
21    and everything goes by seniority, and so they have the good
22    courtrooms, and I have the least desirable one.   I'll put
23    it that way.
24                   All the other jury rooms are upstairs on the
25    ninth floor for the other courtrooms, and the jury just
```

1   goes right up through the courtroom up to the ninth floor,
2   so that you don't have to be in the hallways and possibly
3   have contact with the lawyers and the defendants and
4   everything, because I know that's always a little awkward
5   during the course of a trial.  So I apologize for the lack
6   of facilities we have got.
7          And, as a result of that, I know that you're all,
8   you know, in the hallway and can't avoid occasionally
9   seeing counsel and possibly the defendants.  So I just want
10  to give you an instruction, and this is just a cautionary
11  instruction, that you are to draw no inference from the
12  fact that the defendants may be in handcuffs.  That has
13  nothing whatsoever to do with your determination of their
14  innocence or guilt.  And, if that happens, I'm not saying
15  that is the fact in this case, but, if it is the fact, I
16  want you to totally disregard that fact in your
17  deliberations.
18         Anything further in that regard, counsel, before
19  we bring back the witness?
20         MR. THAPAR:  Nothing from the government, Your
21  Honor.
22         MR. FELSON:  Nothing from Tyreese Pugh.
23         DEFENDANT W. PUGH:  Nothing from Walter Pugh.
24         THE COURT:  Okay.  Let's bring back the witness
25  then.  And if I live long enough, I may get a new

```
 1   courtroom.
 2              MR. FELSON:  I believe it's my witness.
 3              THE COURT:  Yes.  You may proceed, Mr. Felson,
 4   with cross-examination.
 5              MR. FELSON:  All right.
 6              (The testimony of Shanell Holston continued.)
 7                              * * *
 8              THE COURT:  Who is the government's next witness?
 9              MS. CROSS:  United States calls Agent Gwen
10   Gregory.
11              (Witness sworn by the courtroom deputy.)
12                         GWEN GREGORY
13                       DIRECT EXAMINATION
14   BY MS. CROSS:
15   Q.   Good morning.  Will you please state your name for the
16   record and spell your last name?
17   A.   My name is Gwen Gregory, G-r-e-g-o-r-y.
18   Q.   Where and how are you employed?
19   A.   I'm a special agent with the Bureau of Alcohol,
20   Tobacco and Firearms located here in Cincinnati.
21   Q.   And how long have you been a special agent with the
22   ATF?
23   A.   It's 13 years this month.
24   Q.   And will you just summarize what your duties are as a
25   special agent of the Bureau of Alcohol, Tobacco and
```

GREGORY - DIRECT

1   Firearms?

2   A.   We enforce violations of federal firearms laws, arsons

3   and bombings.

4   Q.   Have you held any other positions with the bureau

5   other than as a special agent?

6   A.   As a special agent, I have also held an extra position

7   of an interstate nexus expert is what the title of that

8   position is.

9   Q.   Prior to becoming a special agent with the ATF, where

10  else did you work?

11  A.   Prior to ATF, I was in the United States Army for

12  three years, and prior to that I had college.

13  Q.   In your capacity as a special agent with the Bureau of

14  Alcohol, Tobacco and Firearms, approximately how many

15  firearms have you handled?

16  A.   Well, in the Interstate Nexus School that I took, we

17  handled over 5,000 firearms, and, over the course of years,

18  I would say it's thousands and thousands of firearms.

19  Q.   In the course of your duties, have you had the

20  occasion to examine firearms to determine their origin and

21  identification?

22  A.   Yes.

23  Q.   Have you received specialized training regarding

24  firearms?

25  A.   Yes, I have.

GREGORY - DIRECT

1   Q.    Will you describe that training to the members of the
2   jury?
3   A.    Sure.  When I first came on, they had what they called
4   at that time new agent training, and following that -- it's
5   a two-month school.  Following that was another school that
6   was agent training where we were specifically taught in
7   certain fields, firearm identification and things
8   associated with arsons, things associated with bombings,
9   and, following that school, then we underwent a program
10  kind of like on-the-job training sort of, where you were
11  underneath a journeyman agent where you're with them for
12  approximately one year, and then, following that, once we
13  were journeymen field agents, then we were out on our own.
14       Well, at a later date then -- I believe it was 1993 --
15  I took an additional course, which is Interstate Nexus
16  School, which taught me, by the use of looking and
17  observing and physically reviewing manuals and -- manuals
18  and the identification of the firearm itself, the origin of
19  the firearms and where they were manufactured and their
20  travel in interstate commerce.
21  Q.    Have you, yourself, conducted any training for ATF or
22  any other law enforcement personnel regarding firearms?
23  A.    Yes.  On numerous occasions in my 13 years, we end up
24  doing a lot of schooling and classes with firearms
25  identification.

GREGORY - DIRECT

| | |
|---|---|
| 1 | Q. Have you ever previously qualified or testified in |
| 2 | court as an expert witness regarding the manufacture of |
| 3 | firearms? |
| 4 | A. The interstate commerce nexus aspect of firearms, yes, |
| 5 | I have. |
| 6 | Q. On approximately how many occasions? |
| 7 | A. With grand jury and everything, I will say hundreds. |
| 8 | Q. At the state or federal level? |
| 9 | A. At both levels. |
| 10 | Q. Have you ever been refused qualification in this area? |
| 11 | A. No, I have not. |
| 12 | MS. CROSS: Your Honor, at this time I would |
| 13 | offer Special Agent Gwen Gregory as an expert in the area |
| 14 | of interstate nexus. |
| 15 | THE COURT: Any objection? |
| 16 | MR. FELSON: I'm going to object for the record. |
| 17 | THE COURT: Do you want to voir dire the witness? |
| 18 | MR. FELSON: If I could. I'm not sure you want |
| 19 | to do that within the province of the jury. |
| 20 | THE COURT: I'm satisfied we can do that in the |
| 21 | province of the jury. |
| 22 | MR. FELSON: May I do it right now then? |
| 23 | THE COURT: Yes. |
| 24 | VOIR DIRE EXAMINATION |
| 25 | BY MR. FELSON: |

GREGORY - VOIR DIRE

1    Q.    Did you review this particular weapon?  Have you -- do

2    you have experience with these particular types of weapons?

3    A.    What -- what are you referring to?

4    Q.    Exhibit 10.

5    A.    Is that the Mossberg shotgun?

6    Q.    Yes.

7    A.    Yes.

8    Q.    Okay.  And when you say that you have experience with

9    it, in other words, what, did you go to the factory to see?

10   I just don't understand exactly what your experience is.

11   A.    They actually do have an advanced course where the

12   agent goes to the factories, which I have not attended that

13   at this time, however, my experience is mostly with

14   examination of the firearm itself, the markings that are on

15   the firearm, and the knowledge about where they are

16   manufactured, each type of weapon, and when they were

17   manufactured, and I also review from several sources of

18   information the confirmation of that.

19   Q.    Okay.  And you have already reviewed this particular

20   firearm that you're asked to do investigation on today?

21              MS. CROSS:   Your Honor, I thought we were --

22              THE COURT:   This is just her qualifications.

23              MR. FELSON:   Okay.  All right.

24   BY MR. FELSON:

25   Q.    So how many of these particular Mossberg firearms have

GREGORY - VOIR DIRE

| 1 | you reviewed, have you seen?  With 5,000 different kinds of |
| 2 | guns, right, or thousands of guns -- |
| 3 | A.    No.   I have reviewed at minimum, the reference library |
| 4 | that ATF holds in ATF headquarters has a library of 5.000 |
| 5 | weapons of various manufacture and caliber and make. |
| 6 | Additional to that, I have, within the scope of |
| 7 | investigations and my title of being an interstate nexus |
| 8 | expert, I have reviewed thousands of weapons on top of |
| 9 | that.  So, in regard to Mossberg shotguns, I would say, |
| 10 | because it's a relatively common weapon, and in fact we use |
| 11 | a similar-type weapon for the Bureau of Alcohol, Tobacco |
| 12 | and Firearms, I would say I have handled a minimum of 50 to |
| 13 | 60 Mossberg shotguns. |
| 14 | Q.    Over a period of how long a time? |
| 15 | A.    Thirteen years, and then, prior to that, I was in the |
| 16 | service.  So I could have handled them during my time in |
| 17 | the service as well, because I was an investigator in the |
| 18 | service. |
| 19 | Q.    When is the first time you were qualified as an |
| 20 | expert? |
| 21 | A.    I believe it was 1993. |
| 22 | Q.    Okay.  So you have been testifying as an expert for |
| 23 | the last eight or nine years? |
| 24 | A.    Yes. |
| 25 |          MR. FELSON:  All right, Judge, I'm satisfied. |

GREGORY - VOIR DIRE

1    THE COURT:  Mr. Pugh or Mr. Andrews, do you wish
2    to voir dire this witness?
3              MR. ANDREWS:  I don't.
4              DEFENDANT W. PUGH:  No.
5              THE COURT:  All right.  Ms. Cross, what
6    specifically are you offering her as an expert in?
7              MS. CROSS:  In the area of interstate nexus,
8    identification of and origin of firearms.
9              THE COURT:  All right.  Ladies and gentlemen of
10   the jury, you're going to hear the testimony of Gwen
11   Gregory, who the Court has found to be an expert witness in
12   the field stated by Ms. Cross.
13             When I give you your instructions before you
14   retire to deliberate, I'll explain to you how you should
15   handle the testimony from a expert; however, I wanted to
16   explain to you now that an expert witness is a witness who
17   has special knowledge or experience that allows him or her
18   to give an opinion regarding a particular subject.  You're
19   not required to accept that opinion and may give it the
20   weight that you think it deserves, depending upon such
21   things as the expert's qualifications and the manner in
22   which the witness reached her conclusions.
23             You may proceed, Ms. Cross.
24             MS. CROSS:  Thank you, Your Honor.
25             DIRECT EXAMINATION (Cont.)

GREGORY - DIRECT

| | |
|---|---|
| 1 | BY MS. CROSS: |
| 2 | Q.   Special Agent, Gregory, will you explain the |
| 3 | procedures that you follow to determine the place where |
| 4 | firearms are manufactured? |
| 5 | A.   Typically, in the initial contact that I have with the |
| 6 | officer or the agent involved in the investigation, I am |
| 7 | typically provided a description of a firearm.  Sometimes I |
| 8 | am provided photographs or CD's with photographs on them or |
| 9 | disks with photographs on them, and at that time I make |
| 10 | what I consider a preliminary examination until I can |
| 11 | physically examine the firearm itself.  I prefer to handle |
| 12 | and look at the firearm when I can, you know, have it |
| 13 | physically in my custody and look at all aspects of it. |
| 14 |       After I have looked at it based on my 13 years |
| 15 | experience and the resources that I have available, I have |
| 16 | two entire book shelves that are dedicated to the |
| 17 | identification of firearms and their manufacture and their |
| 18 | history.  And I utilize the resources and my knowledge, and |
| 19 | also, in some circumstances, I contact the Bureau of |
| 20 | Alcohol, Tobacco and Firearms.  There are firearms |
| 21 | examiners that their entire job consists of dealing with |
| 22 | firearms every day of their lives practically, and they're |
| 23 | a wealth of information and knowledge. |
| 24 |       Well, based on what I review myself and the research |
| 25 | that I conduct, I make a determination on where that |

GREGORY - DIRECT

 1   firearm was manufactured based on the markings and where it
 2   had traveled in interstate commerce.
 3   Q.   Focusing on this case, did you have an occasion to
 4   examine a firearm involved in this case?
 5   A.   Yes, I did.
 6   Q.   How many?
 7   A.   I ended up examining three separate firearms.
 8   Q.   And will you tell the members of the jury the type,
 9   brands or models of these firearms that you examined?
10   A.   Well, I prefer to have them in my possession, but one
11   is a shotgun, and two are revolvers.
12            THE COURT:  Do you want them on the witness stand
13   with you?
14            MS. CROSS:  May she have Government Exhibit 10,
15   11 and 12?
16            THE COURT:  And also 11-A and 12 A.
17   A.   I just want to be accurate when I talk about them.
18   BY MS. CROSS:
19   Q.   You have before you Government Exhibit 10, 11 and 12,
20   as well as 11-A and 12-A, which have all been admitted into
21   evidence.  Focusing your attention on Government's Exhibit
22   Number 10 first of all, do you see that in front of you?
23   A.   Yes, I do.
24   Q.   Did you examine that?
25   A.   Yes, I did.

GREGORY - DIRECT

| | |
|---|---|
| 1 | Q.   And what type of weapon is that? |
| 2 | A.   There is a safety mechanism in there and no |
| 3 | ammunition, so that firearm is safe, entirely safe. |
| 4 | This is a Mossberg model 500A 12-gauge shotgun with |
| 5 | serial number L, as in Lincoln, 792549. |
| 6 | Q.   And you have examined that, correct? |
| 7 | A.   Yes. |
| 8 | Q.   Based on your examination and your research that you |
| 9 | have conducted, do you have an opinion regarding where this |
| 10 | firearm was manufactured? |
| 11 | A.   Yes.  Mossberg manufactures their firearms in |
| 12 | Connecticut, and, therefore, the firearm would have |
| 13 | traveled in interstate commerce to have come from |
| 14 | Connecticut to the State of Ohio. |
| 15 | Q.   Do you have any knowledge as to whether or not that |
| 16 | firearm has been test fired? |
| 17 | A.   Yes.  I test fired this firearm on I believe it was |
| 18 | September 4th, and this firearm functioned as designed.  It |
| 19 | is able to expel a projectile by the action of an |
| 20 | explosive. |
| 21 | Q.   Thank you.  Turning your attention now to Government |
| 22 | Exhibit Number 11 and 12, actually, have you examined both |
| 23 | of those? |
| 24 | A.   Yes. |
| 25 | Q.   And do you see 11-A and Government Exhibit 12-A? |

1   A.   Yes.

2   Q.   Will you explain to the members of the jury what you

3   have noticed about 11-A and 12-A?

4   A.   Okay.  I also test fired both of these weapons, which

5   these are -- the cylinder has been removed.  They're both

6   revolvers, for safety purposes for the ease of the jury and

7   the members of the court, they have been removed for safety

8   purposes.  And when I went to test fire each of them, as

9   you can see, they're different.  And one is listed -- one

10  was listed 11-A, and one was 12-A, and I was trying to put

11  12-A in Exhibit 12, and I was trying to put 11-A in Exhibit

12  11, and I could not, and I determined that 11-A is supposed

13  to be with Exhibit 12 and 12-A is supposed to be with

14  Exhibit 11.  So they're mixed up.

15  Q.   Mislabeled?

16  A.   They're mislabeled, correct.  But they are all in the

17  same box.

18  Q.   And when you put them in the correct, the cylinders in

19  the correct revolver, were able to work it properly?

20  A.   Yes.  They both functioned as designed.  They are both

21  able to expel a projectile also.

22          MS. CROSS:  Thank you, Special Agent Gregory.

23          No further questions, Your Honor.

24          THE COURT:  Thank you.

25          Mr. Felson, do you wish to cross-examine?

GREGORY - CROSS

| | |
|---|---|
| 1 | MR. FELSON:  Thank you. |
| 2 | CROSS-EXAMINATION |
| 3 | BY MR. FELSON: |
| 4 | Q.  Special Agent, is that how I'm to refer to you? |
| 5 | A.  That's fine. |
| 6 | Q.  Okay.  Now, you talked about you examined this Exhibit |
| 7 | 10.  Let's focus on Exhibit 10 for now.  When did you first |
| 8 | examine it personally? |
| 9 | A.  I saw photographs of it from a CD on I believe it was |
| 10 | June the 27th, and I was provided several photographs from |
| 11 | different angles and views of the firearm, and I physically |
| 12 | examined it on Monday, which I believe was September the |
| 13 | 3rd -- or Tuesday, rather. |
| 14 | Q.  And that was the first time you have actually seen the |
| 15 | weapon itself? |
| 16 | A.  Yes. |
| 17 | Q.  And it's appropriate for you to see the weapon itself |
| 18 | before you make a final determination? |
| 19 | A.  I prefer to do that, yes. |
| 20 | Q.  Why is that? |
| 21 | A.  So that I can -- so that I can ensure and physically |
| 22 | see every aspect of it, because some photographs were not |
| 23 | taken of some markings on it.  So I just like to verify |
| 24 | that it is indeed an accurate depiction of a firearm and |
| 25 | not a replica of one. |

GREGORY - CROSS

1   Q.   Okay.  How can you determine a replica?

2   A.   Due to the stampings and markings and the professional

3   aspects of the firearm itself.

4   Q.   And what about a Mossberg would be authentic as

5   opposed to replicated?  I mean, what would you look for?

6   Have you seen a replica of a Mossberg?

7   A.   No.

8   Q.   So you don't know what a replica of a Mossberg might

9   look like?

10  A.   I have seen replicas of other firearms, not

11  specifically a Mossberg, because there might not have been

12  a need to replicate the firearm because of its price.

13  Usually, it's the higher price weapons that are replicated

14  and not a simple shotgun.

15  Q.   Okay.  They're replicated and then sold for less

16  money, sort of like they do with records and other -- there

17  are other knock-offs if you will.  Would that be the common

18  term, something made in China that sort of steals a brand

19  name?

20  A.   Yes.

21  Q.   Okay.  Now, how many -- have you seen other 500A

22  Mossbergs?

23  A.   Yes.

24  Q.   This particular one?

25  A.   Model 500A?

GREGORY - CROSS

1    Q.    Yes.

2    A.    Yes.

3    Q.    How do you tell whether one is a replica or not?

4    A.    Well, for a Mossberg shotgun, due to their price,

5    there wouldn't be a need to replicate one.  But the

6    manufacturer's markings and stampings on them are

7    indicative of the typical configuration of the markings and

8    stampings of a Mossberg shotgun.

9    Q.    Okay.  Give me an example of that.

10   A.    Okay.  On the underneath side, it has the Mossberg

11   logo with an "M" in the Mossberg in a larger size and the

12   rest of the word in the smaller stamping, with also they're

13   made in U.S.A. in New Haven, Connecticut.

14   Q.    But these are just stamps.  In other words, that could

15   have been done by the replicator, couldn't it?

16   A.    Could this have?  In my opinion, this is a Mossberg

17   shotgun.

18   Q.    I understand.  But what I'm saying is that could have

19   been done by the replicators, because, as far as I

20   understand, even when they're making CDs or when they're

21   making other things, they look authentic; they do have the

22   stamps on it; is that correct?

23   A.    I don't know about CDs.

24   Q.    Okay.  But I'm talking about -- you're talking about a

25   stamp that went on this Mossberg gun, and you're saying it

GREGORY - CROSS

1   looks like the one from the factory; isn't that right?

2   A.    This appears, in my opinion, to be a factory-made

3   Mossberg shotgun.

4   Q.    Right.  But you didn't take this to the factory, did

5   you?

6   A.    No, I did not.

7   Q.    How many factories are there for Mossberg?

8   A.    I don't know the answer to that question.

9   Q.    Do you have the location of all the different

10  factories, if there are more than one factory?

11  A.    I know that they went from New Haven to North Haven,

12  but I don't know how many factories they have.

13  Q.    How long has Mossberg been a company in business?

14  A.    A very long time, but I'm not sure specifically how

15  many years.

16  Q.    Could it be 100 years?

17  A.    It could be.

18  Q.    Do you know if they have been bought out by another

19  rifle company?

20  A.    I believe that they took over some of the Smith and

21  Wesson shotguns.

22  Q.    Okay.  Do you know where -- is it possible some of the

23  parts were made by Smith and Wesson?

24  A.    They took over the manufacture of it.

25  Q.    So the parts were made by Smith and Wesson?

GREGORY - CROSS

```
1    A.    That's not what I'm saying.

2    Q.    I just want to understand.

3              MS. CROSS:  Your Honor, I'm just going to object

4    to relevance.

5              THE COURT:  What's the relevance?

6              MR. FELSON:  They're making statements that this

7    particular gun was made in Connecticut, therefore

8    satisfying this requirement of interstate commerce.  And

9    I'm trying to attack that statement.

10             MS. CROSS:  With the parts, Your Honor?  She's

11   already testified that this is a genuine Mossberg.  It was

12   made in Connecticut.  And he's asking about parts?  I just

13   object.

14             THE COURT:  Are you saying that, if some of the

15   individual parts were not made in Connecticut, that that

16   defeats the statute?  Is that your theory?

17             MR. FELSON:  No, Your Honor.  I'm saying that

18   this particular weapon may not have been made in

19   Connecticut.  And, in other words, I'm trying to zero in on

20   where the gun may have been made.

21             THE COURT:  All right.  I'll give you -- I'll let

22   you follow this line of questioning a little further, but

23   not much.

24             MR. FELSON:  All right.

25   BY MR. FELSON:
```

GREGORY - CROSS

| | |
|---|---|
| 1 | Q.    Okay.  Smith and Wesson bought the company, correct? |
| 2 | Smith and Wesson took over.  Put it in your words. |
| 3 | A.    It's my understanding that Mossberg took this style |
| 4 | firearm and started making it from Smith and Wesson, which |
| 5 | is manufactured -- Smith and Wesson is Springfield, |
| 6 | Illinois -- or Springfield, Massachusetts, and it would |
| 7 | have traveled in interstate commerce had Smith and Wesson |
| 8 | manufactured it also. |
| 9 | Q.    But you don't know where all the Smith and Wesson |
| 10 | Company's manufacturers are either, do you? |
| 11 | A.    Springfield, Massachusetts. |
| 12 | Q.    Any other ones? |
| 13 | A.    I'm not entirely sure if they have other ones outside |
| 14 | of that, but I know that neither Smith and Wesson nor |
| 15 | Mossberg manufacture any firearms in the State of Ohio. |
| 16 | Q.    Well, do you know whether or not this might, this |
| 17 | particular gun, might have been manufactured by another |
| 18 | manufacturer and then put the Mossberg name on it? |
| 19 | A.    I wouldn't think that that would be the case in this |
| 20 | situation.  Mossberg has a very strong, staunch name and |
| 21 | reputation and title where they are very proud of their |
| 22 | reputation and where they come from and their quality |
| 23 | product. |
| 24 | Q.    Mossberg is very -- okay.  Well, you understand that |
| 25 | sometimes companies make, manufacture goods themselves, and |

1   sometimes they have other manufacturers make the goods and

2   they put their stamp on it.

3            THE COURT:  Mr. Felson, you need to ask a

4   question, not lecture the witness.  I think you have

5   covered this area thoroughly.

6            MR. FELSON:  All right.

7   BY MR. FELSON:

8   Q.   Now let's talk about the particular, the number

9   L792549.  That's the -- that's some number on that gun,

10  right?

11  A.   Would you repeat the number, please?

12  Q.   This is the number I thought you gave, L792549.

13  A.   That is correct.

14  Q.   Do you know what the "L" stands for?

15  A.   No, I do not.

16  Q.   Do you know if these numbers might indicate where this

17  gun was manufactured?

18  A.   I know that there are numbers and letters that are

19  placed on a firearm and, like, for instance with Smith and

20  Wesson, and it could be with Mossberg as well, although I

21  did not research that aspect of it, that the serial number

22  designation would fall within a time period of when the

23  firearm was manufactured.

24  Q.   How about the location for the firearms?

25  A.   It should be stamped on the receiver, frame or

GREGORY - CROSS

1   receiver, which it is stamped right here.

2   Q.   What's it say?

3   A.   It says L, as in Lincoln, 792549.

4   Q.   I thought you were going to say it's stamped where it

5   was made.  Is it stamped where it was made on the gun

6   anywhere?

7   A.   Its says made in U.S.A. North Haven, Connecticut.

8   Q.   Okay.  All right.  And then did you verify this with

9   anybody from the company?

10  A.   No, I did not.

11           MR. FELSON:  All right.  Thank you.  That's all I

12  have.

13           THE COURT:  Anything of this witness, Mr. Pugh or

14  Mr. Andrews?

15           DEFENDANT W. PUGH:  Mr. Andrews.

16           MR. ANDREWS:  Could I have Exhibit 4.1 through 4,

17  I believe it is, given to the witness?

18                     CROSS-EXAMINATION

19  BY MR. ANDREWS:

20  Q.   Have you been handed Exhibit, Government Exhibit 4.1

21  through 4, correct?

22  A.   Yes.

23  Q.   Have you seen these pictures before?

24  A.   I may have seen similar photographs as these.

25  Q.   Okay.  Can you identify any of the weapons in any of

1    those pictures as to make or model?

2    A.    As to make or model?  No, I cannot.

3    Q.    Okay.  And you cannot determine the caliber of the

4    weapons in those pictures, can you?

5    A.    No.  I would not be able to determine the caliber of

6    either of the weapons just by looking at this photograph.

7    Q.    Matter of fact, as to the long gun pictured, I believe

8    it's 4.2?

9    A.    4.1.

10   Q.    In the upper right-hand corner?

11   A.    4.1.

12   Q.    You can't determine whether or not that long gun has a

13   stock on it or not, can you, by that depiction in that

14   picture?

15   A.    His arm is in an upward angle.

16   Q.    So there is no way of telling what's behind his arm at

17   that point, is there?

18   A.    It appears to be a shotgun.

19   Q.    It appears to be a shotgun, but you don't know if

20   there is a stock, a butt on the end of that shotgun or not,

21   just because his arm is in the way, correct?

22   A.    That is correct.

23   Q.    The handgun that's displayed by the other individual,

24   which is in 4.1, and I believe it's 4.2 right below it,

25   other than it appears to be a revolver, you can't tell

1  anything in the world about that, can you?

2  A.   They both appear to be revolvers.

3  Q.   And they could -- well, beyond that, you really can't

4  tell anything; isn't that correct?

5  A.   I couldn't tell you the manufacture of them.

6  Q.   Couldn't tell the caliber, couldn't tell --

7  A.   No.  I could make an educated guess on the caliber on

8  both of them, but I couldn't tell you.

9  Q.   Certainly not as -- not to the point that you could

10  testify as to that being a Mossberg shotgun, et cetera,

11  having it in front of you seeing markings, correct?

12  A.   Correct.

13          MR. ANDREWS:  Thank you.

14          THE COURT:  Are you done, Mr. Andrews?

15          MR. ANDREWS:  I'm done.

16          THE COURT:  Do you have any redirect of this

17  witness?

18          MS. CROSS:  No, Your Honor.

19          THE COURT:  All right.  Ms. Gregory, the Court

20  appreciates very much your coming here, and you are

21  excused.

22          Does the government have any more witnesses?

23          MR. THAPAR:  Your Honor, we have one that the

24  direct will take no more than five minutes.  We are

25  recalling Officer Colwell, and it's for a very limited line

```
 1   of testimony.
 2            THE COURT:  All right.  Can you all hang in there
 3   for another few minutes?
 4                   JAMES COLWELL (Recalled)
 5                    DIRECT EXAMINATION
 6            THE COURT:  Good morning again, sir.
 7            THE WITNESS:  Good morning, Your Honor.
 8            THE COURT:  You have previously been sworn, so we
 9   don't need to swear you in again.
10                      JAMES COLWELL
11                    DIRECT EXAMINATION
12   BY MR. THAPAR:
13   Q.   Good mourning, Officer Colwell.  You previously talked
14   to this jury yesterday.  What I want to talk to you about
15   is something very specific, and that is Government's
16   Exhibit 28.  Mr. Snyder is bringing it to you now.  Could
17   you tell me what that is?
18   A.   This is the log of all the property in this case.
19   Q.   Okay.  And did you review that log?
20   A.   Yes, sir, I did.
21   Q.   Okay.  And what date did you print this out?
22   A.   I printed it out yesterday, last night.
23   Q.   So this is an up-to-date log of where all the property
24   in this case has been?
25   A.   Yes.
```

COLWELL - DIRECT

1   Q.   And are log sheets, are these types of log sheets

2   ordinarily kept by the Hamilton Police Department?

3   A.   Yes, sir.  It's all kept.  It's in a computer.

4   Q.   Okay.  And is it the duty of you and/or Officer Payne

5   to keep these log sheets?

6   A.   Yes, sir, it is.

7   Q.   And in this case, did you or Officer Payne actually

8   keep these log sheets?

9   A.   Yes, sir.

10              MR. THAPAR:  Okay.  Your Honor, at this time I

11  will offer Government's Exhibit 28 as a business record.

12              THE COURT:  Any objection?

13              MR. ANDREWS:  We'd like to see it.  Other than

14  that, I --

15              THE COURT:  You don't have copies?

16              MR. THAPAR:  Your Honor, I provided them.

17              DEFENDANT W. PUGH:  He wasn't here.

18              MR. ANDREWS:  I'm sorry.  Apparently Mr. Pugh had

19  a copy.  I'm sorry.

20              THE COURT:  Any objections, counsel?

21              MR. FELSON:  Your Honor, this goes up to 25.

22              MR. THAPAR:  Your Honor, we gave it to them this

23  morning.  I don't know --

24              THE COURT:  The Court has a copy if you want to

25  take the Court's copy.

COLWELL - DIRECT

```
 1              MR. THAPAR:  Your Honor, should I offer it again?
 2              THE COURT:  No.  I assume counsel is still
 3    reviewing it.  How much longer do you need?
 4              MR. FELSON:  I'm just trying to understand where
 5    they're pointing to.  If they could maybe focus me in on
 6    the difference between this one.
 7              THE COURT:  As I understand it, it's a new
 8    printout that this witness prepared last night.
 9              MR. FELSON:  I understand, but I thought that
10    there was a difference in the dates, that that's what they
11    are talking about.
12              (Mr. Thapar confers with Mr. Felson.)
13              MR. FELSON:  All right.  I'll be able to ask a
14    couple questions on it?
15              THE COURT:  Of course.
16              Do you object to its admission?
17              MR. FELSON:  No objection for now.  He prepared
18    it.  No objection.
19              THE COURT:  All right.  Government Exhibit Number
20    28 will be admitted.
21    BY MR. THAPAR:
22    Q.   Now I want to ask you a few specific questions.  You
23    reviewed this log sheet now, the up-to-date log sheet,
24    correct?
25    A.   Yes, sir.
```

1   Q.   Was all of the evidence in this case in the possession

2   of the Hamilton County Police Department and specifically

3   the property room since the time it was seized to the time

4   it was brought to court?

5   A.   It was in the possession of the Hamilton City Police

6   Department.

7   Q.   Hamilton City Police Department, I'm sorry.  And so

8   the answer is it was in the possession the entire time?

9   A.   Yes, sir.

10  Q.   Okay.  Specifically, I want to talk to you about the

11  three shotguns or the one shotgun and the two revolvers.

12  Were those in the possession of the Hamilton County Police

13  Department since the beginning until the time it was

14  brought to the court Tuesday?

15  A.   In the Hamilton City, yes, sir.

16  Q.   Hamilton City, I'm going to get this soon.  Now,

17  yesterday you testified that -- and I want you to look at

18  this -- evidence was removed on June 25th and you didn't

19  know if it had been returned.  Was it returned after

20  reviewing the up-to-date log sheet?

21  A.   Yes, sir.

22  Q.   Okay.  And when was it returned?

23  A.   It was returned on the same day that it was removed.

24  Q.   And why didn't yesterday's log sheet that we looked at

25  reveal that?

1  A.    The one that you had was not up to date, and the

2  property was actually returned back by Officer Payne, not

3  myself.

4  Q.    Okay.  And how come it doesn't indicate on here that

5  the evidence was brought down to trial?

6  A.    Because the property either stayed with Officer Payne

7  or myself during transport, and, once we got down here, we

8  turned it over to the court, put it in their custody.

9  Q.    And why didn't you know all of this yesterday?

10  A.    Because, like I said, Officer Payne is the one that

11  actually logged it back in, and he is the primary property

12  officer.

13           MR. THAPAR:  No further questions, Your Honor.

14           THE COURT:  Any cross-examination, Mr. Felson?

15           MR. FELSON:  Just to make sure I understand.

16                     CROSS-EXAMINATION

17  BY MR. FELSON:

18  Q.    These documents, Exhibit 28 collectively, refer to

19  which pieces of property, which evidence?

20  A.    That is all the evidence that was logged into our

21  police department.

22  Q.    Okay.  And it was all logged out on 6/25, every piece?

23  A.    I believe so, by Officer Payne.

24  Q.    And then logged back in the same day?

25  A.    Yes, sir.

COLWELL - CROSS

1   Q.   And then you have been in possession of it ever since?

2   A.   Yes, sir.

3   Q.   Until you brought it down here?

4   A.   Until we released it to the court yes, sir.

5        MR. FELSON:  All right.  Nothing further.

6        THE COURT:  Mr. Pugh or Mr. Andrews?

7        DEFENDANT W. PUGH:  No questions, ma'am.

8        THE COURT:  Officer Colwell, the Court

9   appreciates very much your coming back, and you are

10  excused.

11       I assume the government has no redirect.

12       MR. THAPAR:  No, Your Honor.  Thank you.  Sorry.

13       THE COURT:  Does the government have any more

14  witnesses?

15       MS. CROSS:  The United States has no more

16  witnesses, Your Honor.  At this time we would ask the Court

17  to take judicial notice that Butler County is in the

18  Southern District of Ohio.

19       THE COURT:  All right.  The Court will take

20  judicial notice that Butler County is located in the

21  Southern District of Ohio.  What judicial notice means is

22  that the Court is taking judicial notice of certain facts.

23  That means that you then may accept them as true, but

24  you're not required to accept them.  It's up to you to

25  decide what inferences are to be drawn from the evidence

1   and to decide what facts are established by the evidence.

2           MS. CROSS:  At this time, Your Honor, the United

3   States rests.

4           THE COURT:  All right.  Well, let's begin the

5   defense case after lunch.

6           Counsel, do you know, are we still talking about

7   the same number of witnesses we discussed last night?

8           MR. ANDREWS:  I was given several more this

9   morning by Mr. Pugh, so I'm still grappling with exactly

10  how many.

11          MR. FELSON:  But on the other hand, the expert is

12  not going to testify.  So that saves us several hours.

13          THE COURT:  All right.  Well, are you

14  anticipating we will be done with the evidence this

15  afternoon?

16          MR. ANDREWS:  I would hope so, Your Honor.

17          MR. FELSON:  Yes.

18          THE COURT:  Ladies and gentlemen, please remember

19  not to discuss the case with anyone.

20          We will stand in recess until 1:30.

21          (Jury excused from the courtroom.)

22          THE COURT:  Counsel, do you wish to make a Rule

23  29 motion?

24          MR. FELSON:  Yes, I do.

25          First, while it's fresh in any mind, the charge

1  regarding possessing the weapon with a prior felony for

2  Mr. Tyreese Pugh, that's the one I would like to address

3  first, and I think the government has to show beyond a

4  reasonable doubt all the elements of that particular crime.

5           THE COURT:  Right.  Which count is that?

6           MS. CROSS:  Count five.

7           MR. FELSON:  And so first they have got -- I'm

8  looking for the -- to show obviously that he possessed the

9  gun, and I guess that's not really appropriate for Rule 29,

10 because whether he knowingly possessed it would be a jury

11 question.

12          But, on the other hand, the last part of it is

13 they have to prove beyond a reasonable doubt it was used in

14 interstate commerce, and I understand that's what the last

15 witness was an expert and testified to.  But that was

16 this -- she didn't indicate that she was, to a reasonable

17 degree of probability, even -- not even certainty, but to a

18 reasonable degree of probability that's what her opinion

19 was based to that extent.  In other words, she had an

20 opinion, and she said she thought it was, but she didn't

21 think it was to a reasonable degree of probability.

22          THE COURT:  Mr. Felson, did we listen to the same

23 testimony?

24          MR. FELSON:  Yes.

25          THE COURT:  That witness testified that a

1   Mossberg gun, that there is no gun manufactured in the
2   State of Ohio.  So whether it was a Mossberg or a Smith and
3   Wesson, it was either made in Massachusetts or New Haven,
4   and, even if it was a replica of that, there are no guns
5   manufactured in Ohio.  So it therefore had to have traveled
6   in interstate commerce.  Further, I believe she opined that
7   it definitely was a Mossberg in her opinion.  So there is
8   certainly evidence that it traveled in interstate commerce.
9          MR. FELSON:  Okay.  Well, I thought that she
10  testified that she wasn't sure if there were other
11  factories around and that Smith and Wesson wasn't in Ohio.
12  Smith and Wesson, I think she said, was in Illinois.
13          THE COURT:  She testified there is no gun
14  manufactured in the State of Ohio.
15          MR. FELSON:  Okay.  I'm sorry, Your Honor.  I did
16  not gather that from her testimony.  There is no gun
17  manufactured at all in the State of Ohio.  Maybe that's --
18  that may be what she said.  I didn't write my notes down
19  that way.  I didn't hear her say that like that.  I thought
20  she just said she didn't know if there were other factories
21  and she didn't know where they were.  I mean, Smith and
22  Wesson wasn't in Ohio, but she didn't mention Mossberg.
23          In any event, her opinion was not based on to a
24  reasonable degree of certainty or probability at all.  So
25  if she said -- if you're in fact right that there are no

1    manufacturers in Ohio at all, even underground, even

2    replicas, then I guess that would be true.  But I didn't

3    think she really made that statement.  I would be certainly

4    eager to read her testimony back to see if she said that.

5              THE COURT:  I'm convinced she said that, and

6    that's all we need.

7              MR. FELSON:  Okay.  Now as far as --

8              THE COURT:  Mr. Thapar, do you want to be heard

9    as to that?

10             MR. THAPAR:  Just one thing, Your Honor, and I

11   think it will help with the argument.  I think the standard

12   in the Sixth Circuit is not reasonable degree of certainty

13   but the evidence, when viewed in a light most favorable to

14   the government, would a reasonable juror be able to find

15   guilt.  And so, as long as we're all operating under that

16   standard, it might make the argument easier.

17             THE COURT:  Thank you.

18             MR. FELSON:  Let's go on to the -- unless you

19   want to address one at a time.  I don't know if he's got --

20             THE COURT:  I assume he's not interested in count

21   five.  I'm referring to Mr. Walter Pugh.

22             MR. ANDREWS:  No, he's not.

23             THE COURT:  Since he's not charged in that count.

24             MR. FELSON:  Then we've got the other issue would

25   be whether or not Tyreese was involved in this robbery

and/or brandishing a weapon in the robbery.  And all I can
say is that there doesn't seem to be any testimony that
Tyreese was in the bank.  There is no evidence presented,
either scientific evidence such as any lab results of any
sort, any prints, any hairs, any fibers.  There doesn't
seem to be any eye witness.  There doesn't seem to be any
ear witness.  And what they have, I guess, if they're going
to place him in there is something that -- allegedly a
hearsay statement that Walter Pugh may have inferred about
somebody else, which is -- I guess that's the only
testimony that I saw that connected them.  That Ms. Luster
said that Walter told her about that or that she saw.  And
then she testified that I think she saw what might have
been some money in rubber bands in a hotel where she didn't
really know where she was staying and she didn't have to
use a credit card or any identification to get a room.

         And I understand the standard has to be it has to
be -- you have to look at the light -- in the light most
favorable to the plaintiff, and I understand that, but
still there is no direct evidence linking my client to any
of this, except for a hearsay statement.  So with that I'll
turn it over to my colleague.

         MR. ANDREWS:  Your Honor, at this point, there is
no, as the Court has pointed out, as Mr. Felson has pointed
out, there is no eyeball witness, so to speak, and there is

1    certainly differing opinions as to who appears in the

2    various pictures which have been demonstrated before the

3    Court, the Exhibits 1 through 4.  So there is a differing

4    opinion as to, even amongst the witnesses who have

5    testified, as to who appears in those pictures.

6              I would just state, as a cumulative nature, there

7    is not sufficient evidence for a reasonable juror to

8    convict upon what has been presented.  At this point, we

9    have questionable pictures that are of questionable value,

10   no eye witness identification, and then circumstantial

11   evidence involving statements made by the defendant and

12   statements made by people who appear to be coconspirators

13   who are casting the blame onto our clients as opposed to

14   themselves.

15             That being the case, I believe Rule 29 would be

16   appropriate at this time.  I understand the Court's ruling.

17   Thank you.

18             MR. THAPAR:  Your Honor, I'll be really brief.

19             THE COURT:  Mr. Thapar, just one quick question.

20   Which counts now are we talking about?

21             MR. THAPAR:  What I'll do is they lumped -- I

22   think it was my understanding they lumped counts one

23   through four, which were the conspiracy, the bank robbery

24   and the brandishing, and I think that makes sense to lump

25   them, because they're all the same acts.

```
 1              And I'm going to be very brief.  If the Court has
 2   questions for me, I will be happy to answer them.  But when
 3   Your Honor takes the standard into account, viewed in the
 4   light most favorable to the government, I agree there is no
 5   eye witness in the bank that says those are the men that
 6   did it, but Your Honor looks at all of the evidence in the
 7   totality, and, when doing so, you can see things like Ms.
 8   Bessie Pew identifying Mr. Walter Pugh as being her brother
 9   in that picture.  You can listen to the tape where he
10   discusses things.  You can listen to -- you can look at
11   Stephanie Luster's testimony where she points out that
12   Tyreese was in the room -- Tyreese Pugh was in the room
13   with the money, where Mr. Tyreese Pugh demonstrated to his
14   relatives how he held the shotgun, where Mr. Walter Pugh
15   discusses going into the vault and how Tyreese Pugh --
16              THE COURT:  Will you wait?  Refresh my
17   recollection where you said that Mr. Tyreese Pugh
18   demonstrated to relatives how he held the shotgun.
19              MR. THAPAR:  Stephanie Luster said that, when she
20   was in the house, I believe it was in Decatur, Georgia,
21   Tenikia was outside.  She was inside kind of being nosey,
22   kind of eavesdropping and watching.  She saw they were
23   talking about the robbery, the bank robbery.  Mr. Walter
24   Pugh was talking about going into the bank, and she said
25   that Mr. Tyreese Pugh was demonstrating how he was holding
```

1  the shotgun.  And I think she held her arms up like this.

2  And so that all of that would be sufficient for that.

3         And on count five, we basically submit and say

4  Detective Wittich found him with the gun, and Special Agent

5  Gregory testified it went through interstate commerce, and

6  they stipulated to his conviction.

7         THE COURT:  Okay.  Anything in response to that

8  before the Court rules?

9         MR. ANDREWS:  Your Honor -- go ahead.  I'm sorry.

10        MR. FELSON:  The gun, I think the gun used in the

11  robbery, first of all, I don't think was the same gun.

12  There was testimony that the gun used in the robbery had a

13  wooden stock on it from Mr. -- the bank manager, Jim

14  Connaughton.  He indicated he looked at the gun.  He was

15  fixated on the gun, and that it had a stock on it.  There

16  was nothing unusual, and it was wooden.  I tried to really

17  pin him down on that there was a wooden stock.

18        Now, somebody said -- I think one of the

19  witnesses here said that Walter sawed off this particular

20  gun well before the robbery, that this gun that was

21  presented in Exhibit 10 was sawed well before the robbery

22  when they lived together.  That was back before March.

23        THE COURT:  Mr. Felson, even if the Court accepts

24  your proposition as true that the gun he was -- that was

25  found at the time of his arrest was not the same gun that

1  was in the bank, what about all the other circumstantial

2  evidence that the government just cited?

3  MR. FELSON:  Well, there is really not much

4  against Walter.  I guess that I really --

5  THE COURT:  You're talking about Tyreese.

6  MR. FELSON:  I'm sorry.  About Tyreese.  I really

7  didn't hear -- didn't gather that she was saying that she

8  saw my client do that.  I mean, I guess we'll have to read

9  her testimony, but, even if she said that she saw Tyreese

10  Pugh demonstrate something about how to hold a shotgun, she

11  was eavesdropping.  She didn't say what they were talking

12  about.

13  THE COURT:  All right.  I think the Court has

14  enough to rule at this point.

15  MR. ANDREWS:  My client wants me to point out

16  that Ms. Luster's testimony, she never did say that she

17  ever heard any of this had anything to do with the bank

18  robbery.  It had to do with some activity, but not a bank

19  robbery.  Thank you.

20  THE COURT:  Thank you.

21  The Court finds that -- first, let me go over the

22  standards again, and it is almost exactly as Mr. Thapar

23  stated.  It's well settled that the test to be applied by a

24  trial court in determining a defendant's motion for

25  acquittal pursuant to Rule 29 of the Federal Rules of

 1    Criminal Procedure is taking the evidence and inferences

 2    most favorably to the government.  If there is evidence

 3    therefrom to conclude that a reasonable mind might fairly

 4    find guilt beyond a reasonable doubt, the issue is for the

 5    jury.  And the Sixth Circuit, the case cited for the Sixth

 6    Circuit standard is <u>United States v. Micou</u>, M-i-c-o-u, 48

 7    F.3d 1220.

 8             The Court finds that, taking the evidence and

 9    inferences most favorably to the government, a reasonable

10    mind could fairly find guilt beyond a reasonable doubt for

11    all of the factual reasons stated by Mr. Thapar, both with

12    regard to counts one through four and count five.

13    Therefore, because this is a jury issue, in this case the

14    motion is denied and the case will proceed.

15             We will reconvene at 1:30.

16             And, Mr. Felson, are you going to present

17    defense's witnesses first?  Are you doing it in the same

18    order?

19             MR. FELSON:  Could we discuss that?  Because I

20    think some of the witnesses might even overlap.

21             THE COURT:  That's fine.  Whatever.  I just want

22    to make sure that we have a continuous flow of witnesses.

23    I would like very much to get done this afternoon.

24             MR. FELSON:  We will discuss it and see who we

25    will put on first.

CAUDELL - DIRECT

```
 1              THE COURT:  Okay.  Thank you.

 2              (Luncheon recess at 12:20 p.m.)

 3                      AFTERNOON SESSION

 4              THE COURT:  The defense will call its first

 5     witness.

 6              MR. FELSON:  Yes.  We're going to call Donna

 7     Caudell, and I think she's in the witness room.  Actually,

 8     Your Honor, I apologize.  She's not here.  I'll call my

 9     next witness.  So we will call Ra-Shay Patterson.

10              Here's Ms. Caudell.

11              THE COURT:  Ms. Caudell, you come on up.  You're

12     already under oath, so we don't need to swear you in again.

13                      DONNA CAUDELL

14                    DIRECT EXAMINATION

15     BY MR. FELSON:

16     Q.   Ms. Caudell, could you just state your name once again

17     for the record?

18     A.   Donna Caudell.

19     Q.   And your employment is with whom?

20     A.   First Financial Bank.

21     Q.   You testified earlier this week, I think, right?

22     A.   Yes.

23     Q.   Okay.  Now, your position is you're involved with

24     security with the bank?

25     A.   Yes.
```

CAUDELL - DIRECT

1   Q.    Okay.  Now, do you happen to -- you're familiar with

2   how the bank packages money?

3   A.    Yes.

4   Q.    And we're talking about the bank which was robbed,

5   which is the subject of this litigation here today?

6   A.    Yes.

7   Q.    Right.  And you're aware how they package their money?

8   A.    I'm aware what the proper procedure is to document

9   money, but I cannot say as to exactly how it was packaged

10  at that time.

11  Q.    Okay.  That moment or that day?

12  A.    Yes.

13  Q.    But typically you understand how it's packaged?

14  A.    Yes.

15  Q.    And how is that?

16  A.    Normally, within the teller drawers it's packaged in

17  smaller increments.  In the vault, it's packaged in larger

18  increments which we call or term fed straps, which are

19  larger amounts.

20  Q.    What actually holds it?  Is it held together by

21  something?  Is there a certain number of bills in packages

22  separate?

23  A.    Yes.  They are held together by a paper strap

24  depicting the amount of money that would be in each

25  particular package.

CAUDELL - DIRECT

1   Q.   Okay.  For example, hundreds, how many would be in one
2   package?
3   A.   Are you speaking of in the vault or in the teller
4   station?
5   Q.   Let's try one of each.  In the vault first.
6   A.   In the vault, normally they will be anywhere from a
7   $5,000 to a $10,000 strap.
8   Q.   Okay.  And how big would that be size-wise?
9   A.   In the hundreds denomination?
10  Q.   Yes.
11  A.   It would be relatively small.
12  Q.   Half -- you don't know exactly?
13  A.   I can't.
14  Q.   How about in singles, how about the singles, how are
15  they packaged in the vault?
16  A.   In the vault they're packaged in hundred-dollar
17  increments.
18  Q.   Can you give us an approximate size?  Like that?
19  A.   Okay.
20  Q.   Okay.  How about in the teller drawer?
21  A.   Teller drawer, what denomination are you speaking of?
22  Q.   First of all, are they packaged with the same paper
23  things you talked about?
24  A.   Same paper, but except they are in smaller increments.
25  Q.   Okay.  So hundreds would be?

CAUDELL - DIRECT

1   A.    Hundreds are usually in a thousand, which is very
2   small.
3   Q.    Okay.  And tens, that's just ten bills then, right?
4   A.    Right.
5   Q.    How about one-dollar bills?
6   A.    They're normally in fifty dollars.
7   Q.    This is the way it was at the time of this robbery on
8   April 24, 2002?
9   A.    I cannot answer that, because that is normal
10  procedure, but, however, I did not see them, so I can't
11  really -- I can tell you what our policy is on that, and
12  that's what I have stated to you.  But as far as seeing the
13  bills and knowing what was in the drawers, I do not know.
14  Q.    Okay.  But typically that's what their people are
15  trained, how people are trained to package them in your
16  system?
17  A.    Typically, yes.
18  Q.    Okay.  And you have no reason to believe they were
19  packaged any other way, do you?
20  A.    I can't answer that.
21  Q.    All right.  Well, who's in charge of the packaging?
22  Who does that?  Who puts that together?
23  A.    Sometimes the head teller, sometimes the tellers
24  themselves make a decision on how they want things
25  packaged, whatever is the most convenient or whatever

CAUDELL - CROSS

1   they're most used to using, whatever type of increment

2   they're used to using.  It can vary.  It's everybody's own

3   discretion pretty much so, what they're comfortable with.

4   Q.   So is it safe to say the bills, when they're packaged,

5   it might not be in that type of paper, but it would be

6   marked as to how much money is in the package?

7   A.   Typically, unless you have like mutilated money, and

8   that has no bearing on it, or two's have no bearing on that

9   as well.

10  Q.   But you want to know how much money is in each

11  package.  I would imagine that would be important to you

12  for easy counting and easy accounting?

13  A.   Yes.

14              MR. FELSON:  Okay.  That's all I have.  Thank you

15  very much.

16              THE COURT:  What are we going to do for the order

17  of examination?  You want to go next, Mr. Andrews?

18              MR. ANDREWS:  Yes.

19                        CROSS-EXAMINATION

20  BY MR. ANDREWS:

21  Q.   You do not use rubber bands around your money in the

22  bank?

23  A.   I have seen them, but I cannot testify as to if a

24  teller uses them or not in that particular office.

25  Q.   Okay.  It would be out of the ordinary?

CAUDELL - CROSS

1   A.    We have our policy and procedures in play, but,

2   however, tellers can --

3   Q.    Can vary?

4   A.    Can do that, yes.

5   Q.    As to the -- you counted the money, or you did the

6   audit to determine the money that was missing?

7   A.    Myself and another person.

8   Q.    Right.  And you did that on the cash drawers?

9   A.    Yes.

10  Q.    And you did that on the vault?

11  A.    Yes.

12  Q.    Whoever robbed this bank did not get all the money in

13  the vault?

14  A.    I can't recall specifically.

15  Q.    Okay.

16  A.    I don't have the sheets.

17  Q.    There was money left, I believe.  Looking at your

18  audit sheet, and I'm talking from my memory, this bank was

19  allowed to have up to 210,000.  There was 153,000 missing.

20  So it would seem like there would probably seem like there

21  was 60,000 or so in there?

22  A.    I would need to look at the sheet to give you a

23  correct answer.  May I?

24          MR. ANDREWS:  Government Exhibit 8.

25  Q.    Can you tell me, looking at your audit sheet, if there

CAUDELL - CROSS

```
 1   was money left --
 2   A.    Yes, there was.
 3   Q.    -- in the bank?  Okay.  And the money that was left
 4   was packaged how, if you recall?  If you recall.
 5   A.    I don't recall exactly, no.
 6   Q.    Okay.  So all you can testify to is your -- the
 7   general way that it is to be done, the policy of the bank
 8   as to how it is to be done?
 9   A.    Normal policy and procedure, yes.
10          MR. ANDREWS:  Okay.  I don't think I have
11   anything further.
12          THE COURT:  Do you have any cross-examination of
13   this witness?
14          MS. CROSS:  Briefly, Your Honor.
15                  CROSS-EXAMINATION
16   BY MS. CROSS:
17   Q.    Ms. Caudell, typically, all the money that is packaged
18   in straps are made out of the same type of material,
19   correct?
20   A.    Typically, they are paper straps.
21   Q.    And are they easily discardable?
22   A.    Yes.
23          MS. CROSS:  Thank you.  No further questions.
24          THE COURT:  Would you move the mike to the other
25   side?  Your voice carries pretty well, but it just helps.
```

PATTERSON - DIRECT

1         Any redirect examination?

2              MR. FELSON:  No.

3              THE COURT:  Ms. Caudell, thank you again for

4    coming here, and you are finally excused.

5              You may call your next witness.

6              MR. FELSON:  Ra-Shay Patterson.

7              (Witness sworn by the courtroom deputy.)

8                        RA-SHAY PATTERSON

9                        DIRECT EXAMINATION

10   BY MR. FELSON:

11   Q.   Please state your name.

12   A.   My name is Ra-Shay Patterson.

13   Q.   Spell that for us.

14   A.   R-a hyphen S-h-a-y. Patterson with two t's,

15   P-a-t-t-e-r-s-o-n.

16   Q.   And, Ra-Shay, what's your address?

17   A.   4562 Wintree Drive, Apartment 155, Hamilton, Ohio,

18   45011.

19   Q.   And you know Tyreese Pugh?

20   A.   Yes, I do.

21   Q.   What's his relationship to you?

22   A.   He's -- I consider him my fiance, because we are about

23   to get married.

24   Q.   And do you have a child with him?

25   A.   Yes, I do.

PATTERSON - DIRECT

1    Q.    How old is the child?

2    A.    He'll be three at the end of this month.

3    Q.    Now, you also know Tyreese's father?

4    A.    Yes, I do.

5    Q.    This is Tyreese to my right here?

6    A.    Yes.

7    Q.    Okay.  That's his father, Walter?

8    A.    Um-hum.

9    Q.    Now, do you also know someone named Stephanie Luster?

10   A.    Yes, I do.

11   Q.    How do you know Stephanie?

12   A.    I know her from before she started dating Mr. Pugh.

13   Q.    Okay.  And she was dating Mr. Pugh, what, fairly

14   recently?

15   A.    Yes.

16   Q.    And I guess during the course of -- you had a

17   relationship with him first?

18   A.    Yes.

19   Q.    And then something, whatever, happened personally, and

20   he was dating her for a while?

21   A.    Right.  We was going through some problems, yes.

22   Q.    And we're talking about Tyreese now, right?

23   A.    Right.

24   Q.    You never dated Walter, for clarification?

25   A.    (Laughing.)

PATTERSON - DIRECT

1   Q.   And how would you describe your relationship with

2   Ms. Luster, with Stephanie?

3   A.   We don't have one.

4   Q.   Does that mean it's not a good one?

5   A.   Not a very good one.

6   Q.   And is the reason -- I guess the obvious reason would

7   be that it's Tyreese?

8   A.   Correct.

9   Q.   Is she not happy with the fact that you're with

10  Tyreese?

11  A.   No, she's not.

12  Q.   When did you start getting back with Tyreese as far as

13  being his fiance and that type of thing?

14  A.   In April.

15  Q.   April of this year?

16  A.   Yes, in the beginning.

17  Q.   Okay.  And have you had any incidents or we'll say

18  anything unusual occur between you and Ms. Luster in the

19  past few months, around April or that time frame?

20  A.   To be truthful, through their whole relationship.

21  Q.   You have had problems?

22  A.   Um-hum.

23  Q.   Just tell the jury, give an example of the problems

24  that you have had.

25  A.   One exactly is he had got in my vehicle, and we was

PATTERSON - DIRECT

1   talking about our son, and she had called because she knew

2   he was in the car with me, and she said, "Why are you in

3   the car with that bitch?"  And she kept saying that.  And I

4   was going to say something, but he didn't want me to, so I

5   just left it alone.

6   Q.   You heard her talking on the phone?

7   A.   Yes.

8   Q.   Was that on the cell phone?

9   A.   Yes, his cell phone.

10  Q.   You actually heard her voice?

11  A.   Yes.

12  Q.   Was she speaking loudly?

13  A.   Yes.  It was loud where there wasn't no music on; you

14  could just hear her screaming at him.

15  Q.   All right.  So have you had any physical

16  confrontations with her?

17  A.   Almost.

18  Q.   You mean -- what do you mean "almost"?  Did it almost

19  come to fisticuffs?  Did something stop you?

20  A.   Well, he stopped me.

21  Q.   Okay.  And I take it that it was, what, some incident

22  on the street or in somebody's home or --

23  A.   Well, she also had came out to my house one time where

24  he had dropped my son off, and she had came up to me

25  confronting me about some stuff that happened or whatever,

PATTERSON - DIRECT

1   but she didn't want --

2   Q.   She didn't want to be part of this?

3   A.   No.

4   Q.   When you say she confronted you, did it appear it was

5   going to be physical but it never got that far?

6   A.   It could have been, but the kids was outside.  So I

7   didn't want to disrespect the children.

8   Q.   All right.  As far as whether she likes you on a scale

9   of one to ten, ten being that she likes you a lot and one

10  being she doesn't like you a lot, where would it be?

11  A.   One.

12  Q.   Okay.  And now that you're back with Tyreese now, and

13  you have been back with him since when?

14  A.   Since April.

15  Q.   Okay.  And since that time, has she been hanging

16  around?  Have you had some confrontations with her,

17  discussions with her?

18  A.   What you mean?

19  Q.   Since April?

20  A.   Oh, I mean, it could be -- really, it could be every

21  day.  I mean, she could just look at me and then turn to a

22  party or same party that I be knowing and be like "that

23  bitch this" or "that bitch that" or something.

24  Q.   So, do you think she's -- that she likes Tyreese now?

25  You think she's still trying to get back with him, or you

PATTERSON - CROSS

1   think she's angry at him?

2   A.   She's very angry right now.

3          MR. FELSON:  All right.  That's all I have.

4   Thank you.

5          THE COURT:  Mr. Andrews, do you have any

6   questions of this witness?

7          DEFENDANT W. PUGH:  Mr. Pugh.

8          THE COURT:  Yes.  Okay, Mr. Pugh.

9                    CROSS-EXAMINATION

10  BY DEFENDANT W. PUGH:

11  Q.   Ra-Shay, how you doing?

12  A.   Fine.

13  Q.   Ms. Holston testified in this court yesterday.  Can

14  you recall or do you recall any time during the month of

15  April when me and Ms. Holston separated, any incidents that

16  occurred?

17  A.   Yes.

18  Q.   To show that she have some kind of animosity towards

19  me, can you explain to the Court, please, one of the

20  incidents?

21  A.   Well, this one incident, the last where he broke --

22          MS. CROSS:  Objection, Your Honor.  I'm just

23  objecting to any hearsay that she may have.  Only what she

24  has personally seen.

25          THE COURT:  Do you understand what hearsay is?

PATTERSON - CROSS

| 1 | THE WITNESS: Um-hum. And I was just going to |
| 2 | tell her a incident where I was present. |
| 3 | THE COURT: Okay. |
| 4 | A.    Yes.  It was a incident in April where I was present. |
| 5 | He was trying to leave her, and she wasn't -- she didn't |
| 6 | want him to leave.  I personally went over there myself to |
| 7 | get a set of keys to his car, and she was not going to give |
| 8 | the keys up.  So we left.  Well, I left.  Well, I was with |
| 9 | two other parties, but I left and came back, tried to, you |
| 10 | know, tried to do it again or whatever.  She, with the |
| 11 | other party, she pulled out a knife on, which was my |
| 12 | cousin, she pulled out a knife on her, threatened her.  If |
| 13 | she didn't tell where Mr. Pugh was, they was going to have |
| 14 | a little confrontation. |
| 15 | I done tried to go get his clothes from this woman's |
| 16 | house.  She would not give it up.  It was one time the same |
| 17 | day where, when she called the police and said there was |
| 18 | guns and drugs in the car, they investigated it and it |
| 19 | wasn't nothing. |
| 20 | I can keep going on a lot of incidents personally that |
| 21 | I seen.  And she done did some of this stuff in front of my |
| 22 | son, Tyreese, Jr. |
| 23 | DEFENDANT W. PUGH: Thank you.  That will be all |
| 24 | from the defense table. |
| 25 | THE COURT: I'm sorry?  Okay.  You're done, |

PATTERSON - CROSS

1    Mr. Pugh?

2              DEFENDANT W. PUGH:  Yes, ma'am.

3              THE COURT:  Any cross-examination, of this

4    witness?

5              MS. CROSS:  Yes, Your Honor.  Thank you.

6                    CROSS-EXAMINATION

7    BY MS. CROSS:

8    Q.   Ms. Patterson, my name is Wende Cross.  I'm an

9    assistant United States attorney with the United States

10   government.  You have seen me the last couple of days,

11   correct?

12   A.   Correct.

13   Q.   And I have seen you?

14   A.   Um-hum.

15   Q.   We haven't talked at all?

16   A.   Right.

17   Q.   And you, in fact, were sitting in the courtroom for a

18   couple of days in the beginning of the trial, correct?

19   A.   Correct.

20   Q.   When did you know that you were going to be a witness?

21   A.   I didn't.

22   Q.   When did you find out?

23   A.   Sometime yesterday.

24   Q.   Okay.  You said that you and Tyreese are engaged?

25   A.   Yes.  We were, but right now he's just incarcerated

1   right now, and --

2   Q.   When did you get engaged?

3   A.   At the beginning of April when he asked me.

4   Q.   And did you know that at the beginning of April he was

5   still with Stephanie Luster?

6   A.   Yes, I did.

7   Q.   Now, your child is little Tyreese?

8   A.   Yes.

9   Q.   And Tyreese Pugh, the defendant, is his father?

10  A.   Right.

11  Q.   And the defendant Walter Pugh is his grandfather?

12  A.   Correct.

13  Q.   You don't -- you don't like Stephanie Luster, do you?

14  A.   She don't like me.  That's why I do not like her.

15  Q.   Okay.  So your answer is "yes"?

16  A.   Yes.

17  Q.   Okay.  And you all have had several disagreements,

18  correct?

19  A.   Correct.

20  Q.   Several heated disagreements?

21  A.   Correct.

22  Q.   In fact, a couple of days ago before she testified,

23  you had some type of heated disagreement with her?

24  A.   No.  I was not in the courtroom.  I came in at the

25  end.

PATTERSON - CROSS

1    Q.    I didn't say in the courtroom, ma'am.  But you did

2    have a heated --

3    A.    I didn't see her at all until she was on the stand

4    when she was going to get off, but I was the bathroom

5    changing my eight-and-a-half-month-old son.

6    Q.    Okay.  Now, you're wanting to -- do you consider

7    yourself to be an honest person?

8    A.    Yes, I do.

9    Q.    And you're telling this jury today based on your

10   honest recollection of everything, correct?

11   A.    Yes, ma'am.

12   Q.    Isn't it true that you have been convicted of theft?

13   A.    Yes, two years ago.

14   Q.    Two years ago?

15   A.    Um-hum.

16   Q.    And what else have you been convicted of?

17           MR. FELSON:  Objection.

18           MR. ANDREWS:  Objection.

19           THE COURT:  What's the basis?

20           MR. FELSON:  She is certain --

21           MR. ANDREWS:  Your Honor, I believe there is a

22   correct way to inquire.  The first we allowed to go by, but

23   obviously we don't know what fits within the parameters of

24   what could be asked.

25           THE COURT:  Ms. Cross, do you understand the

1    objection?

2              MS. CROSS:  Yes, Your Honor.

3    BY MS. CROSS:

4    Q.    You have been convicted of theft.  How many times?

5    A.    Once.

6    Q.    And when was that?

7    A.    I know it was two years ago.  I can't remember what

8    month, but it was two years ago, almost two years if it

9    ain't been two years.

10   Q.    Did that occur in Hamilton?

11   A.    No.

12   Q.    Where did that happen?

13   A.    Cincinnati.

14   Q.    Cincinnati, Ohio?

15   A.    Um-hum.

16   Q.    And have you been in any trouble since then?

17             MR. FELSON:  Objection.

18             MR. ANDREWS:  Objection.

19             MS. CROSS:  Let me ask it this way, Your Honor.

20             THE COURT:  All right.

21   BY MS. CROSS:

22   Q.    Ms. Patterson, isn't it true that you have an

23   outstanding warrant right now for your arrest?

24   A.    Um-hum, in Denver, Colorado.

25             MR. FELSON:  Objection.

PATTERSON - CROSS

| | |
|---|---|
| 1 | MR. ANDREWS:  Objection. |
| 2 | Q.    And you're eluding the police? |
| 3 | THE COURT:  Wait.  You had an objection. |
| 4 | MR. FELSON:  Objection. |
| 5 | MR. ANDREWS:  Objection.  Of course we will ask |
| 6 | for instructions to strike, and I might want to be heard |
| 7 | beyond that, certainly that much. |
| 8 | MR. FELSON:  Maybe a sidebar, Judge? |
| 9 | THE COURT:  Yes, I think so. |
| 10 | Ladies and gentlemen of the jury, I apologize, |
| 11 | but I need to confer with the attorneys outside of your |
| 12 | presence.  I'm going to ask that you go back into the jury |
| 13 | room for a few minutes. |
| 14 | (Jury excused from the courtroom.) |
| 15 | THE COURT:  Mr. Andrews, do you want to put your |
| 16 | objection more specifically on the record? |
| 17 | MR. ANDREWS:  Yes, Your Honor.  While I initially |
| 18 | did not object to the question whether or not the witness |
| 19 | had been convicted of a theft, because it does roughly fall |
| 20 | within the generally accepted way to ask the question, |
| 21 | which I understand to be:  Have you been convicted of a |
| 22 | state or federal offense for which the penalty is more than |
| 23 | one year in prison or involves a crime of dishonesty? |
| 24 | Then, if you have been so convicted, is that within the |
| 25 | last ten years?  Since that fit within that general |

1 | framework, I did not object.

2 |        However, I objected thereafter to "any other

3 | trouble," et cetera.  These don't fit into 404 or any of

4 | the other exceptions, and asking whether or not a person

5 | has an outstanding warrant is not, as far as I know,

6 | sanctioned anywhere within the rules of evidence.  It is

7 | clearly improper.

8 |        And I actually would make a motion for a mistrial

9 | at this point, this being used on a defense witness at the

10 | beginning of the defenses' case.  I'm not sure there is a

11 | way to properly handle this.  Instructions alone, after the

12 | cat's out of the bag, just will not cure this problem.  The

13 | cat's out of the bag.  You know, there is a warrant out for

14 | this woman in Denver, Colorado, she says.  I didn't know

15 | this.  I'm sure that Mr. Felson was unaware of this.  And,

16 | obviously, throwing this in front of the jury on a witness

17 | who bears heavily on the motives of one of the

18 | prosecution's witnesses and how they testified, I think,

19 | does irreparable harm to the defense.

20 |        I would move for a mistrial at this time.

21 |        THE COURT:  Mr. Felson, anything you wish to add?

22 |        MR. FELSON:  I'm just going to concur with that.

23 |        THE COURT:  I can't hear a word you're saying.

24 |        MR. FELSON:  I'm just going to concur with my

25 | colleague.  Just to make a point, these rules have been

1   around on how to ask this question, and it should have been

2   asked appropriately.  I'll leave it at that.  Thank you.

3           THE COURT:  Ms. Cross, do you want to respond to

4   both the evidentiary issue and the motion for mistrial?

5           MS. CROSS:  Your Honor, first of all, my question

6   is covered by Rule 608, Subsection B, of the Federal Rules

7   of Evidence.  It talks about specific instances of conduct

8   of a witness for purposes of attacking her credibility and

9   going to her statements about truthfulness.  And it says

10  that basically specific instances of conduct of the witness

11  for purpose of attacking or supporting the witness'

12  credibility, I can prove it up, but I cannot prove it by

13  extrinsic evidence.  I can ask her about it on

14  cross-examination, which goes to her truthfulness.

15          This woman said that she's here being honest and

16  that she considers herself to be an honest person, yet she

17  is evading police, and she knows she has an active warrant.

18  That goes to her truthfulness, as well as her credibility

19  as a witness in this case.  And I think it's covered by

20  Rule 608(b).

21          MR. ANDREWS:  Your Honor, the reason we have the

22  rules in this area is because attacking with things like

23  this is so devastating.  The fact that a person does or

24  does not have a warrant in some other jurisdiction could

25  be -- first of all, I have no idea what it's for.  Could be

1   totally and one hundred percent meaningless, as in a
2   speeding warrant.  However, we don't know.

3          The damage is done.  Do you have a warrant in
4   some other jurisdiction?  It doesn't mean a person is
5   evading.  First of all, warrants are issued prior to a
6   person being prosecuted.  They haven't been within the
7   jurisdiction of the court; therefore, the warrant's never
8   been executed.

9          You know, this is wholly and totally improper.
10  By asking a question that infers an answer that is that
11  you're lying and that you're a conniving bum by the fact
12  that there is an outstanding warrant in another
13  jurisdiction is just completely improper.

14         The only thing under the Federal Rules of
15  Evidence I know, and this goes back to my law school days
16  some 24 years ago, that you can ask is about a conviction.
17  Now, you can ask other bad acts, but it has to fit within
18  the parameters of that rule.  This doesn't.  This is asking
19  have you committed another crime that you're running from
20  the police on.  That's what she just asked.

21         THE COURT:  All right.

22         MR. ANDREWS:  You can flower it up any way you
23  want, but that's what the question is.  And very simply
24  here, the damage has been done.  I don't know any way to
25  un-ring this bell.

1          THE COURT:  All right.  I understand your point.

2          Anything further, Ms. Cross?

3          MS. CROSS:  Your Honor, first of all, I didn't

4    lead the witness, and this goes to her credibility.  So

5    far, Ms. Patterson hasn't testified to anything that's

6    relevant to the substance of this case.  All I was doing,

7    which I'm allowed to do, is attack her credibility.  And

8    the fact that she knows that she has a warrant outstanding

9    and is not trying to take care of it goes to her

10   credibility for honesty in this case.

11         THE COURT:  All right.  The Court's going to take

12   a recess for just a few moments.  I'll be back.

13         (Court in recess at 2:05 p.m.)

14                      AFTER RECESS

15         THE COURT:  Counsel, the Court is prepared to

16   rule on the objection currently pending before the Court

17   and the motion for mistrial.  The Court finds that under

18   608, Federal Rule of Evidence 608(b), the question was

19   appropriate, because the Court finds -- let me just read

20   what 608(b) states:  That specific instances of conduct to

21   attack or support credibility may not be proved by

22   extrinsic evidence except convictions; however, they may be

23   inquired into on cross-examination if probative of

24   truthfulness or untruthfulness at the Court's discretion.

25         And the Court finds that, if the witness was

1    aware that there was a warrant out for her arrest, that

2    that may certainly go to her truthfulness or

3    untruthfulness.

4            So I'm going to deny the objection, deny the

5    motion for mistrial.  But I would ask, so that we don't

6    have to keep sending the jury out, what's the rest of your

7    line of questioning going to be in regard to warrants,

8    convictions, anything of that nature, Ms. Cross?

9            MS. CROSS:  In fact, Your Honor, that was the

10   last of my questions.

11           MR. ANDREWS:  Just for the record, note our

12   objections, obviously.

13           THE COURT:  Obviously.

14           Let's bring the jury back.

15           (Jury present.)

16           THE COURT:  You may proceed, Ms. Cross.

17           MS. CROSS:  Your Honor, for the record, would the

18   Court rule on the objection so that the jury will know

19   whether or not --

20           THE COURT:  The Court denied the objection, and I

21   think the answer was already in.  Is that correct?

22           MS. CROSS:  No further questions, Your Honor.

23           THE COURT:  Any redirect examination of this

24   witness?

25           MR. ANDREWS:  Briefly, Your Honor.

PATTERSON - REDIRECT

1          REDIRECT EXAMINATION

2   BY MR. ANDREWS:

3   Q.   Ra-Shay?

4   A.   Yes.

5   Q.   You were asked a question whether or not there is an

6   outstanding warrant in Denver, Colorado?

7   A.   Yes.

8   Q.   And what county is that in Denver -- or in Colorado?

9   A.   Arapahoe County.

10  Q.   You owe a fine?

11  A.   Yes.

12  Q.   Okay.  Thank you.

13          THE COURT:  Anything further, Mr. Felson?

14          MR. FELSON:  No.

15          THE COURT:  Ms. Cross?

16          MS. CROSS:  No, Your Honor.

17          THE COURT:  Okay.  Ms. Patterson, the Court

18  appreciates your coming in, and you are excused.

19          Who is your next witness?

20          MR. FELSON:  Sequana Thompson.

21          (Witness sworn by the courtroom deputy.)

22          THE COURT:  I'm sorry.  I didn't hear your

23  answer.

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.

| 1  | SEQUANA THOMPSON |
| 2  | DIRECT EXAMINATION |
| 3  | BY MR. FELSON: |
| 4  | Q. State your name. |
| 5  | A. Sequana Thompson. |
| 6  | Q. Spell your full name for the court reporter.  Okay? |
| 7  | A. S-e-q-u-a-n-a T-h-o-m-p-s-o-n. |
| 8  | Q. And how old are you, Sequana? |
| 9  | A. Fifteen. |
| 10 | Q. What's your date of birth? |
| 11 | A. 6/19/87. |
| 12 | Q. Okay.  And where are you going to school? |
| 13 | A. Hamilton High. |
| 14 | THE COURT:  Hang on a minute, Mr. Felson. |
| 15 | Can you hear? |
| 16 | A JUROR:  It's hard to hear. |
| 17 | A. Hamilton High. |
| 18 | Q. Okay.  And you're -- what relation are you to Tyreese? |
| 19 | A. Brother. |
| 20 | Q. He's your brother? |
| 21 | A. He's my brother. |
| 22 | Q. Okay.  What's your dad's name? |
| 23 | A. Tony. |
| 24 | Q. I'm sorry? |
| 25 | A. Tony Thompson. |

THOMPSON - DIRECT

1   Q.   Okay.  What's your mom's name?

2   A.   Ruby Thompson.

3   Q.   So you share the same mother, right?

4   A.   Um-hum.

5   Q.   Okay.  You know Ms. Luster, Stephanie Luster?

6   A.   Um-hum.

7   Q.   Did you see her out there a couple days ago or the

8   last couple days?  Say "yes" or "no."  Okay?

9   A.   Yes.

10  Q.   And how do you know Stephanie?

11  A.   That's my brother's ex.

12  Q.   Ex-girlfriend you mean?

13  A.   Um-hum.

14  Q.   And how long -- well, you know how long they were

15  going out together?

16  A.   I don't know.

17  Q.   Okay.  Do you -- does your -- do you know her very

18  well, Stephanie?  Do you hang out with her at all?

19  A.   I only hung out with her because she went with my

20  brother.

21  Q.   Okay.  You did when they went together?

22  A.   Um-hum.

23  Q.   But they have been broken up for a little while now?

24  A.   Yes.

25  Q.   You know how long?

THOMPSON - DIRECT

| 1 | A. | No. |

1   A.   No.

2   Q.   Do you also know Ra-Shay Patterson?

3   A.   Um-hum.

4   Q.   Is that your brother's fiancee?

5   A.   Baby's mama.

6   Q.   Baby's mother, too?  Okay.  Do you know if they get

7   along?  Have you ever seen them interact, the two of them?

8   A.   They don't get along at all.

9   Q.   What do you mean by that?  Do they fight?  They argue?

10  A.   They argued because Stephanie done calls her a B.

11  Q.   What's a B?

12  A.   Bitch.

13  Q.   Okay.  Right.  And to her face?

14  A.   Sometimes.  They'd be like -- they be -- Ra-Shay be in

15  a car riding or something, and she look at her like

16  "bitch."

17  Q.   You heard Stephanie call her that?

18  A.   Like, twice.

19  Q.   Okay.  And so, needless to say, they don't get along

20  too well?

21  A.   Unh-unh.

22  Q.   Do you know why they won't get along?  Is it because

23  of your brother?

24          MS. CROSS:  Objection.  Speculation.

25          THE COURT:  I think it's probably sustainable.

THOMPSON - CROSS

1   But I'm going to allow her to answer, but --

2   BY MR. FELSON:

3   Q.   You think they don't like each other because they both

4   like the same guy?

5   A.   For the simple fact Ra-Shay is the baby's mama, and

6   Stephanie, she ain't -- she really ain't nothing.

7   Q.   She's not nothing.  Okay.  Have you ever seen them

8   fight or almost fight?

9   A.   Almost, but Ra-Shay walks away.

10  Q.   Okay.  All right.  That's all I have.  Thank you.

11       Wait a minute.  Wait a minute.  Hold it.  You got some

12  other people got to ask you questions.

13           THE COURT:  Mr. Andrews or Mr. Pugh, anything?

14           MR. ANDREWS:  We have no questions, Your Honor.

15           THE COURT:  Ms. Cross, do you wish to

16  cross-examine?

17                     CROSS-EXAMINATION

18  BY MS. CROSS:

19  Q.   Sequana, you said Tyreese is your brother?

20  A.   Yes, sir -- I mean yes, ma'am.

21  Q.   And --

22           THE COURT:  Could you get the microphone?

23           MS. CROSS:  I'm sorry.

24  Q.   And you love your brother, correct?

25  A.   Yes, ma'am.

1              MS. CROSS:  Thank you, for being here today.  No

2     further questions?

3              THE COURT:  Anything further?

4              MR. FELSON:  No.

5              THE COURT:  Thank you.  The Court appreciates

6     your coming here.  You are excused.

7              Who is your next witness?

8              MR. FELSON:  I'm going to rest on behalf of

9     Tyreese.

10             THE COURT:  Are you offering any exhibits?

11             MR. FELSON:  I think we have.

12             THE COURT:  The only one I have -- I'm not sure

13    if you -- I don't think you admitted it.  I think Exhibit

14    B, the statement of Stephanie Luster, I don't think you --

15             MR. FELSON:  No, I'm not.

16             THE COURT:  I don't think you moved for the

17    admission of that.  Okay.  No exhibits.

18             All right.  Mr. Pugh, Mr. Andrews, do you have

19    any witnesses?

20             MR. ANDREWS:  Yes.  We're calling Evelyn --

21             Can we have one moment?

22             (Discussion off the record among Mr. Andrews,

23    Mr. Felson and Ms. Cross.)

24             MR. ANDREWS:  Calling Evlyn Gleaton.

25             (Witness sworn by the courtroom deputy.)

1              THE COURT:  Mr. Pugh or --

2              DEFENDANT W. PUGH:  Just a minute, please.  His

3    attorney is not here.

4              THE COURT:  I'm sorry.  Where did he go?

5              DEFENDANT W. PUGH:  Who knows.

6              MR. ANDREWS:  He's contacting a witness by phone.

7              MR. THAPAR:  Defense counsel is outside on the

8    phone.

9              THE COURT:  Would you get him, please, and tell

10   him I'm waiting for him?

11             Mr. Felson, we're waiting.

12             MR. FELSON:  I apologize, Judge.  I thought I was

13   supposed to call Detective Calhoun.  That's what he gave

14   me, the number of the detective.  The FBI agent gave me the

15   number to call Detective Calhoun, and I thought he was told

16   to get down here.

17             THE COURT:  Don't you have an assistant to do

18   that?

19             MR. FELSON:  Yes, but --

20             THE COURT:  All right.  Don't leave the courtroom

21   when we're in session, please.

22             MR. FELSON:  I apologize, Judge.

23             THE COURT:  Mr. Pugh, are you ready to proceed

24   with direct examination?

25             DEFENDANT W. PUGH:  Yes, Your Honor.

1          EVLYN GLEATON

2        DIRECT EXAMINATION

3   BY DEFENDANT W. PUGH:

4   Q.   Will you please state your name and spell it for the

5   court, please?

6   A.   Evlyn, E-v-l-y-n, Gleaton, G-l-e-a-t-o-n.

7        THE COURT:  I'm sorry.  Could you give me the

8   last name again?

9        THE WITNESS:  Gleaton.

10        THE COURT:  G-l --

11        THE WITNESS:  G-l-e-a-t-o-n.

12   BY DEFENDANT W. PUGH:

13   Q.   For the record, can you tell the Court where you live

14   at?

15   A.   I live in Atlanta, Georgia.

16   Q.   How long you been living in Atlanta, Ms. Evlyn?

17   A.   All my life.  I was born and raised in Georgia.

18   Q.   Can you recall the month and year that Walter Pugh,

19   Jr. came to Atlanta of this year?

20   A.   April of 2000.

21   Q.   Yes.

22   A.   The month, April.

23        THE COURT:  Do you mean 2000 or 2002?

24        THE WITNESS:  2002.  Yes, 2002.

25   Q.   What car was he driving?

GLEATON - DIRECT

```
 1   A.   He was driving a Cadillac.

 2              THE COURT:  Can you get a little closer to the

 3   microphone there?  Thanks.

 4   A.   He was driving a Cadillac.

 5   Q.   Did he come in one car or two cars?

 6   A.   It was two cars.

 7   Q.   What was the other car; do you know?

 8   A.   Nissan, a late model car.

 9   Q.   It was a late model.  Are you sure it wasn't a newer

10   model?  A late, you said late.  We'll go with late.

11   A.   Well, late model could be a newer model car.

12   Q.   Okay.  And where was that car parked at?

13   A.   The newer model car is parked down there on -- first

14   street down from my mom.

15   Q.   Can you give the address to this here Court, please?

16   A.   1111 Crestview Drive.

17   Q.   And who stayed there?

18   A.   Tenikia Lovett.

19   Q.   And who else?

20   A.   Her kids.

21   Q.   And who else?

22   A.   Walter, Jr.

23   Q.   And who else?

24   A.   And Butter.

25   Q.   Do you remember who Butter had with him?
```

```
 1   A.    Butter had a young lady with her two kids, a boy and a
 2   girl.
 3   Q.    Ms. Luster testified in this court that we stayed at
 4   your parents' house.  Is that correct?
 5   A.    No.  It's not.
 6   Q.    How many people stay in that house, at your parents'
 7   house?
 8   A.    My three nieces, 14, 15, 16, and my mother and my
 9   father, both in their 70's, and my father work every day.
10   Q.    And when we came in those two cars, there was seven of
11   us, and she's going to say we stayed there; is that
12   correct?
13   A.    No, it's not.
14   Q.    You're not saying that Ms. Luster committed perjury by
15   stating that?
16             MR. THAPAR:  Your Honor, I'd object on two
17   grounds.  One is that it's asking for a legal conclusion,
18   which this witness isn't --
19             DEFENDANT W. PUGH:  I'll withdraw.
20             MR. THAPAR:  And, second --
21             THE COURT:  That's all right.  He's withdrawing
22   it.
23             MR. THAPAR:  I know.  On the other questions, I
24   just ask the Court to not allow leading questions on direct
25   examination of this witness.
```

GLEATON - DIRECT

1   THE COURT:  Do you understand?

2   DEFENDANT W. PUGH:  Yes.  Yes, ma'am.

3   THE COURT:  Thank you.

4   BY DEFENDANT W. PUGH:

5   Q.   In the month of May, can you explain to the Court who

6   left from that address?  I spoke with you that night on

7   leaving, towards leaving.

8   A.   Who left with you?

9   Q.   Yes, ma'am.

10  A.   Butter, yourself, and Butter's girlfriend.

11  Q.   Did you go shopping with me and Tenikia?

12  A.   Yes.  You and Tenikia met me at my mom's house, and

13  you backed the Cadillac in my mom's driveway, and I  pulled

14  down, and you and Tenikia got in the car, and we went down

15  to where I live in Stockbridge, Georgia, which we went

16  shopping at K Mart, which was going out of business.  And

17  we went to Wall Mart to drop some photos off.

18  Q.   Whatever happened to those photos?

19  A.   Well, I went looking for them for Walter Pugh, Jr.,

20  but we couldn't find them.

21  Q.   They just disappeared, didn't they?

22  A.   Yes.

23  DEFENDANT W. PUGH:  No further questions.  Oh,

24  yes, yes, I do.

25  Q.   Did you happen to see a large quantity of money on me

GLEATON - DIRECT

1   or Tenikia or my son?

2   A.   No, I did not.

3   Q.   When we purchased the clothes, what size -- did we pay

4   for it with a credit card, or did we have cash?

5   A.   Can I ask what clothes?  Only clothes you purchased at

6   that time was kids' clothes, a few items for the kids.

7   Q.   You already stated you didn't see no large quantity of

8   money.

9   A.   No.

10  Q.   What size bills did you see?

11  A.   I wasn't really right up there at the cash register

12  when it was paid for, but I never seen any large amounts of

13  money.

14  Q.   Did you see me with any guns?

15  A.   No, I did not.

16  Q.   Did I tell you anything about I done robbed a bank or

17  something to that nature?

18  A.   No.  I didn't hear that until recently.

19  Q.   Excuse me.  Did you hear anything about my son having

20  any guns?

21  A.   No.

22  Q.   Did anyone force you to come in here and make this

23  testimony?

24  A.   No.  I came on my own free will.

25  Q.   But I am your cousin, correct?

GLEATON - DIRECT

1    A.    Yes.

2    Q.    You do love me, right?

3    A.    Yes, I do.

4    Q.    But you're not lying, right?  You're telling the

5    truth?

6    A.    No, I'm not going to jail.  No.

7    Q.    It's been stated that I gave my family members some

8    money, the money from a bank that I gave to my family

9    members, that I distributed it to my family members down in

10   Georgia.  Can you testify to that?

11   A.    I'm blood.  You didn't give me any money.  I haven't

12   seen any money.

13   Q.    So you didn't hear us talking about anything that we

14   done or we done something?  Did you hear any rumors or talk

15   about us?  Did you hear me and Tyreese or Tenikia or

16   Tyreese's girlfriend, Stephanie Luster, talking about a

17   bank or anything of that nature?

18   A.    No, I did not.

19   Q.    Can you recall the date and time that we came there to

20   Atlanta?

21   A.    It was April, about the end of April.  No.  On the

22   24th, 25th, something like that.  I'm not --

23   Q.    Ms. Luster stated that we stayed in the motel two days

24   and we stayed at your parents' house for two days.

25   A.    No, that's not correct.  May I finish, Your Honor?

GLEATON - DIRECT

1          THE COURT:  Sure.

2    A.   You didn't stay at my parents' house.  I don't know

3    where you stayed from there, but you never stayed at my

4    parents' house.

5    Q.   From the motel, where did we stay?

6    A.   1111 Hillcrest.

7    Q.   And isn't it a proven fact about two months ago I told

8    you to get me something from that motel that I need for

9    this court?

10   A.   Yes, you did.  Walter, Jr. asked me to get a

11   registration which showed that he was there in Atlanta with

12   his two cars and the people that was in.  But I wasn't able

13   to get it, because I got sick and went in the hospital.

14          DEFENDANT W. PUGH:  Ms. Gleaton, thank you.

15          THE COURT:  Mr. Felson, do you have any

16   examination of this witness?

17          MR. FELSON:  No.

18          THE COURT:  Ms. Cross or Mr. Thapar, do you wish

19   to cross-examine?

20          MR. THAPAR:  Yes, Your Honor.

21          THE COURT:  Would you turn the microphone toward

22   you, Mr. Thapar?

23          MR. THAPAR:  Yes.

24                   CROSS-EXAMINATION

25   BY MR. THAPAR:

1    Q.    Ma'am, it sounds like you have a scratchy throat like

2    myself.   There's some water in front of you if you would

3    like.

4    A.    I'm fine.

5    Q.    Okay.   My name is Amul Thapar, and I'm one of the

6    prosecutors in this case.   Good afternoon.

7    A.    Good afternoon.

8    Q.    You stated or you may have stated you live at 108

9    Julie Lane, right?

10   A.    Yes.

11   Q.    That's in Atlanta?

12   A.    108 Julie Lane, Stockbridge, Georgia.

13   Q.    Stockbridge.   Okay.   Got that.   And when Walter Pugh

14   and Tyreese Pugh and Stephanie Luster and Tenikia and the

15   kids came down to Atlanta, they did not stay with you,

16   right?

17   A.    No.

18   Q.    So is it a fair assumption that you weren't with them

19   24 hours a day 7 days a week, right?

20   A.    Yes, that's a fair assumption.

21   Q.    And you -- they did stay somewhere, right?

22   A.    Yes.

23   Q.    Okay.   And you testified you didn't see any large sums

24   of money, correct?

25   A.    Right.

GLEATON - CROSS

1   Q.   You didn't go through their personal belongings, I

2   assume?

3   A.   No.

4        THE COURT:  Can you get closer to the microphone?

5   A.   No.

6   Q.   Okay.  And you didn't go through their clothing?

7   A.   No, I did not.

8   Q.   Now, you're not sure where they stayed, right?

9   A.   I know they didn't stay at 1111 Key Road, my mom's

10  house.  And 108 Julie Lane, my house, I know they didn't

11  stay there.  I know they stayed at 1111 Hillcrest.

12  Q.   Oh, okay.  They stayed at 1111 Hillcrest.  So they

13  were down there from, you said, the end of April, right?

14  A.   Yes.

15  Q.   To sometime in early May, correct?

16  A.   Yes.

17  Q.   And then you stated Walter, Butter -- who you also

18  know as Tyreese Pugh, correct?

19  A.   Yes.

20  Q.   -- and Stephanie left?

21  A.   Yes.

22  Q.   Correct.  And Ms. Luster left her kids behind,

23  correct?

24  A.   Yes, she did.

25  Q.   And Tenikia stayed behind?

GLEATON - CROSS

| 1 | A. | Yes. |
| 2 | Q. | And Tenikia's child stayed behind, correct? |
| 3 | A. | Yes. |
| 4 | Q. | Okay.  And you went to the store, you said, with |
| 5 | | Walter and Tenikia? |
| 6 | A. | Yes. |
| 7 | Q. | And they bought some children's clothing, right? |
| 8 | A. | Yes.  They picked up a couple of items, yes. |
| 9 | Q. | And, but you didn't see what they paid with, correct? |
| 10 | A. | I saw what they paid with, yes.  They paid with money. |
| 11 | Q. | They paid with money or cash? |
| 12 | A. | Cash, yes. |
| 13 | Q. | Now, have you heard about any of the testimony in this |
| 14 | | case before coming here today? |
| 15 | A. | No. |
| 16 | Q. | And so you can't tell the jury whether four witnesses |
| 17 | | or eight witnesses or one witness told the truth or lied, |
| 18 | | can you? |
| 19 | A. | No. |
| 20 | Q. | All you can say is what you know to be true, right? |
| 21 | A. | Yes. |
| 22 | Q. | Now, you said you didn't see any guns, correct? |
| 23 | A. | Correct. |
| 24 | Q. | Again, you didn't go in their trunk and start fishing |
| 25 | | around looking for anything in particular like guns, did |

GLEATON - REDIRECT

1   you?

2   A.    No.

3   Q.    And you would have no reason to search through

4   everything they brought down to see if they had guns, would

5   you?

6   A.    No, I wouldn't.

7            MR. THAPAR:   No further questions, Your Honor.

8   Thanks.

9            THE COURT:   Thank you, Mr. Thapar.

10           Anything further, Mr. Pugh?

11           DEFENDANT W. PUGH:   Yes.

12                    REDIRECT EXAMINATION

13   BY DEFENDANT W. PUGH:

14   Q.    Like you stated, you never knew -- you -- it wasn't

15   brought to your attention about what the other witnesses

16   stated in this court, correct?

17   A.    Correct.

18   Q.    And you don't know if they was telling the truth or

19   lying, right?

20   A.    Right.

21   Q.    But if an individual came to this courtroom and said

22   this here party stayed at your mama's house, is that a lie

23   or is that the truth?

24   A.    That's a lie.

25           DEFENDANT W. PUGH:   Thank you.

```
 1                  THE COURT:  Anything further, Mr. Thapar?
 2                  MR. THAPAR:  Nothing from the government, Your
 3    Honor.
 4                  THE COURT:  Okay.
 5                  DEFENDANT W. PUGH:  We're finished with the
 6    witness, ma'am.
 7                  THE COURT:  Thank you, Mr. Pugh.
 8                  Thank you very much for coming up here.  You are
 9    excused.
10                  MR. ANDREWS:  Your Honor, we're going to need a
11    couple minutes recess to secure our next witness.  We
12    thought he was available.  Turns out he is not here.  We
13    have to make a phone call and get him here.
14                  THE COURT:  Do you have someone else you can
15    call?
16                  MR. ANDREWS:  Not at this point.
17                  THE COURT:  All right.  It's early, but let's --
18    why don't we take -- then let's just take the afternoon
19    recess now.
20                  MR. ANDREWS:  Thank you.
21                  THE COURT:  We will stand in recess until ten of.
22                  (Recess at 2:30 p.m.)
23                            AFTER RECESS
24                  THE COURT:  What seems to be the problem?
25                  MR. ANDREWS:  Your Honor, part of this, I think,
```

1    is created by the fact that Mr. Pugh and I are kind of, I

2    guess, co-counseling his case at this point.  But he has

3    handed me each morning this week names of people to

4    subpoena, who I have subpoenaed and have process served

5    through Legal Beagles.

6            THE COURT:  Just tell me who have you subpoenaed

7    that you don't have.

8            MR. ANDREWS:  We don't --

9            DEFENDANT W. PUGH:  Mr. Renfro, Cortes Renfro,

10   Detective Calhoun, Jim Calhoun, Adrian Jackson, and a

11   retired detective, Nugent, N-u-g-e-n-t.

12           THE COURT:  When did you get the subpoenas out?

13           MR. ANDREWS:  The subpoenas were issued this

14   morning.  We understand Legal Beagles actually took them

15   from her somewhere in the noon hour.  We understand from

16   Legal Beagles that they have been served in Hamilton at the

17   police department.  I talked to Officer Calhoun during the

18   break.  He had not seen the subpoena and was not inclined

19   to come here without having physically received it and told

20   me candidly he was going on to football practice for a

21   middle school where he is coach.

22           THE COURT:  Let's wait a minute.  I would assume

23   the United States Attorney's Office could help with Officer

24   Calhoun.

25           MR. THAPAR:  Yes.  We wouldn't have a problem

```
 1   with that, Your Honor.  He said he hadn't received the
 2   subpoena.  We haven't talked to him.  He said he hadn't
 3   received it.  The problem is, from my perspective or our
 4   perspective, it takes about an hour in no traffic to get
 5   here from Hamilton.  Your Honor said you're recessing at
 6   4:30 today.  We can tell him right now come down
 7   immediately whether you have a subpoena or not.  If he's
 8   got to come down and it's only going to take an hour and we
 9   can get him on at four, fine.
10           We'll tell him to do whatever it takes to get
11   here by four.  He gets off work at either 2:30 or 3.  So
12   his preference was to come if -- I'm surmising, because I
13   have not talked to him.  My hunch is his preference is to
14   come if he's going to testify and not to come if he's not,
15   because he coaches a football team, I think.
16           DEFENDANT W. PUGH:  Yeah.  But, Judge, Your
17   Honor, Detective Calhoun was told, when he was going to sit
18   in here, that he was going to be a witness, the defense was
19   going to call him for a witness.  And then, as far as
20   Mr. Renfro, they said, the prosecutor said they sent him a
21   subpoena.  The prosecutor said he was out there the first
22   day, Tuesday, but the defense had not started Tuesday.  We
23   needed him today.  That's fact.
24           THE COURT:  Did anybody cancel the subpoena?
25           DEFENDANT W. PUGH:  No, ma'am.
```

1    MR. ANDREWS:  As to Mr. Renfro, that's one

2    witness I have not had any contact with.

3         THE COURT:  Whose subpoena was he here for on

4    Tuesday?

5         MR. THAPAR:  He was here for the government on

6    Tuesday.  We didn't need him.  I assumed they subpoenaed

7    him.  That's why he didn't stay.

8         THE COURT:  The government had no responsibility

9    to keep him here for you.

10        MR. ANDREWS:  No.  I'm not saying they did.  We

11   know he was available.

12        THE COURT:  All right.  It sounds like -- here's

13   what I'm going to do.  As much as I hate to wait this

14   afternoon and drag this case out, I'm going to give you the

15   rest of today -- the rest of today and the weekend to get

16   your witnesses here Monday morning.

17        MR. ANDREWS:  They will be here.

18        THE COURT:  If they're not here Monday morning,

19   then you have given up the right to call your witnesses.

20   If you need the assistance of the Marshal Service or

21   whatever to get these subpoenas served, I'll order that

22   that be done.

23        MR. ANDREWS:  Thank you.

24        THE COURT:  But we need to know that this

25   afternoon, because I need to let the Marshal's Office know

1    before the end of the day.

2              MR. ANDREWS:  I think the only real assistance we

3    need is that Detective Calhoun knows that he needs to be

4    here at nine o'clock or whatever time the Court directs

5    Monday morning.

6              THE COURT:  Yes.

7              MR. ANDREWS:  And make sure that, when the

8    subpoenas actually got to the Hamilton police force, they

9    weren't misdirected off somewhere.

10             THE COURT:  No, no.  I want the U.S. Attorney's

11   Office or the FBI to make the call to Officer Calhoun and

12   tell him the Court wants him here at 9 a.m. Monday morning.

13             MR. ANDREWS:  And we would also ask that also

14   include Officer Jackson.  Well, Nugent is a retired

15   officer.

16             MR. THAPAR:  We have no control over him.

17             THE COURT:  Are those all officers?  Can you have

18   all of them here Monday morning?

19             MR. THAPAR:  Officers Jackson and Calhoun.  The

20   retired one we have no control over.

21             DEFENDANT W. PUGH:  But he made a statement

22   within the police report.

23             THE COURT:  They can't make a retired person come

24   here.  We can make sure that a subpoena --

25             MR. ANDREWS:  We can make sure the subpoena finds

1  him.

2          THE COURT:  Yes.  If the subpoena is served on

3  him, I'm relatively certain he will comply with the

4  subpoena.  So, if you need help serving the subpoena, I'm

5  going to order the marshal's office to do that.

6          MR. ANDREWS:  Finally, Renfro, I will take

7  responsibility.

8          THE COURT:  All right.

9          MR. ANDREWS:  If I can't get him in here, he's

10  not able to be got in here.  One final thing I'd like to

11  say.

12          THE COURT:  Let me back up.  Nugent, is he the

13  retired?

14          MR. ANDREWS:  Retired officer.

15          THE COURT:  You'll let us know by 4 o'clock today

16  if you want any assistance from the marshal's office in

17  serving that subpoena.

18          MR. ANDREWS:  I may need that only on Renfro.  I

19  think the other --

20          THE COURT:  Renfro or Nugent?

21          MR. ANDREWS:  Renfro.  Nugent is the retired

22  police officer.  Renfro is a private individual.

23          THE COURT:  You can get Nugent here.

24          MR. ANDREWS:  I'm hoping through the police

25  department, if they have contact with him.

1           MR. THAPAR:  If we can contact him, we will

2    surely try to get him.

3           THE COURT:  If you would try to get us those

4    three, and then you need to let us know before 4 o'clock

5    about Renfro, if you want any help in serving that

6    subpoena.

7           MR. ANDREWS:  Absolutely.

8           THE COURT:  With regard to the charges, the

9    charge conference, I don't think we have anything too

10   different.

11          Mike, did we have one change that was agreed to?

12          MR. RICH:  Which --

13          THE COURT:  I remember you said Mr. Felson had

14   something this morning.

15          MR. RICH:  Right, which was in regard to an alibi

16   charge.

17          MR. THAPAR:  At this point, it's moot, because

18   there is no alibi that's been presented, so we wouldn't

19   have a charge on that.  And I think also now, the ones "if

20   necessary," the voice and the expert, can all be --

21          MR. FELSON:  Excuse me, Your Honor.  Let me make

22   one comment, if I may, about that before we go off the

23   record.  The alibi, it really doesn't talk about the word

24   "alibi," but it really says that he wasn't there.  In other

25   words, I understand that it's not an alibi in the sense of

1  that we're presenting evidence that he was elsewhere, but

2  we're saying he wasn't there.  It's sort of the same

3  discussion we had, and that charge goes to that.

4          MR. THAPAR:  Your Honor, if I may respond, I

5  think the presumption of innocence goes to that, and he can

6  argue he's not guilty, and therefore not there.  I don't

7  think anyone, even the United States, assumes he was there

8  at that time and didn't participate in robbing the bank.

9  Everyone agrees he was either there and robbed the bank or

10  was not there.  Alibi is I wasn't there; I was at place Y,

11  and here's what I was doing at place Y, and I'm going to

12  put on six witnesses who say, oh, yeah, he was playing

13  cards with me.

14          THE COURT:  Correct.  I would agree.

15          MR. FELSON:  I don't think we are in any

16  disagreement, but I just thought the charge that I brought

17  up, what I was requesting, fit that -- fit the scenario

18  that I'm talking about, which is he's saying he wasn't

19  there and the state must prove he was there.

20          THE COURT:  All right.  We'll take a look at that

21  and your authority for that, and I'll let you know.

22          MR. THAPAR:  Can I suggest something that I think

23  may alleviate this and the government will be fine with?

24  At some point, we talk about the indictment somewhere.  I

25  can't remember if there's a sentence in there that says the

1   defense contends that they were not present in the bank at
2   the time it was robbed.  We would not object to that
3   sentence being stuck in saying this is what they're
4   claiming.
5           MR. ANDREWS:  That's fine.
6           MR. FELSON:  I don't know.  The case law -- the
7   case that I brought in sort of addresses this very issue,
8   so --
9           THE COURT:  I understand.  It's just an issue --
10  it's just an issue -- all the instructions are, are trying
11  to advise the jury on the law.  And so, you know, what
12  Mr. Thapar just suggested may be a more logical place to
13  put it so that the jury understands the defense.
14          MR. FELSON:  I understand.
15          THE COURT:  Why don't you -- we'll take a look at
16  it and see what we think is the most logical, and, if you
17  have any other authority, let us know before this
18  afternoon, all right, with regard to alibi.
19          MR. RICH:  The only other thing --
20          THE COURT:  The charge on the impeachment?
21          MR. RICH:  Right.
22          THE COURT:  We also have one jury instruction we
23  were going to add.  It's called "Impeachment of a Witness
24  Other Than Defendant."  And this was with regard to --
25  Ms. Patterson?  Yes, Ms. Patterson.  And it reads:  You

1    have heard the testimony of Ra-Shay Patterson.  You have

2    also heard that Ms. Patterson knows of an outstanding

3    warrant for her arrest and that before this trial she was

4    convicted of a crime.  This evidence was brought to your

5    attention only as one way of helping you decide how

6    believable her testimony was.  Do not use it for any other

7    purpose.  It is not evidence of anything else.

8         MR. ANDREWS:  Your Honor, I would not have a

9    problem with that if you want to add in that she had an

10   outstanding warrant for owing a fine.

11        MR. THAPAR:  Your Honor --

12        MR. ANDREWS:  Because the implication has been

13   made that she's running terrified from the authorities for

14   an open warrant.  We're stuck with the evidence as it is.

15   You can't go to the extrinsic evidence, but the evidence in

16   the record is she owes a fine.

17        MR. THAPAR:  Your Honor, and that's the evidence

18   they put in.  We didn't feel like belaboring the point, but

19   that's not the reality of it.  Your Honor can look at the

20   record.  That's irrelevant, to what -- the point is not

21   that there is a warrant.  The point is that she hasn't

22   turned herself in regarding the warrant, and that would be

23   our point on the record.

24        THE COURT:  All right.  Let me think about what

25   we're going to do with this.  We will advise you of it on

1  Monday morning, too.

2           How long do you anticipate these witnesses

3  taking?  We're talking about four witnesses?

4           MR. ANDREWS:  Only the three police witnesses, we

5  think total for Walter to do or for me to do the direct on

6  them would be no more than an hour on all three.  As to

7  Renfro -- for everything we're indicating an hour and 45

8  minutes total, absolutely.

9           THE COURT:  Okay.  A couple hours.

10           MS. CROSS:  I can't see me adding too much more

11  to that.

12           THE COURT:  So we definitely will be done in the

13  morning.  I'm just trying to think of what I'm thinking.

14           MR. FELSON:  I don't know about the cross.

15           THE COURT:  No.  I think we will be done with

16  everything by noon regardless if we start at nine o'clock.

17  What I'm thinking of doing then is meeting with you all at

18  8:30 to do the jury charges, to finish those up so we can

19  get those made and copied.  Then we will have the

20  testimony.  I'm going to have lunch brought in for the

21  jury, so we can have a short lunch period for them, and we

22  will have the charge then right after lunch and argument

23  right after that.  So the case will still get submitted to

24  them at least Monday afternoon.

25           I'm just trying to figure out timing so I can

1    give the jury timing of when they're going to get the case.

2    We have jurors with problems, one with a doctor's

3    appointment on Monday, one fellow with a nonrefundable

4    ticket for something on Tuesday.  So we need to figure out

5    what we're going to do with the jury.

6         It may be, Steve, you want to go back and talk to

7    them at this point and see what the juror with the doctor's

8    appointment on Monday morning, what she wants to do?  I

9    would be willing to excuse her and allow on alternate to

10    take her place if she -- you know, since the trial has gone

11    that long.  I think -- let's see.

12         If testimony goes until noon, we bring in lunch,

13    we start at one with the charge, the case would get to them

14    right about four o'clock.  I guess the other question to

15    ask them is if they want to stay at all Monday later, if

16    they want to work later Monday, or they think they would

17    want to go over to Tuesday to deliberate.  That's the other

18    possibility.

19         Bring up all these possibilities.  What does she

20    want to do about Monday?  Do they want to stay a little

21    later Monday to deliberate?  And what does the gentleman

22    want to do whose got the plane ticket for Tuesday?  And if

23    anybody else has any Tuesday problems.

24         Counsel, while we're waiting, my law clerk,

25    Mr. Rich, has a question on one more jury charge.

1          MR. RICH:  Yes.  We discovered there was a

2     "Testimony of an Informer" charge in the original set of

3     proposed jury instructions.  It seems to me from the

4     evidence it's not relevant.  Is that what's the opinion of

5     counsel on that?

6          THE COURT:  I think what Mr. Rich said is the

7     idea behind the charge is you're talking about a paid

8     informant.

9          MS. CROSS:  Yes.  That doesn't apply.

10         MR. ANDREWS:  There certainly is no evidence she

11     was paid.

12         MS. CROSS:  That wouldn't apply, Your Honor.

13         MR. RICH:  I just wanted to make sure that was

14     the agreement of counsel.

15         DEFENDANT W. PUGH:  It don't have to be in there.

16         THE COURT:  Is everyone in agreement that we will

17     delete that charge?

18         DEFENDANT W. PUGH:  Yes.

19         MS. CROSS:  Yes.

20         THE COURT:  Thank you.

21         Steve has found out our juror with the doctor's

22     appointment has cancelled her doctor's appointment.  So she

23     remains on the jury.  The juror who has the business trip

24     on Tuesday hasn't decided if he wants to stay or if he's

25     going to go ahead on the business trip.  We can afford to

| | |
|---|---|
| 1 | lose him, because we still have the two alternates.  So |
| 2 | he's going to take the weekend to decide.  And we have |
| 3 | advised him that we need to know Monday before they begin |
| 4 | deliberations whether he's in or out.  And he will let us |
| 5 | know on Monday. |
| 6 | The jury said that they will work until five |
| 7 | o'clock on Monday, and they may consider staying later, but |
| 8 | they won't make that determination until Monday.  They need |
| 9 | the weekend to see if they can make arrangements to be able |
| 10 | to stay later on Monday.  If not, we will just go into |
| 11 | Tuesday. |
| 12 | All right.  I think we will bring the jury back |
| 13 | then. |
| 14 | Anything further? |
| 15 | I'm going to bring the jury back, give them the |
| 16 | admonition, and let them go home. |
| 17 | MR. THAPAR:  Just for the record before you do, |
| 18 | our understanding is -- I just want to cover this one more |
| 19 | time so we don't make any mistakes on Monday.  Jackson, |
| 20 | Calhoun, and we'll try to get Nugent.  They're going to get |
| 21 | Renfro.  And everyone else is released.  In other words, |
| 22 | the bank employee, Ms. Caudell, won't have to come back |
| 23 | because she's done? |
| 24 | THE COURT:  I don't think she could testify any |
| 25 | more than she already has.  I think everybody has called |

```
 1   Ms. Caudell.  She's the all-purpose witness.  She's the
 2   utility witness here.
 3            MR. THAPAR:  I just want to be sure there is
 4   nobody you want us to retain; we can let everyone else go.
 5   There's the two we are to obtain and Mr. Renfro, and
 6   everyone else is released?
 7            THE COURT:  Is that correct?
 8            DEFENDANT W. PUGH:  Yes.
 9            MR. ANDREWS:  Yes.
10            THE COURT:  All right.  That's the understanding.
11            Bring in the jury.
12            (Jury present.)
13            THE COURT:  Ladies and gentlemen of the jury,
14   first of all, I want to thank you very much for your
15   attentiveness.  I have been watching you the last few days,
16   and I have never seen such an interested, attentive jury.
17   So I'm very appreciative about that.
18            I'm sorry to tell you that, as much as we try to
19   predict when a trial is going to be over and how long it's
20   going to take, those predictions generally prove unreliable
21   or a lot of times unreliable, because you never know how
22   long testimony is going to take and what legal issues might
23   arise that the Court has to consider out of your presence.
24            We don't have any more witnesses for this
25   afternoon, but we will have the remainder of the witnesses
```

on Monday.  I feel relatively certain that the testimony will be completed by lunch on Monday.  And what I propose to do is have a lunch brought in for you on Monday.  Steve will give you menus Monday morning, and we will provide lunch for you then so that we can take a quicker lunch period and then have the charge, the instruction on the law to you, right after lunch and the argument of counsel, so that you will be able to start deliberating sometime Monday afternoon.

I know some of you or at least one of you has some plans on Tuesday, and you need to let us know before we begin deliberations on Monday who cannot be here on Tuesday, because, at that point, I'll either excuse the alternates or I'll substitute an alternative for a regular jury member at that time.

I really appreciate again the sacrifice and contribution you're making to the justice system, and I want to remind you of the admonition I have given you before, and this will probably be the last time I have to give you this.

During this recess or any other recess, you must not discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else.  If anyone tries to talk to you about the case, please let me know about it immediately, and,

1    finally, keep an open mind until all of the evidence has

2    been received and you have heard the views of your fellow

3    jurors.

4            I wish you all a good weekend and a happy New

5    Year to some of you, and I'll see you Monday morning, 8:45

6    in the jury room upstairs.  And we promise you a real

7    gourmet lunch on Monday -- right, Steve -- at government

8    expense.

9                    COURT IN RECESS AT 3:45 P.M.

10

11

12                    C E R T I F I C A T E

13            I, Betty J. Schwab, the undersigned, do

14    hereby certify that the foregoing is a correct

15    transcript from the record of the proceedings in

16    the above-entitled matter.

17

18                    _Betty J. Schwab_
         BETTY J. SCHWAB, RPR

19                    Official Reporter

20

21

22

23

24

25