CALHOUN - CROSS

1    other relatives in the Columbus, Georgia, area.

2    Q.    Now, between the 26th and the 29th, Mr. Andrews went

3    over how you didn't take any notes, correct?

4    A.    Correct.

5    Q.    And is that -- do you take notes only when there is

6    activity on the case; in other words, something happens

7    versus when you can't find the defendants and they're

8    nowhere to be found do you not take notes?

9    A.    The second part of that statement is correct.  There

10   was no activity on the case at that time.  We had notified

11   police agencies in the areas where we thought they might

12   be.  Our officers were out looking.  Butler County was out

13   looking.  Everyone was out looking for these individuals,

14   and at that time there was no activity.  They weren't

15   located anywhere.  The cars weren't available to be found.

16   So there was really nothing to take notes of at that point

17   in time.

18   Q.    Okay.  And you remember how Mr. Andrews asked you

19   about your notes and the handwritten notes versus the

20   typewritten notes?

21   A.    Yes, sir.

22   Q.    Is it true that, when you take handwritten notes, the

23   typewritten notes are an exact replication of the

24   handwritten notes?

25   A.    In my case, yes, sir.

CALHOUN - CROSS

1   Q.   He then asked you about Officer Jackson contacting

2   you.  Is it the duty of a police officer to contact the

3   lead detective on a case when he gets information about the

4   case?

5   A.   Yes, sir.

6   Q.   In fact, if he doesn't provide you relevant or

7   irrelevant information, he could be fired, right?

8   A.   There can be misconduct charges, those type of things,

9   yes, sir.

10  Q.   Now, he described Ms. Holston as a jolted

11  ex-girlfriend.  Was it your understanding that she was

12  jolted on did the jolting?

13  A.   I don't know the circumstances surrounding it.  I

14  believe that Mr. Pugh was stepping out on her, at least

15  from her characterization.

16  Q.   All right.  Now, you remember there were a number of

17  questions about this other car in Dayton and about the

18  course of your investigation, about why you did certain

19  things you did?

20  A.   Yes, sir.

21  Q.   Okay.  Now, you have been a police officer 13 years,

22  right?

23  A.   Correct.

24  Q.   And you have investigated a number of cases either as

25  an officer or a detective, right?

CALHOUN - CROSS

1  A.    That is correct.

2  Q.    And, in an investigation, you often have more than one

3  suspect, correct?

4  A.    At the beginning of a case, there are sometimes many,

5  sometimes few, depending on the type of case.

6  Q.    And the more notorious the case, the more leads you

7  get, correct?

8  A.    That is correct.

9  Q.    And it's your duty to follow a lead until it's dead,

10  right?

11  A.    Correct.

12  Q.    And you use different means to eliminate suspects,

13  right?

14  A.    Yes, sir.

15  Q.    In this case, you knew the bank was robbed by two

16  African-American men brandishing firearms, right?

17  A.    From the surveillance video, correct.

18  Q.    And you knew from the video of the robbery that the

19  robbery took about two minutes, right?

20  A.    Yes, sir.

21  Q.    And you found out on the day of the robbery that a

22  maroon late '80s Olds four-door Cutlass was used?

23  A.    The description we had was a maroon older model

24  four-door, possibly Olds Cutlass, yes.

25  Q.    And then, the next day, Bessie Pew came into the

CALHOUN - CROSS

1  station and identified the defendant and his son, correct?

2  A.    Correct.

3  Q.    And the defendant is Bessie Pew's brother, right?

4  A.    That is correct.

5  Q.    And you asked Ms. Pew what time the defendants arrived

6  at her place of work on 4/24, right?

7  A.    Correct.

8  Q.    And she said it was a little after or around 3

9  o'clock, because she knew that because it was the end of

10  the first shift?

11  A.    Correct.

12  Q.    Which happened between 3 and 3:30, right?

13  A.    Yes, sir.

14  Q.    Okay.  And you found out they didn't deliver her car

15  directly to her, right?

16  A.    That is correct.

17  Q.    Okay.

18  A.    They told her where it was located at, and she had to

19  go get it.

20  Q.    And that was at the apartments on Pleasant, right?

21  A.    Yes, sir.

22  Q.    And just so I'm clear, how far are the apartments on

23  Pleasant from the bank?

24  A.    Just a few minutes.  I don't know mileage-wise.  It

25  would take maybe five minutes, maybe ten at the most, if

CALHOUN - CROSS

1    there is heavy traffic, to get there.

2    Q.    Then how far from the apartments on Pleasant to

3    Ms. Pew's job?

4    A.    Probably 15, 20, maybe 25 minutes maximum in heavy

5    traffic.

6    Q.    So that means, if the bank was robbed at 2:22 or

7    thereabouts and it took a few minutes and then they went

8    and dropped the car off at Pleasant and then went over to

9    her job, it would take about a half hour, right?

10    A.    Give or take, yes, sir.

11    Q.    It would put them there around 3 o'clock, right?

12    A.    Three, shortly thereafter, yes, sir.

13    Q.    Ms. Pew told you they appeared anxious; is that

14    correct?

15    A.    Yes, sir.

16    Q.    And then they left that day, according to what you

17    found out, and went to Georgia, right?

18    A.    According to Stephanie Luster, yes, sir.

19    Q.    And they did not take, according to Stephanie Luster,

20    they didn't take clothes, diapers or car seats, correct?

21    A.    Correct.

22    Q.    And Walter Pugh had a job, correct?

23    A.    That was my understanding, yes, sir.

24    Q.    And that was a Wednesday that they left on, right?

25    A.    The day of the robbery, I believe, yes, whatever the

CALHOUN - CROSS

1   24th was.

2   Q.   And when they returned to town on May 3rd, they only

3   went to Hamilton briefly, but then they hid out in Mt.

4   Healthy, right?

5   A.   Correct.

6            MR. FELSON:  Objection.  Hid out.

7            THE COURT:  I'm sorry.

8            MR. FELSON:  The concept of hiding out.  I don't

9   think that's -- I move to strike that.

10           THE COURT:  I'll strike that portion of the

11   answer.

12           MR. THAPAR:  Okay.  I'm sorry.  I'll rephrase.

13   BY MR. THAPAR:

14   Q.   They came back to Hamilton, but then they went to

15   Mt. Healthy, correct?

16   A.   That was where we located them that evening, yes, sir.

17   Q.   So they obviously went there?

18   A.   Yes.

19   Q.   But his Cadillac, Mr. Walter Pugh's Cadillac, was

20   found in Hamilton?

21   A.   Correct.

22   Q.   And based on your investigation, Tyreese and Walter

23   were together the whole time from the 24th, or at least I

24   mean together, meaning in the same area, from the 24th

25   until the 3rd when you found them?

CALHOUN - CROSS

1          MR. FELSON:  Objection.  There is no testimony of

2    that.  There was no testimony of that.  He doesn't have any

3    personal knowledge of that.

4          THE COURT:  Overruled.  You may answer if you

5    can.

6    A.    To the best of my knowledge after consulting with

7    witnesses and so forth, yes, they were together in the same

8    area.

9    Q.    And I'm asking just for your knowledge, because what

10   we're trying to get at here, just so you understand, maybe

11   this will make it easier for everyone, is why you ruled out

12   the other suspects, and I'm going through the facts of that

13   aspect.

14          MR. ANDREWS:  Objection as to explanation as to

15   why he's asking the questions.  It's not particularly

16   relevant.

17          THE COURT:  Overruled.

18   BY MR. THAPAR:

19   Q.    Now, when Tyreese Pugh and Walter Pugh were arrested,

20   you found guns, right?

21   A.    Other officers found guns, yes, sir.  There were guns

22   located in the house.

23   Q.    And they found, according to your investigation, they

24   found Tyreese Pugh with a shotgun, correct?

25   A.    Yes.

CALHOUN - CROSS

1   Q.   And that matched or at least seemed to appear like the

2   shotgun you saw used in the robbery, right?

3   A.   That is correct, yes.

4   Q.   And they also found two handguns, correct?

5   A.   Yes, sir.

6   Q.   And those appeared similar, one of them appeared

7   similar to the handgun used in the robbery, right?

8   A.   Yes, sir.

9   Q.   And now I want to talk about you found a Black & Milds

10  in Walter's Cadillac, right, a box and a white tip?

11  A.   Correct.

12  Q.   And a white tip cigar appears to be --

13         MR. ANDREWS:   Your Honor, my client is pointing

14  out that, when the inventory was presented on the vehicle

15  on that search, the tip was not reflected in that.

16         MR. THAPAR:   I'll rephrase it to avoid redirect.

17  BY MR. THAPAR:

18  Q.   You found a Black & Mild box, correct?

19  A.   Yes, sir.

20  Q.   Have you ever seen a Black & Mild cigar before?

21  A.   Yes, sir.

22  Q.   What do they appear like?

23  A.   They appear like -- they're not a large cigar.

24  They're larger than a cigarette but smaller than what you

25  would think of as a normal cigar.  They also have a white

CALHOUN - CROSS

1    tip on the end, a white plastic tip on the end.

2    Q.    You reviewed the bank photos, correct?

3    A.    Yes, sir.

4    Q.    Did it appear that Walter Pugh had a Black & Mild in

5    his mouth?

6    A.    Yes, sir.

7    Q.    Now, was there any point in testing the Black & Mild

8    tip that was found in the car?

9    A.    No, sir.  I could not say that that was the tip that

10   was found in the bank.  If I would have found it at the

11   bank, then there would have been a point in testing it,

12   but, since it was in Mr. Pugh's car, there was no point in

13   testing it.

14   Q.    Because, even if it showed it was Mr. Walter Pugh's,

15   that wouldn't have done anything to further or limit the

16   investigation, correct?

17   A.    Correct.

18   Q.    And similarly with the latex glove you found in Bessie

19   Pew's car, would that have done anything to eliminate any

20   other bank robbers or further the investigation?

21   A.    No, sir.  I knew that Ms. Pew told me that it was not

22   her glove.  She also told me that her brother Walter used

23   rubber gloves at times in her car.  If I would have found

24   it at the scene at the bank, then there would have been a

25   point in testing it, but there was no point in testing it

CALHOUN - CROSS

1  since it was found in the car.

2  Q.    You remember the questions about the three robbers

3  versus two robbing the bank?

4  A.    Yes, sir.

5  Q.    About Walter and Tyreese and someone else robbing the

6  bank?

7  A.    Yes, sir.

8  Q.    And the defendants focused on Stephanie Luster as

9  being the third one.  Do you remember those questions?

10  A.    Yes, sir.

11  Q.    How did you come to eliminate Stephanie Luster?

12  A.    Through my interview with her.  To be quite frank,

13  there is no way I would have used her as my getaway driver.

14  Q.    Why not?

15  A.    I don't think she's capable of doing it and doing it

16  in the right way to help you get away.

17  Q.    Okay.  And you remember all this about, I guess,

18  jolted lovers being Stephanie and Shanell, those questions

19  about those?

20  A.    Yes, sir.

21  Q.    Did it appear from your conversations with either

22  Stephanie or Shanell that they were out to get Walter and

23  Tyreese Pugh?

24  A.    No, sir.

25  Q.    In fact, isn't it true that, when you discussed it

CALHOUN - CROSS

1   with each of them independently, they still appeared to be

2   fond of Mr. Walter Pugh and Mr. Tyreese Pugh?

3   A.    I would characterize Stephanie as that way.  She, in

4   my personal dealings with her, kind of filtered

5   information.  She didn't give us everything she knew.  She

6   kind of held back certain things.  And after talking with

7   her, those things came out.  With Shanell, I believe she

8   was more in fear for her life with Mr. Pugh the way she

9   appeared.

10  Q.    Was it true that Stephanie and -- let me characterize

11  it this way.  Isn't it true that neither of them said to

12  you that they heard Walter and Tyreese admit to them that

13  they robbed the bank?

14  A.    That is correct.

15  Q.    And if they were jolted, would that seem logical to

16  you that they would be out to get them and they would give

17  you all kinds of inflammatory statements?

18  A.    In my past experience as a detective, someone with

19  those kind of motives will be prone to fabricating

20  statements to further our cause.  That's one of the things

21  I've got to be careful of when I interview someone to

22  actually ascertain are they telling me the truth or are

23  they fabricating things.  In both cases, I don't believe

24  they fabricated anything.

25  Q.    And, finally, when you were narrowing your suspects or

CALHOUN - CROSS

1  narrowing it down to Walter and Tyreese Pugh as the bank

2  robbers, you listened to the tape that Mr. Andrews

3  mentioned?

4  A.    Yes, sir.

5  Q.    And you heard Mr. Walter Pugh talking about laundering

6  $100,000, right?

7  A.    Yes, sir.

8  Q.    You heard that someone stole some money from him and

9  he said it was no big deal?

10  A.    That is correct.

11  Q.    And you heard him telling Shanell to buy a car and he

12  would pay cash for it, right?

13  A.    Yes, sir.

14  Q.    So all this evidence we have just talked about and

15  more -- I don't want to go into every piece of detail --

16  helped you narrow down the suspects to the actual bank

17  robbers, which were Walter and Tyreese Pugh, right?

18  A.    Yes, sir.

19  Q.    From your experience as a police officer, have you

20  found Hamilton to be in Butler County?

21  A.    Yes, sir.

22        MR. THAPAR:  No further questions, Your Honor.

23        THE COURT:  Any redirect, Mr. Andrews?

24        MR. ANDREWS:  Just about three questions, Your

25  Honor.

CALHOUN - REDIRECT

1                    REDIRECT EXAMINATION

2    BY MR. ANDREWS:

3    Q.   Officer, would you look at Exhibit BB-4, that we

4    handed to you before?  I ask you to read --

5             MR. THAPAR:  Your Honor, this witness has

6    testified he has no personal knowledge as to this on direct

7    examination.  They're now going back to it.

8             MR. ANDREWS:  I believe a very quick matter.  We

9    can resolve this very quickly and prevent having to call

10   another witness very simply.  It's a very quick question.

11            THE COURT:  I don't want him to read anything

12   from a document he hasn't seen.  Why don't you ask the

13   question about what it says?

14   BY MR. ANDREWS:

15   Q.   Do you see your name reflected in paragraph seven?

16   A.   Yes, sir.

17   Q.   Would you read that sentence, not out loud, just read

18   to yourself?

19            MR. THAPAR:  Objection.

20            THE COURT:  It's okay.

21   Q.   That relates that you and Agent Moran had interviewed

22   Stephanie Luster on the 3rd of May?

23   A.   We had a conversation, yes.

24   Q.   You did not make that a written statement, however, at

25   that time?

CALHOUN - REDIRECT

1   A.   That is correct.

2   Q.   And that's why you say that was not a statement on May

3   3rd?

4   A.   That's not a statement that I took, no, sir.

5   Q.   Okay.  Now, did you ever take a written statement from

6   Shanell Holston?

7   A.   No, sir, I did not.

8   Q.   You have nothing in writing from her at all?

9   A.   I don't believe I do.  I would have to review my

10  complete case file, but I don't believe I do, sir.

11  Q.   Now, you indicated you would not use Stephanie Luster

12  as a getaway driver?

13  A.   Yes, sir.

14  Q.   Would you also not use a car that had bad brakes and

15  had alternator problems?

16  A.   I would use something of sound mechanical capacity,

17  yes.

18  Q.   Okay.  And, finally, in reviewing the time between

19  April 24th and May 3rd, you have discussed this, this

20  period of time, with Stephanie Luster?

21  A.   The day of the robbery until the day she was found,

22  yes, I did discuss that period of time with her, yes.

23  Q.   And you have found that, within her count of days,

24  there are three days that are absolutely missing from her

25  count, isn't that correct?  If you want me to, I can run

CALHOUN - REDIRECT

1   through them very quickly.

2   A.    I don't know, sir.

3   Q.    As I recall what you told us on direct and what has

4   been testified otherwise, the robbery was to have taken

5   place on the 24th of April?

6         MR. THAPAR:  Your Honor, just for this piece of

7   questioning, and I'm going to object to all of it, to the

8   extent what has been told to us otherwise is irrelevant in

9   this courtroom to this witness.  It's what he knows and

10  what he's testified to.

11        MR. ANDREWS:  If that needs to be stricken, Your

12  Honor, I understand.

13        MR. THAPAR:  You don't need to strike it.  Just

14  let me object if he's going to refer to "other things."

15        THE COURT:  All right.

16  BY MR. ANDREWS:

17  Q.    The robbery took place on the 24th?

18  A.    Correct.

19  Q.    On the afternoon or evening of the 24th, according to

20  your investigation, these people left for Tennessee?

21  A.    Are you asking?

22  Q.    I am asking.

23  A.    That's my understanding, yes, sir.  Actually, they

24  left for Georgia.  They only made it to Tennessee.

25  Q.    You want to go on?  They stayed on the evening of the

CALHOUN - REDIRECT

1    24th in Tennessee?

2    A.    That's my understanding, yes, sir.

3    Q.    Went to Georgia on the 25th?

4    A.    Correct.

5    Q.    Stayed there the evening of the 25th and 26th?

6    A.    At the --

7    Q.    In a hotel?

8    A.    At the Travelodge, yes, sir.

9    Q.    And the 27th and 28th, they spent the evenings at the

10   Watson's house is what you were told?

11   A.    I don't know, sir.

12   Q.    At a relative's house?

13   A.    I was told, while they were in Georgia, they stayed at

14   a hotel and at a relative's house.  I wasn't told specific

15   days.  Ms. Luster didn't know specifics.

16   Q.    Okay.  And that takes us up to the, if my count on the

17   calendar is correct, the 29th of April?

18   A.    To my knowledge, sir, they were with relatives.

19   Q.    The whole time?

20   A.    I don't know any different.

21   Q.    If other testimony is otherwise, you're unaware of

22   that?

23   A.    I have not interviewed anyone else who has given me

24   information to the contrary.

25   Q.    That's fine.  I'm not asking for anything you don't

CALHOUN - RECROSS

1    have otherwise.

2              MR. ANDREWS:  I have nothing further, Your Honor.

3              THE COURT:  Mr. Felson, any questions?

4              MR. FELSON:  Just a couple questions.

5                        RECROSS-EXAMINATION

6    BY MR. FELSON:

7    Q.    You're saying that one or more than one person's

8    identified Tyreese Pugh from the bank photos; is that

9    right?

10   A.    Yes, sir.

11   Q.    Okay.  Appears in the bank photos that we saw there?

12   A.    Yes, sir.

13   Q.    Okay.  And was -- isn't it true that Jim Connaughton

14   testified that the second robber, in other words the person

15   that did not jump over the counter, was wearing some sort

16   of a face cover?

17   A.    I don't know what Mr. Connaughton testified to, sir.

18   I was not in the courtroom.

19   Q.    You did not interview him?

20   A.    No, sir, I did not.

21   Q.    Jim Connaughton, the bank manager, you did not

22   interview him?

23   A.    No, sir.

24   Q.    Are you the lead investigator on this?

25   A.    Yes, sir.

CALHOUN - RECROSS

1  Q.    Aren't you aware that the people in the bank, the

2  tellers, that they were not able to identify the face of

3  the second robber, the guy that -- well, either one, but

4  definitely one had something covering his face; aren't you

5  aware of that?

6  A.    I'm aware in this statement somewhere that it said

7  that.

8  Q.    You don't believe them?

9  A.    I don't know, sir.  I have dealt with people that have

10 had traumatic experiences before, and they have problems at

11 times remembering.

12 Q.    So you think you don't believe the bank manager or you

13 think he might have trouble remembering whether or not the

14 robber had a mask?

15 A.    I believe what I see in the photograph, and it does

16 not appear to me he's wearing a mask.

17 Q.    All right.  Okay.  That's all.  Okay.  Did you show

18 Ms. Luster or Ms. Pew or anyone else any other photos,

19 other than what we saw, these exhibits that you presented

20 that are in the U.S. attorney's book?

21 A.    No, sir.

22 Q.    That's it, right.  Those are the only photos you

23 showed these people?

24 A.    It's bank surveillance photos, correct.

25 Q.    Didn't you have some photos on your desk?

CALHOUN - RECROSS

1    A.    Yes, sir, I did.

2    Q.    Were they from the bank?

3    A.    No, sir.

4    Q.    Did you show them those photos?

5    A.    No, sir.  There was no point.  I knew who these

6    pictures were of.

7    Q.    Do you recall when you issued a warrant against

8    Tyreese Pugh?

9    A.    Pardon me, sir?

10    Q.    Did you recall when you issued a warrant for Tyreese

11    Pugh?

12    A.    I would have to look at the dates on the paperwork.

13    Q.    Okay.  Now, you testified, I think, with regard to why

14    you didn't take or have the glove tested?

15    A.    Yes, sir.

16    Q.    Is that right?  And you said, I believe, that you

17    didn't need to or it wouldn't be of any assistance because

18    it was found in the car.  Isn't that right?  Because the

19    glove was found in the car and not in the bank?

20    A.    It would do nothing to eliminate or include Mr. Pugh

21    at that time.  I knew that he used gloves.  I also knew

22    that he had the car.  It was just a curious fact that a

23    latex glove which appears to be in the bank robbery photos

24    was found torn underneath the driver's seat of the car.

25    Q.    What if it had Tyreese Pugh's evidence on it?  You

CALHOUN - RECROSS

1  didn't have anything to link Tyreese Pugh with the glove,

2  did you?

3  A.    No, sir.

4  Q.    Well, that glove could have linked it, right?

5  A.    It could have linked him to the glove, however, to the

6  bank --

7  Q.    But you had no testimony by Bessie Pew or anybody else

8  that Tyreese wore gloves or did any work on her car?

9  A.    No, sir, I didn't.

10  Q.    So that would have helped you identify Tyreese as at

11  least somebody who was wearing the glove.  And also you're

12  saying that he's the one in the picture in the bank, right?

13  A.    Yes, sir.

14  Q.    And that person was wearing gloves, wasn't he?

15  A.    Yes, sir.

16  Q.    So why didn't you test it?

17  A.    It was not found at the bank, sir.  It was found a day

18  later in a car that was away from the bank, sir.

19  Q.    But that was the car you're saying was used in the

20  robbery?

21  A.    Yes, sir.

22  Q.    Suffice it to say you probably should have tested that

23  glove?

24  A.    No, sir.

25  Q.    You're saying it wouldn't have helped identify Tyreese

CALHOUN - RECROSS

1  Pugh as somebody wearing a glove?

2  A.   It would have identified him as wearing that glove;

3  however, I can't positively say that glove was used in the

4  bank, sir.

5  Q.   Okay.  But wouldn't it also have possibly eliminated

6  maybe or thrown some -- we'll say if it wasn't either of

7  these persons, then your argument about that this glove was

8  used in that bank robbery might get weaker, wouldn't it?

9  A.   If -- if the glove were tested and it weren't one of

10 those two, I don't know whose it would have been, sir.  I

11 don't know --

12 Q.   And, well, now, it turns out that, similarly, you

13 actually, you did test the gym shoes found, right?

14 A.   I visually inspected them, yes, sir.

15 Q.   But you actually put them up, and those were not the

16 shoes of anybody that touched the counter, right?

17 A.   They weren't the shoes that made the print on the

18 counter; that is correct, sir.

19 Q.   And then were there -- well, okay.

20        MR. FELSON:  All right.  That's all I have.

21 Thank you.

22        THE COURT:  Anything further, Mr. Thapar?

23        MR. THAPAR:  Two questions, Your Honor.

24                  RECROSS-EXAMINATION

25 BY MR. THAPAR:

CALHOUN - RECROSS

1   Q.    Who wasn't wearing a mask in the bank?

2   A.    Walter Pugh.

3   Q.    Who was wearing a mask in the bank?

4   A.    I don't believe anyone was.

5   Q.    Did Tyreese have anything over his face?

6   A.    He had a ball cap down over it.  I don't think there

7   was anything lower.  You can see the profile.  It doesn't

8   appear that way.

9          MR. FELSON:  I object to that.  That's for the

10  jury to determine --

11         THE COURT:  I'm not sure what --

12         MR. FELSON:  -- whether or not Tyreese Pugh was

13  in the bank.

14         THE COURT:  Well, I don't think he's saying it

15  was in the bank.  Why don't you say the photograph that is

16  alleged to have been?

17  BY MR. THAPAR:

18  Q.   Based on your investigation, did the tellers and/or

19  the bank manager tell you that one of them was wearing --

20  they thought one of them was wearing something over their

21  face and one of the bank robbers was not?

22  A.    That is correct.

23  Q.    And which one did they think was wearing -- was not

24  wearing the mask?

25  A.    The one that jumped the counter.

CALHOUN - RECROSS

1    Q.   And did you look at the photo?

2    A.   Yes, sir.

3    Q.   And was the one that jumped the counter wearing a

4    mask?

5    A.   No, sir.

6    Q.   Walter Pugh is a mechanic, correct?

7    A.   I believe that's true, yes.

8         MR. THAPAR:  No further questions.

9         THE COURT:  Anything further, Mr. Andrews?

10        MR. ANDREWS:  Nothing, Your Honor.

11        THE COURT:  Mr. Felson?

12        MR. FELSON:  No.

13        THE COURT:  Okay.  Officer Calhoun, I think you

14   are finally done testifying in this case.  We appreciate

15   your being here, and you are excused.

16        Who is your next witness?

17        MR. ANDREWS:  It will be Officer Jackson.

18        MR. THAPAR:  Can Detective Calhoun remain in the

19   courtroom?  We don't intend to call him.

20        MR. ANDREWS:  I don't think we'll be calling him.

21        THE COURT:  Yes.  I think he's done.

22        Officer, good morning.  Come on up here.

23        (Witness sworn by the courtroom deputy.)

24        THE COURT:  You may proceed, Mr. Andrews.

25        MR. ANDREWS:  Thank you, Your Honor.

JACKSON - DIRECT

1        ADRIAN JACKSON

2        DIRECT EXAMINATION

3  BY MR. ANDREWS:

4  Q.    Officer, state your name and spell your last name.

5  A.    Adrian Jackson, J-a-c-k-s-o-n.

6  Q.    How are you employed and assigned?

7  A.    Sorry?

8  Q.    How are you employed and assigned?

9  A.    Hamilton police officer.

10 Q.    And what's your present assignment?

11 A.    Patrolman.

12 Q.    Okay.  And are you related to or do you know Shanell

13 Holston?

14 A.    Yes, I know Shanell.

15 Q.    Are you related to her?

16 A.    No, I'm not.

17 Q.    You have known her for a long time?

18 A.    Yes.

19 Q.    How long?

20 A.    Since she was born.

21 Q.    Okay.  How do you know her?

22 A.    Friends with her family, her mother and father, close

23 friends with her mother and father.

24 Q.    Okay.  And you're aware that she had a relationship

25 with Walter Pugh?

JACKSON - DIRECT

1   A.   Yes, sir, I am.

2   Q.   And you're aware that that relationship ended in March

3   of this year?

4   A.   I'm not sure when it ended, but I was aware that it

5   ended.

6   Q.   Okay.  On April 25, 2002, did you receive a phone call

7   from -- 24th?

8          DEFENDANT W. PUGH:  Excuse us.

9          (Defendant Walter Pugh conferring with

10  Mr. Andrews.)

11  BY MR. ANDREWS:

12  Q.   Did you have any contact from Shanell Holston on the

13  24th of April of 2002?

14  A.   I'm not sure of the date, but I did receive a phone

15  call.

16  Q.   Okay.  Do you recall if that was in the morning or

17  afternoon or evening?

18  A.   I think it was in the evening, well, four or five,

19  six, around in there.

20  Q.   Okay.  And she called you to tell you what?

21  A.   She had some information of the whereabouts of the

22  suspects.

23  Q.   Okay.  And the suspects was who?

24  A.   Tyreese and Walter.

25  Q.   Okay.  And this would have been the day of the

JACKSON - DIRECT

1  robbery?

2  A.   No.

3  Q.   The day after the robbery?

4  A.   No.  This was maybe a week and a half after.

5  Q.   A week and a half after.  Did you give information to

6  Officer Calhoun on the 25th of April?

7  A.   I can't recall the date, but I remember I did give

8  Calhoun some information.  I'm not sure what day it was.

9  Q.   So this would have been the day after the robbery.

10 Did you give him any information that date?

11 A.   I'm not sure if it was the day after, but, yes,

12 shortly thereafter.

13 Q.   Did you give him a copy of Walter's picture?

14 A.   No, I didn't.

15 Q.   You didn't put that on his desk?

16 A.   No, I did not.

17 Q.   You gave him other information?

18 A.   I gave him some information that -- I was given some

19 information that possibly they were the suspects in the

20 robbery.  I don't believe they had a suspect at that time.

21 Q.   Okay.  And where did you get that information from?

22 A.   From Shanell.

23 Q.   From Shanell.  Okay.  Now, you were not part of --

24 your assignment was not -- I'm not faulting you for this,

25 but your assignment was not to work on this robbery?

JACKSON - DIRECT

1    A.    Exactly.

2    Q.    You're out doing what patrolmen do?

3    A.    Right.

4    Q.    Okay.  Now, between the 24th and 29th of April, if you

5    can picture that in your mind, did you have conversations

6    with Officer or Detective Calhoun?

7    A.    Yes.  Yes.

8    Q.    Do you recall how many?

9    A.    A couple of times, I believe.

10   Q.    Okay.  And what prompted you to have these

11   conversations?

12   A.    Well, I received this information, and I was just

13   forwarding it to the detective that was handling the case.

14   Q.    And this information on all occasions came from whom?

15   A.    From Shanell.

16   Q.    Okay.  And when you talked to Shanell, was she angry

17   at Walter?

18   A.    No.

19   Q.    No.  Okay.  She knew -- she thought that Walter had

20   left town with another woman?  She convey that to you?

21   A.    She did mention something like that.

22   Q.    And she had been with Walter for over two years?

23   A.    Right.  Well, however long.

24   Q.    Also, did any of the information that you're

25   discussing here come in conjunction with a retired

JACKSON - DIRECT

1   Detective Nugent?

2   A.    No.

3   Q.    Okay.  How many times between the 24th and 29th of

4   April did Shanell call you?

5   A.    The initial call that I got was shortly after the

6   robbery, and she had asked if we had any suspects.  Then I

7   got another call, I guess about a week, week and a half

8   after, saying they issued some warrants for his arrest.

9   Q.    What?

10  A.    I guess a week and a half after the incident, I guess,

11  the detective bureau had issued a warrant for his arrest,

12  and that's when she had called me again.

13  Q.    Did she know where they were?

14  A.    Yes.

15  Q.    Okay.  And was that in Hamilton County, Ohio?

16  A.    Yes, it was.

17  Q.    Okay.  And you then disclosed who this anonymous

18  informant up to that time was to the rest of the police

19  department; is that correct?

20  A.    To Detective Calhoun.

21  Q.    To Calhoun, okay.  Were you present during any

22  interviews with Shanell Holston?

23  A.    No.  No, I wasn't.

24  Q.    Did you -- did you take any notes of anything she told

25  you in any of these conversations?

JACKSON - DIRECT

1    A.    No, I did not.

2    Q.    Okay.  Did you produce a report as to anything she

3    told you in any of these conversations?

4    A.    No, sir, I did not.

5    Q.    So all of your communications were purely oral to

6    Officer Calhoun?

7    A.    Right.

8    Q.    Do you know of your own personal knowledge whether or

9    not Shanell Holston talked to either Agent Moran of the FBI

10   or Officer Calhoun prior to the arrest of Walter Pugh?

11   A.    Yes.  Yes, she did.

12   Q.    And do you know whether or not Shanell Holston was

13   interviewed by Agent or -- excuse me -- yes, Agent Moran

14   and Detective Calhoun after the arrest of Walter Pugh?

15   A.    I'm not sure.

16   Q.    You're not sure?

17   A.    No.

18   Q.    Were you ever present during any of the interviews or

19   interrogations of Shanell Holston?

20   A.    No, sir, I was not.

21   Q.    Shanell -- strike that.

22         MR. ANDREWS:  I have nothing further of this

23   witness.

24         THE COURT:  Thank you.

25         Mr. Felson, do you have any questions of this

JACKSON - CROSS

1    witness?

2                    CROSS-EXAMINATION

3    BY MR. FELSON:

4    Q.   Did you interview Ms. Luster at all?

5    A.   Ms. who?

6    Q.   Stephanie Luster.

7    A.   No.

8    Q.   Do you know who Stephanie Luster is?

9    A.   No.

10            MR. FELSON:  That's all.

11            THE COURT:  Ms. Cross, Mr. Thapar, do you have

12   any questions, any cross-examination of this witness?

13            MR. THAPAR:  Very briefly, Your Honor.

14                    CROSS-EXAMINATION

15   BY MR. THAPAR:

16   Q.   Shanell trusted you, right?

17   A.   Yes, she did.

18   Q.   People that trust you tell you things, correct?

19   A.   Right.

20            MR. FELSON:  Object.

21            THE COURT:  Who objected?

22            MR. FELSON:  "People," its relevance.

23            MR. THAPAR:  I'll rephrase it, Your Honor, just

24   to make it simple.

25   BY MR. THAPAR:

JACKSON - CROSS

1    Q.    As a law enforcement officer, people in your community

2    respect you, right?

3    A.    Yes.

4    Q.    And you have friends in the community still, right?

5    A.    Yes, sir.

6    Q.    And they often tell you things that they wouldn't tell

7    other law enforcement officers, correct?

8    A.    Yes, sir.

9    Q.    You have known Shanell her whole life, right?

10   A.    Yes.

11   Q.    On this occasion, you could tell whether she was

12   telling the truth or not based on that association?

13        MR. FELSON:    Objection.    That's for the jury.

14   BY MR. THAPAR:

15   Q.    In your opinion, Officer, could you tell -- could you

16   form an opinion as to that based on your knowledge of her?

17   A.    Yes.    I believe she was truthful.

18        MR. FELSON:    Objection.

19        THE COURT:    Overruled.

20   BY MR. THAPAR:

21   Q.    I'm sorry, Officer.    You can state that.

22   A.    I believe that she was truthful.

23   Q.    Okay.    And she told you that her and Walter Pugh were

24   broken up at the time she talked to you, right?

25   A.    Yes, she did.

JACKSON - REDIRECT

1    Q.    And but he was still contacting her, wasn't he?

2    A.    Yes.

3              MR. THAPAR:  No further questions, Your Honor.

4              THE COURT:  Mr. Andrews, anything further?

5                      REDIRECT EXAMINATION

6    BY MR. ANDREWS:

7    Q.    Officer, you believe she was telling the truth even

8    though you're aware of her criminal history that includes a

9    number of crimes of deceit, correct?

10   A.    Yes, I believe she was telling the truth.

11   Q.    You are aware that she has been convicted of forgery?

12   A.    Yes, I am aware of that.

13   Q.    Theft?

14             MR. THAPAR:  Your Honor, at this point I'm going

15   to object.  He asked if he knew of her criminal history.

16   He said yes.

17             THE COURT:  Overruled.

18   BY MR. ANDREWS:

19   Q.    Theft, you know she has been convicted of theft?

20   A.    Yes, sir.

21   Q.    Robbery?

22   A.    Yes.

23   Q.    You believed her because you have known her forever?

24   A.    I believe she was telling me the truth based on the

25   information that she shared, and it seemed it panned out.

JACKSON - REDIRECT

1    It was consistent.  And it led to their apprehension.

2    Q.    When she first contacted you --

3    A.    Yes.

4    Q.    -- other than women's intuition, what did she base the

5    belief that Walter Pugh was involved in this robbery on?

6    A.    Well, the description of the car given, the weapon

7    that was displayed, those are the two main things why she

8    thought it was them.

9    Q.    And that would have been what she read in the

10   newspaper?

11   A.    Yes, exactly.

12   Q.    Okay.  And the make and model of car is what?

13   A.    I can't recall, sir.

14   Q.    Okay.  You have read these newspaper articles she

15   referred to?

16   A.    No, I haven't.

17   Q.    So you have no knowledge of what they said in them at

18   all?

19   A.    Not really.

20           MR. ANDREWS:  I have nothing further at this

21   time.

22           THE COURT:  Anything further, Mr. Felson?

23           MR. FELSON:  Yes.

24                    RECROSS-EXAMINATION

25   BY MR. FELSON:

JACKSON - RECROSS

1    Q.    Based on -- you're saying that she was discussing with

2    you and she believed that there was some involvement based

3    on the newspaper article; is that right?

4    A.    Say that again.

5    Q.    You're saying that Shanell was relaying this message

6    that you thought she was telling the truth, but she got her

7    information from the newspaper article; is that what you

8    testified?

9    A.    No.  What I'm saying is that she had called me and

10   asked me did we have any information on the suspects in the

11   robbery.  And I said no, we don't.  It was -- the

12   information was vague, male blacks.  I guess they gave a

13   description of the car, and I guess by the film you could

14   see what type of weapons it was.  And that's when she

15   says -- well, she told me who she thought it was.

16   Q.    All right.  But you mentioned -- you agreed.  I think

17   Mr. Andrews mentioned the newspaper article, and you said

18   you agreed that she got some information from that; is that

19   right?

20   A.    I think it was in the newspaper.  I imagine she read

21   the newspaper, but --

22   Q.    Are you aware that the newspaper article describes a

23   third man who was the driver?

24   A.    I'm not aware.  I'm not aware.  I was unaware.  I

25   didn't read the article.  I don't get the Journal.

RENFRO - DIRECT

1        MR. FELSON:  That's all I have for him.

2        THE COURT:  Anything further, Mr. Thapar?

3        MR. THAPAR:  Nothing further, Your Honor.

4        THE COURT:  Officer Jackson, the Court

5  appreciates very much your being here, and you are excused,

6  sir.

7        Who is your next witness?

8        MR. ANDREWS:  Mr. Renfro, I believe, but I don't

9  know if he's out in the hallway or not.

10        THE COURT:  Is he also your last witness?

11        MR. ANDREWS:  He may well be.

12        THE COURT:  Let's take the morning break at this

13  point in time then.  We will stand in recess until 11 a.m.

14        (Recess at 10:45 a.m.)

15                    AFTER RECESS

16        THE COURT:  Mr. Andrews, you may call your next

17  witness.

18        MR. ANDREWS:  Calling Cortes Renfro.

19        (Witness sworn by the courtroom deputy.)

20        THE COURT:  You may proceed, Mr. Andrews.

21                    CORTES RENFRO

22                  DIRECT EXAMINATION

23  BY MR. ANDREWS:

24  Q.   Sir, state your name and spell your last name for the

25  record.