1   you, and I don't want to do that.  So, if you will, please

2   allow me to summarize the relevant pieces of evidence which

3   prove the defendants' guilt beyond a reasonable doubt.

4        And I believe the evidence can be categorized or

5   separated into two categories.  First of all, the evidence

6   that is undisputed, evidence which the defendants do not

7   take issue with or evidence which there has been no

8   evidence presented to the contrary.  So undisputed evidence

9   and then that which is disputed.

10       Let's take a look at the undisputed evidence.  It

11  is undisputed that on April 24, 2002, at approximately 2:20

12  in the afternoon, the first National Bank of Southwestern

13  Ohio, located at 2299 Peck Boulevard in Hamilton, Ohio, was

14  robbed; that the robbers were two black men who came in

15  carrying and brandishing firearms, one a shotgun and the

16  other a revolver.  One was wearing a mask and a ball cap

17  holding a black pump action shotgun.  The evidence is

18  undisputed that the other was wearing a stocking cap and

19  holding a long-barreled revolver.  It's undisputed that

20  both of them were wearing white latex gloves.

21       It is undisputed that during the armed robbery

22  the robber with the shotgun went directly to the bank

23  manager, Jim Connaughton, and told him to get down on the

24  floor; don't activate the alarm.  And there has been

25  undisputed evidence that, at one point, that robber touched

1     Jim Connaughton's shoulder with that shotgun. And you

2     heard Jim Connaughton. He said he was scared.

3          It's undisputed that the other robber immediately

4     vaulted the teller counter of Jenny Tettenhorst. She went

5     into shock. It's undisputed evidence that this robber

6     yelled and screamed at Jenny and Pam Philpot telling them

7     to empty their teller drawers.

8          It's undisputed that the robber went to the vault

9     with Jenny Tettenhorst, pointing a gun at her head and

10    telling her to fill up the garbage can until he told her to

11    stop. Then he left Jenny inside the vault alone.

12         It's undisputed that one of the robbers said,

13    "Hurry up. The mailman is coming"; that the robbers left

14    this federally insured bank with approximately $153,198 of

15    unmarked cash belonging to the bank, no dye packs, no bait

16    money.

17         It's undisputed that, in committing this armed

18    bank robbery, the two bank robbers assaulted and put in

19    jeopardy the life of Jim Connaughton, Jenny Tettenhorst and

20    Pam Philpot by the use of dangerous weapons, guns.

21         It's undisputed that the two armed bank robbers

22    knowingly carried and displayed these weapons and that the

23    two armed bank robbers had some sort of agreement among

24    them to commit this offense. The evidence proves that they

25    worked in conjunction with each other inside of the bank.

1    They entered together. They moved about in the bank
2    together, and they left with the money together.
3              It is undisputed that Jim Connaughton caught a
4    glimpse of the getaway vehicle, a late 1980's Oldsmobile,
5    maroon in color.
6              It is undisputed that, before May 3, 2002,
7    Tyreese Pugh had been convicted of an offense which carried
8    a penalty -- or I'm sorry -- was punishable by a term of
9    imprisonment of more than one year. You saw the
10   stipulation, and you will see the stipulation when you do
11   your deliberations.
12             And, finally, it is undisputed that, at the time
13   of the arrest on May 3rd, 2002, a black Mossberg 12-gauge
14   shotgun was recovered in the same room where Tyreese was
15   sleeping, that the serial number on that shotgun was
16   L792549, and that that gun had traveled in interstate
17   commerce.
18             All of that is undisputed. There has been no
19   evidence presented to the contrary.
20             MR. FELSON:  Objection.
21             THE COURT:  Overruled. This is argument.
22             MS. CROSS:  The United States has certain
23   elements that it has to prove. The defendants are charged
24   in a five-count indictment. Here are the elements for
25   count one. There has been undisputed evidence that proves

1   that, whoever these bank robbers were, they had an
2   agreement amongst themselves to commit the offense and that
3   one of them did one of the overt acts listed in the
4   indictment, walk into the bank with the gun. That's an
5   overt act.

6           Count two. Here are the elements for count two,
7   the armed bank robbery. We know that whoever committed the
8   bank robbery knowingly committed the robbery, taking the
9   money and assaulting and putting in jeopardy the life of
10  another and that they used a dangerous weapon.

11          Count three and four basically says that the
12  crime of bank robbery was committed. We know that. That
13  during and in relation to committing this bank robbery, a
14  firearm was carried, used or brandished. That was the
15  evidence.

16          So that really leaves in dispute then two things.
17  First of all, were the two black men that walked into this
18  bank, robbed it, conspired with each other carrying and
19  displaying guns, fleeing the bank with over $153,000, were
20  they in fact Walter Pugh and Tyreese Pugh? Because all the
21  other elements of the offense have been proven. And,
22  second of all, whether Tyreese was in possession of the
23  Mossberg 12-gauge shotgun on May 3rd, 2002.

24          Count five. Let's start there, the elements for
25  count five. The question is whether Tyreese Pugh was in

1   possession of the Mossberg 12-gauge shotgun.

2          Ladies and gentlemen, I submit to you that the

3   evidence positively states that he was. First of all, his

4   father sure thought he was. Do you remember the testimony

5   of Deputy Matthew Wittich? He told you that Walter, on the

6   night of the arrest, told his SWAT team that Tyreese was in

7   the house and that Tyreese was a heavy sleeper. And what

8   else? That Tyreese had a gun. So surely Walter thought he

9   had a gun that night.

10          Officer Wittich said that everything that Walter

11  told them that evening actually proved to be true. He even

12  gave them directions to get in the house and go upstairs to

13  the room. If you recall, Officer Wittich testified that he

14  went inside of the house using Walter's directions and

15  found the room where Tyreese was sleeping. He stated that

16  he entered the room and that it wasn't completely dark

17  because the TV was on, and also the lights on the guns of

18  the SWAT team were shining bright.

19          He stated that, when they walked into the room,

20  Tyreese was sleeping with -- in the bed with Stephanie

21  Luster. And, ladies and gentlemen, you saw for yourself

22  the demonstration of Deputy Wittich on how he effected the

23  arrest of Tyreese Pugh. He stated that he walked up to the

24  bed and he grabbed the back of Tyreese's shirt and pulled

25  him off of the bed, that Tyreese fell face-flat onto the

1    floor with his arms underneath him.  Do you recall that
2    testimony?  And that, when he went to cuff him, he put one
3    hand behind his back, and, when he went to grab the other
4    hand, that's when Officer Wittich felt the shotgun.

5            If you recall, Officer Wittich said, when he
6    walked up to the bed, he hadn't stepped on the gun.  Ladies
7    and gentlemen, I submit to you that that's because Tyreese,
8    the gun was in the bed with Tyreese and that, when he fell,
9    the gun fell.

10           And what about the only other witness in the room
11   that testified?  Stephanie Luster, what does she say?  She
12   said that she went to bed before Tyreese went to bed.  She
13   must have fell asleep before he did, because she doesn't
14   recall saying good-night.  She said that, when she
15   awakened, she was being arrested and that she thought she
16   had heard Tyreese fall on the floor.  She said, when she
17   looked around, if you recall her testimony, she saw the
18   police picking up Tyreese and the gun up off of the floor.

19           And, ladies and gentlemen, I expect that, when I
20   sit down, the defense will say, well, that gun could have
21   belonged to someone else.  That shotgun, Tyreese didn't
22   live there, so that shotgun could have belonged to Cortes
23   Renfro.  But Cortes Renfro testified today, and, when we
24   asked him was it his gun, what did he say?  No.

25           This is the gun that Tyreese possessed in that

1    room.  It did not belong to Cortes Renfro.  It belonged to

2    Tyreese Pugh.  He's the one who brought it there.  You

3    remember the testimony of Stephanie Luster and Shanell

4    Holston who corroborated each other on that fact and said

5    that Tyreese transferred that gun from Shanell -- from

6    Walter's Cadillac to Shanell's car when they returned from

7    out of town to Hamilton?  When they transferred their

8    items, that was the gun they saw being transferred.

9           The judge has instructed you on the law of

10   possession.  And now that she has, you know that there are

11   two types of possession, actual and constructive.  I submit

12   to you that, under either definition of possession, you

13   will find from the evidence it is clear that Tyreese Pugh

14   knowingly possessed that Mossberg 12-gauge shotgun on or

15   about May 3rd, 2002.

16          So now, we know that it was the defendant who

17   possessed, knowingly possessed the firearm.  Count five has

18   been proven.  So let's go to the other issue, the final

19   issue, whether or not the two black men that went into that

20   bank were, in fact, Walter and Tyreese Pugh.

21          And, ladies and gentlemen, the defendants want

22   you to -- in fact, the defendants are hoping, they're

23   counting on, they're praying that you will ignore your

24   common sense.  But I implore you to draw upon your common

25   sense in deciding this case.  And you will, if you do that,

1    come to the only reasonable conclusion from the evidence

2    that can be drawn, and that is that it was Walter Pugh and

3    Tyreese Pugh that robbed that bank on April 24, 2002.

4            But let's look at the evidence.  What do we know

5    from the evidence?  Well, I encourage you, in doing your

6    deliberations, to look at the bank surveillance photograph,

7    the bank surveillance videotape, Government Exhibits 5.1

8    and 5.2.  Look at that.  Also, look at the photographs that

9    Robert Wolfe made from the videotape.

10            Here's Government Exhibit 4.1.  There they are.

11    And, ladies and gentlemen, you don't have to just look at

12    it on the screen.  You're going to have an opportunity to

13    take these pictures back with you and look at them closely

14    for yourselves.

15            One of the robbers carried and brandished a black

16    pump-action shotgun, a black pump-action shotgun.  Where

17    was this found?  Look at the pictures and look how the

18    robber is holding it.  Where was this found?  With Tyreese

19    Pugh on May 3, 2002.

20            Look at that photograph.  And here's Government

21    Exhibit 4.3, another photograph from that bank.  I do

22    encourage you to look at the photographs for yourself,

23    because, because of the lighting, you can't really see it.

24    But, when you look at the photograph, you will be able to

25    see that this robber with the pump-action shotgun has on

1  all black.

2         What do we know from the evidence about what

3  Tyreese Pugh was wearing on the day of the robbery?  What

4  did Stephanie Luster tell you?  He was wearing all black

5  when he left, black pants, black shirt.

6         And Bessie Pugh, what did she say when she looked

7  at the photographs?  Looks like Walter.  Looks like my

8  nephew, Tyreese.

9         Now, the other robber was carrying and

10  brandishing a revolver, a long-barreled revolver, which he

11  pointed at Jenny Tettenhorst, a long-barreled revolver.

12         Where was this found, ladies and gentlemen?

13  Government Exhibit Number 11, a long-barreled revolver,

14  well, it was found in Government Exhibit Number 14, in the

15  bag.

16         And what is Government Exhibit 14?  You will get

17  to see all of this.  Inside of it -- this was taken out of

18  the Cortes Renfro home the night of the arrest, if you

19  recall, in the basement with Walter's stuff.  Inside of it

20  is Walter's Technicrete Corporation pay stub from April,

21  2002.  This check was for $39, but his year-to-date was

22  $1,450.  But this gun was found with Walter's pay stub at

23  the house, a long-barreled revolver which you can see in

24  Government Exhibit 4.

25         Now, Shanell Holston told you that she had seen

1   Government Exhibit 10, the shotgun, Number 11, the

2   revolver, and the other revolver, Government Exhibit Number

3   12, before.  Didn't she?  She said she had seen them at her

4   house.  With who, Ms. Holston?  With Junior.  With Junior.

5           Who did Bessie Pew think was in the photo?  And

6   even on cross-examination, when Walter Pugh asked his

7   sister himself:  Who do you think is in there?  Who is

8   that?  And she said:  It's you, Walter.  It looks like you.

9           And Walter tried to get Bessie to say that

10  doesn't this person have a scar on their face.  Ladies and

11  gentlemen, I ask you to look at the photos.  Look at all

12  the photos of the bank surveillance tape, and you make the

13  determination as to whether or not you see a scar or just a

14  blemish in the grain of the photo.  This robber does not

15  have a scar, I submit to you.  Why?  Because this man does

16  not have a scar on his face.

17          What about that getaway car?  Jim Connaughton

18  told you that his recollection was a late 1980s Oldsmobile

19  vehicle was the getaway car.  That's the glimpse he saw.

20  Whose car is that?  That's Bessie Pew's car, a late '80s

21  Oldsmobile car, maroon in color.  And who had it on the day

22  of the robbery?  Walter Pugh.

23          Everyone that had seen Walter and Tyreese Pugh on

24  April 24, 2002, saw them together.  Stephanie saw them that

25  morning when they took her to Tenikia's house.  They were

1    together.  That afternoon, Bessie saw them around what
2    time?  Three, 3:30, they were together when they came to
3    pick up his car.  When they returned to pick up Stephanie
4    at Tenikia's house and go out of town because Walter said
5    let's go, they were together.  I submit to you that the
6    evidence shows that's right, they were together.  And they
7    were together in that bank.

8              And while we're on the subject of going out of
9    town, why all of a sudden did they have to go out of town?
10   Ask yourself that.  Well, we know it was all of a sudden,
11   because Stephanie said no one packed.  No one had time to
12   call anyone.  There was no time to get any clothes.  There
13   was not even time to get her children's car seats.  They
14   were in a hurry, because Walter said let's go.

15             Stephanie testified they went to a Tennessee
16   hotel.  She'd seen the money on the bed.  And what did she
17   say that she heard Walter say in the hotel room?  "We hit a
18   lick," something about taking some teller to the vault and
19   how Tyreese manned the door.

20             Also, while they were out of town, all of a
21   sudden everything was being paid for with cash.  Tyreese
22   didn't have a job.  Walter's paycheck in the week before
23   was $39.  What did they buy?  They bought food.  They paid
24   for the hotel rooms with cash.  And then they bought --
25   they went shopping.  And what did they buy?  Government

```
 1   Exhibit 26, I'll tell you what they bought.  They bought an
 2   outfit, $62.  A shirt --
 3              MR. FELSON:  Objection.
 4              THE COURT:  What's the basis?
 5              MR. FELSON:  I don't think this was presented in
 6   the case.
 7              THE COURT:  Overruled.  It's argument.
 8              MS. CROSS:  -- $62.  Another shirt, $62.  Clothes
 9   and clothes.  $70.  $69.
10              This is the suitcase that they brought into
11   Cortes Renfro's house.  What's inside of here?  More
12   clothes.  $65 shorts.  And you'll have a chance to look at
13   all of this, ladies and gentlemen.  More clothes, $51.
14   Everything paid for with cash.
15              There was some implication that maybe Walter
16   could have hit the lottery.  If Walter hit the lottery,
17   wouldn't he have told someone?  Maybe he would have
18   invested the money.  Walter hadn't hit the lottery, ladies
19   and gentlemen.  I submit to you that he hadn't won the
20   lottery.
21              Walter had just hit a lick, and that lick was the
22   First National Bank of Southwestern Ohio in Hamilton, Ohio.
23   Listen to his own words.  I encourage you to listen to
24   Government Exhibit 22, which is the audiotape.  Listen to
25   Walter's own words.  Judge for yourself whether or not he
```

1   won the lottery or had just hit a lick.

2           Before I sit down, I just want to tell you,

3   ladies and gentlemen, that, in order for you to find Walter

4   Pugh and Tyreese Pugh guilty as charged and being the armed

5   bank robbers, you must believe the testimony of the women

6   who knew them best.  Bessie Pew, his sister and aunt,

7   Stephanie Luster, his girlfriend, and Shanell Holston, his

8   live-in girlfriend of two years, the women that knew them

9   best.

10          Determining their credibility is your job.  You

11  saw and heard them on the stand, ladies and gentlemen.  Did

12  they appear to be credible to you?  I expect that the

13  defense will get up and tell you that you can't believe a

14  word that these ladies said.  Can't believe them.  And I'm

15  real curious to see how they're going to persuade you or

16  try to persuade you that Bessie Pew is not credible.  So

17  listen real good, because, when I sit down, I'm going to be

18  listening real good, too.

19          But, ladies and gentlemen, if the government were

20  asking you to solely rely on the testimony of Bessie and

21  Stephanie and Shanell, then you may have cause to agree

22  with the defendants.  But the government is not asking you

23  to base this case and solely believe those ladies.  In

24  fact, we are asking you to ask yourselves:  Was their

25  testimony corroborated?  We're not asking you to believe

1　them solely, but ask yourself:  Was Bessie's testimony

2　corroborated?  Was Stephanie's testimony corroborated?  Was

3　Shanell's testimony corroborated?  Yes, it was.  Not only

4　corroborated by the physical evidence, Travelodge, where

5　they stayed, how long they stayed, not just the physical

6　evidence, ladies and gentlemen, but the officers'

7　testimony.  The defenses witnesses corroborated their

8　testimony, and, most importantly, Walter Pugh in his own

9　words on that audiotape corroborates their testimony.

10　　　　　There has been no evidence that these ladies had

11　any ax to grind against these defendants.  These women in

12　fact loved these two men.  And you saw how difficult it was

13　for them to be here.  In fact, they didn't necessarily want

14　to be here.

15　　　　　Ladies and gentlemen, the defendants were the two

16　men that robbed this bank on April 24, 2002.  Walter Pugh,

17　Jr. and his son, Tyreese Pugh, robbed this bank.  They know

18　it, and now you know it.  Please say so by returning a

19　verdict of guilty on all five counts of the indictment.

20　　　　　Thank you very much for your attention.

21　　　　　THE COURT:  Thank you, Ms. Cross.

22　　　　　Who's going to go first for the defense?

23　Mr. Felson?

24　　　　　MR. FELSON:  Yes, Your Honor.

25　　　　　THE COURT:  You may proceed.

1          MR. FELSON:   Ladies and gentlemen of the jury, I

2   would like to thank you again for listening to this case.

3   It's been a long five days.

4          Let's start by talking about reasonable doubt.

5   The judge is going to give you an instruction on reasonable

6   doubt.   Each element of the crime, each and every crime has

7   to be proven beyond a reasonable doubt.   What is reasonable

8   doubt?   Well, there is a legal definition, but you have to

9   treat the case with the same seriousness as the most

10  important of your own affairs, and she will explain that to

11  you, too.   And when we talk about the most important of our

12  affairs, I mean the most important, our health, out child's

13  health.   That is the seriousness you have to take this case

14  with.

15          A lot of people try to think -- I try to put this

16  in a layperson's terms as to what reasonable doubt is, and

17  sometimes I think about it as if, when I go to the doctor,

18  if the doctor told me I had to have surgery, would I want a

19  second opinion.   Well, sometimes if one little something

20  doesn't fit, yes, you want to get a second opinion, and

21  that second opinion doesn't mean that the first doctor's

22  wrong or right.   It's just reasonable doubt.   That's all it

23  is.

24          Anyway, let's talk about everything here that the

25  State of Ohio or -- I'm sorry -- that the United States

1 | attorney has talked about. You have to take apart these
2 | individual counts, and I know she's got some -- these are
3 | all nicely done here at Kinko's, I guess. And we'll go
4 | through those, each and every one of them. But each and
5 | every element has to be proved beyond a reasonable doubt.

6 | Let's go start with the bank robbery. Okay? The
7 | important thing I told you about right at the beginning of
8 | this case was not what evidence they present but what lack
9 | of evidence there is, and that's also to be taken into
10 | account as you'll read in your instruction booklet. This
11 | case has an extreme lack of evidence as far as -- of
12 | course, I speak for Tyreese Pugh only. He's who I
13 | represent. And Walter Pugh represents himself with the
14 | assistance of Mr. Andrews.

15 | But we're talking about physical evidence. We
16 | are talking about statements of women who, if you don't
17 | believe, of course, we're saying that that's the only
18 | evidence that they have is a couple of women's testimony
19 | who have an ax to grind, who do have an ax to grind. And
20 | I'll get to that in a minute.

21 | But, first of all, I want to point out that the
22 | United States has the ability, whether it's the Hamilton
23 | Police Department or whether it's the FBI, both of which
24 | were involved in this case, they have the background. I
25 | mean they have laboratories they can go to. They have

1    expert witnesses.  They brought in one of their experts, I
2    think.  They brought in their gun expert, who is just an
3    expert on where guns are made.  That's all that expert
4    apparently does.  They could have fingerprint experts,
5    palmprint experts, DNA experts, fiber experts, hair
6    experts.  And it's fascinating to me that somehow they
7    indicated that none of these experts were necessary, but I
8    submit to you that they were necessary if they have the
9    evidence.

10        When they don't have evidence, what happens is
11   they just take -- when they don't have evidence, they say
12   it's not necessary, and they don't take their -- they don't
13   utilize what -- we will say they don't utilize the
14   laboratories and the ability that they have.

15        And let me make a point, a particular point about
16   what Detective Calhoun said.  You have to remember, and
17   this is sort of a basis for all Detective Calhoun's
18   testimony.  When I look at the gym shoes -- he said he
19   found gym shoes in the car, and I think it was Bessie's
20   car, Bessie Pew's car.  And he originally wanted you to
21   believe that these gym shoes were the same gym shows that
22   made a print in this particular -- let me see if I can get
23   this out of here.  We are upside down now, okay.

24        When this particular person jumped up on this
25   counter -- can you see that? -- he apparently made a print

1   there with the shoe. And Calhoun wanted you to believe

2   that this is the same shoe print as what was on this gym

3   shoe that was found in Bessie Pew's car. So what does he

4   do? He says it looks similar. And he told you this. And

5   it's in my notes, and I know you will remember when you

6   discuss it back there. It looks similar. He implied this

7   was the same print.

8        And it wasn't until cross-examination, which is,

9   that's what I do, that I seemed to uncover the fact that he

10  actually did -- he said he didn't need the expert because

11  you could tell by his own eyes -- he could tell by his own

12  eyes it was very similar. Well, the implication again was

13  this was the same shoe that made that print. Of course, I

14  guess that would do my client in, or at least that would be

15  very -- if that shoe was the same print that made it right

16  here and was found in Bessie's car, of course that would

17  make it much more difficult for my client.

18       But as a poker player from way back, I sort of

19  smelled a rat. I said to myself, well, wait a minute. If

20  that was the shoe, why didn't they present it here? Why

21  didn't they show it to you, et cetera, et cetera? Well,

22  the reason was because it wasn't the shoe. It didn't make

23  the print. He finally admitted that he did some kind of a

24  test with the cellophane and he folded it over and put it

25  up and matched it himself. That's why he didn't go to the

1   expert, because he knew that it wasn't the right shoe.  He

2   knew it.  And he's trying to present that to you that it

3   was similar.

4          You know how that works.  He tries to -- it's

5   misleading.  It's not necessarily a lie, because it might

6   be similar.  They might be both gym shoes, and that could

7   be similar.  That might be not necessarily a lie, but, on

8   the other hand, that was misleading.  It took

9   cross-examination to pull out of him that it, in fact,

10  wasn't the same shoe and it had nothing to do with the

11  print at the bank.

12          So what does that tell you?  That tells you to be

13  careful what you hear from the officer.  Be careful what

14  you hear.  This is a court of law.  You have to have guilt

15  beyond a reasonable doubt.  The similarities, I mean, if

16  it's not the right shoe, you should be told it's not the

17  right shoe.  I mean, this isn't a kid's game.  This is very

18  serious.

19          Okay.  Now, if you're like me, that would bother

20  you a little.  Okay?  And then you would, of course, have

21  to think what else do you believe from this particular

22  gentleman.

23          Now, another thing, he says then they found half

24  a glove.  He's saying that these gloves are latex.  First

25  of all, I don't think there is any evidence that these are

1   latex gloves.  But, putting that aside, maybe they are and
2   maybe they aren't.  You can't create evidence out of
3   anything.  You find half a latex glove in Bessie's car, and
4   he implies that that's the same glove here.  It's either
5   this glove or one in this other photo.  I think there was
6   another photo of the other robber might have had a white
7   glove on.

8           Well, he doesn't test the glove.  Why doesn't he
9   test the glove for somebody's skin or piece of their nail
10  or anything that might be inside?  Because we can look at
11  it under the microscope.  We have the ability.  You can go
12  to the lab, and you can get the experts to testify, well,
13  we found some hair.  They find a little piece of skin, and
14  again it was the same.  You can do that.  But he makes you
15  think that this is the same glove.  He implies it's the
16  same glove, but he says:  I didn't test it because it was
17  found in the car and it wouldn't do the jury any good.  It
18  wouldn't do our case any good unless it was found at the
19  bank.  Because, of course, Walter uses the gloves or he was
20  told that Walter uses the gloves when he fixes the car and
21  that kind of stuff.  But then he forgot that he's also
22  trying to convict Tyreese, and Tyreese, there is no
23  evidence that he used the gloves.  So, therefore, if that
24  glove had Tyreese's -- if it belonged to Tyreese or if he
25  had it on during the robbery and there was a little bit of

1 | something in there, something in Tyreese's glove, of course
2 | that would be incriminating to Tyreese.

3 | But they don't do that. Why? Because, well, I
4 | mean I submit to you that they don't do it because, if they
5 | do it and -- if they do the test and it's not Tyreese and
6 | it's not Walter, then the defense attorneys win. So they
7 | just don't do it.

8 | Or the other issue might be they do the test.
9 | They know it's not right. They know it doesn't fit. And
10 | so they just forget about it. They brush it under the
11 | carpet, and that's it. And, of course, they say they don't
12 | need it. Of course, he had trouble answering that. He was
13 | concentrating on Walter without thinking that Tyreese, he
14 | might have incriminated Tyreese with that glove, too, but
15 | he didn't. Okay. So there is another bit of lack of
16 | evidence.

17 | Now, we go over all of the items here. Let's
18 | just take them. We can take them one by one. It's
19 | fascinating to me that these shirts and whatever these
20 | clothes are, these new clothes, did you hear any evidence
21 | that they fit Tyreese Pugh? No. Did you hear any evidence
22 | that they were tried on by Tyreese Pugh? Look at them
23 | under a microscope. Maybe they were, if he tries them on.
24 | No. Is it Tyreese Pugh's size? No. Do you have any
25 | evidence of that? No. Yet the implication is that this

1    somehow belongs to Tyreese Pugh.  And, of course, I'm only
2    speaking for Tyreese.  That's my client.

3          And the evidence, they didn't present it for
4    either defendant, but, for Tyreese Pugh they didn't, yet
5    they try to make you think that this is the same shirt that
6    belonged to -- Tyreese might have purchased.  Okay?

7          Now, I submit to you that they didn't do the
8    sizes and they didn't say, well, this is a size, you know,
9    medium, or this is a size 10 or whatever it is and Tyreese
10   wears a size 10.  I assume that they didn't do that,
11   because that doesn't fit.  That's why you won't hear it.
12   That doesn't fit.

13         I'm also assuming that they didn't test it for
14   Tyreese's DNA or his fibers or hairs.  Maybe they did and
15   there just wasn't anything from Tyreese.  Who knows?  But
16   believe me, if they had found some on and they tested it,
17   they would show you.  They would bring in the expert, and
18   the expert would be sitting right there saying I found
19   whatever from Tyreese Pugh on this particular shirt or on
20   that pair of pants, and I found it and that's what it is.
21   And you would have heard from the expert, but you didn't.

22         Okay.  Now, they bring in these bags and they
23   bring in this suitcase here and these pants, and I can only
24   assume -- I think there is a some other things in here.
25   And, of course, oh, there is a box down here, and there is

1    some other stuff.  All I can tell you is, if Tyreese Pugh

2    had handled any of these items, if he handled them, if he

3    touched them, if he had anything, you would be hearing

4    about it.  He didn't touch this.  There is no evidence that

5    he touched any of these items, that any of these items were

6    ever tried on by him, that he spent one lousy dollar on

7    anything.

8            I think there was evidence that he didn't have

9    any money.  And, of course, there was no evidence that he

10   bought anything.  Okay.

11           Now, we have got guns.  The interesting point

12   with these guns here, and I don't like to handle guns

13   particularly.  This particular gun, Number 10, in order to

14   believe that this was the gun used in this robbery by this

15   particular person -- let me see if I can find him on here.

16   By this particular person, in order to know whether Exhibit

17   10 was the gun used by this person, you have to disbelieve

18   their own witness, Jim Connaughton -- Connaughton, I think

19   I'm pronouncing that right -- who testified that he saw the

20   shotgun, that he concentrated on the shotgun.  He looked at

21   it, and it was the thing that scared him the most.  It had

22   wood on it.  There was nothing unusual, and it had wood on

23   it.  He saw wood.  And I think he even described the color

24   of the wood as typical wood color.

25           Now, this does not have any wood on it.  It's got

1   a black piece that looks like plastic, and I think it was
2   testified that it was plastic.  And then it's got metal,
3   and it's all black.
4       Now, the wood part would be right here where the
5   stock was.  So he was not presented by the defense.  He was
6   presented by the U.S. attorney.
7       In addition to that, you heard from the U.S.
8   attorney's witness, a woman named Shanell or Shamel, who
9   testified she lived with Walter, that that was Walter's
10  gun.  Testified that was Walter's gun and that somehow she
11  saw Walter take this handle off.  I'm not sure how he got
12  it off, but somehow she knew when they were living together
13  back in March or before then -- the robbery was in April --
14  back in March, a piece was taken off at some point back
15  then.  Okay.
16      So, for this to be the one that Jim saw in the
17  bank robbery, somehow this wooden piece would have had to
18  have been put on and taken off again.  I don't think there
19  is any evidence that is possible, let alone that's what
20  occurred.
21      But, in any event, those are both witnesses
22  presented by the government, not by us.  Those aren't
23  biased witnesses for us.  They just -- so they're asking, I
24  guess, not to believe their own witness, that he saw the
25  shotgun, that he saw the stock on the shotgun, that he saw

1  the wood.  Well, that, to me, that's fascinating.

2  So let's assume, if anything else, that's

3  reasonable doubt that that's the shotgun.  All right?  So

4  let's just assume, because you have to resolve all of these

5  questions in favor of the defendant.  So apparently, if

6  you're not sure whether that is or not, you have to sort of

7  side with us on that and give us the benefit of the doubt.

8  So let's say it's not.  Therefore, if that's not the

9  shotgun, where is the shotgun?  Well, we don't know.  It

10  certainly wasn't in Tyreese's possession.  Okay?

11  Now, we have got that -- oh, by the way, no

12  prints on that.  You know, it's interesting to note that

13  they're saying under count five that Tyreese was sleeping

14  on top of a loaded shotgun.  I find that kind of hard to

15  believe.  But let's just say, for example, that you want to

16  try to believe that for a second.  There is no testimony he

17  was wearing gloves that night.  Now they're saying, well,

18  he was wearing gloves here, okay, therefore prints might

19  not matter.

20  But he wasn't wearing gloves that night.  There

21  was no evidence of that.  So did he not touch the gun?  How

22  could he not touch the gun and yet put it under him?  So

23  why didn't they test it?  Why didn't they test it for

24  prints?  I mean, did they even try to test it for prints?

25  They certainly implied that they didn't try to test it for

1   prints. Well, but wouldn't that solve the whole problem if
2   you got his prints all over the gun? If you're holding the
3   gun like this, however you want to hold it, however you
4   want to hold it, you're going to get prints.
5            I mean, you'll take a look at this gun back
6   there.
7            Can I just show it?
8            THE COURT: Certainly.
9            MR. FELSON: If you will take a look at this gun.
10  I'm not going to -- but there is a place for prints to go,
11  I mean all over this thing. You can't even avoid it. So
12  if there are prints on the gun and they belong to Walter or
13  they belong to Tyreese, where are they? I mean, I'm not
14  saying he was wearing gloves. All I'm suggesting to you is
15  that that certainly does create some reasonable doubt for
16  you, doesn't it? Well, why didn't they test for that?
17           It was an interesting point, jumping around a
18  little bit here, but let's just talk about the gun that
19  night. You know, they were in Mr. Renfro's house. This
20  guest room where Walter was found -- where Tyreese was
21  found with the gun and with Ms. Luster, now we don't know
22  exactly how long Tyreese was in that room. For all they
23  know, he could have gone in there, I don't know, having a
24  couple drinks, you know, he flops down on that bed and goes
25  to sleep.

1    It's an interesting point that the government
2    makes a big stink out of -- I think the bed -- let me see
3    if I can get it straight.  Let's say the bed is facing you,
4    and then Tyreese is laying longways here, and he reaches
5    over, and he pulls Tyreese off, and he hits the ground.
6    And, therefore, he would have somehow kicked the gun.  But
7    if he left room to pull Tyreese off the bed and dumps him
8    down on the ground, I mean, that gun could have been
9    anywhere under here.  He wouldn't necessarily have stepped
10   on it.  He didn't come all the way up to the bed and pull
11   him off.

12        So, if you just do that in the back, I mean I'm
13   not asking you to take my word for it.  Just pretend --
14   you're allowed to do that.  Just pretend back there that
15   you're pulling somebody off the bed and that the gun is
16   down either underneath the bed or close to underneath.  And
17   we don't know who put it there, but just try it and see if
18   that would be logical for the officer that did that to kick
19   the gun, if you would have had to kick the gun in order for
20   the gun to be on the bed.  Do the test yourself.  I'm not
21   asking you to take my word for it.

22        In any event, they made a big stink about Walter
23   saying -- what was it?  Oh, Tyreese had -- there is a gun
24   in the house, or I guess he was trying to protect him,
25   lying there trying to protect Walter -- Walter's trying to

1   protect his son.  And it's an interesting point.  How would
2   Walter know that the gun was up in that room unless he put
3   it there?  How would Walter know?

4           Now, we know that this gun is Walter's according
5   to their own witness.  Their own witness says this gun
6   belonged to Walter; he took the stock off himself, and he
7   took that off before March of this year.  So we know it's
8   Walter's gun.  And then Walter says there is a gun up
9   there.  How in the world does he know if he's not even at
10  the house?

11          Well, I'm suggesting to you that he knows because
12  he probably put it there.  I don't know who put it there,
13  but there is certainly no evidence that my client put it
14  there.  It was near him; there is no question about it.
15  But, as you read the instructions, and you will get the
16  instructions, all I have to do is show reasonable doubt.
17  They have got to prove it, okay, beyond a reasonable doubt.

18          Now, the instructions say it doesn't matter how
19  near you are to something.  You have to know it's there.
20  You have to know it's there.  Okay.  So, for example, if
21  your kid puts something -- I don't know, steals something
22  and you're at the grocery store and steals something and
23  puts it in the cart and you walk on through and you didn't
24  pay for it, are you guilty of stealing?  No, you're not.
25  You have to know it's there.  Even though it's right next

1   to your purse or right underneath something, you're not
2   guilty.  You have to know.  You have to do it
3   intentionally.

4           I'm not saying he did it intentionally or did not
5   intentionally.  That's not my point.  My point is to show
6   you reasonable doubt, that you can't just make up things.
7   You only can go by what you hear on the evidence stand, and
8   that's it.  And the fact is that this young man could have
9   got on that bed any number of ways.  He doesn't have to go
10  from the side.  He could go over Ms. Luster, go over her
11  end of the bed.  So there's a thousand different ways he
12  could get on that bed.  He might have been there five
13  minutes; he might have been there ten; he might have been
14  there 20 hours.  I don't know, but neither do they.
15  Neither do they.

16          He might have handled that gun, and, you know,
17  who knows.  He might sleep with that gun every night.  I
18  don't know.  That gun might be his next girlfriend for all
19  I know.  But, of course, maybe it wasn't.  Maybe that gun
20  was there because Walter put it there.

21          Mr. Renfro said it wasn't his gun, but who knows.
22  I'm not saying it was Mr. Renfro's gun.  All I'm saying is
23  there is no proof beyond a reasonable doubt that it was
24  Tyreese's gun.  That's all I'm saying.  And they can't just
25  make up stuff and expect you to fill in the gaps.  Okay?

1    Now let's move on.  Okay.  We have covered this.
2    The -- oh.  Interesting point.  Wincanton where the shotgun
3    was found, there is something in your instruction book that
4    says that Butler County is in the Southern District of
5    Ohio.  I just don't remember that, any testimony that
6    Wincanton was in the Southern District of Ohio.  Now maybe
7    you do, but I don't remember that.  And I think that's one
8    of the elements they have to show.  So talk it over amongst
9    yourself.  You know, it's a long trial.  I don't have it in
10   my notes.  I usually check that stuff off.  I don't have it
11   in my notes.  If you remember them saying Wincanton was in
12   the Southern District of Ohio, then scratch that point.
13   Okay?  But if you don't, then he's not guilty of violating
14   anything in the Southern District of Ohio.

15   Just talk it over amongst yourselves.  That's all
16   I'm asking you to do.  The best part about the jury is
17   somebody always remembers everything that happened.
18   Usually, usually somebody of the 12 of you remembers;
19   sometimes even more.  But somebody usually remembers
20   everything.  So I'm counting on that to occur here.  I
21   don't remember that part, but maybe one of you do.  Okay.
22   Now, let's see.  We have got the white gloves.
23   Oh, not all black.  You know, that's an
24   interesting point. I can't quite see this.  Maybe -- you
25   will get a good look at it back in the jury room, but this

1   looks like something white around the neck, and this looks

2   like a lighter color than black.  I don't know.  This all

3   black of the second person, look for yourselves.  I'm not

4   trying to put any words or ideas in your mouth.  Just look

5   for yourself.  If it's all black, okay, then maybe it's all

6   black.  But black is a very common color.  But if it's not,

7   then consider that it's not, and that might be some

8   reasonable doubt.  Okay?  That's all.

9           Now, interesting -- this -- I can't go any

10  further without talking about Ms. Luster and whether or not

11  she has an ax to grind or not an ax to grind against

12  Tyreese.  We do know a couple of things, I think, from the

13  testimony that Ms. Luster was the girlfriend, and we know

14  she was with him on May 3rd, the day he was arrested and

15  the day the police came in and, I guess, half destroyed the

16  house or whatever.  We know that.

17          And then we also know that Ms. Ra-Shay Patterson

18  came and testified that she was then the fiancee at that

19  point.  I think she said she was the fiancee from sometime

20  in April, and I'm not sure.  I think you can check your

21  notes, the dates, because I'm just here taking notes just

22  like you are.  So check your own notes.  The point is that

23  I'm saying that there is an argument between them, that

24  they're not happy with each other, that the jilted lover in

25  this case is Ms. Luster.  She was sleeping with the guy,

1  and then she finds out. Of course, she went to see him.

2  Remember, she went to see him at the jail.

3          But she seems to say that there was no dispute or

4  no argument or no bad feelings towards her and Ra-Shay

5  Patterson. Now, Ms. Patterson and Tyreese's younger

6  sister, the 15 year old, say that there was. And the "B"

7  word, I think, the bitch or whatever, we've all heard those

8  words before and we've all felt those feelings at one time

9  in our lives towards another person. And the point is that

10  just make your own decision about the timing of it. Okay?

11  And granted, Tyreese might be a jerk when it comes to

12  women, but that doesn't mean he robbed the bank. Okay?

13          So he's at some point, I guess, he's sleeping

14  with Ms. Luster. He's sleeping with her on May 3rd, and

15  then this other woman claims to be his fiancee as of April,

16  and that timing is a little funny. I'm not sure Ms. Luster

17  knew about it, but she went to see him in jail sometime

18  after May 3rd, and then she turns on him like a venomous --

19  she's hoping venomous results. All I'm suggesting to you

20  is maybe you can't believe everything she says, and you

21  have to take her statements to the police, et cetera, with

22  a grain of salt.

23          And the way you look at it, the most important

24  part about it is did she see the money. If she saw a big

25  pile of money and if she saw that, you know, obviously

1   that, you know, that would be incriminating I would venture
2   to say.  Okay?  Now, but did she?  Okay.  But did she
3   really see a pile of money that could be construed as not
4   $800?  We're talking about $153,000 or some huge amount.
5   Okay?

6          Now take a look at some of the stuff that she
7   said -- we're talking about Ms. Luster -- she said that
8   occurred on the way down, on the way to Tennessee and then
9   on the way to Georgia.  That just didn't make sense.  Okay?
10  Because, obviously, if somebody wants you to believe
11  something, it's, oh, I saw this.  I saw a whole bunch of
12  money.  I saw it.  He was in the same room with it, et
13  cetera, et cetera.  But then that cross-examination comes
14  in, and that's when I get a chance to try to pick apart and
15  see if she really remembers what she saw and really
16  remembers the details sufficient enough where she knows
17  more than just the incriminating statement.  Okay?

18         So let's talk about that.  First of all, she
19  doesn't know the name of anything, any exits, any cities,
20  any towns, any hotels, any gas stations.  She goes down
21  without the car seats.  She goes down without -- she
22  doesn't know the name of the hotel.  She goes from one room
23  to the other where the money is allegedly.  She leaves her
24  two year old and four year old alone in the room.  She
25  says -- at first she says she opens the door and sees the

1    money.  Of course then she realized you can't open the

2    doors from the outside.  And she didn't know where Tyreese

3    was.  And then, after some prodding, then she says Tyreese

4    opened the door for me.  Even though she didn't know where

5    he was, he opened the door.

6              So what does that mean?  Does she really know?

7    Did she really see the money?  Boy, I'll tell you, it

8    doesn't sound right to me.  And then she goes down to --

9    oh, she says it was wrapped in rubber bands.  You heard the

10   word "rubber bands" later, and, of course, under further

11   exam it was these little hair things that women put in

12   their hair.  We're not talking about the kind of rubber

13   bands you know.

14             The money was wrapped, according to the witness

15   for the bank -- I can't remember.  Ms. Caudell I think it

16   was -- that they were wrapped in these, you know, the

17   paper, the paper with the markings on it of $50 or $100 or

18   whatever the amount is, whatever.  So we don't think, in

19   other words, I surmise and I'm submitting to you that she

20   didn't see this money.  She just didn't see it.  That's not

21   what she saw.  She saw something else.  She wants you to

22   say she saw money, because she's trying to get my client in

23   trouble.

24             In any event, had it been that and then some

25   other evidence, for example, this bag right here, had that

1    had my client's prints on it, had that had anything of

2    Tyreese's inside of it, but nothing.

3           This box here, did that have anything from my

4    client in it?  No.  Did it have his prints on it?  No.  His

5    DNA?  No.  His fibers?  No.  His hair follicles?  No.

6    Nothing.

7           Here's the police scanner.  Did my client ever

8    touch that?  That have any of my client's -- evidence from

9    my client?  No.

10           This bag here, did that have anything of my

11   client's?  No.

12           This bag, this box over here, these two bags over

13   here, these two bags over here, did any of these shoes fit

14   my client?  No.  Did my client's feet go in any of these?

15   No.  Did he put this on?  No.  There is no evidence of

16   anything to tie my client to this crime except her

17   testimony.  She's trying to tie him in with her testimony,

18   and I'll submit she just doesn't know enough about what

19   happened to make you believe beyond a reasonable doubt that

20   he was involved in this crime.

21           Remember, the statements that she was saying were

22   made that incriminate, that might be construed to

23   incriminate Tyreese, were -- we didn't get a chance to

24   cross-examine the statements.  In other words, the person

25   that made the statements was allegedly Walter.  Now, did he

1    say, "We hit a lick"?  Did he say, "I hit a lick"?  Did he

2    say -- I mean, what words did he actually say?  Was it

3    exactly?  Was it a quote?  It's not on tape.  It's not

4    written down anywhere.  She can't remember anything else.

5    So can you actually say that these were the exact words

6    said several months ago, when she gets on the stand, that

7    these were the exact words said, when she can't even

8    remember what hotel they were in?

9            She can't remember, I mean, virtually anything

10   about this trip, yet you're going to take four words that

11   she says she remembers and then hold that when we don't get

12   a chance to figure out exactly what was said and exactly

13   what was meant?

14           I don't think you can do that.  It's just not

15   fair.  It's not fair to Tyreese to do that, to just all of

16   a sudden come up with a meaning for those words.

17           Same thing with the other things that she said.

18   If you take them apart and you're not sure exactly what was

19   said, then it's not fair to construe it against the

20   defendant Tyreese.  You have to construe it in his favor,

21   because he's innocent as he sits here.  He's presumed

22   innocent.  He's only guilty after the United States

23   government proves guilt beyond reasonable doubt.  Okay?

24   Please try to remember that throughout the scope of this.

25           Okay.  I think I have said almost everything I